1  **SNYDER BURNETT EGERER, LLP**
   **Sean R. Burnett (SB# 227952)**
2  **Jessica Farley (SB# 280123)**
   5383 Hollister Avenue, Suite 240
3  Santa Barbara, California  93111
   Telephone No.:  805.692.2800
4  Facsimile No.:  805.692.2801
   sburnett@sbelaw.com
5  jfarley@sbelaw.com

6  Attorneys for Defendant TARGET CORPORATION

7

8              **UNITED STATES DISTRICT COURT**

9      **CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

10

11  CONNIE TAYLOR BROADOUS,          Case No. 2:20-cv-10950 GW (JEMx)

12              Plaintiff,           Hon. George H. Wu

13  v.

14  TARGET CORPORATION; individually   **DECLARATION OF JESSICA**
    and dba TARGET STORE T-2329; and   **FARLEY IN SUPPORT OF**
15  DOES 1 to 20,                      **PLAINTIFF'S UNOPPOSED**
                                       **APPLICATION FOR AN ORDER**
16              Defendants.            **TO SEAL PORTIONS OF**
                                       **EXHIBIT 7 TO DECLARATION**
17  _____/        **OF STEVEN BERKOWITZ**

18                                     **[Filed concurrently with**
                                       **Application; [Proposed] Order]**
19

20

21      I, Jessica Farley, declare the following facts:

22      1.    I am an attorney duly licensed and admitted to practice before all of

23  the courts of the state of California and the United States District Court for the

24  Central District of California.  I am a partner at the firm of Snyder Burnett Egerer,

25  LLP, counsel of record for defendant Target Corporation in the matter brought by

26  plaintiff Connie Taylor Broadous.  I have personal knowledge of the matters

27  discussed herein, and if called upon as a witness to testify, I could and would

28  competently do so.

SNYDER BURNETT
EGERER, LLP
5383 Hollister Avenue
Ste. 240
Santa Barbara, CA 93111

1

**DECLARATION OF JESSICA FARLEY IN SUPPORT OF PLAINTIFF'S UNOPPOSED**
**APPLICATION FOR AN ORDER TO SEAL**

2.      This declaration is made in support of Plaintiff's Unopposed Application for an Order to Seal Portions of Exhibit 7 to Declaration of Steven Berkowitz in Support of Opposition to Defendant's Motion for Summary Judgment ("Application").

3.      Target Corporation does not oppose plaintiff's Application. Target is in favor of replacing the current version of Exhibit 7 with the redacted version of Exhibit 7 that is attached to the Application as Exhibit A.

4.      The redactions in Exhibit A relate to sensitive and confidential information about Target's security system, such as the number, location, and operation of security cameras in the store and their fields of vision.  Target has a proprietary and business interest in keeping this information from the general public because the security system is designed to protect against and deter theft and other crimes.

5.      Target has gone out of its way to keep this information out of the public's grasp in all cases and in its everyday practices and procedures.  For instance, when this information is shared as a required part of litigation, it is a requirement of Target to have a Protective Order in place in an effort to minimize the exposure of this information to anyone outside of Target.  Documents containing this information are not published for the public.  They are made available only to employees who would benefit from the documents as part of their job duties for Target.

6.      The scope of confidential information to be sealed is narrow. Target is not seeking to seal the entire deposition transcript, only those portions that are most important to protect Target's interests in maintaining the confidentiality of its security system.

7.      There is a substantial probability of harm and prejudice to Target if the application is not granted because the public will have unfettered access to this

SNYDER BURNETT
EGERER, LLP
5383 Hollister Avenue
Ste. 240
Santa Barbara, CA 93111

2

DECLARATION OF JESSICA FARLEY IN SUPPORT OF PLAINTIFF'S UNOPPOSED
APPLICATION FOR AN ORDER TO SEAL

1  information, despite Target's consistent and far-reaching efforts to keep the

2  information confidential.

3     8.     Since plaintiff has filed the entire transcript already, there are no less

4  restrictive means to protect Target's confidential information than to grant the

5  Application submitted by plaintiff.

6     I declare under penalty of perjury that the foregoing is true and correct.

7  Executed this 2nd day of December, 2021, at Santa Barbara, California.

8

9                              */s/ Jessica Farley*

10                             _____

                               Jessica Farley, Declarant

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SNYDER BURNETT**
**EGERER, LLP**
5383 Hollister Avenue
Ste. 240
Santa Barbara, CA 93111

3

**DECLARATION OF JESSICA FARLEY IN SUPPORT OF PLAINTIFF'S UNOPPOSED**
**APPLICATION FOR AN ORDER TO SEAL**

# EXHIBIT A

1          UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA-WESTERN DIVISION

3

4    CONNIE TAYLOR          )
     BROADOUS,              )
5                           )
             Plaintiff,   )  Case No. 2:20-cv-10950 GW (JEMx)
6                           )
     vs.                    )
7                           )
     TARGET CORPORATION,  )
8    et al.,                )
                            )
9            Defendants. )
     _____)

10

11

12

     REMOTE VIDEOTAPED 30(b)(6) DEPOSITION OF TARGET CORPORATION
13
                      LALEH JAFARI
14
                    October 4, 2021
15

16

17

18

19

20

21

22

23

24

25      Reported by: Maryann Matthews, CSR

                                            Page 1

```
1      REMOTE VIDEOTAPED 30(b)(6) DEPOSITION OF TARGET CORPORATION

2

3           BE IT REMEMBERED that the remote videotaped deposition

4      of LALEH JAFARI, 30(b)(6) designee for TARGET CORPORATION

5      was taken via videoconference by the Plaintiff before

6      Veritext Legal Solutions, Maryann Matthews, Court Reporter

7      and Notary Public in and for the County of Ada, State of

8      Idaho, on Monday, the 4th day of October, 2021, commencing

9      at the hour of 10:03 a.m. Pacific Daylight Time in the

10     above-entitled matter.

11

12

13     APPEARANCES (Remotely):

14

       For the Plaintiff: ETEHAD LAW, A PROFESSIONAL CORPORATION

15                         By:  Steven Berkowitz, Esq.
                           150 South Rodeo Drive, Suite 350

16                         Beverly Hills, California  90212
                           Telephone:  (310) 550-1220

17                         Facsimile:  (888) 266-5502
                           steven@etehadlaw.com

18

19     For the Defendant and the Witness:

20                         SNYDER BURNETT EGERER, LLP
                           By:  Sean R. Burnett, Esq.

21                         5383 Hollister Avenue, Suite 240
                           Santa Barbara, California  93111

22                         Telephone:  (805) 692-2800
                           Facsimile:  (805) 692-2801

23                         sburnett@sbelaw.com

24

       Videographer:       Jackie Uribe

25
```

Page 2

```
 1                      I N D E X
 2                E X A M I N A T I O N
 3

    LALEH JAFARI                               PAGE

 4
 5   By:  Mr. Berkowitz...................................5
 6
 7                 E X H I B I T S
 8   NO.                                       PAGE
 9   Exhibit A.  Notebook (RETAINED BY WITNESS.............23
          (3 pages)
10

     Exhibit B.  Photograph ending 33330F.jpeg.............55
11        (1 page)
12   Exhibit C.  Photograph ending 98747.jpeg..............71
          (1 page)
13

     Exhibit D.  Second Amended Notice of Deposition.......82
14        of Defendant and Request for
          Production of Documents
15        (9 pages)
16   Exhibit E.  Guest Incident Report, two..............108
          photographs Declaration of
17        Luis Saldana, TC00001-6
          (6 pages)
18
19
20
21
22
23
24
25
```

Page 3

```
 1                 P R O C E E D I N G S

 2

 3            THE VIDEOGRAPHER:  Good morning.  We are

 4    going on the record at 10:03 a.m. on October 4th,

 5    2021.  Please note that the microphones are sensitive

 6    and may pick up whispering, private conversations, and

 7    cellular interference.

 8            Please turn off all cell phones or place

 9    them away from the microphones as they can interfere

10    with the deposition audio.  Audio and video recording

11    will continue to take place unless all parties agree

12    to go off the record.

13            This is media unit one of the

14    video-recorded deposition of Laleh Jafari, 30(b)(6)

15    for Target, taken by counsel for plaintiff in the

16    matter of Connie Taylor Broadous v. Target

17    Corporation, et al., filed in the United States

18    District Court, Central District of California,

19    Western Division, Case No. 2:20-cv-10950 GW (JEMx).

20            This deposition is being held remotely

21    using Veritext virtual remote technology.  All parties

22    are appearing remotely, and the witness is located in

23    Granada Hills, California.

24            My name is Jackie Uribe from the firm

25    Veritext Legal Solutions, and I am the videographer.
```

Page 4

```
 1   The court reporter is Maryann Matthews from the firm
 2   Veritext Legal Solutions.  I am not related to any
 3   party in this action nor am I financially interested
 4   in the outcome.
 5             Counsel and all present in the room and
 6   everyone attending remotely will now state their
 7   appearances and affiliations for the record.  If there
 8   are any objections to proceeding, please state them at
 9   the time of your appearance, beginning with the
10   noticing attorney.
11             MR. BERKOWITZ:  Steven Berkowitz on behalf
12   of the plaintiff, Connie Taylor Broadous.
13             MR. BURNETT:  Sean Burnett on behalf of the
14   deponent and Target.
15             THE VIDEOGRAPHER:  Will the court reporter
16   please swear in the witness.
17
18                     LALEH JAFARI,
19   a witness having been first duly sworn remotely to tell
20   the truth, the whole truth, and nothing but the truth,
21   testified as follows:
22
23                      EXAMINATION
24   BY MR. BERKOWITZ:
25        Q.   Please state your full name and spell it.

                                            Page 5
```

```
 1          A.   Laleh Jafari, L-A-L-E-H J-A-F-A-R-I.

 2          Q.   Do you have a middle name?

 3          A.   No.

 4          Q.   Have you ever had a middle name?

 5          A.   No, I have not.

 6          Q.   Have you ever had your deposition taken

 7   before?

 8          A.   No.  In regards to this matter?  No.

 9          Q.   I'm sorry.  I didn't hear your -- when --

10               (Unintelligible crosstalk.)

11          Q.   (BY MR. BERKOWITZ) -- I asked you if you

12   had your deposition, you said in what matter?

13          A.   In regards this case, no.

14          Q.   In regard to any case have you ever had

15   your deposition taken before?

16          A.   Yes.

17          Q.   Approximately how many times?

18          A.   I don't recall the exact number, but

19   definitely more than three times.

20          Q.   All right.  Let me go over the deposition

21   caveats regardless of whether you know them or not or

22   have been advised by your counsel.

23               You have just been sworn under oath.  The

24   oath you have taken is entitled to just as much

25   importance as if you were testifying in a court of law
```

Page 6

```
 1   under oath.

 2          Do you understand that?

 3      A.   Yes.

 4      Q.   Now, the questions that I ask, any questions

 5   asked by your counsel and your responses and any

 6   objections will be taken down by the court reporter here

 7   and later prepared in a booklet form.  You will later on

 8   have an opportunity to review that transcript and to

 9   make any changes to your responses.

10          I must caution you, though, that if you

11   decide to make changes to your responses after the

12   transcript is prepared and sent to you and they are of a

13   substantive nature, I will have an opportunity to

14   comment upon that and it may adversely reflect your

15   credibility.

16          For that reason, it's most important that you

17   give your most accurate and complete testimony today.

18   Do you understand that?

19      A.   Yes.

20      Q.   The court reporter cannot take down two

21   people talking at the same time.  I will do my best to

22   allow you to finish your responses, if you'll afford me

23   the same courtesy with respect to my questions.  This

24   way we don't encumber the record.

25          Is that understood?
```

Page 7

```
 1        A.   Yes.
 2        Q.   The court reporter cannot take down nods of
 3   the head.  To the extent that a question calls for a yes
 4   or a no, if you could verbally give that.  Now, I'm not
 5   looking for a guess or speculation from you, but I am
 6   entitled to estimates or approximations.
 7             Let me explain the difference between the
 8   two.  On the one hand, if you have no foundational
 9   knowledge, such as if I were to ask you my sister's
10   name, that would be a guess or speculation.
11             If you have some foundational knowledge but
12   you don't know specifically the answer, you can always
13   give me an estimate or an approximation, such as the
14   length of the table in front of you.
15             Do you understand the difference between the
16   two?
17        A.   Yes.
18        Q.   Now, at any time you can ask me to repeat,
19   rephrase or clarify my question.  Otherwise, I will have
20   assumed that you fully understood my question and have
21   given your most complete and accurate testimony to it.
22   Understood?
23        A.   Yes.
24        Q.   In the last 24 hours have you taken any
25   alcohol or medication that would prevent you from giving
```

                                                    Page 8

1    your most complete and accurate testimony today?

2        A.   No.

3        Q.   In the previous depositions that you have

4    given, approximately three, were they all as a PMK or

5    PMQ on behalf of Target?

6        A.   Yes.

7        Q.   And what is your position for Target at the

8    present time?

9        A.   The first deposition I remember I was an

10   executive soft lines in charge of sales floor, uh --

11        MR. BURNETT:  Laleh, he's just asking you

12   what your current position is.

13        THE WITNESS:  Current position would be

14   executive asset protection team leader.

15        Q.   (BY MR. BERKOWITZ) And how long have you

16   had -- held that position with Target?  Approximately.

17        A.   Approximately over eight years.

18        Q.   And as an executive protection [sic] team

19   leader, what are your duties or tasks?

20        A.   The main focus is providing an amazing guest

21   service; and within that category I am responsible for

22   different things such as safety, security, shortage,

23   development, et cetera.

24        Q.   And did you have any training from Target to

25   engage in this role?

Page 9

```
 1        A.   Yes.

 2        Q.   What kind of training have you had?

 3        A.   (Unintelligible) college, and different

 4   training at all times.

 5             THE REPORTER:  I'm sorry.  Would you repeat

 6   the answer, please.

 7             THE WITNESS:  Yes.  The answer would be yes,

 8   we do have training at all times.

 9        Q.   (BY MR. BERKOWITZ) No.  She wanted you to

10   repeat exactly what you said before.  You remember, you

11   said, "Business college, and" --

12        A.   Yes.  As an -- as an executive team leader,

13   you have to attend business --

14        Q.   No, no, no --

15             (Unintelligible crosstalk.)

16        Q.   (BY MR. BERKOWITZ) -- you don't understand

17   me.  You must repeat exactly what you said initially.

18   That's what she was asking you for.

19             MR. BURNETT:  I don't think that she probably

20   knows exactly what she said.  The word that was missed,

21   Ms. Matthews, is "business college."

22             THE REPORTER:  Thank you.

23        Q.   (BY MR. BERKOWITZ) Okay.  So you've had

24   business college and some training from Target.  Was

25   that your response?
```

Page 10

```
 1          A.   Yes.

 2          Q.   And where was this business college that you

 3    attended?

 4          A.   In Pasadena, California.

 5          Q.   When did you attend the business college?

 6          A.   2007.

 7          Q.   And for how long did you attend business

 8    college in Pasadena?

 9          A.   Approximately seven weeks.

10          Q.   And what did you study at the business

11    college in Pasadena?

12          A.   Different aspects of leadership and what we

13    are in charge of as leaders at Target.

14          Q.   And what would that be?

15               MR. BURNETT:  Let me object to the extent

16    that it calls for a narrative.

17               But you can respond.

18               THE WITNESS:  Providing an amazing guest

19    experience, developing the team, standing for Target

20    (unintelligible).

21               THE REPORTER:  I'm sorry.  What was the last

22    sentence, please?

23               THE WITNESS:  Protecting -- standing for

24    Target beliefs.  Protecting Target basically.

25               THE REPORTER:  Did you say "standing for
```

Page 11

```
 1    Target beliefs"?

 2              THE WITNESS:  And protecting, yes.  Learning

 3    about -- I'm correcting myself.  Learning about the

 4    company and providing the best service to our guests and

 5    our team.

 6              THE REPORTER:  Thank you.

 7         Q.   (BY MR. BERKOWITZ) So part of your training

 8    was protecting Target and standing for Target's beliefs;

 9    is that correct?

10         A.   Learning about -- I -- I corrected myself.

11    Learning about Target policies, beliefs, and -- yes.

12         Q.   But you used the words previously "Target

13    beliefs," didn't you?

14         A.   I made a mistake.

15         Q.   What did you intend instead of "Target

16    beliefs"?

17         A.   Target --

18              MR. BURNETT:  I'll object -- I'll object that

19    it's argumentative.  She's already corrected herself.

20              If you want to respond, Laleh, go ahead.

21              THE WITNESS:  What Target stands for.  I

22    corrected myself.

23         Q.   (BY MR. BERKOWITZ) What is the name of this

24    business college?

25         A.   Target Business College.
```

Page 12

```
 1        Q.    So is it your understanding that it's
 2   operated by Target?
 3        A.    Yes.
 4        Q.    And besides attending Target's business
 5   college, what other type -- and the classes you took,
 6   what other type of training have you received from
 7   Target?
 8        A.    We do have a lot of training that we are
 9   taking on a weekly/monthly basis.
10        Q.    Do you have training with respect to the
11   surveillance and video cameras in Target stores?
12        A.    Yes, sir.
13        Q.    And what kind of training have you received
14   from Target regarding that?
15        A.    I don't recall the exact name of the
16   training.
17        Q.    Right.  But just tell me, what is the nature
18   of the training you received regarding surveillance and
19   video cameras in Target stores?
20        A.    Making sure cameras are functioning
21   correctly, the naming, the progress, and the use of the
22   camera.
23             MR. BERKOWITZ:  Court reporter, can you read
24   back that response.  I -- I think I missed something.
25             THE REPORTER:  I'll read back what I think I
```

Page 13

```
 1    heard.
 2                    (The record was read.)
 3         Q.    (BY MR. BERKOWITZ) What do you mean by the
 4    naming of cameras?
 5         A.    The area the camera covered.
 6         Q.    Does each camera have a different name?
 7         A.    Yes, sir.
 8         Q.    Is it the camera itself that has a different
 9    name or is it the location where the camera is that has
10    a name?
11         A.    The location for the camera.
12         Q.    Now, you're in charge of many Target stores;
13    is that correct?
14         A.    I am in charge of Granada Hills, California,
15    store.
16         Q.    Any other stores that come within your
17    purview?
18         A.    No, sir.
19         Q.    Do you know if there's an asset protection
20    team leader for every Target, if you know?
21         A.    Executive asset protection team leader for
22    main Target stores, yes, not for Target Express.
23         Q.    So since the time you've been an executive
24    asset protection team leader, has it always been for a
25    single store?
```

Page 14

```
 1        A.    I did cover different stores before just to

 2   cover when my peers were on leave of absence or we did

 3   not have a leader at the time.

 4        Q.    How long have you been an executive asset

 5   protection team leader for the Target in Granada Hills?

 6        A.    Approximately eight years.

 7        Q.    In order to perform your role as an executive

 8   asset protection team leader, do you have to be at the

 9   individual store, in this case, the Granada Hills store?

10        A.    Yes, sir.

11        Q.    Are you there every day of the work week?

12              MR. BURNETT:  Objection --

13              THE WITNESS:  (Unintelligible) --

14              MR. BURNETT:  -- vague.

15              THE WITNESS:  -- a week.

16        Q.    (BY MR. BERKOWITZ) Okay.  Generally how -- on

17   the average, how many times are you at the Granada Hills

18   store --

19              (Unintelligible crosstalk.)

20              THE REPORTER:  I'm sorry.  I need to have one

21   person talking at a time, please.

22              MR. BURNETT:  Laleh, just wait until he's

23   done with his question.  Give him -- give him a pause.

24   Thanks.

25              THE REPORTER:  I did not get the question or
```

Page 15

```
 1    the answer.
 2         Q.   (BY MR. BERKOWITZ) Generally how many days a
 3    week do you work as an executive asset protection team
 4    leader at the store itself where you're physically
 5    located at the Granada Hills store?
 6         A.   Five days a week.
 7         Q.   And generally are there specific days that
 8    you're there?  What I'm asking, what are those five days
 9    of the week?
10         A.   My schedule varies.
11         Q.   Can it include weekends?
12         A.   Yes.
13         Q.   And generally how many hours each workday are
14    you at the Granada Hills store performing your work
15    functions?
16         A.   Approximately eight to ten hours.
17         Q.   Do you also monitor the cameras on a daily
18    basis while you're at the -- Granada Hills --
19              MR. BURNETT:  Objection --
20         Q.   (BY MR. BERKOWITZ)  -- in terms of looking at
21    the footage?
22              MR. BURNETT:  Objection.  Vague.
23              You can respond if you understand.
24              THE WITNESS:  Can you please repeat.
25         Q.   (BY MR. BERKOWITZ) Yes.  With respect to just
```

Page 16

Veritext Legal Solutions
866 299-5127

1    the store cameras, tell me how you determine whether
2    they're functioning properly.
3           A.    I use cameras daily.  As a camera is not
4    functioning, it turns red, which would take action to
5    fix it.
6           Q.    And when the camera turns red, is it the
7    camera location itself that turns red or is there some
8    department that you can look at the feed and see the red
9    camera?
10          A.    The camera stop working when it turns red.
11   We see it on our camera tree.
12          Q.    You said a "camera tree"; is that right?
13          A.    Yes, sir.
14          Q.    Okay.  And where is this camera tree located
15   in the Granada Hills store?
16          A.    It's on my computer that I can look at it.
17          Q.    ███████████████████████████████████████████
18   ████████████████████████████████████████████
19            ████    █████   ██████
20                MR. BURNETT:  Objection.  Vague.
21          Q.    (BY MR. BERKOWITZ) Do you bring your computer
22   with you to the Granada Hills store?
23          A.    No.  I have an office camera -- office
24   computer.
25          Q.    Okay.  And is that -- is it located on the

                                            Page 17

```
 1    bottom floor, the second floor, of the Granada Hills
 2    store?
 3              Where specifically is this computer located?
 4         A.   We are on the second level.  The first level
 5    is parking.  So we are on top of the parking, so on
 6    second level.
 7         Q.   Is it your understanding that the store
 8    itself, though, has two levels?
 9         A.   Only one level, but we are on the second
10    level.
11         Q.   And so when you turn on your work computer,
12    you can tell, if you look at the cameras from the camera
13    tree in your computer, whether they're working or not;
14    is that correct?
15         A.   Yes.
16         Q.   And what do you do if a camera turns red or
17    is not functioning?
18         A.   Try to fix it first.  Then call for
19    assistance if we cannot fix it in-store.
20         Q.   Do you personally attempt to fix it manually?
21         A.   Not personally.  My team help me.
22         Q.   And how many people are part of your team
23    during -- were part of the team during these eight years
24    you were the executive asset protection team leader for
25    the Granada Hills store?
```

Page 18

```
 1          A.    It varied.

 2          Q.    What's the range?

 3          A.    Between four to seven.

 4          Q.    By the way, are you at Target right now?

 5          A.    Yes.

 6          Q.    Okay.  And which Target are you located at

 7    right now?

 8          A.    Granada Hills, California, Target Store 2329.

 9          Q.    Is anyone in the room with you?

10          A.    No.

11          Q.    Has anyone entered the room since you've been

12    take -- appearing here for your deposition?

13          A.    No.

14          Q.    Do you have any notes in front of you?

15          A.    Yes.

16          Q.    And who prepared those notes?

17          A.    It's my notebook.

18          Q.    Can you show me it, show it to the screen,

19    your notebook?

20          A.    (Complied.)

21          Q.    I see it's open but it's -- hold it.  Stop,

22    stop.  Put it back on the screen, please.

23          A.    (Complied.)

24          Q.    So this is a black notebook with writing in

25    it --
```

                                                Page 19

```
 1              MR. BURNETT:  I'm --

 2       Q.   (BY MR. BERKOWITZ) -- is that correct?

 3              MR. BURNETT:  Steve, I'm a little -- I'm a

 4  little concerned that what is contained in that notebook

 5  may be attorney-client communications in terms of our

 6  prep.  I don't know what's in that notebook, but that's

 7  my concern.

 8              So, Laleh, if it's information that I

 9  provided to you, I don't want you to share that with

10  him.

11       Q.   (BY MR. BERKOWITZ) Throughout this deposition

12  you've been looking at these notes, though, right?

13       A.   Sir, this (indicating) is my personal

14  notebook.  I came back after five days' vacation, taking

15  notes of the tasks that I have and I completed so far.

16       Q.   That wasn't my question.  During this

17  deposition, you have looked at your notebook, is that

18  correct --

19       A.   No.

20       Q.   -- when I asked you -- you had the notebook

21  open at the time I asked you to show it to the camera,

22  did you not?

23       A.   It was open because I was working prior to

24  deposition.

25       Q.   Does anything in this notebook pertain to the
```

Page 20

1    June 1st, 2020 incident that's the subject of this

2    matter?

3              MR. BURNETT:  Other than anything that I've

4    told you.

5              THE WITNESS:  No.

6         Q.   (BY MR. BERKOWITZ) No.  Does it pertain to

7    anything -- regardless of what he told you, does it

8    pertain to anything regarding this incident regarding

9    Connie Broadous, the slip and fall, the container?

10             MR. BURNETT:  And, Laleh, you can answer that

11   question as a yes or no.  I do not want you to share

12   with him the content of anything that is in there.

13             THE WITNESS:  Can you please repeat.

14        Q.   (BY MR. BERKOWITZ) Is there anything in this

15   notebook pertaining to the June 1st, 2020 incident with

16   Connie Broadous or the container itself that was

17   involved in the incident or the video footage or the

18   investigation?

19        A.   The page that was open had nothing to do with

20   this deposition, sir.  And in this notebook I took few

21   notes of when I was talking to Sean.

22        Q.   You need to answer my question, not your own.

23   My question was this.

24             Is there anything in that notebook that

25   pertains to this incident, Connie Broadous, the fall of

                                          Page 21

```
 1    the container, the investigation of the incident?  Yes

 2    or no.

 3          A.   Yes.

 4          Q.   How many pages are devoted to that?

 5          A.   Two (unintelligible).

 6               THE REPORTER:  Two what?

 7               THE WITNESS:  Two (unintelligible).

 8               THE REPORTER:  I'm sorry.  I --

 9                  (Unintelligible crosstalk.)

10               MR. BURNETT:  Two paragraphs.

11          Q.   (BY MR. BERKOWITZ) Is that what you meant to

12    say, "two paragraphs"?

13          A.   Yes, sir.

14               MR. BURNETT:  That's what she said.

15          Q.   (BY MR. BERKOWITZ) And what do those

16    paragraphs pertain to?

17          A.   About the date and the time of incident.

18          Q.   Do they give a description at all about what

19    occurred?

20          A.   I always have the description of the

21    incident, yes.  I took notes as a reminder.

22          Q.   That's not my question.  I'm asking about

23    this specific notebook and what it contains regarding

24    these two paragraphs.

25               Do they contain at all any description of the
```

Page 22

```
1    incident?  Yes or no.
2          A.   Yes.
3          Q.   I'm going to mark this as an exhibit to the
4    deposition, Exhibit A.  Please preserve those two
5    paragraphs you're referring to.  Okay?
6          A.   Okay.
7          Q.   There may be a later dispute regarding
8    admissibility, but for now I'm going to ask that it be
9    marked as Exhibit A to the deposition.  Okay?
10         A.   Yes.
11              (Deposition Exhibit A was marked.)
12         Q.   (BY MR. BERKOWITZ) Is there anything else in
13   that notebook that pertains at all to any investigation
14   or reports regarding this incident, regarding Connie
15   Broadous?
16         A.   No.  Not that I recall, no.
17         Q.   Is there anything in this notebook that
18   pertains to your deposition this morning?
19              MR. BURNETT:  Other than the two paragraphs
20   that she's already testified about, Steve?
21              MR. BERKOWITZ:  Yes.
22              MR. BURNETT:  Laleh --
23              THE WITNESS:  (Unintelligible.)
24              THE REPORTER:  I'm sorry.  I didn't hear
25   that.
```

Page 23

```
 1              THE WITNESS:  Just the two paragraphs.
 2         Q.   (BY MR. BERKOWITZ) Other than the two
 3    paragraphs -- by the way, are they on one page or more
 4    than one page, these two paragraphs you're referring to?
 5         A.   I believe it's two page.  I can look at it.
 6         Q.   Is there anything else in the notebook
 7    besides these two paragraphs that pertain at all to
 8    Connie Broadous, the fall, the investigation, the
 9    reports by Target regarding this matter?
10         A.   No.
11         Q.   Did you review any documents in preparation
12    for your deposition?
13         A.   Did not review anything.
14         Q.   Besides your attorney or attorneys, did you
15    talk to anyone about this incident regarding Connie
16    Broadous, June 1st, 2020, the slip and fall, the
17    container?
18         A.   Can you please be more specific about the
19    timing.
20         Q.   Yes.  We'll start with in the last 30 days,
21    besides your attorneys, have you spoken to anyone
22    regarding -- and just -- strike that.
23              From now on when I talk about "the incident,"
24    the definition will be as follows:  Anything pertaining
25    to the slip and fall on June 1st, 2020 regarding Connie
```

```
 1    Broadous, regarding the container that she allegedly --
 2    the droppage and the liquid from it that allegedly
 3    caused her fall, and any investigation reports,
 4    surveillance regarding either the container dropping or
 5    the slip and fall.
 6              That will be my definition of "incident."
 7    Okay?
 8         A.   Okay.
 9         Q.   Okay.  So in the last 30 days, besides your
10    attorneys, have you spoken to anyone about the incident?
11         A.   Yes.  My APS.
12         Q.   What's an APS?
13         A.   Asset protection specialist.
14         Q.   And what's the name of the accident
15    protection specialist that you spoke with?
16         A.   Asset protection specialist Brenda
17    Casstelions.
18         Q.   Can you spell that last name as best as you
19    can?
20         A.   It's C-A -- sorry.  I have to write it in
21    order to -- sorry.  C- as in cat, -A- as in apple,
22    double -S-T as in Tom, -E- as in Edward, -L- as in
23    Larry, -I-O-N-S.  I believe so.  Best I can spell.
24         Q.   And do you know how long Brenda has been an
25    asset protection specialist for Target?
```

Page 25

```
 1         A.   I don't have the exact time.  Over one year
 2    for sure.
 3         Q.   And do you have an understanding what an
 4    asset protection specialist does for Target at the
 5    present time?
 6         A.   She is the second position after my position.
 7         Q.   You said she's second position after your
 8    position; is that correct?
 9         A.   Yes.  Help -- yes.
10         Q.   What do you mean by that?
11         A.   Helping me -- helping me running the team.
12         Q.   So --
13         A.   I --
14         Q.   -- she's part of your team, then.  Oh, I'm
15    sorry.  I interrupted you.  Go ahead.
16         A.   Sorry.  She's a part of my team.  She's a
17    higher pay grade than regular Target security team
18    members.
19         Q.   But you supervise her as part of your team;
20    is that right?
21         A.   Yes.
22         Q.   Did you speak to anyone other than your
23    attorneys and Brenda in the last 30 days regarding your
24    deposition?
25         A.   No.
```

Page 26

```
 1        Q.   What did you speak to Brenda about in
 2   connection with this deposition?
 3        A.   I wanted to make sure we look back the -- I
 4   wanted to know if she remembers the incident.
 5        Q.   Did she remember the incident as I described
 6   it?
 7        A.   She did not see the incident.  She does
 8   remember talking to the TSS at the time, Jonathan, who
 9   helped reviewing for the footage.
10        Q.   I think you used the title for Jonathan.  You
11   said something like -- you used an acronym.  Can you
12   tell me --
13        A.   T --
14        Q.   -- what you said?
15        A.   Sorry.  TSS, Target security specialist.
16        Q.   What's Jonathan's last name?
17        A.   Colson.
18        Q.   Can you spell that, please?
19        A.   C-O-L-S-O-N.
20        Q.   On June 1st, 2020, at any time in the
21   afternoon that day, were you at the Granada Hills
22   Target?
23        A.   I don't recall.
24        Q.   Do you understand on June 1st, 2020 in the
25   afternoon that Jonathan Colson at any time was at the
```

Page 27

1  Granada Hills Target?

2      A.   Yes.

3      Q.   Do you understand on June 1st, 2020 in the

4  afternoon at any time that Brenda was at the Granada

5  Hills Target?

6      A.   I don't recall.

7      Q.   Did Brenda ever tell you she was not there at

8  that Target that day?

9      A.   We did not talk about that.

10     Q.   But Jonathan Colson did tell you he was at

11  the Target that day at the time the incident occurred;

12  is that correct?

13     A.   Jonathan is no longer with Target -- uh --

14  with Target.  He's no longer employed by Target.

15     Q.   Did Jonathan Colson ever tell you he was at

16  the Granada Hills Target in the afternoon that day?

17     A.   I don't recall.

18     Q.   Did he -- but did he tell you he was at the

19  Target that day at any time on June 1st, 2020?

20     A.   I don't recall.

21     Q.   But you told me that Jonathan Colson was at

22  the Target that day; is that correct?

23     A.   His name was as the reporting person helping

24  with camera footage.

25     Q.   For that day; is that correct?

Page 28

```
 1        A.   Yes, sir.
 2        Q.   And what is a document that would show --
 3   what's the name of this document that would show that he
 4   was at the Target that day, June 1st, 2020?
 5        A.   Guest incident report.
 6        Q.   Did you just say "incident report" or did you
 7   use a word before the word "incident"?
 8        A.   Guest incident report.
 9        Q.   Oh, "guest."  Okay.  And who prepared this
10   guest incident report?
11        A.   The leader on the duty.
12        Q.   And who was that?
13        A.   I believe it was Anita Pittmen.
14        Q.   Can you spell Anita's last name?
15        A.   P-I-T-T-M-E-N.
16        Q.   And as of June 1st, 2020 what was your -- by
17   the way, you're looking down.  Is there anything you're
18   looking at specifically?
19        A.   It's my phone (indicating).  I want to get
20   the spelling of Anita's last name.
21             MR. BURNETT:  So you --
22        Q.   (BY MR. BERKOWITZ) You don't have to worry
23   about that.  I have the incident report.
24        A.   Okay.
25        Q.   But thank you.
```

Page 29

```
 1              MR. BURNETT:  And, Laleh, just so you're
 2    clear, you don't have to do any research while you're on
 3    this deposition.  You've done what you need to do.  And
 4    if you don't have the correct spelling, that's okay.
 5    We'll get it right somehow.  Okay?
 6              THE WITNESS:  Yes.
 7         Q.   (BY MR. BERKOWITZ) As of June 1st, 2020, what
 8    was your understanding as to Anita Pittmen's position
 9    held with Target?
10         A.   Can you repeat.
11         Q.   Yes.  What was Anita Pittmen's position with
12    Target, if you know, as of June 1st, 2020?
13              MR. BURNETT:  Steve, can you tell me how this
14    is within the scope of any of the categories that she's
15    being designated for?  Because --
16              MR. BERKOWITZ:  Yeah.
17              MR. BURNETT:  Go ahead.
18              MR. BERKOWITZ:  There's a -- for example,
19    number five, reports of the incident.  Others deal with
20    the investigation of the incident.  Not to mention she's
21    brought it up herself.
22              MR. BURNETT:  I'll let her answer the
23    question under number five.  But I'll tell you in terms
24    of the, quote, investigation of the incident, she is not
25    being produced for any of those categories because she
```

Page 30

```
 1    wasn't part of that.
 2             MR. BERKOWITZ:  All right.  I'm just trying
 3    to get the players, that's all.
 4             MR. BURNETT:  Under -- I -- I understand and
 5    I appreciate your explanation, and I'll let her respond
 6    to that.
 7        Q.   (BY MR. BERKOWITZ) All right.  Do you know
 8    what her position was as of June 1st, 2020?  We're
 9    talking about Anita Pittmen.
10        A.   Executive soft line team leader or -- they
11    change the position name.  I don't recall exactly what
12    it was.
13        Q.   Is she one of the people that you supervise
14    as part of your team?
15        A.   No, sir.
16        Q.   Did you understand her to be a manager at the
17    Target in Granada Hills that day?
18        A.   Yes.  She's my peer.
19        Q.   "She's my" what?
20        A.   She's my peer.  She has the same position as
21    I do in different area of the store.
22             MR. BERKOWITZ:  Okay.  Why don't we take a
23    five-minute break.  Is that okay with you, Sean?
24             MR. BURNETT:  Yeah.
25             THE VIDEOGRAPHER:  This marks the end of
```

Page 31

```
 1    media number one.  The time is 10:42 a.m.  We are off
 2    the record.
 3            (Break taken from 10:42 a.m. to 10:51 a.m.)
 4            THE VIDEOGRAPHER:  This marks the beginning
 5    of media number two.  The time is 10:51 a.m.  We are on
 6    the record.
 7        Q.   (BY MR. BERKOWITZ) You still understand
 8    you're subject to the oath you took and telling the
 9    truth.  Okay?
10        A.   Yes.
11        Q.   Let me just quickly get your background
12    information.  Describe where you attended high school.
13        A.   I was not in United States.
14        Q.   Okay.
15        A.   Iran.  Tehran, Iran.
16        Q.   Is that where you were born?
17        A.   Yes.
18        Q.   And what's your date of birth?
19        A.   March 21st, 1970.
20        Q.   Did you attend schooling in Iran?
21        A.   Yes.
22        Q.   Okay.  And what formal education did you have
23    in Iran with respect to their schools?
24        A.   I have bachelor's.
25        Q.   And how many years did you have to attend
```

Page 32

```
 1    school to obtain a bachelor's?

 2         A.    Four years.

 3         Q.    And do you remember -- did you graduate, by

 4    the way?

 5         A.    Yes.

 6         Q.    When did you graduate, approximately, for

 7    your bachelor's?

 8         A.    Been long time.  I believe it was -- I don't

 9    recall exactly.  It was '95, I believe.

10         Q.    And did you have any further schooling,

11    formal, at -- in Iran?

12         A.    No.

13         Q.    And besides the business college you state

14    you attended in Pasadena, did you have any schooling

15    in -- formal schooling in the United States?

16         A.    No.

17         Q.    So to clarify, would it be true, is this

18    correct, that you did not attend high school or college

19    in United States aside from the Target Business School?

20         A.    Yes.  As I mentioned, I have my high school

21    diploma and bachelor's from Iran.

22         Q.    And where did you attend high school?

23         A.    School name?

24         Q.    Yeah.  They didn't call it high school there;

25    is that correct?
```

Page 33

```
1                MR. BURNETT:  I'm -- I'm not understanding

2        the question, Steve.  I'm not sure why --

3                MR. BERKOWITZ:  Well --

4                MR. BURNETT:  -- it's relevant, but --

5        Q.   (BY MR. BERKOWITZ) Yeah.  You just said you

6    had a -- a high school [sic], and I'm asking you where

7    you attended.

8        A.   Tehran, Iran.

9        Q.   Okay.  And for the -- have you worked for

10   Target more than eight years?

11               MR. BURNETT:  Objection.  Asked and answered.

12               You can respond.

13               THE WITNESS:  Yes.

14       Q.   (BY MR. BERKOWITZ) Okay.  So prior to holding

15   the position as an executive asset protection team

16   leader, what previous positions have you held with

17   Target?

18       A.   Different executive position such as

19   operations, soft lines, senior merchant, replenishment,

20   remodel.

21       Q.   So you've mentioned soft lines,

22   replenishment, remodel -- and, I'm sorry, I missed one

23   of the descriptions.  Operation?

24       A.   Operation, yes.

25       Q.   And when were you first employed by Target?
```

Page 34

```
 1         A.    October 2007.
 2         Q.    What did you do as an executive in soft line?
 3         A.    I was in charge of the entire -- clothing,
 4   jewelry, shoes, handbags -- the entire team basically in
 5   those area.
 6         Q.    What did you do as an executive in
 7   replenishment?
 8         A.    Replenishing the floor and being in charge of
 9   the back room.
10         Q.    What did you do as an executive in remodel?
11         A.    The first -- one of the first T Fresh
12   remodels for group 294 when we first brought food to
13   Target, fresh food.
14         Q.    I'm sorry.  What does -- what does remodeling
15   have to do with fresh fruit?
16         A.    Fresh food, sir.
17         Q.    What does fresh food have to do with remodel?
18         A.    Because we did not have the T Fresh area
19   prior to remodel.  So it was -- it was major moves that
20   needed to happen, and I was in charge of that process.
21         Q.    And what did you do as an executive in
22   operations?
23         A.    I was in charge of the operation matrix and
24   working with my peers to make sure we are operationally
25   running smooth.
```

Page 35

```
 1          Q.    Let me see if I fully understood what you
 2    just said.  I asked you what you did in operations, and
 3    you said, "I was in charge of the operation -- matrix"?
 4    Is that m-a-t-r-i-x?
 5          A.    Yes.
 6          Q.    And working with your peers.  Is that what
 7    you said?
 8          A.    Working with my peers to ensure we are
 9    operationally sound.
10          Q.    Well, how did you -- I'm still not sure what
11    you mean when you said you did operation.  Can you break
12    that down?
13                What specifically would you do as part of
14    operation?
15          A.    Sir, operation has different area such as
16    back room location accuracy, price change --
17          Q.    I'm sorry.  Stop right there.  I didn't hear
18    that second -- what did you just say?
19          A.    Price change.
20          Q.    Oh, price change.  Okay.  Keep going.
21          A.    Location accuracy on the sales floor,
22    in-stock process, safety.
23          Q.    What did you do in connection with safety
24    when you were an executive for operations?
25          A.    Making sure our guests and our team are safe.
```

Page 36

1    Making sure there are no hazards at any time.

2         Q.   Presently as the PMQ in this matter, the

3    person most qualified, are you here to talk about safety

4    on behalf of Target?

5              MR. BURNETT:  Objection.  She's here to talk

6    about the categories for which she's already been

7    designated.  I don't think safety is any of them.  Maybe

8    I'm wrong, Steve.  You can correct me.

9         Q.   (BY MR. BERKOWITZ) All right.  So let's just

10   go over the categories.  The first category has to do

11   with picture and videotape of the incident, and the

12   incident was defined as what I stated before basically.

13             Have you done -- do you know anything about

14   the pictures and videotape of the incident?

15        A.   Of this incident?

16        Q.   Yes.

17        A.   Yes, I do.  There is no video of this

18   incident.

1

2

3        Q.   Remember the term you used before?  I think

4   it was -- was it "camera tree"?

5        A.   Yes.

6        Q.   Is that -- okay.  Now, does the camera tree

7   list all of the -- through your computer, does it list

8   all the cameras and their footage?

9        A.   For this incident, sir?

10       Q.   No.  For any -- does it -- does it contain

11  all of your cameras, uh --

12       A.   Yes.

13       Q.   Would you be able to -- if you looked at the

14  cameras' footage, would you be able to see what was

15  going on as displayed by the camera viewpoint --

16       MR. BURNETT:  Objection --

17       Q.   (BY MR. BERKOWITZ) -- at any time?

18       MR. BURNETT:  Objection.  Vague.

19       You can respond if you understand.

20       THE WITNESS:  I don't understand your

21  question.

22

23

24

25

1 ████████████████████████

2 ███ ███ ███████████████ ████

3 ███ ████ ████████████████████████

4 █████████████ █████████████████████

5 ████████████ ██████████████████████████

6 ██████████████

7 ██. ███████████

8 **Q.    Okay.  Do you recall, with respect to June**

9 **1st, 2020, if any cameras were not working that day on**

10 **the walls or ceilings of the Granada Hills Target?**

11 **A.    I don't recall.**

12     Q.    How would you be able to determine at a later

13 date, say, three days or five days after the fact,

14 whether a camera was working or not at the Granada Hills

15 Target?

16     A.    I don't recall, sir.

17     Q.    No, that's not what I'm asking you.  If you

18 were to look at your camera footage three to five days

19 after the incident, would you be able to tell if any

20 cameras were working that day on -- three to five days

21 previously?

22     A.    If I go back on the dates, yes.

23 ██ ████████████████████████

24 ████████████████████████

25 ████████████████████



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    Q.    Do you recall if Target was notified to

25 preserve camera footage in this incident?

Page 40

1    A.   I believe so.

2    Q.   And was there an attempt to preserve camera

3    footage throughout the store, anywhere in the store --

4         MR. BURNETT:   Objection --

5    Q.   (BY MR. BERKOWITZ) -- as a --

6         MR. BURNETT:   -- vague.

7    Q.   (BY MR. BERKOWITZ) -- as a result of that?

8    A.   I don't recall.

9    Q.   If a request came in from an attorney's

10   office to preserve camera footage with respect to a slip

11   and fall, who normally would have received that

12   correspondence if it was just directed generally to the

13   Target store in question?

14        MR. BURNETT:   Objection.  Calls for

15   speculation.

16        If you know, you can respond.

17        THE WITNESS:   I don't understand your

18   question.  If -- can you repeat.

19   Q.   (BY MR. BERKOWITZ) Yes.  From now on when I

20   talk about Target, unless otherwise specified, I'm going

21   to be talking about the Target involved in the subject

22   slip and fall by Connie Broadous, okay, on June 1st,

23   2020.  Understood?

24   A.   Yes.

25   Q.   Okay.  Let's suppose within 30 days of a slip

Page 41

```
 1    and fall Connie Broadous's attorneys sent a letter to

 2    the store asking it to preserve footage.

 3              Who would have received that letter at the

 4    store?

 5         A.   The reporting person, the reporting leader on

 6    duty that took the incident report, myself, and I

 7    believe the store director.

 8         Q.   As of June 1st, 2020, who was the director?

 9         A.   Jennifer Hallverson.

10         Q.   Can you spell her last name, please?

11         A.   To my best knowledge, H-A-L-L-V-E-R-S-O-N.

12         Q.   Did you understand what her role was as a

13    director of the Granada Hills store as of June 1st,

14    2020?

15         A.   She was the store director.

16         Q.   Right, I know that.  Do you understand what

17    her -- her tasks were, her duties?

18         A.   To manage and run the Granada Hills store.

19         Q.   Was she your supervisor at that time?

20         A.   Yes.

21         Q.   Is she still at the Granada Hills store?

22         A.   Yes.

23         Q.   Is she still a director there?

24         A.   Yes.

25         Q.   Is Anita Pittmen still at the Granada Hills
```

Page 42

```
 1    store?
 2         A.   Yes.  However, she's on a leave of absence.
 3         Q.   When do you expect her back from her leave of
 4    absence?
 5         A.   I don't have an exact time.
 6         Q.   Do you know why she's on a leave of absence?
 7              MR. BURNETT:  Objection.  Don't respond to
 8    that question.  It invades her privacy.
 9         Q.   (BY MR. BERKOWITZ) But you do expect her to
10    come back to the Granada Hills store after the leave of
11    absence is over; is that correct?
12         A.   Sir, I don't know.
13         Q.   When was Jonathan Colson no longer part of
14    the Granada Hills store?
15         A.   I don't have the exact time.
16         Q.   When do you believe he left?
17         A.   I don't have the exact time.
18         Q.   You spoke to Jonathan Colson about this
19    incident within 30 days ago; is that correct?
20         A.   No, sir.
21         Q.   When was the last time you spoke to Jonathan
22    Colson about this incident?
23         A.   I had not spoke with Jonathan for more than
24    five months, I would say, or four months.  I don't know.
25    I have not talked to Jonathan recently.
```

Page 43

```
 1        Q.   When you did speak with him, whether it was

 2   four months or five months ago, did you know whether he

 3   was still employed by Target at that time?

 4        A.   Sir, I don't have the exact time that he

 5   left.  But since he left, I have not spoke to him.

 6        Q.   But when you did speak to him, which you

 7   approximated to be four to five months ago, was it your

 8   understanding he was still employed by Target?

 9        A.   I don't recall.

10        Q.   What did you speak to him about?

11        A.   I believe the last conversation I had was

12   about a truck that he purchased, not that has anything

13   to do with the incident.

14        Q.   No.  I was talking only about the incident.

15        A.   Yeah.  I have not talk about the incident

16   with him.

17        Q.   Did you ever talk to him about the incident?

18        A.   After every incident when I receive the

19   e-mail about an incident happened at our store, I always

20   follow up to make sure if we had a video coverage and if

21   the video coverage was saved and sent with the

22   investigation kit.

23        Q.   Approximately how many times have you talked

24   to Jonathan Colson about the incident?

25        A.   I don't recall.
```

Page 44

```
 1        Q.    More than one?

 2        A.    I don't recall.

 3        Q.    When was the last time you talked to Jonathan

 4   Colson about the incident?

 5        A.    Sir, I don't recall.

 6        Q.    Give me your best estimation.

 7        A.    Perhaps right after the incident on the first

 8   time I saw him.

 9        Q.    Okay.  So if the incident occurred June 1st,

10   2020, you believe you spoke to Jonathan Colson on or

11   about June 1st, 2020, is that correct, concerning the

12   incident?

13        A.    I don't recall the same exact date, but

14   hundred percent I always follow up on incidents.

15        Q.    Did you keep notes regarding that

16   conversation you had with Jonathan Colson about the

17   incident?

18        A.    No, sir.

19        Q.    Would that have been your protocol, to keep

20   notes about a conversation regarding a slip-and-fall

21   incident?

22        A.    No, sir.

23        Q.    Why did you decide not to keep notes about

24   this conversation?

25        A.    I don't keep conversations -- I don't keep
```

Page 45

```
 1    notes of my conversations.  I have a big team; and every
 2    day if I just spent time taking notes of every
 3    conversation I have, I don't get to do my duties.
 4         Q.    But now we're talking about a slip and fall
 5    which an ambulance was called in.  Under those
 6    circumstances, would you attempt to keep notes with
 7    respect to your investigation of the incident?
 8         A.    I did not keep any notes, sir.  The incident
 9    was taken by a leader on duty and it was reported the
10    way it happened.
11         Q.    And what topics do you recall talking to
12    Jonathan Colson about the incident about?
13         A.    Whether in this incident or every incident, I
14    always ask if he had a camera coverage and if the video
15    was saved and sent with the guest incident report.
16         Q.    Did you just say that you would have talked
17    to Jonathan Colson, whether it was this incident or any
18    other incident, whether he had camera coverage and was
19    it safe?  Is that --
20         A.    Saved.
21         Q.    -- what you said?  Saved.
22         A.    Saved.
23         Q.    I'm sorry.  Saved.  Is that what you said?
24         A.    Yes.
25         Q.    Okay.  And do you recall asking him that
```

Page 46

```
 1   question in connection with this incident?
 2       A.   I don't recall the exact incident but I
 3   always do, so my -- I believe I did.
 4       Q.   And do you recall what his response was?
 5       A.   I don't recall.  There is always on the
 6   report if it was a video coverage or it was not, and it
 7   was noted as no coverage.
 8       Q.   What report is that where it indicated that
 9   there was no coverage?
10       A.   The guest incident report.
11       Q.   And with respect to the guest incident
12   report, did you prepare any part of that?
13       A.   No.
14       Q.   And how do you know the guest incident report
15   says no coverage?
16       A.   After every incident, the leader --
17            MR. BURNETT:  Laleh, let me interrupt you.
18   Sorry.  Let me just object.  To the extent it's
19   information that you have from me alone -- if you have
20   it from an outside source, you can provide it.
21            If it's information from me alone, then don't
22   provide that.  But you can go ahead and respond.  Sorry
23   for interrupting.
24       Q.   (BY MR. BERKOWITZ) You can answer.
25       A.   Can you repeat your question now.
```

Page 47

1           MR. BERKOWITZ:  Ms. Matthews, could you

2  repeat the question.  I'm sorry.

3               (The record was read.)

4           THE WITNESS:  After incident, the leader of

5  duty who is taking the report partner with asset

6  protection team in regards camera coverage, and it was

7  noted as "No."

8      Q.  (BY MR. BERKOWITZ) Are you saying that

9  Ms. Pittmen indicated in the guest incident report that

10  there was no camera coverage of the incident?

11      A.   I don't have the kit in front of me.  If it

12  noted "No," it was no camera coverage, sir.

13      Q.   But you previously told me the report stated

14  no coverage.  How do you know that?

15           MR. BURNETT:  Again, if you have information

16  outside of any conversation you've had with me, you can

17  provide it.

18           THE WITNESS:  I don't have any other

19  information.  With what I know, it was no camera

20  coverage.  I don't have the kit in front of me.

21      Q.  (BY MR. BERKOWITZ) Who would have checked

22  personally to determine if there was camera coverage of

23  this incident on June 1st, 2020 on behalf of Target?

24      A.   The leader who took the incident would

25  partner with my team.

Page 48

1      Q.   And you're referring to Ms. Pittmen; is that

2   correct?

3      A.   Yes.  She would partner with Jonathan, who

4   was working at the day at the time.

5      Q.   And did you check to determine, yourself, if

6   there was no camera coverage of any part of the incident

7   on June 1st, 2020?

8      A.   I don't recall.

9      Q.   Would that have been part of your role then

10   on June 1st, 2020, to have gone personally to check to

11   see if there was camera coverage of this incident?

12      A.   Yes.

13      Q.   And -- but you don't recall doing that; is

14   that correct?

15      A.   Sir, I always check for footage of any

16   incident --

17      Q.   That's not --

18      A.   -- and I --

19      Q.   -- my question.

20          (Unintelligible crosstalk.)

21      Q.   (BY MR. BERKOWITZ) That's not my question.

22      A.   I don't know -- I don't know.  I don't have

23   the date to tell you at that date or that time I looked

24   at the camera.  I don't recall, sir.  But that's a part

25   of my routine.

Page 49

```
 1          Q.   So even though Jonathan Colson may have
 2   looked at the cameras, do you believe that as of June
 3   1st, 2020 you also would manually have looked at the
 4   cameras in the store to see if there was coverage of any
 5   part of the incident?  Yes or no.
 6          A.   I don't recall.
 7          Q.   Would there be any document to indicate that
 8   you had that role, to look at the camera coverage --
 9          A.   I --
10               (Unintelligible crosstalk.)
11          Q.   (BY MR. BERKOWITZ) -- in connection with this
12   incident?
13               I'm sorry.  Your response?
14          A.   I don't recall.
15          Q.   So in connection with this incident on June
16   1st, 2020, who assigned it to Jonathan Colson to look at
17   the -- to see if there was camera coverage?
18          A.   Sorry.  Your question was who decided?
19          Q.   Yeah.  Who assigned it to Jonathan to look
20   for camera coverage, if any?
21          A.   Anita Pittmen.
22          Q.   Would she have spoken to you or would she
23   have spoken to Jonathan directly to make that
24   determination, whether there was camera coverage?
25          A.   To Jonathan directly if I wasn't here.
```

Page 50

1     Q.    Okay.  And do you believe in connection with

2     the June 1st, 2020 incident that Ms. Pittmen spoke to

3     Mr. Colson personally because you weren't present?

4     A.    I don't recall, sir.

5     Q.    Did you ask Ms. Pittmen?

6     A.    I don't recall.

7     Q.    Are there any documents I could look at to

8     determine if Ms. Pittmen talked to you about the

9     incident in terms of coverage?

10    A.    No, sir.

11    Q.    Well, do you personally recall looking at any

12    of the cameras in connection with this June 1st, 2020

13    incident?

14    A.    I don't recall.

15    Q.    Do you know if any of those cameras on June

16    1st, 2020 were not working?

17    A.    I don't recall.

18

19

20

21

22

23

24

25

Veritext Legal Solutions
866 299-5127



Page 52



 1    ■    ——————

 2    ■    —————————

 3    A.    ——————  ————————  ——————  ■

 4    ——————————

 5    ■    ——————————————

 6    —————  ————————  ————  ——————————————

 7    ■    ———————

 8    ■    ————

 9    ■    —————————————

10    ■    ——————————————————

11    ——————————  ——————————

12    ■.    ——————————————————

13    Q.    You know where the slip and fall took place

14    in this matter at Target; is that correct?

15    A.    Yes, sir.

16    ■    ————————————————————————

17    ———————————————————  ————  ————

18    ■    ——————————

19    ■    ——————————————————

20    ——————————————  ——————  ————  ——

21    ————————————————

22    ■    ——

23    ■    ——————————————————

24    ——————————  ——————————  ————————

25    ■    ——————————

Page 53



Q. And you know the aisle just in back of the

cashiers where -- which also contained the incident, the

slip and fall in this matter?

Are you familiar?

Page 54

```
 1        A.   Yes.

 2        Q.   Okay.  Would you have expected those cameras

 3   to be working with respect to that aisle?  And if you

 4   need me to show you a picture, I will.

 5             MR. BURNETT:  Let me just object, Steve.  I

 6   want to make sure we're talking about the correct aisle.

 7   Because if you're looking away from the checkstands,

 8   there's clothing, if I recall correctly, directly across

 9   from you; and to the left there's what's called

10   chemicals, which is where -- the start of the section

11   that has laundry detergents and dish soap and all of

12   that kind of stuff.

13             So I want to make sure that she understands.

14   Are you talking about chemicals or are you talking about

15   something in soft lines clothing area?

16             MR. BERKOWITZ:  I'm going to actually show

17   you a picture --

18             MR. BURNETT:  Okay.

19             MR. BERKOWITZ:  -- what I'm referring to.  So

20   I'm going to mark this as Exhibit B.

21             (Deposition Exhibit B was marked.)

22        Q.   (BY MR. BERKOWITZ) Can you see this picture?

23        A.   Yes.

24        Q.   Okay.  Does that look familiar to you?

25        A.   Yes.
```

                                              Page 55

1        Q.    And what does it depict?

2        A.    Can you repeat.

3        Q.    What does it show?  What am I looking at

4   right now?

5        A.    You're looking at the main aisle on the check

6   lanes, between --

7        Q.    What --

8        A.    -- soft lines and check lane.



24       Q.    I haven't referred to any specific camera.

25   So listen to my question.  I'm asking, would you have

Page 56

1    expected the cameras showing this main aisle overhead to

2    have been working as of June 1st, 2020?

3         A.    Yes.

4         Q.    Okay.  And that's because it's a -- this is a

5    very important area, right?

6              MR. BURNETT:  Objection --

7         Q.    (BY MR. BERKOWITZ) It's --

8              MR. BURNETT:  -- vague.  Sorry, Steve.

9              MR. BERKOWITZ:  Go ahead.

10             MR. BURNETT:  No.  I just said, "Objection.

11   Vague."  I'm sorry.  I didn't mean to interrupt you.

12        Q.    (BY MR. BERKOWITZ) And that's because this is

13   a very important area with respect to guest safety,

14   right?

15        A.    Every area -- area of the store is important.

16   We don't pick and choose.

17        Q.    But you do pick and choose where to have

18   working cameras; is that correct?

19   

20   

21   

22   

23   

24   

25   

Page 57



 1   ███████████  █████████████

 2    ██████████    ████████████████

 3  ████████      █████████████████████████

 4  ██████████████

 5          Q.   (BY MR. BERKOWITZ) You had mentioned that

 6   there's some type of moving camera.  Which camera were

 7   you referring to that's a moving camera?

 8          A.   PTZ camera.

 9          Q.   I'm sorry.  I didn't understand that

10   response.

11          A.   It's P- as in Paul, -T- as in Tom, -Z as in

12   zebra, PTZ camera.

13          Q.   What does that stand for, PTZ?

14          A.   I don't recall, sir.  Sorry.

15          Q.   Who named it PTZ?

16          A.   It's been named since I've been in this role.

17      ██  █████████████  ███████████████

18  ████████████████

19     ███  ████████  ████████  █████████████

20    ████████████

21    ████████████  █████████████████

22  ██████

23    ██  █████████  ████████████████████

24  ████████████  ██████████████████████████

25  █████████████████████

Veritext Legal Solutions
866 299-5127



Page 59



Page 60

```
 1  ████████████████████████████████████

 2  ████████

 3      ██   ████████████████████████████

 4  █████████████

 5          Q.   Do you --

 6          A.   We do change.

 7          Q.   But I'm not asking you where it was pointed

 8  at.  Assuming it was pointed downward, a PTZ camera,

 9  what is -- what would have its field of vision been, how

10  wide?

11              MR. BURNETT:  Objection.  Incomplete

12  hypothetical.  Vague.

13              If you understand, you can answer, Laleh.

14              THE WITNESS:  Honestly, I don't understand

15  the answer -- the question.  I don't --

16          Q.   (BY MR. BERKOWITZ) Well --

17          A.   -- understand.

18          Q.   -- some cameras only show a very small area.

19  Okay?  Others show a wider area.  I'm trying to -- we

20  call that the field of vision.

21              I'm trying to get an understanding how wide

22  the field of vision was with the PTZ camera as of June

23  1st, 2020.

24          A.   Sir, I don't recall what it was pointed at

25  the time or saved to be captured at the time.  These
```

                                              Page 61

1   are -- this camera can capture the main aisle, like,
2   let's say, seven to eight aisles or even more.  It can
3   be fixed just to take a little section and monitor that
4   area.
5        Q.   Well, do you know if there were any cameras
6   located pointing at the main aisle that we're looking at
7   in Exhibit B that could see more than -- more than a
8   five-foot, seven-foot square foot area?
9             MR. BURNETT:  Objection.  Vague.
10            You can respond if you understand.
11            THE WITNESS:  I don't understand.
12       Q.   (BY MR. BERKOWITZ) Do you even know what the
13  field of vision was for any of these cameras as of June
14  1st, 2020 at the Granada Hills Target store?
15       A.   Are you referring to PTZ camera or ceiling
16  camera?
17       Q.   Any --
18            (Unintelligible crosstalk.)
19  ████  ███████████████  ███████████  ██████████████
20  ████████████████████████  ████████████████████████
21  ███████████████████████████████████████████
22  ████████████████████████████████████████████
23  ██████  ██████
24       ██  ██████████████████████████████████
25  ██████████████████  █████████████████████████

                                          Page 62



Q. Okay. You see this Exhibit B right here
(indicating)?

A. Yes.

Q. All right. Are you -- do you see where
there's cameras for the checkout counters?

A. Yes.

Q. Okay. But there's also other cameras all
around the store that are not checkout cameras. Do you
know their field of vision, any of them, as of June 1st,
2020 at the Granada Hills Target store?

A. No, I don't.

Q. What's your best estimate?

MR. BURNETT: That's -- you're asking her to
estimate what the field of vision of any camera in the
Target store was? I don't know how she can --

MR. BERKOWITZ: No, that's not what I asked.

Q. (BY MR. BERKOWITZ) I'm saying other than the

Page 63

1    cameras for the checkout counters, were you aware of the

2    field of vision of any other camera as of June 1st, 2020

3    at the Granada Hills store, any of them?

4         Did you know their field of vision?

5         MR. BURNETT:  Objection.  Vague as to time.

6         You can respond.

7    

14        A.    I don't know how to answer your question,

15   sir.



         Q.    (BY MR. BERKOWITZ) Let's suppose no one's

monitoring the actual camera footage at the time of the

incident.

              Later on, though, you can zoom in or out if

```
 1   you want to look at that footage if it's preserved,
 2   correct?
 3              MR. BURNETT:  Objection --
 4              THE WITNESS:  No, sir.  You cannot go back
 5   and check the other area --
 6        Q.   (BY MR. BERKOWITZ) No, I --
 7        A.   -- at the time.
 8        Q.   That's not what I said.  Let's suppose you
 9   have a camera overhead that depicts an area, and no
10   one's monitoring at the time.
11              The next day can someone look at that camera
12   footage for that particular camera and zoom in and out?
13        A.   They can just look at it and zoom in and out,
14   yes.
15        Q.   Yes.  Okay.  And when they zoom out, they get
16   a broader viewpoint; is that correct?
17        A.   They cannot zoom out more than what camera
18   was showing at the time, sir.
19        Q.   All right.  Okay.  In Exhibit B, do you know
20   approximately where that slip -- the Connie Broadous
21   slip and fall occurred?
22        A.   By the check lane.
23        Q.   Okay.  And I have -- I don't know if you can
24   see it.  I have a cursor.  Do you think it was closest
25   to this checkout lane right here (indicating), which is
```

Page 66

```
 1   labeled, if you take a look at it, No. 21?

 2           Do you think it was closest to No. 21?

 3      A.   Could be either 21 or 23.  I believe 23.

 4      Q.   Okay.  And 23 is where my cursor is right

 5   here (indicating); is that correct?

 6      A.   Yes.

 7      Q.   Okay.  And you can see my cursor; is that

 8   right?

 9      A.   Yes.

10      Q.   Okay.  I want you to tell me to stop when you

11   think where the -- where the actual liquid was on the

12   floor which Connie Broadous claims she slipped on.

13      A.   I don't recall, sir.  I wasn't there.

14      Q.   Do you believe it was -- you see this little

15   red circle here (indicating) that's marked with two

16   footprints?

17           MR. BURNETT:  Steve, I'm having a difficult

18   time seeing your cursor.  Where is it?

19           MR. BERKOWITZ:  Right here (indicating).

20           MR. BURNETT:  Oh, there it is.  I see it now.

21   See it now.

22      Q.   (BY MR. BERKOWITZ) Okay.  Ms. Jafari, can you

23   see my cursor?

24      A.   Yes.

25      Q.   Okay.  Do you think it was very close to this
```

Page 67

```
 1    red circle here (indicating) on the far right-hand side
 2    of Exhibit B?
 3         A.    I don't know, sir.
 4         Q.    What's your best estimate?
 5         A.    I haven't been there, sir.  I don't know.
 6         Q.    Did you ever look at photos regarding the
 7    incident?
 8         A.    I have.  Can you --
 9         Q.    And --
10         A.    -- refresh my memory, please.
11         Q.    Well, let me get some foundation.  When is
12    the last time you looked at any photos regarding the
13    incident?
14         A.    When I was talking to Sean.
15         Q.    Just give me an approximate date or a month.
16         A.    About a week.
17         Q.    A week ago?
18         A.    Yes.
19         Q.    Okay.  Based upon that -- and you can use
20    this to refresh your memory, Exhibit B -- and assuming
21    it was aisle 23, you think it was over here
22    (indicating)?  Here (indicating)?  Here (indicating)?
23               What's your best estimate?  Where should I
24    put the cursor?
25         A.    I believe it was closer to the red dot on the
```

Page 68

```
 1    floor.

 2         Q.   Okay.  You see where my cursor is right here

 3    (indicating)?

 4         A.   Yes.

 5         Q.   You think that's the spot?

 6              MR. BURNETT:  Objection to the extent it

 7    calls for speculation.  I will tell you, Steve, that I

 8    don't believe any of the pictures that she's seen has

 9    your client in them.

10         Q.   (BY MR. BERKOWITZ) Okay.  Do you think that's

11    where the slip and fall occurred on June 1st, 2020,

12    where my -- where this cursor is right now (indicating)?

13         A.   I don't know, sir.

14         Q.   What's your best estimate?

15         A.   I don't know.  If I don't know, I cannot give

16    you an estimate.  Sorry.

17         Q.   All right.  But you see this red dot here

18    (indicating)?  You said you think it's close to the red

19    dot, right?

20         A.   I said maybe closer to the red dot.  I don't

21    know exactly.

22         Q.   Okay.  If I were to draw a circle around here

23    (indicating), though, you think it was somewhere in this

24    area?  That's your best estimate?

25              MR. BURNETT:  Objection.  Misstates
```

Page 69

```
 1    testimony.
 2            Q.   (BY MR. BERKOWITZ) I'm only looking for your
 3    best estimate.
 4            MR. BURNETT:  And she's told you she doesn't
 5    have one.
 6            MR. BERKOWITZ:  You're coaching her right
 7    now, Sean.
 8            MR. BURNETT:  I'm not coaching her.
 9              (Unintelligible crosstalk.)
10            MR. BERKOWITZ:  Let her respond.  No, Sean,
11    you're coaching her.  I know coaching when I see it.
12    You --
13              (Unintelligible crosstalk.)
14            MR. BERKOWITZ:  -- are coaching her.  I asked
15    her for her best estimate.  She said near the red dot.
16            Q.   (BY MR. BURNETT) What's your best estimate?
17            A.   Sir, I don't know.  I told you I don't know.
18            Q.   And is it your testimony you can't even give
19    me an estimate, then?
20            A.   No, I can't.
21            MR. BERKOWITZ:  Okay.  Another five-minute
22    break, Sean?  Is that okay?
23            MR. BURNETT:  That's fine.
24            THE WITNESS:  Fine, too.
25            THE VIDEOGRAPHER:  This marks the end of
```

Page 70

```
 1   media number two.  The time is 11:46 a.m.  We are off
 2   the record.
 3        (Break taken from 11:46 a.m. to 11:55 a.m.)
 4            THE VIDEOGRAPHER:  This marks the beginning
 5   of media number three.  The time is 11:55 a.m.  We are
 6   on the record.
 7            (Deposition Exhibit C was marked.)
 8        Q.   (BY MR. BERKOWITZ) Okay.  Let me show you
 9   another exhibit, Exhibit C -- if I can.  Okay.  Can you
10   see Exhibit C?
11        A.   Yes.
12        Q.   And does that also depict a portion of the
13   Granada Hills store?
14        A.   Yes.
15        Q.   Okay.  And you see this depicts aisle 23?
16        A.   Yes.
17        Q.   Okay.  And do you believe the slip-and-fall
18   area that is where the liquid was that Connie Broadous
19   allegedly slipped upon was located next to this red
20   circle where my cursor is (indicating)?
21            MR. BURNETT:  Objection.  Vague.
22            THE WITNESS:  I don't know, sir.
23        Q.   (BY MR. BERKOWITZ) I'm sorry.  I didn't hear
24   you.
25        A.   I don't know.
```

Page 71

1          Q.   Well, previously you said it was next to a

2     red circle and you believed it was Exhibit 23 -- aisle

3     23.  I'm now showing you checkstand 23.

4               What's your best estimate as to where the

5     slip-and-fall area occurred?

6               MR. BURNETT:  Steve, I'm just going to

7     object.  She -- I understand there may be some

8     foundational reasons for the questions.  But just so you

9     know, she isn't the PMQ that's going to talk about the

10    investigation of the incident.  So I just want to make

11    sure you're aware of that.

12              And, Laleh, we can have the question read

13    back and you can respond if you know the answer.

14         Q.   (BY MR. BERKOWITZ) Okay.  Are you saying you

15    don't know where this occurred in connection with

16    Exhibit C?

17         A.   No.

18         Q.   I mean is that correct, that you don't know

19    where it occurred approximately in connection with

20    Exhibit C?  Is that correct?

21         A.   I don't know.

22         ███   ████  ████  ███████  ████████████

23    ████████████████████████████  ████████████  ██████

24    ████████  ███  ██████████  ████████  ███████████████

25    ████████

                                        Page  72



Veritext Legal Solutions
866 299-5127

1        A.    We had the register cameras; we had PTZ

2 cameras as we always had.

3        Q.    How about the manufacturer?  What was the

4 manufacturer of any of these cameras?

5        A.    I don't know, sir.

6        Q.    Okay.  Do you have the specs for any of these

7 cameras that were used on June 1st, 2020 at the Granada

8 Hills store?

9        A.    Can you repeat.

10        Q.    Do you have the specifications for any of

11 these cameras, the manufacturing specifications for any

12 of these cameras that were used at the Granada Hills

13 store on June 1st, 2020?

14        A.    I don't recall.

15        Q.    Do you recall ever receiving any notice from

16 anyone within 30 days of the June 1st, 2020 incident to

17 preserve camera footage?

18        A.    I don't recall in regards this incident.  But

19 as I mentioned before, there is always an e-mail when we

20 are sending the guest incident package.

21        Q.    How many camera -- excuse me.

22

23

24

25

1     Q.    Do you think you looked at any of the camera

2     footage?

3     A.    I don't recall.    As a routine, as I

4     mentioned, after every incident I will.  Now, whether I

5     looked at this incident for camera footage, I don't

6     recall.  I don't recall the dates -- or if I did look at

7     it.  But as a routine, that's my routine.

8     Q.    When you're looking at camera footage as part

9     of your routine regarding a slip and fall, what

10    specifically are you looking for?

11    A.    On any incident?

12    Q.    Yes.  Let's suppose a slip and fall.  What

13    would you be looking for to determine whether or not to

14    preserve the footage?

15    A.    If an area -- different cameras are leading

16    to the area, to see if we can see the incident from any

17    angle.

18    Q.    And were you able to find any video or camera

19    footage of any part of the incident in this matter?

20    A.    In this matter I don't recall, sir.  I told

21    you I don't remember.

22    Q.    But have you -- after June 1st, 2020 through

23    the present, have you looked to see if there's any video

24    or camera footage of any aspect of the incident?

25    A.    Before the deposition I went back on the

Veritext Legal Solutions
866 299-5127

1    saved camera, saved footages that I have to see if I
2    find any, and it was none.
3            Q.    Well, what -- how many saved cameras' footage
4    did you have from June 1st, 2020?
5            A.    None.
6            Q.    So would it be fair to say that presently
7    there's no saved footage of any part of the store on
8    June 1st, 2020 regardless of where it occurred?
9            A.    I don't know, sir.
10           Q.    Well, then, is there anything saved from June
11   1st, 2020, any image saved from June 1st, 2020 at the
12   Granada Hills store?
13           A.    I don't know.
14           Q.    Well, based on your position, though, did you
15   look to see if anything was saved?
16           A.    I did not find anything.
17           Q.    But when you say you didn't find anything,
18   either -- does that mean you looked at every single
19   thing that had been saved or was it not saved at all?
20   I'm trying to understand.  Did it ever exist?  Let me
21   ask you this.
22                 Since you've been at the store on June 1st,
23   2020, did you ever see any saved footage of any part of
24   the store on June 1st, 2020?
25           A.    I don't recall, sir.

Page 76

```
 1          Q.    Okay.  And when you -- when was the last time
 2     you checked to see if there was saved footage --
 3          A.    Last --
 4          Q.    -- from --
 5          A.    -- week.
 6          Q.    Okay.  And what did you check?
 7          A.    To see if there is any saved footage --
 8                     (Unintelligible crosstalk.)
 9                THE WITNESS:  -- for that day.
10          Q.    (BY MR. BERKOWITZ) Where did you go to check
11     this?
12          A.    On the camera tree.
13          Q.    Right.  And that camera tree would have been
14     on your working camera; is that correct -- on your
15     working computer; is that right?
16          A.    Yes.
17          Q.    Okay.  And do you have anything saved on your
18     computer from June 1st, 2020?
19          A.    No.
20          Q.    Do you recall ever having anything saved from
21     June 1st, 2020 on your computer?
22          A.    I don't recall.
23          Q.    Did you talk to anyone else who may have had
24     saved footage from June 1st, 2020 at the Granada Hills
25     store?
```

                                                   Page 77

```
 1        A.   No.

 2        Q.   Why not?

 3        A.   Because I can see all the saved videos.

 4        Q.   Do you know if anyone attempted to save any

 5   footage from any part of the store on June 1st, 2020?

 6        A.   No.

 7        Q.   Did you instruct anyone at the store on or

 8   about June 1st, 2020 to save footage from the cameras in

 9   connection with that day?

10        A.   I don't recall.

11        Q.   Would that have been your protocol or

12   practice?

13        A.   Only if there is an accident that we can see,

14   we save the video.  If there is nothing, there is no

15   reason, there is no point of saving anything.

16        ████    █████   ████████████████████████████████

17   ████████████████████████████████████████████████████

18   ██████ --  ████████████████████████████████

19          ████   ███████████████████████████  ██████████

20   ██████████████████████

21        Q.   Do you recall, though, that you had notice

22   within 30 days of the incident to try to save camera

23   footage regarding the incident or any part of it?

24             MR. BURNETT:  Objection.  Vague.

25             THE WITNESS:  I don't recall.
```

Page 78

1      Q.    (BY MR. BERKOWITZ) Okay.  Do you recall at

2   any time reviewing footage showing Connie Broadous in

3   any part of the store on June 1st, 2020?

4      A.    I don't recall.

5      Q.    Do you recall seeing any footage of the

6   checkout stand 23 camera footage in the afternoon of

7   June 1st, 2020?

8      A.    I don't recall.

9      Q.    Do you recall seeing any camera footage of

10   the container that was dropped on the floor which

11   allegedly led to the spill resulting in Connie

12   Broadous's fall on June 1st, 2020?

13      A.    I don't recall.

14      Q.    Have you ever seen that container that was

15   involved in this incident?

16      A.    I don't recall.

17      Q.    Were you responsible at any time for placing

18   an order for the purchase of any of the cameras located

19   in the store on June 1st, 2020?

20      A.    I don't recall.

21      Q.    Do you know which company you would have --

22   that the store uses to purchase cameras located on the

23   ceilings and walls of your Granada Hills store as of

24   June 1st, 2020?

25      A.    Sir, I don't have authority to purchase

Page 79

```
 1    cameras, so I don't know.
 2         Q.   But do you have authority to ask others to
 3    purchase cameras for the store?
 4         A.   During my Target [sic], I have not purchased
 5    any cameras nor asked for -- to purchase any camera.
 6         Q.   By the way, have you produced any documents
 7    in -- at today's deposition in connection with my
 8    document requests?
 9              MR. BURNETT:  Steve, let me jump in here.  We
10    e-mailed you -- hopefully you got it -- some documents
11    earlier today.
12              Frankly, I think they -- most of them are --
13    well, they're (inaudible) response procedures, things
14    like that.  Hopefully you received them.
15              But, yes, we did produce documents in
16    conjunction with the PM -- the 30(b)(6) deposition
17    notice for which we will be producing two different
18    witnesses.
19              MR. BERKOWITZ:  Okay.  And you're right, I
20    did receive a few pages this morning.  Is that the sole
21    production you're referring to, Sean?
22              MR. BURNETT:  Yes.
23              MR. BERKOWITZ:  Okay.  It was in one e-mail;
24    is that correct?
25              MR. BURNETT:  Yes.
```

Page 80

```
 1                    MR. BERKOWITZ:  All right.
 2                    MR. BURNETT:  That --
 3                        (Unintelligible crosstalk.)
 4                    MR. BURNETT:  -- confidential production.
 5      Any other documents that may be responsive have been
 6      previously produced in our discovery responses, and you
 7      already have them.  I'm not sure that there are any, but
 8      you have all that we will be producing.
 9           Q.   (BY MR. BERKOWITZ) Did you sign any reports
10      in connection with the incident?
11           A.   No, I have not.
12           Q.   Did you review and approve any reports
13      prepared in connection with the incident --
14           A.   No --
15           Q.   -- by --
16           A.   -- I have not.
17           Q.   All right.  Did you re -- here's what I meant
18      to say.
19               Did you review and approve any reports
20      prepared in connection with the incident prepared by
21      your fellow employee or employees?
22           A.   No, sir.
23           Q.   When the guest incident report is prepared in
24      this case by Ms. Pittmen, was it sent to you before it
25      was finalized?
```

Page 81

```
 1        A.   No, sir.

 2             MR. BERKOWITZ:  Okay.  I'm now going to go

 3   over the topics in which you are listed as qualified.

 4   So -- well -- and here's what I can do.

 5             To make it easier for you, I'm going to mark

 6   this as an exhibit.  Okay.  I'm going to mark this as

 7   Exhibit D, as in dog.

 8             (Deposition Exhibit D was marked.)

 9        Q.   (BY MR. BERKOWITZ)  The second amended notice

10   of deposition of defendant and request for production of

11   documents.  Do you see that?

12        A.   Yes.

13        Q.   Okay.  Now, I'm going to go to a list of

14   topics.  Okay.  It talks about pictures and videotape of

15   the incident, and then it describes the incident.

16             Do you see that?

17        A.   Yes.  However, I cannot see the -- the right

18   side of it.  The pictures are covering it.

19        Q.   Oh, I'm sorry.  I probably didn't -- here,

20   let me get rid of all the pictures.  I didn't realize

21   anything covered it.

22             MR. BURNETT:  Laleh, Steve, I thinks what's

23   happening is all of our pictures (indicating) are

24   covering it on the Zoom.

25             THE WITNESS:  Yes.
```

Page 82

```
 1              MR. BURNETT:  So, Laleh, you can move those.
 2    You can move us around so --
 3              THE WITNESS:  Correct.
 4              MR. BURNETT:  -- that you can see everything.
 5    If you can't, though, speak up like you just did.
 6              THE WITNESS:  Yes, I can see it.
 7         Q.   (BY MR. BERKOWITZ) Okay.  Now you can see it?
 8         A.   Yes.
 9         Q.   Okay.  And you see number one right here
10    (indicating)?
11         A.   Yes.
12         Q.   Have you produced any pictures and videotape
13    of the incident as described here?
14              MR. BURNETT:  I'll just object that these --
15    these are the matters for examination, Steve, but --
16              MR. BERKOWITZ:  All right.
17              (Unintelligible crosstalk.)
18              MR. BERKOWITZ:  -- the matters for
19    examination.
20              THE WITNESS:  I have not documented the
21    incident, sir.  So the pictures were sent with the guest
22    incident report, and with my understanding there was no
23    video of the incident.
24         Q.   (BY MR. BERKOWITZ) Okay.  Are there any still
25    pictures of the incident?
```

Page 83

```
 1          A.   No, sir.

 2          Q.   Okay.

 3               MR. BURNETT:  Let me belatedly object that

 4    the question was vague.

 5               THE WITNESS:  Sir, I'm sorry.  I need to add,

 6    the pictures were sent with the incident.  So there is a

 7    picture and I believe you -- you should have a copy of

 8    the incident, but I do not have any pictures saved in my

 9    office.

10          Q.   (BY MR. BERKOWITZ) So to be clear, what I

11    have is an incident report, but I don't have any

12    pictures or videotape.

13               Is that -- is that your understanding, too?

14          A.   There is no videotape of the incident.  There

15    was no camera coverage, sir.

16               MR. BURNETT:  Steve, we produced two pictures

17    that you should have.  They're TC0002 and 0003.  That

18    was -- those -- you're in the wrong file.  They were

19    produced in response to your document demand in ordinary

20    discovery, but --

21               MR. BERKOWITZ:  All right.  Give me a second

22    here.  All right.  Here's what I'm going to do.  Sean?

23               MR. BURNETT:  Yeah.

24               MR. BERKOWITZ:  I wonder if you could send me

25    those pictures.  I looked at your document production
```

Page 84

```
 1    previously.  I'm not seeing it.  If you could send that
 2    to me over the lunch hour.  We're going to take a -- a
 3    break.
 4              I can -- I think I can finish this within the
 5    hour after we finish a -- a short meal.  Can we --
 6    Maryann and Jackie and Ms. Jafari, can we do this
 7    within, say, 30, 40 minutes, a lunch break?
 8              THE VIDEOGRAPHER:  (Nods head.)
 9              THE WITNESS:  Sure.
10              MR. BERKOWITZ:  All right.  Why don't we take
11    a break now and come back at 1:00 o'clock then.  And
12    I'll finish, I believe, easily by 2:00 o'clock.
13              MR. BURNETT:  I'm going to hold you to it.
14    Are we off the record yet?
15              THE REPORTER:  No.
16              MR. BURNETT:  Well, I'll say it on the
17    record.  Steve, I'm going to hold you to it.  But I'm
18    just kidding with you.
19              I'm going to go off the record.
20              MR. BERKOWITZ:  All right.
21              THE VIDEOGRAPHER:  This marks the end of
22    media number three.  The time is 12:17 p.m.  We are off
23    the record.
24          (Break taken from 12:17 p.m. to 12:58 p.m.)
25              THE VIDEOGRAPHER:  This marks the beginning
```

Page 85

```
 1    of media number four.  The time is 12:58 p.m.  We are on
 2    the record.
 3         Q.   (BY MR. BERKOWITZ) Okay.  When we last left
 4    off, we were looking at the topics for examination.
 5              MR. BURNETT:  Steve, just as a preliminary
 6    note, we forgot to do this at the beginning, but let's
 7    put this on the record.
 8              You and I agree that there's been a
 9    stipulated protective order that's been executed by your
10    office and my office and it's been filed with the court,
11    and we are agreeing to proceed with this deposition
12    under the rules and the guidance set forth in the
13    stipulated protective order and to be bound by it
14    despite the fact the court has yet to sign it.
15              The other thing that I will say is I will
16    preliminarily designate, because of some of the
17    testimony already, this transcript as confidential.
18              And then once I get the transcript, I will go
19    back through it and just select those portions that will
20    be subject to the protective order, which at this point
21    isn't a whole lot.
22              MR. BERKOWITZ:  Okay.  I'll stipulate to
23    that.  And will you stipulate that at some point I'll be
24    allowed to depose Ms. Pittmen, who prepared the incident
25    report, prior to trial?
```

Page 86

```
 1            MR. BURNETT:  I'm not going to stipulate to

 2    that right now, Steve, because I just don't know.

 3            MR. BERKOWITZ:  Okay.  Back on the record?

 4            THE REPORTER:  Yes.

 5       Q.   (BY MR. BERKOWITZ) Ms. Jafari, I want you to

 6    read to me those two paragraphs in Exhibit A that you

 7    have prepared.

 8       A.   What number, sir?

 9       Q.   Remember the two paragraphs in your personal

10    notes, in your little notebook?  I want you to read them

11    to me.

12            MR. BURNETT:  Laleh, if it's information that

13    I conveyed to you and it was information that you wrote

14    down during our attorney-client communication, I do not

15    want you to read those.

16            If it's something else that you wrote down

17    during your investigation to prepare yourself for

18    today's deposition, you can read those.  But nothing

19    based on communications that you and I had.

20            THE WITNESS:  I won't be able to read it.

21       Q.   (BY MR. BERKOWITZ) Is it you won't be able to

22    read it because you believe these are attorney-client

23    communications?

24       A.   Yes.

25       Q.   I'm going to --
```

Page 87

```
 1                    (Unintelligible crosstalk.)

 2        Q.   (BY MR. BERKOWITZ) I'm going to ask you to

 3   read it anyway.

 4             MR. BURNETT:  And I'm not -- Laleh, do not

 5   read notes that document conversations between me and

 6   you.

 7        Q.   (BY MR. BERKOWITZ) Okay.  And do you,

 8   Ms. Jafari, agree with your counsel's statement that you

 9   will not read those statements based on his objections?

10        A.   Those are personal conversations I had, and I

11   do not want to read them.

12        Q.   Okay.  And personal conversations with who?

13        A.   With Sean.  Not personal; it regard this

14   accident.  And I do not want to read them.

15        Q.   When did you have these conversations with

16   Sean?

17        A.   Last week.

18        Q.   And these are the notes from that

19   conversation?

20        A.   There are a few things that I wrote down,

21   yes.

22        Q.   Is there anything in these personal notes,

23   any part of the -- regarding any part of the incident

24   which are not part of your communications with Sean?

25        A.   Nothing that you haven't covered, just --
```

Page 88

```
 1                    (Unintelligible crosstalk.)
 2         Q.   (BY MR. BERKOWITZ) That's not my question.
 3    Is there anything in these personal notes, these two
 4    paragraphs, not including conversations you had with
 5    Sean, regarding the incident?  Yes or no.
 6         A.   No.
 7         Q.   Then why did you say nothing that I haven't
 8    already covered?  Why did you say that?
 9         A.   It's about the time and the date of the
10    incident and --
11                    (Unintelligible crosstalk.)
12              MR. BURNETT:  Laleh, let me stop you.  I
13    don't want you -- you've already said that it doesn't
14    contain anything that isn't from our conversation.  So I
15    don't want you to tell him about anything that's in your
16    notes.
17              MR. BERKOWITZ:  Okay.  I'll move to compel
18    and -- on the basis that even if they dealt with
19    conversations with Sean, they've been waived.
20         Q.   (BY MR. BERKOWITZ) Okay.  Let's go with
21    Exhibit D.  You see that before you?
22         A.   Yes.
23         Q.   Did you do any -- other than what you've
24    testified today, have you done any other investigation
25    regarding the incident?
```

Page 89

1        A.    As I mentioned before, I went back to check

2    if there is anything saved for that day and I did not

3    find any.

4        Q.    And regardless of whether there was imaging

5    saved regarding the incident or any part of the -- video

6    footage of any part of the store or other persons, are

7    you saying that nothing was saved from that day, June

8    1st, 2020, from the camera footage?

9              Is that correct?

10       A.    Not that I'm aware of.

11       Q.    No, I'm -- you know what?  It's a double

12   negative.  So let me ask you this.

13             Was anything saved, whether it was part of

14   the incident or any other aspect of the store and its

15   operations, in the video footage from June 1st, 2020?

16       A.    I did not find anything when I was looking.

17       Q.    Okay.  At any time, regardless of whether you

18   looked last week or from the inception, June 1st, 2020,

19   did you see any video footage of any part of the store

20   or persons on June 1st, 2020 regardless of whether it

21   pertained to the incident or not?

22       A.    Not that I recall.

23       Q.    Do you know what happened to that container

24   that was dropped on the floor that day that Ms. Broadous

25   claims contributed to her fall that day on June 1st,

                                              Page 90

```
 1    2020?
 2         A.   I can't speak of the process.  I don't know
 3    what happened to the exact container.  But it should be
 4    bagged, cleaned -- cleaned, bagged, and sent out as
 5    sensitive material.
 6         Q.   As part of your obligations as an executive
 7    asset protection team leader, would you have saved the
 8    container that was involved in this incident?
 9              MR. BURNETT:  Objection.  Vague.
10              You may respond.
11         Q.   (BY MR. BERKOWITZ) Do you -- I'm sorry.  Your
12    response?
13         A.   No.
14         Q.   Do you know who at the store would have saved
15    that container, if anyone?
16         A.   No.
17         Q.   Do you know which position at the store had
18    the obligation to save that container, if anyone, upon
19    receiving our preservation letter?
20         A.   I don't know.
21         Q.   All right.  Let's -- I want you to look at
22    number three on Exhibit D, pictures and videotape of the
23    plaintiff.
24              At any time, whether you personally or from
25    people who you've talked to who worked at the store,
```

Page 91

```
 1    were you aware that there was videotape of the plaintiff
 2    while she was -- that is, Connie Broadous -- while she
 3    was at the store on June 1st, 2020?
 4            A.    As I said, it was no video coverage of the
 5    incident.  I don't recall hearing any other camera
 6    coverage for this incident from where she was inside the
 7    store.
 8            Q.    If there was videotape of Connie Broadous
 9    contained from any of the cameras at the store on June
10    1st, 2020, as part of your role as the executive asset
11    protection team leader, should that have been saved
12    after receipt of a preservation letter?
13                 MR. BURNETT:  Objection.  Vague.
14                 You can respond.
15                 THE WITNESS:  I believe there was no video.
16    There was no video of the incident, so it was nothing
17    saved.
18            Q.    (BY MR. BERKOWITZ) Right.  But, again, you
19    keep talking about the incident.  Now I narrowed it
20    down.
21                 If there was video footage of Connie Broadous
22    at the store, anywhere at the store, on June 1st, 2020,
23    in your role as an executive asset protection team
24    leader, should that have been saved upon receipt of a
25    preservation letter?
```

Page 92

1      A.   I'm not aware, sir.

2      Q.   As part of being a protection [sic] team

3   leader, are you in charge of the creation of the

4   policies and procedures of the Target Store, Granada

5   Hills, for the maintenance of the floor regarding

6   spillage?

7      A.   I am in charge of making sure we are

8   providing an amazing service to our guests and our team

9   and making sure floors are clear of debris, liquid.  It

10  comes with it as part of providing that experience to

11  our guests.

12     Q.   Okay.  And what are the policies and

13  procedures of Target as of June 1st, 2020 in making sure

14  that the main aisle we talked about was free and clear

15  of spillage?

16     A.   It is not the policy for the main aisle.  As

17  I mentioned, guest service is our biggest focus at

18  Target.  So safety of our guests and our team is in that

19  category.

20          So we do have spill stations with all the

21  materials that we need for cleaning up a spill, whether

22  it's water that everyone can clean or it's chemicals

23  that trained team members can clean.  There are safety

24  cones.

25          We check spill stations twice a day.  Our

Page 93

```
 1    team is aware they cannot walk by any spills at any time
 2    because it can literally happen to anyone within a
 3    matter of a second.  We do got the spills and we do ask
 4    for help and we do clean the spills.
 5              Again, if it's a water spill, everyone can
 6    clean it.  If it's chemicals, we need special materials,
 7    special team, to clean it up, bag it, and send it --
 8    send it out as sensitive material because we cannot
 9    throw away chemicals in trash.
10        Q.   As of June 1st, 2020, how many spill stations
11    were there at Target?
12        A.   I don't have the exact number, but we do have
13    at least two or three in every main aisle.
14        Q.   You say "two or three spill stations in every
15    main aisle"?  Is that what you just said?
16        A.   Yes.  But I don't have the exact number for
17    the entire store.
18        Q.   What's a spill station?
19        A.   Spill station is literally an area that is
20    marked as a spill station, and there is a trash can
21    which guests or team can use to drop their trash.
22              On top portion of it there is a little
23    cabinet door.  When you open it, there are different
24    materials for cleaning spills.  There is a paper towel.
25    There is a broom.
```

Page 94

```
 1              There is, like, special materials for
 2   cleaning chemicals, gloves, bags, zip ties for sensitive
 3   materials, chemicals.  There is flashlights.
 4         Q.   In the main aisle we've been talking about
 5   where the spill took place, how often, on June 1st,
 6   2020, was that monitored by employees for spills?
 7         A.   We do have a routine of checking spill
 8   stations twice a day, and that has been a policy as long
 9   as I remember; and there is a follow-up daily in regards
10   that matter.
11              MR. BERKOWITZ:  Ms. Matthews, can you read
12   back that response.
13                   (The record was read.)
14         Q.   (BY MR. BERKOWITZ) What's the purpose of
15   checking a spill station?
16         A.   Making sure they are full so we can clean any
17   spills at any time.
18         Q.   What's your policy -- excuse me.
19              As of June 1st, 2020, what was Target's
20   policy with respect to checking the main aisle for
21   spills?
22         A.   We, as a team, we never walk by a spill.
23   That's our policy.  We do stay there.  We guard the
24   spill.  We ask for help.
25              As I mentioned, there is a cleaning
```

Page 95

```
 1    procedure, whether it's a water or a chemical or
 2    something; and there is a handling situation with
 3    different spills.
 4         Q.   Is there a policy or procedure with respect
 5    to inspecting the main aisle for spills as of June 1st,
 6    2020?
 7         A.   Same as always.  We never walk by a spill.
 8    Yes, that's the policy.
 9         Q.   Is there some type of records kept by Target
10    as of June 1st, 2020 with respect to inspection of
11    various areas of the flooring, including main aisle?
12         A.   No, sir.
13         Q.   If a container held by a customer crashed
14    onto the floor and was heard by an employee of Target,
15    would you expect, as part of the policy and procedure of
16    Target as of June 1st, 2020, for that employee to take
17    immediate steps to make sure there was no hazard or, if
18    a hazard, it was cleaned up promptly?
19         A.   Yes.
20         Q.   So --
21              MR. BURNETT:  Steve, let me belatedly
22    object -- sorry, my mute was on -- incomplete
23    hypothetical and compound.  But she just answered.
24         Q.   (BY MR. BERKOWITZ) So if a cashier close by
25    heard a crash of a container, a loud crash, you would
```

Page 96

1    expect the cashier to have looked at that spill site,

2    right, or -- if there was one?

3          MR. BURNETT:  Objection.  Incomplete

4    hypothetical.  Calls for speculation.

5          You can respond if you know.

6          THE WITNESS:  If cashier heard something

7    crashed, yes.  If they didn't hear it, I wouldn't expect

8    them to go clean anything.

9          Q.   (BY MR. BERKOWITZ) Before this deposition had

10   you ever seen these Exhibit D topics that we're covering

11   right now, "Matters for Examination"?

12         A.   I received them e-mail.  I did not get to

13   look at it.  I was on vacation.  I came back today.  So

14   I'm not sure if this is a part of it.

15         Q.   If not you, who at Target would be aware of

16   the manufacturer of the cameras used on June 1st, 2020

17   by the store?

18         A.   Only myself and my team.

19         Q.   And as of June 1st, 2020, give me the full

20   names of all the team members except for Jonathan Colson

21   and -- and Brenda Casstelions.

22         Who else was part of your team on June 1st,

23   2020?

24         A.   Sir, I had a big turnover due to COVID last

25   year.  I don't have every single name, unfortunately.

                                        Page 97

```
 1    But I know there were at least three team members that
 2    are no longer with Target.
 3         Q.   Is it fair to say that as of June 1st, 2020,
 4    the day in question, besides Brenda and Jonathan you
 5    had -- and yourself, you had three other team members
 6    working?
 7         A.   I don't know if they were scheduled that day,
 8    sir.  I did not say they worked that day.
 9         Q.   Were they part of your team as of June 1st,
10    2020, these three additional unnamed employees?
11         A.   I don't have their exact start and end dates.
12         Q.   But do you believe you had three other team
13    members as of June 1st, 2020 which we have not yet
14    identified?
15         A.   As I mentioned, during the COVID I had a big
16    turnover.  I had at least three team members that they
17    left me.  I don't know if they worked during that time.
18    I don't remember all those details.  I apologize.
19         Q.   Besides you possibly and Jonathan Colson, as
20    part of your team who else looked for video footage of
21    June 1st, 2020 at the store?
22         A.   I don't know.
23         Q.   Did you attempt to ask any of your team
24    members who were working then who may have looked at
25    video footage?
```

Page 98

1          A.    I don't recall.



Veritext Legal Solutions
866 299-5127



Page 100



         9          MR. BURNETT:  Objection.  Vague.

        10          You can respond.

        11          THE WITNESS:  I don't understand your

        12     question.



13          MR. BURNETT:  Objection.  Misstates

14   testimony.

15          You can respond.

16          THE WITNESS:  Sir --

17          (Unintelligible crosstalk.)

Page 102



Page 103



```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12        Q.   Have you ever had a non-PTZ camera show any
13   part of the main aisle?
14        A.   I don't recall.
15        Q.   So then it's conceivable that a non-PTZ
16   camera was located depicting the main aisle, is that
17   correct, on the day in question, June 1st, 2020?
18             MR. BURNETT:  Objection.  Vague.  It calls
19   for speculation.
20             You can respond if you know.
21
22
23
24
25
```

Page 104



1

2

3  --

4

5

6

7

8

9

10

11

12

13

14       Q.    (BY MR. BERKOWITZ) So you're basing your

15  contention that there's no PTZ -- that there was a PTZ

16  camera -- that -- I'm sorry -- that there was no PTZ

17  camera there -- strike that.

18

19

20

21

22

23       Q.    Right.  And so was there a PTZ camera there

24  on the day of the incident that covered the incident?

25       A.    I don't know, sir.  I know what I know, based

Page 105

```
 1    on the guest kit information, it was no camera coverage.

 2    So I don't know.

 3        Q.   You're the executive asset protection team

 4    leader.  Are you telling me today that you don't know

 5    what type of camera was there that day on June 1st, 2020

 6    closest to where the incident was?

 7            Is that your contention?

 8        A.   We are moving cameras on a weekly, monthly,

 9    daily basis wherever --

10        Q.   So --

11        A.   -- we need them.  So I --

12            (Unintelligible crosstalk.)

13        Q.   (BY MR. BERKOWITZ) -- my question.  On June

14    1st, 2020 do you know what camera was looking at the

15    scene of the incident?

16            MR. BURNETT:  Objection.  Asked and answered.

17            You can respond.

18            THE WITNESS:  I don't recall, sir.  I don't

19    know.

20            (Loud background noise.)

21        Q.   (BY MR. BERKOWITZ) At any time -- do you know

22    which aisle Connie Broadous was in before she got to the

23    area closest to the No. 23 checkout counter in --

24            MR. BURNETT:  Objection --

25        Q.   (BY MR. BERKOWITZ) -- June 2020?
```

Page 106

```
 1                    MR. BURNETT:  Objection --

 2                    THE WITNESS:  No, sir.

 3          Q.    (BY MR. BERKOWITZ)  Okay.  Did you attempt to

 4   find camera footage looking -- showing Connie Broadous

 5   on June 1st, 2020?

 6          A.    I don't recall.

 7          Q.    Do you know if any of your team people were

 8   asked to look for camera footage depicting Connie

 9   Broadous on June 1st, 2020?

10          A.    Jonathan Colson was asked.

11          Q.    Who asked him?

12          A.    Leader of duty, Anita Pittmen.

13          Q.    How do you know that?

14          A.    Because that's what we do after every

15   incident.

16          Q.    So you don't have personal knowledge; you're

17   just talking about pattern and practice, right?

18          A.    Sir, it's not a personal knowledge.  There is

19   a kit that we have to send.  We have to check few

20   boxes --

21                    MR. BURNETT:  Laleh, you've answered his

22   question.  You've answered his question.  Let him ask

23   his next one.

24                    MR. BERKOWITZ:  Let me show you what I'll

25   mark as Exhibit E.
```

```
 1                  (Deposition Exhibit E was marked.)

 2          Q.    (BY MR. BERKOWITZ) Do you see this picture,

 3    TC00002?

 4          A.    Yes.

 5          Q.    Did you take this picture?

 6          A.    No.

 7          Q.    Do you know who took it?

 8          A.    I don't know.

 9          Q.    Do you know what the relevance is of this

10    picture?

11                  MR. BURNETT:  Objection.  Calls for

12    speculation.

13          Q.    (BY MR. BERKOWITZ) I'll move -- I'll strike

14    that question.

15                  Do you have -- did you see any camera footage

16    depicting the person who carried the soapy container

17    that led to Connie Broadous's alleged fall?

18          A.    I don't know.

19          Q.    Did you or any of your team members look for

20    camera footage depicting the container which led to

21    Connie Broadous's fall?

22          A.    Jonathan Colson should have.

23          Q.    But you don't have personal knowledge of

24    that; is that correct?

25          A.    He was questioned if he did and he said yes,
```

Page 108

```
 1    and it was no camera coverage to see anything.
 2    ██      ███████████████████████████
 3    ██      █████████████████████████████████
 4    ██ ██████████████████   ████████████████
 5         Q.   But you don't -- I'm asking only your
 6    personal knowledge.
 7              Do you have personal knowledge whether you or
 8    any team person looked for camera footage depicting the
 9    container that led to -- allegedly led to Connie
10    Broadous's fall?
11         A.   I don't know, sir.
12         Q.   Okay.  I'm now showing you a picture of the
13    spillage on the floor, TC00003.  Do you know who took
14    this picture?
15         A.   I don't know.
16         Q.   Do you -- based upon your review of this
17    picture, you see where those Tide containers are located
18    on the left side of the picture?
19         A.   Yes.
20         Q.   What aisle or checkout counter would that be?
21         A.   That's chemicals.  That's -- that should be
22    A1.  The nearest register to that would be register 23
23    and 24, and the other side of the wall should be a
24    trading card wall.
25         Q.   All right.  Still looking at Exhibit E, do
```

Page 109

```
 1    you see the two footprints in the red circle on the left

 2    side of the screen?

 3         A.   Yes.

 4         Q.   And we're talking, again, picture TC00003.

 5    Okay.  Does that lead, as far as you know, to a cash

 6    out -- the cash register checkout 23?

 7         A.   Yes.

 8         Q.   Now, do you see this individual with the red

 9    shirt (indicating) --

10         A.   Yes.

11         Q.   -- in the same picture?

12         A.   Yes.

13         Q.   Do you know who that is?

14         A.   No.

15         Q.   Have you ever talked to Luis Saldana?

16         A.   I'm sorry.  To who?

17         Q.   As I scroll down here, in TC0004 there's a

18    declaration of Luis Saldana.  Have you ever talked to

19    this individual?

20         A.   No.

21         Q.   Do you know who he is?

22         A.   No.

23         Q.   Did you ever review his declaration?

24         A.   No.

25         Q.   Did you ever help prepare a statement for
```

Page 110

```
 1    Luis Saldana to sign via declaration?

 2         A.    No.

 3         Q.    Did you ever talk to Connie Broadous?

 4         A.    No, sir.

 5         Q.    Did you ever talk to her assistant, Verna

 6    Stewart?

 7         A.    No.

 8               MR. BERKOWITZ:  Okay.  Sean, five-minute

 9    break and I'll finish up.  I think I only have five, ten

10    minutes at most.

11               I'm sorry, Sean, I think you're muted.

12               MR. BURNETT:  Sorry.  I said we'll be back

13    quick, try to get this wrapped up.

14               THE VIDEOGRAPHER:  This marks the -- this

15    marks the end of media number four.  The time is

16    1:37 p.m.  We are off the record.

17          (Break taken from 1:37 p.m. to 1:41 p.m.)

18               THE VIDEOGRAPHER:  This marks the beginning

19    of media number five.  The time is 1:41 p.m.  We are on

20    the record.

21         Q.   (BY MR. BERKOWITZ) Were you contacted about

22    the slip and fall on June 1st, 2020, the day it

23    occurred?

24         A.    I don't recall.

25         Q.    When do you recall being first contacted
```

                                              Page 111

1    about this slip and fall?

2         A.   I don't recall, sir.   I don't remember.

3         Q.   What do you recall as to what you did when

4    you did find out about the slip and fall?

5         A.   As every incident, I look at it to make sure

6    what they said as of there's no camera coverage because

7    I always wanted to see the incident.   There was no

8    camera coverage.

9         Q.   But you're just telling me what you normally

10   do.  Do you recall specifically what you did during the

11   month of June 2020 in connection with this incident?

12        A.   Same.

13        Q.   You specifically recall looking at camera

14   footage in connection with this incident?

15        A.   Same as every incident.   I don't recall the

16   date and -- yes.

17        Q.   All right.   So now that you've admitted that

18   you specifically recall this incident, tell me what you

19   did once you got on board.

20        A.   Sir, I don't recall the exact steps.   I -- as

21   I told you, when there is an incident, I will look to

22   see if there is a camera coverage --

23                    (Unintelligible crosstalk.)

24              THE WITNESS:   -- and I did the same for --

25        Q.   (BY MR. BERKOWITZ) But --

                                        Page 112

```
 1          A.   -- for this incident.
 2          Q.   Right now I'm not talking about your general
 3     practice.  I'm asking for your specific recollection,
 4     what you did with this incident.
 5               So here's --
 6          A.   Same --
 7          Q.   -- my question.  No, no, you must listen to
 8     me.  You must answer only questions where you have a
 9     specific recollection.
10               Who did you talk to at the store regarding
11     this specific incident on June 1st, 2020?
12          A.   I don't remember.
13          Q.   Do you recall when you first got involved in
14     connection with this incident?
15          A.   I --
16               MR. BURNETT:  Object --
17               THE WITNESS:  -- don't recall the dates.
18          Q.   (BY MR. BERKOWITZ) What's your best
19     approximation?
20          A.   I cannot estimate the time.
21          Q.   Do you believe it was within one week of the
22     incident?
23          A.   I don't know.
24          Q.   Do you believe it was within two weeks of the
25     incident you were contacted about the incident?
```

Page 113

1          A.   I don't know.

2          Q.   Did you talk to Jennifer Hallverson regarding

3     this specific incident?

4          A.   I don't recall.

5          Q.   Did you talk to Anita Pittmen regarding this

6     specific incident?

7          A.   I don't remember.

8          Q.   Do you remember your specific conversations

9     with Jonathan Colson regarding this specific incident?

10         A.   I don't remember the exact conversation.

11         Q.   I'm sorry.  Did you just say you don't

12    remember a date?

13         A.   I don't remember the conversation.

14         Q.   Oh, okay.

15         A.   I have not said "date."

16         Q.   Give me your recollection of your specific

17    conversations with Brenda Casstelions about this

18    specific incident with Connie Broadous.

19         A.   Yes.

20         Q.   No.  I mean, give -- can you provide me

21    your -- your conversations with Brenda Casstelions about

22    this specific incident?

23         A.   What I asked was if she remembered if there

24    was a spill-and-fall incident June of last year; and if

25    there is, if she has any knowledge of that.

                                        Page 114

1        Q.    Did you --

2        A.    And she told me -- said, "Jonathan looked for

3    the camera coverage, and it was no camera coverage."

4        Q.    And when did you have that conversation with

5    Brenda Casstelions?

6        A.    Last week.

7        Q.    And are you aware of any notes that Brenda

8    kept with respect to this incident?

9        A.    No.

10       Q.    Are you aware of any notes kept by Jonathan

11   Colson with respect to this incident?

12       A.    No.

13       Q.    Are you aware of any notes kept by Anita

14   Pittmen in connection with this incident?

15       A.    No, sir.

16       Q.    Aside from re -- do you believe -- do you

17   specifically remember reviewing the guest incident

18   report in connection with this incident in the month of

19   June of 2020?

20       A.    Can you please repeat.

21       Q.    During the month of June 2020, do you

22   specifically remember looking at the guest incident

23   report?

24       A.    I have not.

25       Q.    When you say you have not, does that mean you

Page 115



```
 1    do not remember or you simply didn't look at it?

 2         A.   Your question was if I remember, and I said I

 3    have not.   I have not remember.

 4         Q.   Now, I just want to confirm.   We've talked

 5    about three types of cameras.

 6

 7

 8

 9

10

11

12          --

13

14

15         Q.   And are you aware of the manufacturer of any

16    of these types of cameras?

17         A.   No.

18         Q.   Are you aware of the store that sold these

19    cameras?

20         A.   No.

21         Q.   And is it true -- I'm almost done.   You'll

22    make your 1:50, I believe.

23

24

25
```

Page 116



Page  117

```
 1    ████  ███████  ████  ████████  ████
 2    ██████████  ████████████
 3         Q.    Last area.   If an incident like this occurs
 4    where a person is injured, ambulance picks her up, does
 5    the store have a policy about keeping the camera footage
 6    for a longer period of time than the retention period?
 7         A.    Yes, we do save the video.   If there is a
 8    camera coverage of the accident, we do save the video.
 9    We send one out with the guest incident, and it is saved
10    on our -- on our cameras basically.   We save it for a
11    longer time.
12         Q.    Well, you say of the accident, but things
13    leading up to the accident might be relevant, too.
14              Is there a policy -- was there a policy in
15    place as of June 1st, 2020 of retaining camera footage
16    of not only the area of the incident but the surrounding
17    area?
18         A.    Not -- not that I'm aware of.
19         Q.    So you're -- and last question or two.   Give
20    me a couple.
21              Are you aware of a policy of Target in
22    connection with a person injured, like Connie Broadous,
23    transported by ambulance, of keeping camera footage
24    where Connie Broadous was depicted on the cameras?
25              MR. BURNETT:   Objection.   Vague.
```

Page 118

1          You can respond if you understand.

2          THE WITNESS:  I didn't understand.

3          Q.    (BY MR. BERKOWITZ) Connie Broadous was in

4    the store shopping, obtaining -- returning a blender,

5    obtaining a new one.  She was in other parts of the

6    store.

7               And I'm asking you if she's the injured

8    victim here, transported by ambulance, was there a

9    policy, once Target became aware of that, to keep

10   footage of Connie Broadous in other parts of the

11   store?

12         A.    Not that I'm aware of, sir.

13              MR. BERKOWITZ:  Okay.  Those are all the

14   questions that I have.  And I reserve the right --

15   yep, that's -- that's all I have right now.

16              MR. BURNETT:  I was going to say, Steve,

17   about what?  But anyway, let's go off the record.

18   We're going to handle the transcript pursuant to code,

19   I assume?

20              MR. BERKOWITZ:  That's correct.

21              THE VIDEOGRAPHER:  And we're in agreement

22   to conclude today's testimony?

23              MR. BERKOWITZ:  Yes.

24              MR. BURNETT:  Yes.

25              THE VIDEOGRAPHER:  We are off the record at

                                        Page 119

```
 1    1:52 p.m.  And this concludes today's testimony given by

 2    Laleh Jafari, 30(b)(6) for Target.  The total number of

 3    media units used was five and will be retained by

 4    Veritext Legal Solutions.

 5

 6    (The remote videotaped deposition concluded at 1:52 p.m.)

 7                        *  *  *

 8                  (Signature was requested.)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 120

```
 1                            VERIFICATION
 2
      STATE OF _____)
 3                            )  ss.
      COUNTY OF _____)
 4
 5        I, LALEH JAFARI, being first duly sworn remotely
 6   on my oath, depose and say:
 7        That I am the witness named in the foregoing remote
 8   videotaped deposition taken the 4th day of October, 2021,
 9   consisting of pages numbered 1 to 120, inclusive; that
10   I have read the said deposition and know the contents
11   thereof; that the questions contained therein were
12   propounded to me; that the answers to said questions
13   were given by me, and that the answers as contained
14   therein (or as corrected by me therein) are true and
15   correct.
16
          Corrections Made:  Yes_____  No_____
17
18
          _____
19                    LALEH JAFARI
20
       Subscribed and sworn to before me this _____
21
      day of _____, 2021, at _____, California.
22
23
                    _____
24              Notary Public for Idaho
                Residing at_____, California.
25              My Commission Expires: _____.

                                              Page 121
```

```
 1                    REPORTER'S CERTIFICATE

 2

     STATE OF IDAHO  )

 3                   )  ss.

     COUNTY OF ADA   )

 4

 5       I, MARYANN MATTHEWS, Certified Shorthand Reporter

 6   and Notary Public in and for the State of Idaho, do hereby

 7   certify:

 8       That prior to being examined, the witness named in

 9   the foregoing deposition was duly sworn remotely by me to

10   testify to the truth, the whole truth and nothing but the

11   truth;

12       That said deposition was taken down by me in

13   shorthand at the time and place therein named and

14   thereafter reduced to typewriting under my direction, and

15   that the foregoing transcript contains a full, true and

16   verbatim record of said deposition.

17       I further certify that I have no interest in the

18   event of the action.

19       WITNESS my hand and seal this 18th day of October,

20   2021.

21

22

                 <%11030,Signature%>

23          MARYANN MATTHEWS, CSR and Notary

              Public in and for the State of Idaho.

24

25   My Commission Expires:  09-12-2025
```

                                                Page 122

```
 1    Sean R. Burnett, Esq.

 2    sburnett@sbelaw.com

 3                                    OCTOBER 18, 2021

 4    RE: BROADUS V. TARGET CORP.

 5    OCTOBER 4, 2021, LALEH JAFARI, JOB NO. 4826702

 6    The above-referenced transcript has been

 7    completed by Veritext Legal Solutions and

 8    review of the transcript is being handled as follows:

 9    __ Per CA State Code (CCP 2025.520 (a)-(e)) - Contact Veritext

10       to schedule a time to review the original transcript at

11       a Veritext office.

12    __ Per CA State Code (CCP 2025.520 (a)-(e)) - Locked .PDF

13       Transcript - The witness should review the transcript and

14       make any necessary corrections on the errata pages included

15       below, notating the page and line number of the corrections.

16       The witness should then sign and date the errata and penalty

17       of perjury pages and return the completed pages to all

18       appearing counsel within the period of time determined at

19       the deposition or provided by the Code of Civil Procedure.

20    __ Waiving the CA Code of Civil Procedure per Stipulation of

21       Counsel - Original transcript to be released for signature

22       as determined at the deposition.

23    __ Signature Waived - Reading & Signature was waived at the

24       time of the deposition.

25
```

Page 123

1    _X_ Federal R&S Requested (FRCP 30(e)(1)(B)) - Locked .PDF

2       Transcript - The witness should review the transcript and

3       make any necessary corrections on the errata pages included

4       below, notating the page and line number of the corrections.

5       The witness should then sign and date the errata and penalty

6       of perjury pages and return the completed pages to all

7       appearing counsel within the period of time determined at

8       the deposition or provided by the Federal Rules.

9    __ Federal R&S Not Requested - Reading & Signature was not

10      requested before the completion of the deposition.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                              Page 124

```
 1    BROADUS V. TARGET CORP.

 2    LALEH JAFARI (#4826702)

 3                    E R R A T A   S H E E T

 4    PAGE_____ LINE_____ CHANGE_____

 5    _____

 6    REASON_____

 7    PAGE_____ LINE_____ CHANGE_____

 8    _____

 9    REASON_____

10    PAGE_____ LINE_____ CHANGE_____

11    _____

12    REASON_____

13    PAGE_____ LINE_____ CHANGE_____

14    _____

15    REASON_____

16    PAGE_____ LINE_____ CHANGE_____

17    _____

18    REASON_____

19    PAGE_____ LINE_____ CHANGE_____

20    _____

21    REASON_____

22

23    _____    _____

24    WITNESS                         Date

25

                                            Page 125
```

**[& - 888]**

| & | | | 3 |
|---|---|---|---|
| **&**  123:23 124:9 | 57:2 59:11 60:11 | 73:23 74:7,13,16 | **3**  3:9 |
| **0** | 60:19,25 61:23 | 74:24 75:22 76:4 | **30**  1:12 2:1,4 4:14 |
| | 62:14,23 63:17 | 76:8,11,11,23,24 | 24:20 25:9 26:23 |
| **0003**  84:17 | 64:2,25 69:11 | 77:18,21,24 78:5,8 | 38:1 39:4 40:7,9 |
| **09-12-2025**  122:25 | 73:8,16,20,23 74:7 | 78:18 79:3,7,12,19 | 40:15 41:25 43:19 |
| **1** | 74:13,16,23 75:22 | 79:24 90:8,15,18 | 52:9,13 53:17,20 |
| | 76:4,8,11,11,22,24 | 90:20 91:1 92:3 | 53:23 54:2 74:16 |
| **1**  3:11,12 121:9 | 77:18,21,24 78:5,8 | 92:10,22 93:13 | 78:22 80:16 85:7 |
| 124:1 | 78:17 79:3,7,12,19 | 94:10 95:6,19 | 99:4,9,10,13,20 |
| **108**  3:16 | 79:24 90:8,15,18 | 96:6,10,16 97:16 | 100:24 101:14 |
| **10950**  1:5 4:19 | 90:20,25 92:3,10 | 97:19,23 98:3,10 | 120:2 124:1 |
| **10:03**  2:9 4:4 | 92:22 93:13 94:10 | 98:13,21 100:4,18 | **30th**  40:12 |
| **10:42**  32:1,3 | 95:5,19 96:5,10,16 | 100:22 102:12 | **310**  2:16 |
| **10:51**  32:3,5 | 97:16,19,22 98:3,9 | 104:17 106:5,14 | **33330f.jpeg..........** |
| **11030**  122:22 | 98:13,21 100:4,17 | 106:25 107:5,9 | 3:10 |
| **11:46**  71:1,3 | 100:22 102:12 | 111:22 112:11 | **350**  2:15 |
| **11:55**  71:3,5 | 104:17 106:5,14 | 113:11 115:19,21 | **4** |
| **120**  121:9 | 107:5,9 111:22 | 116:12 117:1 | |
| **12:17**  85:22,24 | 113:11 116:12 | 118:15 | **4**  1:14 123:5 |
| **12:58**  85:24 86:1 | 117:1 118:15 | **2021**  1:14 2:8 4:5 | **40**  38:2 39:4 52:9 |
| **14**  101:8,14 | **2** | 121:8,21 122:20 | 52:13 53:20,23 |
| **150**  2:15 | | 123:3,5 | 54:2 85:7 |
| **18**  123:3 | **20**  64:8,10,10,10 | **2025.520**  123:9,12 | **4826702**  123:5 |
| **18th**  122:19 | 64:12,13 65:11 | **20th**  65:3 | 125:2 |
| **1970**  32:19 | 72:24 105:3 116:8 | **21**  67:1,2,3 | **4th**  2:8 4:4 121:8 |
| **1:00**  85:11 | **2007**  11:6 35:1 | **21st**  32:19 | **5** |
| **1:37**  111:16,17 | **2020**  21:1,15 24:16 | **23**  3:9 67:3,3,4 | |
| **1:41**  111:17,19 | 24:25 27:20,24 | 68:21 71:15 72:2 | **5**  3:5 |
| **1:50**  116:22 | 28:3,19 29:4,16 | 72:3,3,24 79:6 | **5383**  2:21 |
| **1:52**  120:1,6 | 30:7,12 31:8 | 106:23 109:22 | **550-1220**  2:16 |
| **1st**  21:1,15 24:16 | 37:22 39:4,9 | 110:6 | **6** |
| 24:25 27:20,24 | 41:23 42:8,14 | **2329**  19:8 | |
| 28:3,19 29:4,16 | 45:10,11 48:23 | **24**  8:24 109:23 | **6**  1:12 2:1,4 3:17 |
| 30:7,12 31:8 | 49:7,10 50:3,16 | **240**  2:21 | 4:14 80:16 120:2 |
| 37:22 39:4,9 | 51:2,12,16 52:22 | **266-5502**  2:17 | **692-2800**  2:22 |
| 41:22 42:8,13 | 53:6,17,20,25 54:3 | **294**  35:12 | **692-2801**  2:22 |
| 45:9,11 48:23 | 54:12,18 56:12 | **2:00**  85:12 | **8** |
| 49:7,10 50:3,16 | 57:2 59:11 60:11 | **2:20**  1:5 4:19 | |
| 51:2,12,16 52:22 | 60:19 61:1,23 | | **805**  2:22,22 |
| 53:6,17,20,24 54:3 | 62:14,23 63:18 | | **82**  3:13 |
| 54:12,18 56:12 | 64:2,25 65:3 | | **888**  2:17 |
| | 69:11 73:8,17,20 | | |

[9 - aspect]

| 9 | | | |
|---|---|---|---|
| **9**  3:15 | **ago**  43:19 44:2,7 | **anita**  29:13 30:8 | **approximation** |
| **90212**  2:16 | 68:17 | 30:11 31:9 42:25 | 8:13 113:19 |
| **93111**  2:21 | **agree**  4:11 86:8 | 50:21 107:12 | **approximations** |
| **95**  33:9 | 88:8 | 114:5 115:13 | 8:6 |
| **98747.jpeg...........** | **agreeing**  86:11 | **anita's**  29:14,20 | **aps**  25:11,12 |
| 3:12 | **agreement**  119:21 | **answer**  8:12 10:6 | **area**  14:5 31:21 |
| | **ahead**  12:20 26:15 | 10:7 16:1 21:10 | 35:5,18 36:15 |
| **a** | 30:17 47:22 52:6 | 21:22 30:22 47:24 | 40:1 55:15 57:5 |
| **a.m.**  2:9 4:4 32:1,3 | 57:9 | 54:5 61:13,15 | 57:13,15,15 59:19 |
| 32:3,5 71:1,3,3,5 | **aisle**  54:22 55:3,6 | 64:14 72:13 | 60:12 61:18,19 |
| **a1**  109:22 | 56:5,10,11,11 57:1 | 102:19 103:6 | 62:4,8,24 63:3 |
| **able**  38:13,14,24 | 57:22 60:8,18 | 105:12 113:8 | 66:5,9 69:24 |
| 39:12,19 75:18 | 62:1,6 63:6,7 | **answered**  34:11 | 71:18 72:5 73:12 |
| 87:20,21 | 68:21 71:15 72:2 | 54:4 96:23 106:16 | 75:15,16 94:19 |
| **absence**  15:2 43:2 | 73:7,18 93:14,16 | 107:21,22 | 100:2,10,12,25 |
| 43:4,6,11 | 94:13,15 95:4,20 | **answers**  121:12,13 | 101:21,21,22 |
| **accident**  25:14 | 96:5,11 100:3,5,8 | **anyway**  88:3 | 102:2,7 103:11 |
| 78:13 88:14 103:6 | 100:14,19,24,25 | 119:17 | 104:1,3,9,10 105:1 |
| 118:8,12,13 | 101:6,15,25 103:9 | **apologize**  98:18 | 105:11,21 106:23 |
| **accuracy**  36:16,21 | 104:11,13,16 | **appearance**  5:9 | 117:5 118:3,16,17 |
| **accurate**  7:17 8:21 | 106:22 109:20 | **appearances**  2:13 | **areas**  58:22 59:2,8 |
| 9:1 | 116:24 117:1,7,13 | 5:7 | 73:12 96:11 117:6 |
| **acronym**  27:11 | 117:15,15,16,20 | **appearing**  4:22 | 118:1 |
| **action**  5:3 17:4 | 117:25 | 19:12 123:18 | **argumentative** |
| 122:18 | **aisles**  62:2 100:13 | 124:7 | 12:19 103:20 |
| **actual**  38:25 65:23 | **al**  1:8 4:17 | **apple**  25:21 | **aside**  33:19 115:16 |
| 67:11 101:21 | **alcohol**  8:25 | **appreciate**  31:5 | **asked**  6:11 7:5 |
| **ada**  2:7 122:3 | **alleged**  108:17 | **approve**  81:12,19 | 20:20,21 34:11 |
| **add**  84:5 | **allegedly**  25:1,2 | **approximate**  52:9 | 36:2 54:4 63:24 |
| **additional**  98:10 | 71:19 79:11 109:9 | 68:15 | 70:14 80:5 106:16 |
| **admissibility**  23:8 | **allow**  7:22 | **approximated** | 107:8,10,11 |
| **admitted**  112:17 | **allowed**  86:24 | 44:7 | 114:23 |
| **adversely**  7:14 | **amazing**  9:20 | **approximately** | **asking**  9:11 10:18 |
| **advised**  6:22 | 11:18 93:8 | 6:17 9:4,16,17 | 16:8 22:22 34:6 |
| **affiliations**  5:7 | **ambiguous**  117:18 | 11:9 15:6 16:16 | 39:17 42:2 46:25 |
| **afford**  7:22 | **ambulance**  46:5 | 33:6 38:1 40:4,6,7 | 56:25 61:7 63:21 |
| **afternoon**  27:21 | 118:4,23 119:8 | 40:9 44:23 52:25 | 100:17 101:5 |
| 27:25 28:4,16 | **amended**  3:13 | 59:10 63:4 64:8 | 103:4 109:5 113:3 |
| 79:6 | 82:9 | 66:20 72:19 | 117:19 119:7 |
| | **angle**  75:17 | 116:10 | **aspect**  75:24 90:14 |

Page 2

[aspects - brenda]

| | | | |
|---|---|---|---|
| **aspects** 11:12 | 116:15,18 118:18 | **beliefs** 11:24 12:1 | 84:10,21,24 85:10 |
| **asset** 9:14 14:19 | 118:21 119:9,12 | 12:8,11,13,16 | 85:20 86:3,22 |
| 14:21,24 15:4,8 | **b** | **believe** 24:5 25:23 | 87:3,5,21 88:2,7 |
| 16:3 18:24 25:13 | | 29:13 33:8,9 41:1 | 89:2,17,20 91:11 |
| 25:16,25 26:4 | **b** 1:12 2:1,4 3:7,10 | 42:7 43:16 44:11 | 92:18 95:11,14 |
| 34:15 48:5 91:7 | 4:14 55:20,21 | 45:10 47:3 50:2 | 96:24 97:9 99:13 |
| 92:10,23 106:3 | 62:7 63:9 66:19 | 51:1 67:3,14 | 99:16 101:13 |
| **assigned** 50:16,19 | 68:2,20 80:16 | 68:25 69:8 71:17 | 102:3,18 103:3,22 |
| **assistance** 18:19 | 120:2 124:1 | 84:7 85:12 87:22 | 104:22 105:14 |
| **assistant** 111:5 | **bachelor's** 32:24 | 92:15 98:12 | 106:13,21,25 |
| **assume** 60:9 | 33:1,7,21 | 113:21,24 115:16 | 107:3,24 108:2,13 |
| 119:19 | **back** 13:24,25 | 116:22 | 111:8,21 112:25 |
| **assumed** 8:20 | 19:22 20:14 27:3 | **believed** 72:2 | 113:18 117:8 |
| **assuming** 61:8 | 35:9 36:16 39:22 | **belt** 59:19 63:1 | 119:3,13,20,23 |
| 68:20 | 43:3,10 54:22 | **berkowitz** 2:15 | **best** 7:21 12:4 |
| **attempt** 18:20 | 64:19 66:4 72:13 | 3:5 5:11,11,24 | 25:18,23 42:11 |
| 41:2 46:6 98:23 | 75:25 85:11 86:19 | 6:11 9:15 10:9,16 | 45:6 53:2 63:20 |
| 107:3 | 87:3 90:1 95:12 | 10:23 12:7,23 | 68:4,23 69:14,24 |
| **attempted** 78:4 | 97:13 104:10 | 13:23 14:3 15:16 | 70:3,15,16 72:4 |
| **attend** 10:13 11:5 | 111:12 | 16:2,20,25 17:21 | 113:18 |
| 11:7 32:20,25 | **background** 32:11 | 20:2,11 21:6,14 | **beverly** 2:16 |
| 33:18,22 | 99:10 106:20 | 22:11,15 23:12,21 | **big** 46:1 97:24 |
| **attended** 11:3 | **bag** 94:7 | 24:2 29:22 30:7 | 98:15 |
| 32:12 33:14 34:7 | **bagged** 91:4,4 | 30:16,18 31:2,7,22 | **biggest** 93:17 |
| **attending** 5:6 13:4 | **bags** 95:2 | 32:7 34:3,5,14 | **birth** 32:18 |
| **attorney** 5:10 20:5 | **barbara** 2:21 | 37:9 38:17,22 | **black** 19:24 |
| 24:14 87:14,22 | **based** 68:19 76:14 | 41:5,7,19 43:9 | **blender** 119:4 |
| **attorney's** 41:9 | 87:19 88:9 99:9 | 47:24 48:1,8,21 | **board** 112:19 |
| **attorneys** 24:14,21 | 105:25 109:16 | 49:21 50:11 51:24 | **booklet** 7:7 |
| 25:10 26:23 42:1 | **basically** 11:24 | 54:8 55:16,19,22 | **born** 32:16 |
| **audio** 4:10,10 | 35:4 37:12 118:2 | 56:17 57:7,9,12 | **bottom** 18:1 |
| **authority** 79:25 | 118:10 | 58:5,23 59:22 | **bound** 86:13 |
| 80:2 | **basing** 105:14,18 | 60:17,23 61:16 | **boxes** 107:20 |
| **automatically** | **basis** 13:9 16:18 | 62:12,19 63:24,25 | **break** 31:23 32:3 |
| 78:18,20 | 89:18 106:9 | 64:9 65:22 66:6 | 36:11 70:22 71:3 |
| **avenue** 2:21 | **beginning** 5:9 32:4 | 67:19,22 69:10 | 85:3,7,11,24 |
| **average** 15:17 | 71:4 85:25 86:6 | 70:2,6,10,14,21 | 103:15 111:9,17 |
| **aware** 64:1,24 | 111:18 | 71:8,23 72:14 | **brenda** 25:16,24 |
| 72:11 73:17 90:10 | **behalf** 5:11,13 9:5 | 77:10 79:1 80:19 | 26:23 27:1 28:4,7 |
| 92:1 93:1 94:1 | 37:4 48:23 | 80:23 81:1,9 82:2 | 97:21 98:4 114:17 |
| 97:15 115:7,10,13 | **belatedly** 84:3 | 82:9 83:7,16,18,24 | 114:21 115:5,7 |
| | 96:21 | | |

Veritext Legal Solutions
866 299-5127

[bring - case]

**bring**  17:21
**broad**  62:20
**broader**  66:16
**broadous**  1:4 4:16
  5:12 21:9,16,25
  23:15 24:8,16
  25:1 41:22 60:11
  66:20 67:12 71:18
  79:2 90:24 92:2,8
  92:21 106:22
  107:4,9 111:3
  114:18 118:22,24
  119:3,10
**broadous's**  42:1
  79:12 108:17,21
  109:10
**broadus**  123:4
  125:1
**broom**  94:25
**brought**  30:21
  35:12
**bubble**  51:25
**burnett**  2:20,20
  5:13,13 9:11
  10:19 11:15 12:18
  15:12,14,22 16:19
  16:22 17:20 20:1
  20:3 21:3,10
  22:10,14 23:19,22
  29:21 30:1,13,17
  30:22 31:4,24
  34:1,4,11 37:5
  38:16,18 41:4,6,14
  43:7 47:17 48:15
  51:21 54:4 55:5
  55:18 56:13 57:6
  57:8,10,24 58:19
  60:14,20 61:11
  62:9 63:21 64:5
  65:17 66:3 67:17
  67:20 69:6,25

  70:4,8,16,23 71:21
  72:6 78:24 80:9
  80:22,25 81:2,4
  82:22 83:1,4,14
  84:3,16,23 85:13
  85:16 86:5 87:1
  87:12 88:4 89:12
  91:9 92:13 96:21
  97:3 101:9,17
  102:13,23 103:20
  104:18 105:7
  106:16,24 107:1
  107:21 108:11
  111:12 113:16
  117:2 118:25
  119:16,24 123:1
**business**  10:11,13
  10:21,24 11:2,5,7
  11:10 12:24,25
  13:4 33:13,19

**c**

**c**  3:12 4:1 25:20,21
  27:19 71:7,9,10
  72:16,20,22
**ca**  123:9,12,20
**cabinet**  94:23
**california**  1:2 2:16
  2:21 4:18,23 11:4
  14:14 19:8 121:21
  121:24
**call**  18:18 33:24
  61:20
**called**  46:5 55:9
**calls**  8:3 11:16
  41:14 57:25 69:7
  97:4 104:18 105:8
  108:11
**camera**  13:22 14:5
  14:6,8,9,11 17:3,6
  17:7,9,10,11,12,14
  17:23 18:12,16

  20:21 28:24 38:4
  38:6,15 39:1,5,14
  39:18,24 40:5,16
  40:25 41:2,10
  46:14,18 48:6,10
  48:12,19,22 49:6
  49:11,24 50:8,17
  50:20,24 51:18,19
  51:24 52:1,7,8,9
  52:17,19 54:8,11
  54:12 56:16,18,19
  56:20,22,24 58:6,6
  58:7,8,12,17,24,24
  59:1,4,6,14,15,20
  60:1,6,7,9,12,18
  60:21,22,25 61:3,8
  61:22 62:1,15,16
  62:19,21 63:5,22
  64:2,17 65:21,23
  66:9,11,12,17
  72:23 74:17,21
  75:1,5,8,18,24
  76:1 77:12,13,14
  78:22 79:6,9 80:5
  84:15 90:8 92:5
  99:3,7,8,9 100:6,7
  100:8,10,10 101:5
  101:14,20,20,21
  101:22,24 102:9
  102:21 103:11,12
  103:13,18 104:2,3
  104:6,8,9,12,16,23
  104:25 105:3,4,10
  105:11,13,16,17
  105:19,21,23
  106:1,5,14 107:4,8
  108:15,20 109:1,8
  112:6,8,13,22
  115:3,3 117:5,11
  117:25 118:5,8,15
  118:23

**camera's**  40:13
**cameras**  13:11,19
  13:20 14:4 16:17
  17:1,3 18:12
  37:19,21 38:8,11
  38:14,24 39:5,9,20
  50:2,4 51:12,15
  53:12,20,24 54:2
  54:14,15,19 55:2
  56:11 57:1,18,21
  58:2,3 59:1,10,18
  61:18 62:5,13,25
  63:13,15,16 64:1,7
  64:23 65:1,5,6,14
  65:15,16 73:3,17
  73:21,23 74:1,2,4
  74:7,11,12,22
  75:15 76:3 78:8
  78:16 79:18,22
  80:1,3,5 92:9
  97:16 99:19,22,24
  100:5,13,14,19,23
  101:6,15 102:5,11
  102:11,20,21
  103:4,5,8,16,23,24
  104:5 106:8 116:5
  116:6,7,8,11,16,19
  116:24,25 117:6
  117:10,13,16,20
  117:20 118:10,24
**capture**  62:1
  100:14 101:22
**captured**  61:25
  101:21 102:5
**capturing**  102:1
  103:8
**card**  109:24
**carried**  108:16
**case**  1:5 4:19 6:13
  6:14 15:9 81:24

[cash - connie]

**cash**  58:4 59:18,19 62:25 63:1 110:5 110:6
**cashier**  54:9,19 96:24 97:1,6
**cashier's**  57:21
**cashiers**  54:15,23
**casstelions**  25:17 97:21 114:17,21 115:5
**cat**  25:21
**categories**  30:14 30:25 37:6,10
**category**  9:21 37:10 93:19
**caused**  25:3
**caution**  7:10
**caveats**  6:21
**ccp**  123:9,12
**ceiling**  37:21 51:19 52:18 60:10 62:15 72:25 105:5 105:10
**ceilings**  39:10 73:24 79:23
**cell**  4:8
**cellular**  4:7
**central**  1:2 4:18
**certain**  117:16
**certificate**  122:1
**certified**  122:5
**certify**  122:7,17
**cetera**  9:23
**change**  31:11 36:16,19,20 53:10 61:6 65:2 125:4,7 125:10,13,16,19
**changes**  7:9,11
**changing**  103:14
**charge**  9:10 11:13 14:12,14 35:3,8,20

35:23 36:3 93:3,7
**check**  49:5,10,15 56:5,8 63:3 66:5 66:22 77:6,10 90:1 93:25 103:10 107:19
**checked**  48:21 77:2
**checking**  95:7,15 95:20
**checkout**  54:19 63:13,16 64:1,17 64:18 65:5,16 66:25 72:24 73:7 73:21 79:6 106:23 109:20 110:6 116:7
**checkstand**  72:3
**checkstands**  55:7 57:22
**chemical**  96:1
**chemicals**  55:10 55:14 93:22 94:6 94:9 95:2,3 109:21
**choose**  57:16,17
**circle**  64:12 67:15 68:1 69:22 71:20 72:2 110:1
**circumstances**  46:6 99:6,19
**civil**  123:19,20
**claims**  67:12 90:25
**clarify**  8:19 33:17
**classes**  13:5
**clean**  93:22,23 94:4,6,7 95:16 97:8
**cleaned**  91:4,4 96:18

**cleaning**  93:21 94:24 95:2,25
**clear**  30:2 84:10 93:9,14
**client**  20:5 69:9 87:14,22
**close**  60:10 67:25 69:18 96:24
**closer**  68:25 69:20
**closest**  54:9 66:24 67:2 106:6,23
**clothing**  35:3 55:8 55:15
**coaching**  70:6,8,11 70:11,14
**code**  119:18 123:9 123:12,19,20
**college**  10:3,11,21 10:24 11:2,5,8,11 12:24,25 13:5 33:13,18
**colson**  27:17,25 28:10,15,21 43:13 43:18,22 44:24 45:4,10,16 46:12 46:17 50:1,16 51:3 97:20 98:19 107:10 108:22 114:9 115:11
**come**  14:16 43:10 85:11
**comes**  93:10
**commencing**  2:8
**comment**  7:14
**commission** 121:25 122:25
**communication** 87:14
**communications** 20:5 87:19,23 88:24

**company**  12:4 79:21
**compel**  89:17
**complete**  7:17 8:21 9:1
**completed**  20:15 123:7,17 124:6
**completion**  124:10
**complied**  19:20,23
**compound**  96:23
**computer**  17:16 17:17,21,24 18:3 18:11,13 38:7 60:2 77:15,18,21
**conceivable** 104:15
**concern**  20:7
**concerned**  20:4
**concerning**  45:11
**conclude**  119:22
**concluded**  120:6
**concludes**  120:1
**cones**  93:24
**confidential**  81:4 86:17
**confirm**  73:6 116:4
**conjunction**  80:16
**connection**  27:2 36:23 47:1 50:11 50:15 51:1,12 72:15,19 78:9 80:7 81:10,13,20 100:8 112:11,14 113:14 115:14,18 118:22
**connie**  1:4 4:16 5:12 21:9,16,25 23:14 24:8,15,25 41:22 42:1 60:10 66:20 67:12 71:18

Veritext Legal Solutions
866 299-5127

[connie - days]

79:2,11 92:2,8,21
106:22 107:4,8
108:17,21 109:9
111:3 114:18
118:22,24 119:3
119:10
**consistent**   53:11
**consisting**   121:9
**contact**   123:9
**contacted**   111:21
111:25 113:25
**contain**   22:25
38:10 89:14
**contained**   20:4
54:23 92:9 121:11
121:13
**container**   21:9,16
22:1 24:17 25:1,4
79:10,14 90:23
91:3,8,15,18 96:13
96:25 108:16,20
109:9
**containers**   109:17
**contains**   22:23
122:15
**content**   21:12
**contention**   100:18
100:20 105:15,18
106:7
**contents**   121:10
**continue**   4:11
**contributed**   90:25
**conversation**
44:11 45:16,20,24
46:3 48:16 88:19
89:14 114:10,13
115:4
**conversations**   4:6
45:25 46:1 88:5
88:10,12,15 89:4
89:19 114:8,17,21

**conveyed**   87:13
**copy**   84:7
**corp**   123:4 125:1
**corporation**   1:7
1:12 2:1,4,14 4:17
**correct**   12:9 14:13
18:14 20:2,18
26:8 28:12,22,25
30:4 33:18,25
37:8 40:10 43:11
43:19 45:11 49:2
49:14 53:14,25
54:20 55:6 57:18
59:23 65:11 66:2
66:16 67:5 72:18
72:20 73:9 77:14
80:24 83:3 90:9
99:16 104:17
108:24 119:20
121:15
**corrected**   12:10
12:19,22 121:14
**correcting**   12:3
**corrections**   121:16
123:14,15 124:3,4
**correctly**   13:21
55:8
**correspondence**
41:12
**counsel**   4:15 5:5
6:22 7:5 123:18
123:21 124:7
**counsel's**   88:8
**counter**   64:17
65:5,16 73:21
106:23 109:20
116:7
**counters**   63:13
64:1
**county**   2:7 121:3
122:3

**couple**   118:20
**court**   1:1 2:6 4:18
5:1,15 6:25 7:6,20
8:2 13:23 86:10
86:14
**courtesy**   7:23
**cover**   15:1,2
100:10 103:11
104:2,3,25 105:22
117:5 118:1
**coverage**   44:20,21
46:14,18 47:6,7,9
47:15 48:6,10,12
48:14,20,22 49:6
49:11 50:4,8,17,20
50:24 51:9 84:15
92:4,6 99:8
101:20 103:13
105:13 106:1
109:1 112:6,8,22
115:3,3 118:8
**covered**   14:5
82:21 88:25 89:8
105:5,10,24
**covering**   82:18,24
97:10
**covers**   105:3 117:6
**covid**   97:24 98:15
**crash**   96:25,25
**crashed**   96:13
97:7
**creation**   93:3
**credibility**   7:15
**crosstalk**   6:10
10:15 15:19 22:9
49:20 50:10 59:16
62:18 70:9,13
77:8 81:3 83:17
88:1 89:1,11
102:17 106:12
112:23

**csr**   1:25 122:23
**current**   9:12,13
39:2
**cursor**   66:24 67:4
67:7,18,23 68:24
69:2,12 71:20
72:23
**customer**   96:13
**cv**   1:5 4:19

**d**

**d**   3:1,13 4:1 82:7,8
89:21 91:22 97:10
**daily**   16:17 17:3
95:9 106:9
**date**   22:17 32:18
39:13 45:13 49:23
49:23 68:15 89:9
112:16 114:12,15
123:16 124:5
125:24
**dates**   39:22 75:6
98:11 113:17
**day**   2:8 15:11
27:21 28:8,11,16
28:19,22,25 29:4
31:17 39:9,20
40:13 46:2 49:4
66:11 77:9 78:9
90:2,7,24,25 93:25
95:8 98:4,7,8
104:17 105:24
106:5 111:22
121:8,21 122:19
**daylight**   2:9
**days**   16:2,6,7,8
20:14 24:20 25:9
26:23 39:13,13,18
39:20 40:2,5,7,9
40:16 41:25 43:19
74:16 78:22 99:4
99:7,9,10,13,20,21

Page 6

[days - eight]

99:22 100:6,11,24 101:8,14
**deal** 30:19
**dealt** 89:18
**debris** 93:9
**decide** 7:11 45:23 57:20
**decided** 50:18
**declaration** 3:16 110:18,23 111:1
**defendant** 2:19 3:14 82:10
**defendants** 1:9
**defined** 37:12
**definitely** 6:19
**definition** 24:24 25:6 52:20
**delete** 78:20
**deleted** 78:16,18
**demand** 84:19
**department** 17:8
**depend** 40:5 63:5 65:19,20 100:1
**depends** 40:1
**depict** 56:1 71:12
**depicted** 103:24 118:24
**depicting** 56:11 100:5 102:20 103:5 104:16 107:8 108:16,20 109:8 116:25
**depicts** 66:9 71:15
**deponent** 5:14
**depose** 86:24 121:6
**deposition** 1:12 2:1,3 3:13 4:10,14 4:20 6:6,12,15,20 9:9 19:12 20:11 20:17,24 21:20

23:4,9,11,18 24:12 26:24 27:2 30:3 55:21 71:7 75:25 80:7,16 82:8,10 86:11 87:18 97:9 108:1 120:6 121:8 121:10 122:9,12 122:16 123:19,22 123:24 124:8,10
**depositions** 9:3
**describe** 32:12
**described** 27:5 83:13
**describes** 82:15
**describing** 64:13
**description** 22:18 22:20,25
**descriptions** 34:23
**designate** 86:16
**designated** 30:15 37:7
**designee** 2:4
**despite** 86:14
**details** 98:18
**detergents** 55:11
**determination** 50:24
**determine** 17:1 39:12 48:22 49:5 51:8 75:13
**determined** 123:18,22 124:7
**developing** 11:19
**development** 9:23
**devoted** 22:4
**difference** 8:7,15
**differences** 59:14
**different** 9:22 10:3 11:12 14:6,8 15:1 31:21 34:18 36:15 56:20,21 58:21,24

59:2,8 65:21 75:15 80:17 94:23 96:3 100:13 103:8 117:6
**difficult** 67:17
**diploma** 33:21
**directed** 41:12
**direction** 122:14
**directly** 50:23,25 55:8
**director** 42:7,8,13 42:15,23
**discovery** 81:6 84:20
**dish** 55:11
**display** 38:25
**displayed** 38:15 39:1 60:13
**dispute** 23:7
**distance** 105:3
**district** 1:1,2 4:18 4:18
**division** 1:2 4:19
**document** 29:2,3 50:7 80:8 84:19 84:25 88:5
**documented** 83:20
**documents** 3:14 24:11 51:7 80:6 80:10,15 81:5 82:11
**dog** 82:7
**doing** 49:13
**dome** 52:17 73:17
**domes** 52:3,11,12 52:14,23 53:5,11 53:12,16,21 73:9 73:12,21
**door** 94:23
**dot** 68:25 69:17,19 69:20 70:15

**double** 25:22 90:11
**downward** 61:8 64:17 73:4
**draw** 69:22
**drive** 2:15
**drop** 94:21
**droppage** 25:2
**dropped** 79:10 90:24
**dropping** 25:4
**due** 97:24
**duly** 5:19 121:5 122:9
**dummy** 52:3,10,12 52:14,17,22 53:5 53:11,12,16,21 73:9,12,17,21
**duties** 9:19 42:17 46:3
**duty** 29:11 42:6 46:9 48:5 107:12 109:3

| e |
| --- |

**e** 3:1,2,7,16 4:1,1 6:1 25:22 29:15 42:11 44:19 74:19 80:10,23 97:12 107:25 108:1 109:25 123:9,12 124:1 125:3,3,3
**earlier** 80:11 103:15
**easier** 82:5
**easily** 85:12
**education** 32:22
**edward** 25:22
**egerer** 2:20
**eight** 9:17 15:6 16:16 18:23 34:10 62:2

Page 7

[either - follows]

| | | | |
|---|---|---|---|
| **either** 25:4 67:3 76:18 | **examination** 5:23 83:15,19 86:4 97:11 | 69:6 | **fine** 70:23,24 |
| **employed** 28:14 34:25 44:3,8 | **examined** 122:8 | **f** | **finish** 7:22 85:4,5 85:12 111:9 |
| **employee** 81:21 96:14,16 | **example** 30:18 | **f** 6:1 | **firm** 4:24 5:1 |
| **employees** 81:21 95:6 98:10 | **excuse** 37:20 39:23 61:1 72:24 74:21 95:18 | **facsimile** 2:17,22 | **first** 5:19 9:9 18:4 18:18 34:25 35:11 35:11,12 37:10 |

**either** 25:4 67:3
76:18
**employed** 28:14
34:25 44:3,8
**employee** 81:21
96:14,16
**employees** 81:21
95:6 98:10
**encumber** 7:24
**engage** 9:25
**ensure** 36:8
**entered** 19:11
**entire** 35:3,4 94:17
**entitled** 2:10 6:24
8:6
**errata** 123:14,16
124:3,5
**esq** 2:15,20 123:1
**estimate** 8:13
37:25 53:2,4
63:20,22 68:4,23
69:14,16,24 70:3
70:15,16,19 72:4
113:20
**estimates** 8:6
**estimation** 45:6
**et** 1:8 4:17 9:23
**etehad** 2:14
**etehadlaw.com**
2:17
**event** 122:18
**exact** 6:18 13:15
26:1 37:24 38:2
43:5,15,17 44:4
45:13 47:2 62:24
91:3 94:12,16
98:11 112:20
114:10
**exactly** 10:10,17
10:20 31:11 33:9
69:21

**examination** 5:23
83:15,19 86:4
97:11
**examined** 122:8
**example** 30:18
**excuse** 37:20
39:23 61:1 72:24
74:21 95:18
**executed** 86:9
**executive** 9:10,14
9:18 10:12 14:21
14:23 15:4,7 16:3
18:24 31:10 34:15
34:18 35:2,6,10,21
36:24 91:6 92:10
92:23 106:3
**exhibit** 3:9,10,12
3:13,16 23:3,4,9
23:11 55:20,21
62:7 63:9 66:19
68:2,20 71:7,9,9
71:10 72:2,16,20
72:22,24 82:6,7,8
87:6 89:21 91:22
97:10 107:25
108:1 109:25
**exist** 76:20
**existed** 53:6
**expect** 43:3,9
96:15 97:1,7
**expected** 54:14,19
55:2 56:10 57:1
**experience** 11:19
93:10
**expires** 121:25
122:25
**explain** 8:7
**explanation** 31:5
**express** 14:22
**extent** 8:3 11:15
47:18 53:6 57:24

69:6

**f**

**f** 6:1
**facsimile** 2:17,22
**fact** 39:13 86:14
105:19
**fair** 65:4,8,13 76:6
98:3
**fall** 21:9,25 24:8
24:16,25 25:3,5
41:11,22 42:1
45:20 46:4 53:13
54:24 60:11 66:21
69:11 71:17 72:5
75:9,12 79:12
90:25 108:17,21
109:10 111:22
112:1,4 114:24
**familiar** 54:25
55:24
**far** 20:15 68:1
110:5
**federal** 124:1,8,9
**feed** 17:8
**feet** 53:17 64:10
64:10,11,12,13,19
65:11 116:9
**fellow** 81:21
**field** 60:5,13,25
61:9,20,22 62:13
62:20 63:17,22
64:2,4,19,25 65:6
65:14
**file** 84:18
**filed** 4:17 86:10
**finalized** 81:25
**financially** 5:3
**find** 75:18 76:2,16
76:17 90:3,16
105:20 107:4
112:4

**fine** 70:23,24
**finish** 7:22 85:4,5
85:12 111:9
**firm** 4:24 5:1
**first** 5:19 9:9 18:4
18:18 34:25 35:11
35:11,12 37:10
45:7 60:24 111:25
113:13 121:5
**five** 16:6,8 20:14
30:19,23 31:23
39:13,18,20 40:2,5
40:9 43:24 44:2,7
59:13 62:8 63:3
64:18 70:21 99:4
99:7,10,13,20,22
100:6,11 111:8,9
111:19 120:3
**fix** 17:5 18:18,19
18:20
**fixed** 62:3
**flashlights** 95:3
**floor** 9:10 18:1,1
35:8 36:21 38:2
53:9 67:12 69:1
79:10 90:24 93:5
96:14 109:13
116:14 117:17
**flooring** 96:11
**floors** 93:9
**focus** 9:20 65:2
93:17
**focused** 63:7 102:9
104:9
**focusing** 104:7
**follow** 44:20 45:14
59:23 95:9
**following** 56:21
59:21 104:7
**follows** 5:21 24:24
123:8

Page 8

[food – high]

**food** 35:12,13,16
35:17
**foot** 62:8,8,8,24
63:3,4 64:8,12
105:3
**footage** 16:21
21:17 27:9 28:24
38:8,14,25 39:5,18
39:24 40:13,16,20
40:25 41:3,10
42:2 49:15 65:21
65:23 66:1,12
74:17,22,23 75:2,5
75:8,14,19,24 76:3
76:7,23 77:2,7,24
78:5,8,17,19,23
79:2,5,6,9 90:6,8
90:15,19 92:21
98:20,25 99:3,7,19
101:6,14 105:11
105:20 107:4,8
108:15,20 109:8
112:14 118:5,15
118:23 119:10
**footages** 76:1
**footprints** 67:16
110:1
**foregoing** 121:7
122:9,15
**forgot** 86:6
**form** 7:7
**formal** 32:22
33:11,15
**forth** 86:12
**forty** 38:1
**forward** 64:19
**foundation** 68:11
**foundational** 8:8
8:11 72:8
**four** 19:3 33:2
40:2,4,6 43:24

**44**:2,7 86:1 100:1
100:15 111:15
**frankly** 80:12
**frcp** 124:1
**free** 93:14
**fresh** 35:11,13,15
35:16,17,18
**front** 8:14 19:14
48:11,20 104:10
**fruit** 35:15
**full** 5:25 95:16
97:19 122:15
**fully** 8:20 36:1
**functioning** 13:20
17:2,4 18:17 54:3
**functions** 16:15
**further** 33:10
122:17

**g**

**g** 4:1
**general** 113:2
**generally** 15:16
16:2,7,13 39:3
41:12 59:6 60:18
**give** 7:17 8:4,13
15:23,23 22:18
45:6 68:15 69:15
70:18 84:21 97:19
114:16,20 118:19
**given** 8:21 9:4
120:1 121:13
**giving** 8:25
**gloves** 95:2
**go** 4:12 6:20 12:20
26:15 30:17 37:10
39:22 47:22 52:6
57:9 64:18 66:4
77:10 82:2,13
85:19 86:18 89:20
97:8 119:17

**going** 4:4 23:3,8
36:20 38:15,25
41:20 55:16,20
56:9 72:6,9 82:2,5
82:6,13 84:22
85:2,13,17,19 87:1
87:25 88:2 119:16
119:18
**good** 4:3
**grada** 61:1
**grade** 26:17
**graduate** 33:3,6
**granada** 4:23
14:14 15:5,9,17
16:5,14,18 17:15
17:18,22 18:1,25
19:8 27:21 28:1,4
28:16 31:17 37:19
37:22 38:23 39:10
39:14 40:17 42:13
42:18,21,25 43:10
43:14 51:20 52:18
52:23 53:24 58:18
58:25 59:11 60:19
61:1 62:14,21,22
63:18 64:3 65:5
71:13 73:24 74:7
74:12 76:12 77:24
79:23 93:4
**greater** 64:25
65:14
**group** 35:12
**guard** 95:23
**guess** 8:5,10
**guest** 3:16 9:20
11:18 29:5,8,9,10
46:15 47:10,11,14
48:9 57:13 63:2
74:20 81:23 83:21
93:17 106:1
115:17,22 118:9

**guests** 12:4 36:25
63:2 93:8,11,18
94:21
**guidance** 86:12
**gw** 1:5 4:19

**h**

**h** 3:7 6:1 42:11
125:3
**hallverson** 42:9
114:2
**hand** 8:8 68:1
122:19
**handbags** 35:4
**handle** 119:18
**handled** 123:8
**handling** 96:2
**happen** 35:20 94:2
**happened** 44:19
46:10 65:3 90:23
91:3 103:9 104:2
**happening** 82:23
**happens** 40:12
**hazard** 96:17,18
**hazards** 37:1
**head** 8:3 85:8
**hear** 6:9 23:24
36:17 71:23 97:7
99:12
**heard** 14:1 96:14
96:25 97:6
**hearing** 92:5
**held** 4:20 9:16
30:9 34:16 96:13
**help** 18:21 26:9
94:4 95:24 110:25
**helped** 27:9
**helping** 26:11,11
28:23
**high** 32:12 33:18
33:20,22,24 34:6

Page 9

[higher - job]

**higher**  26:17
**hills**  2:16 4:23
 14:14 15:5,9,17
 16:5,14,18 17:15
 17:18,22 18:1,25
 19:8 27:21 28:1,5
 28:16 31:17 37:19
 37:22 38:23 39:10
 39:14 40:17 42:13
 42:18,21,25 43:10
 43:14 51:20 52:18
 52:23 53:24 58:18
 58:25 59:11 60:19
 61:1 62:14,21,22
 62:22 63:18 64:3
 65:5 71:13 73:24
 74:8,12 76:12
 77:24 79:23 93:5
**hold**  19:21 85:13
 85:17
**holding**  34:14
**hollister**  2:21
**home**  102:8
**honestly**  61:14
**hopefully**  80:10,14
**hour**  2:9 85:2,5
**hours**  8:24 16:13
 16:16
**hundred**  45:14
**hypothetical**
 61:12 96:23 97:4
 105:8

**i**

**idaho**  2:8 121:24
 122:2,6,23
**identified**  65:15
 98:14
**image**  76:11
**imaging**  90:4
**immediate**  96:17

**importance**  6:25
**important**  7:16
 57:5,13,15
**inaudible**  80:13
**inception**  90:18
**incident**  3:16 21:1
 21:8,15,17,25 22:1
 22:17,21 23:1,14
 24:15,23 25:6,10
 27:4,5,7 28:11
 29:5,6,7,8,10,23
 30:19,20,24 37:11
 37:12,14,15,18
 38:9 39:19 40:20
 40:25 42:6 43:19
 43:22 44:13,14,15
 44:17,18,19,24
 45:4,7,9,12,17,21
 46:7,8,12,13,13,15
 46:17,18 47:1,2,10
 47:11,14,16 48:4,9
 48:10,23,24 49:6
 49:11,16 50:5,12
 50:15 51:2,9,13
 53:17 54:10,23
 65:24 68:7,13
 72:10 74:16,18,20
 74:24 75:4,5,11,16
 75:19,24 78:22,23
 79:15 81:10,13,20
 81:23 82:15,15
 83:13,21,22,23,25
 84:6,8,11,14 86:24
 88:23 89:5,10,25
 90:5,14,21 91:8
 92:5,6,16,19 99:5
 99:7 101:7,16
 102:5,11,20 103:9
 103:13,18,23,24
 104:1,23 105:5,20
 105:24,24 106:6

106:15 107:15
 112:5,7,11,14,15
 112:18,21 113:1,4
 113:11,14,22,25
 113:25 114:3,6,9
 114:18,22,24
 115:8,11,14,17,18
 115:22 118:3,9,16
**incidents**  45:14
**include**  16:11
 52:10,14 53:21
**included**  123:14
 124:3
**including**  89:4
 96:11
**inclusive**  121:9
**incomplete**  61:11
 96:22 97:3 105:7
**indicate**  50:7
**indicated**  47:8
 48:9
**indicating**  20:13
 29:19 51:25 63:10
 66:25 67:5,15,19
 68:1,22,22,22 69:3
 69:12,18,23 71:20
 72:23 82:23 83:10
 110:9
**individual**  15:9
 110:8,19
**information**  20:8
 32:12 47:19,21
 48:15,19 87:12,13
 106:1
**initially**  10:17
**injured**  118:4,22
 119:7
**inside**  51:19 52:1
 52:19 92:6
**inspecting**  96:5

**inspection**  96:10
**instruct**  78:7
**intend**  12:15
**interest**  122:17
**interested**  5:3
**interfere**  4:9
**interference**  4:7
**interrupt**  47:17
 57:11
**interrupted**  26:15
**interrupting**  47:23
**invades**  43:8
**investigation**
 21:18 22:1 23:13
 24:8 25:3 30:20
 30:24 44:22 46:7
 72:10 87:17 89:24
 118:2
**involved**  21:17
 41:21 79:15 91:8
 113:13
**iran**  32:15,15,20
 32:23 33:11,21
 34:8
**items**  63:2

**j**

**j**  6:1
**jackie**  2:24 4:24
 85:6
**jafari**  1:13 2:4 3:3
 4:14 5:18 6:1
 67:22 85:6 87:5
 88:8 120:2 121:5
 121:19 123:5
 125:2
**jemx**  1:5 4:19
**jennifer**  42:9
 114:2
**jewelry**  35:4
**job**  118:1,2 123:5

Page 10

[jonathan - little]

**jonathan** 27:8,10
27:25 28:10,13,15
28:21 43:13,18,21
43:23,25 44:24
45:3,10,16 46:12
46:17 49:3 50:1
50:16,19,23,25
97:20 98:4,19
107:10 108:22
114:9 115:2,10
**jonathan's** 27:16
**jump** 80:9
**june** 21:1,15 24:16
24:25 27:20,24
28:3,19 29:4,16
30:7,12 31:8
37:22 39:4,8
41:22 42:8,13
45:9,11 48:23
49:7,10 50:2,15
51:2,12,15 52:22
53:6,17,20,24 54:3
54:12,18 56:12
57:2 59:11 60:11
60:18,25 61:22
62:13,22 63:17
64:2,25 65:3
69:11 73:8,16,20
73:23 74:7,13,16
74:23 75:22 76:4
76:8,10,11,22,24
77:18,21,24 78:5,8
78:17 79:3,7,12,19
79:24 90:7,15,18
90:20,25 92:3,9,22
93:13 94:10 95:5
95:19 96:5,10,16
97:16,19,22 98:3,9
98:13,21 100:4,17
100:22 102:11
104:17 106:5,13

106:25 107:5,9
111:22 112:11
113:11 114:24
115:19,21 116:12
117:1 118:15

**k**

**keep** 36:20 45:15
45:19,23,25,25
46:6,8 92:19 99:7
99:8 103:3 119:9
**keeping** 118:5,23
**kept** 96:9 115:8,10
115:13
**kidding** 85:18
**kind** 10:2 13:13
55:12 105:12
**kit** 44:22 48:11,20
106:1 107:19
**know** 6:21 8:12
14:19,20 20:6
25:24 27:4 30:12
31:7 37:13 38:2
41:16 42:16 43:6
43:12,24 44:2
47:14 48:14,19
49:22,22 51:15
53:5,13,16 54:11
54:22 56:17 58:1
60:15 62:5,12,20
63:17,23 64:4,14
66:19,23 68:3,5
69:13,15,15,21
70:11,17,17 71:22
71:25 72:9,13,15
72:18,21 74:5
76:9,13 78:4
79:21 80:1 87:2
90:11,23 91:2,14
91:17,20 97:5
98:1,7,17,22 101:2
101:5,13 103:5,15

103:17 104:4,6,20
104:21,22 105:25
105:25,25 106:2,4
106:14,19,21
107:7,13 108:7,8,9
108:18 109:11,13
109:15 110:5,13
110:21 113:23
114:1 121:10
**knowledge** 8:9,11
42:11 107:16,18
108:23 109:6,7
114:25
**knows** 10:20

**l**

**l** 6:1,1 25:22 27:19
42:11,11
**label** 56:9
**labeled** 67:1
**laleh** 1:13 2:4 3:3
4:14 5:18 6:1 9:11
12:20 15:22 20:8
21:10 23:22 30:1
47:17 61:13 72:12
82:22 83:1 87:12
88:4 89:12 107:21
120:2 121:5,19
123:5 125:2
**lane** 56:8 63:3
66:22,25
**lanes** 56:6 103:10
**larger** 65:6
**larry** 25:23
**laundry** 55:11
**law** 2:14 6:25
**lead** 110:5
**leader** 9:14,19
10:12 14:20,21,24
15:3,5,8 16:4
18:24 29:11 31:10
34:16 42:5 46:9

47:16 48:4,24
91:7 92:11,24
93:3 106:4 107:12
109:3
**leaders** 11:13
**leadership** 11:12
**leading** 75:15
118:13
**learning** 12:2,3,10
12:11
**leave** 15:2 43:2,3,6
43:10
**led** 79:11 108:17
108:20 109:9,9
**left** 43:16 44:5,5
55:9 86:3 98:17
109:18 110:1
**legal** 2:6 4:25 5:2
120:4 123:7
**length** 8:14
**letter** 42:1,3 91:19
92:12,25
**level** 18:4,4,6,9,10
**levels** 18:8
**line** 31:10 35:2
123:15 124:4
125:4,7,10,13,16
125:19
**lines** 9:10 34:19,21
55:15 56:8
**liquid** 25:2 67:11
71:18 93:9
**list** 38:7,7 82:13
**listed** 82:3
**listen** 56:25 113:7
**literally** 94:2,19
**little** 20:3,4 51:25
62:3 63:3 67:14
87:10 94:22
117:18

Veritext Legal Solutions
866 299-5127

**llp** 2:20

**located** 4:22 16:5
17:14,25 18:3
19:6 53:6 58:17
59:7 62:6 71:19
79:18,22 100:7
102:21 103:4,16
103:18,23 104:16
104:23 105:5
109:17 116:25

**location** 14:9,11
17:7 36:16,21
51:18,25 52:17
53:17 54:9 56:14
56:20 60:1 73:25
102:8 105:1

**locations** 52:9,13
58:25

**locked** 123:12
124:1

**long** 9:15 11:7
15:4 25:24 33:8
39:23,24 95:8
99:24

**longer** 28:13,14
43:13 98:2 99:23
118:6,11

**look** 17:8,16 18:12
24:5 27:3 38:24
39:5,18 50:8,16,19
51:7 55:24 66:1
66:11,13 67:1
68:6 74:23 75:6
76:15 91:21 97:13
101:24 107:8
108:19 112:5,21
116:1

**looked** 20:17
38:13 49:23 50:2
50:3 68:12 75:1,5
75:23 76:18 84:25

**looking** 8:5 16:20
20:12 29:17,18
40:23 51:11 55:7
56:3,5,21 59:1,15
59:18,20 62:6
70:2 75:8,10,13
86:4 90:16 100:19
102:2,11 105:12
106:14 107:4
109:25 112:13
115:22

**lose** 40:14

**lot** 13:8 86:21

**loud** 96:25 99:10
106:20

**luis** 3:17 110:15,18
111:1

**lunch** 85:2,7

**m**

**m** 3:2 29:15 36:4

**mail** 44:19 74:19
80:23 97:12

**mailed** 80:10

**main** 9:20 14:22
56:5,10,11,19 57:1
57:22 60:8,18
62:1,6 63:6 73:7
73:12,18 93:14,16
94:13,15 95:4,20
96:5,11 100:3,5,8
100:9,14,19,24,25
101:6,15,25 103:8
104:10,13,16
116:23 117:1,6,13
117:15,15,16,20
117:25

**maintaining** 99:3

**maintenance** 93:5

90:18 97:1 98:20
98:24 109:8 115:2

**major** 35:19

**making** 13:20
36:25 37:1 93:7,9
93:13 95:16

**manage** 42:18

**manager** 31:16

**manually** 18:20
50:3 59:23

**manufacturer**
74:3,4 97:16
116:15

**manufacturing**
74:11

**march** 32:19

**mark** 23:3 55:20
82:5,6 107:25

**marked** 23:9,11
55:21 67:15 71:7
82:8 94:20 108:1

**marks** 31:25 32:4
70:25 71:4 85:21
85:25 111:14,15
111:18

**maryann** 1:25 2:6
5:1 85:6 122:5,23

**material** 91:5 94:8

**materials** 93:21
94:6,24 95:1,3

**matrix** 35:23 36:3

**matter** 2:10 4:16
6:8,12 21:2 24:9
37:2 53:14 54:24
75:19,20 94:3
95:10

**matters** 83:15,18
97:11

**matthews** 1:25 2:6
5:1 10:21 48:1
95:11 122:5,23

**meal** 85:5

**mean** 14:3 26:10
36:11 56:18 57:11
72:18 76:18
114:20 115:25

**means** 53:23

**meant** 22:11 81:17

**media** 4:13 32:1,5
71:1,5 85:22 86:1
111:15,19 120:3

**medication** 8:25

**members** 26:18
93:23 97:20 98:1
98:5,13,16,24
108:19

**memory** 68:10,20

**mention** 30:20
99:9 103:9 105:21

**mentioned** 33:20
34:21 54:7 58:5
62:25 63:5 65:11
74:19 75:4 90:1
93:17 95:25 98:15
99:4 101:1 103:7
104:25 109:4
116:13 117:4,9,17

**merchandise** 63:8
104:8

**merchant** 34:19

**microphones** 4:5,9

**middle** 6:2,4

**minute** 31:23
70:21 111:8

**minutes** 65:20
85:7 111:10

**missed** 10:20
13:24 34:22

**misstates** 69:25
102:13,23 103:21

**mistake** 12:14

**monday** 2:8

[monitor - okay]

monitor  16:17
  62:3
monitored  95:6
monitoring  65:23
  66:10
month  68:15
  112:11 115:18,21
monthly  13:9
  106:8
months  43:24,24
  44:2,2,7
morning  4:3 23:18
  80:20
move  53:12 56:20
  59:8 65:1 83:1,2
  89:17 104:6
  108:13
moved  59:2,20,23
  60:4
movement  59:25
  60:1
moves  35:19
moving  56:16,18
  58:6,7 59:4 60:24
  106:8 117:10
mute  96:22
muted  111:11

**n**

n  3:1,2,2 4:1 25:23
  27:19 29:15 42:11
name  4:24 5:25
  6:2,4 8:10 12:23
  13:15 14:6,9,10
  25:14,18 27:16
  28:23 29:3,14,20
  31:11 33:23 42:10
  97:25
named  58:15,16
  121:7 122:8,13
names  97:20

naming  13:21 14:4
narrative  11:16
narrowed  92:19
nature  7:13 13:17
near  70:15 72:23
  72:24 103:9,23
nearest  109:22
necessary  123:14
  124:3
need  15:20 21:22
  30:3 55:4 84:5
  93:21 94:6 106:11
  117:24
needed  35:20
negative  90:12
never  95:22 96:7
  102:1
new  103:19 119:5
nods  8:2 85:8
noise  99:10,11
  106:20
non  65:5 102:5
  104:12,15 105:4
  116:25 117:13,25
normally  41:11
  112:9
notary  2:7 121:24
  122:6,23
notating  123:15
  124:4
note  4:5 86:6
notebook  3:9
  19:17,19,24 20:4,6
  20:14,17,20,25
  21:15,20,24 22:23
  23:13,17 24:6
  87:10
noted  47:7 48:7,12
notes  19:14,16
  20:12,15 21:21
  22:21 45:15,20,23

46:1,2,6,8 87:10
  88:5,18,22 89:3,16
  115:7,10,13
notice  3:13 74:15
  78:21 80:17 82:9
noticing  5:10
notified  40:15,20
  40:24
number  6:18
  30:19,23 32:1,5
  38:2 64:24 71:1,5
  83:9 85:22 86:1
  87:8 91:22 94:12
  94:16 111:15,19
  120:2 123:15
  124:4
numbered  121:9
numbers  37:24

**o**

o  3:2 4:1 25:23
  27:19,19 42:11
o'clock  85:11,12
oath  6:23,24 7:1
  32:8 121:6
object  11:15 12:18
  12:18 47:18 55:5
  72:7 83:14 84:3
  96:22 113:16
objection  15:12
  16:19,22 17:20
  34:11 37:5 38:16
  38:18 41:4,14
  43:7 51:21 54:4
  56:13 57:6,10,24
  58:19 60:14,20
  61:11 62:9 64:5
  65:17 66:3 69:6
  69:25 71:21 78:24
  91:9 92:13 97:3
  101:9,17 102:13
  102:23 103:20

104:18 105:7
  106:16,24 107:1
  108:11 117:2
  118:25
objections  5:8 7:6
  88:9
obligation  91:18
obligations  91:6
obtain  33:1
obtaining  119:4,5
occurred  22:19
  28:11 45:9 66:21
  69:11 72:5,15,19
  76:8 101:7,16
  103:19 104:24
  111:23
occurs  118:3
october  1:14 2:8
  4:4 35:1 121:8
  122:19 123:3,5
office  17:23,23
  41:10 84:9 86:10
  86:10 123:11
oh  26:14 29:9
  36:20 67:20 82:19
  114:14
okay  10:23 15:16
  17:14,25 19:6
  23:5,6,9 25:7,8,9
  29:9,24 30:4,5
  31:22,23 32:9,14
  32:22 34:9,14
  36:20 38:6,22
  39:3,8 40:7,12
  41:22,25 45:9
  46:25 51:1 52:4
  52:22 55:2,18,24
  56:9,10 57:4 59:6
  60:4,9,11 61:19
  63:9,15 64:23
  65:10 66:15,19,23

[okay - plaintiff]

67:4,7,10,22,25
68:19 69:2,10,22
70:21,22 71:8,9,15
71:17 72:14,22
73:6,16 74:6 77:1
77:6,17 79:1
80:19,23 82:2,6,13
82:14 83:7,9,24
84:2 86:3,22 87:3
88:7,12 89:17,20
90:17 93:12 99:18
100:3 107:3
109:12 110:5
111:8 114:14
119:13
**once**  86:18 112:19
119:9
**one's**  65:22 66:10
**open**  19:21 20:21
20:23 21:19 94:23
**operated**  13:2
**operation**  34:23
34:24 35:23 36:3
36:11,14,15
**operationally**
35:24 36:9
**operations**  34:19
35:22 36:2,24
90:15
**opportunity**  7:8
7:13
**opposed**  58:24
99:20
**order**  15:7 25:21
79:18 86:9,13,20
**ordinary**  84:19
**original**  123:10,21
**outcome**  5:4
**outside**  47:20
48:16

**overhead**  56:11
57:1 66:9
**overlooking**
100:24 101:6,15

**p**

**p**  4:1 29:15 58:11
**p.m.**  85:22,24,24
86:1 111:16,17,17
111:19 120:1,6
**pacific**  2:9
**package**  74:20
**page**  3:3,8,11,12
21:19 24:3,4,5
123:15 124:4
125:4,7,10,13,16
125:19
**pages**  3:9,15,17
22:4 80:20 121:9
123:14,17,17
124:3,6,6
**paper**  94:24
**paragraphs**  22:10
22:12,16,24 23:5
23:19 24:1,3,4,7
87:6,9 89:4
**parking**  18:5,5
**part**  12:7 18:22,23
26:14,16,19 31:1
31:14 36:13 43:13
47:12 49:6,9,24
50:5 75:8,19 76:7
76:23 78:5,17,23
79:3 88:23,23,24
90:5,6,13,19 91:6
92:10 93:2,10
96:15 97:14,22
98:9,20 100:14
104:13 109:4
117:16
**particular**  66:12

**parties**  4:11,21
**partner**  48:5,25
49:3
**parts**  119:5,10
**party**  5:3
**pasadena**  11:4,8
11:11 33:14
**pattern**  107:17
**paul**  58:11
**pause**  15:23
**pay**  26:17
**pdf**  123:12 124:1
**peer**  31:18,20
**peers**  15:2 35:24
36:6,8
**penalty**  123:16
124:5
**people**  7:21 18:22
31:13 91:25 107:7
**percent**  45:14
**perform**  15:7
**performing**  16:14
**period**  39:6 99:25
100:4,23 118:6,6
123:18 124:7
**perjury**  123:17
124:6
**person**  15:21
28:23 37:3 42:5
64:18 108:16
109:8 118:4,22
**personal**  20:13
87:9 88:10,12,13
88:22 89:3 107:16
107:18 108:23
109:6,7
**personally**  18:20
18:21 48:22 49:10
51:3,11 91:24
**persons**  90:6,20

**pertain**  20:25 21:6
21:8 22:16 24:7
**pertained**  90:21
**pertaining**  21:15
24:24
**pertains**  21:25
23:13,18
**phone**  29:19
**phones**  4:8
**photograph**  3:10
3:12
**photographs**  3:16
**photos**  68:6,12
**physical**  59:25
**physically**  16:4
**pick**  4:6 57:16,17
**picks**  118:4
**picture**  37:11 55:4
55:17,22 56:23
84:7 108:2,5,10
109:12,14,17,18
110:4,11 117:7
**pictures**  37:14
69:8 82:14,18,20
82:23 83:12,21,25
84:6,8,12,16,25
91:22
**pittmen**  29:13
31:9 42:25 48:9
49:1 50:21 51:2,5
51:8 81:24 86:24
107:12 114:5
115:14
**pittmen's**  30:8,11
**place**  4:8,11 53:13
95:5 102:1 118:15
122:13
**placing**  79:17
**plaintiff**  1:5 2:5,14
4:15 5:12 91:23
92:1

Veritext Legal Solutions
866 299-5127

[players - question]

players 31:3
please 4:5,8 5:8,16
  5:25 10:6 11:22
  15:21 16:24 19:22
  21:13 23:4 24:18
  27:18 42:10 68:10
  102:18 103:6
  115:20
pm 80:16
pmk 9:4
pmq 9:5 37:2 72:9
point 78:15 86:20
  86:23
pointed 61:7,8,24
  73:4 102:7
pointing 56:22
  61:4 62:6 64:17
  100:11 102:2
  103:12 104:9,10
  105:1
policies 12:11 93:4
  93:12
policy 93:16 95:8
  95:18,20,23 96:4,8
  96:15 99:3 118:5
  118:14,14,21
  119:9
portion 63:7 71:12
  94:22 117:14,21
portions 86:19
position 9:7,12,13
  9:16 26:6,6,7,8
  30:8,11 31:8,11,20
  34:15,18 76:14
  91:17
positions 34:16
possibly 98:19
practice 78:12
  107:17 113:3
preliminarily
  86:16

preliminary 86:5
prep 20:6
preparation 24:11
prepare 47:12
  87:17 110:25
prepared 7:7,12
  19:16 29:9 81:13
  81:20,20,23 86:24
  87:7
present 5:5 9:8
  26:5 51:3 75:23
presently 37:2
  76:6
preservation
  91:19 92:12,25
preserve 23:4
  40:16,20,25 41:2
  41:10 42:2 74:17
  75:14
preserved 39:24
  66:1
prevent 8:25
previous 9:3 34:16
  59:17
previously 12:12
  39:21 48:13 53:19
  64:16 72:1 73:11
  81:6 85:1 99:2
price 36:16,19,20
prior 20:23 34:14
  35:19 86:25 122:8
privacy 43:8
private 4:6
probably 10:19
  82:19
procedure 96:1,4
  96:15 123:19,20
procedures 80:13
  93:4,13
proceed 86:11

proceeding 5:8
process 35:20
  36:22 91:2
produce 80:15
produced 30:25
  80:6 81:6 83:12
  84:16,19
producing 80:17
  81:8
production 3:14
  80:21 81:4 82:10
  84:25
professional 2:14
progress 13:21
promptly 96:18
properly 17:2
propounded
  121:12
protecting 11:23
  11:24 12:2,8
protection 9:14,18
  14:19,21,24 15:5,8
  16:3 18:24 25:13
  25:15,16,25 26:4
  34:15 48:6 91:7
  92:11,23 93:2
  106:3
protective 86:9,13
  86:20
protocol 40:17,21
  45:19 78:11
provide 47:20,22
  48:17 114:20
provided 20:9
  123:19 124:8
providing 9:20
  11:18 12:4 93:8
  93:10
ptz 58:8,12,13,15
  58:17,24 59:6,10
  59:14,20 60:7,21

60:23,25 61:8,22
  62:15 63:5 65:14
  74:1 99:22 100:6
  100:8,10,19
  101:20,25 102:1,5
  102:11,20 103:4
  103:12,16,18,24
  104:2,3,12,15,23
  105:1,4,15,15,16
  105:19,21,23
  116:6,24,25 117:5
  117:13,20,25
public 2:7 121:24
  122:6,23
purchase 79:18,22
  79:25 80:3,5
purchased 44:12
  80:4
purpose 56:21
  57:23 59:20 95:14
pursuant 119:18
purview 14:17
put 19:22 68:24
  86:7 104:8
putting 63:2

q

qualified 37:3
  82:3
question 8:3,19,20
  15:23,25 20:16
  21:11,22,23 22:22
  30:23 34:2 38:21
  41:13,18 43:8
  47:1,25 48:2
  49:19,21 50:18
  52:16 56:25 59:17
  61:15 62:20 64:14
  72:12 84:4 89:2
  98:4 101:12 102:6
  102:20 103:2
  104:17 105:2

Page 15

[question - reported]

106:13 107:22,22
108:14 113:7
116:2 118:19
**questioned**  108:25
109:2
**questions**  7:4,4,23
72:8 113:8 119:14
121:11,12
**quick**  111:13
**quickly**  32:11
**quote**  30:24

**r**

**r**  2:20 4:1 6:1 36:4
42:11 123:1 125:3
125:3
**r&s**  124:1,9
**range**  19:2 116:8
**read**  13:23,25 14:2
48:3 72:12 87:6
87:10,15,18,20,22
88:3,5,9,11,14
95:11,13 121:10
**reading**  123:23
124:9
**realize**  82:20
**reason**  7:16 78:15
117:23,24 125:6,9
125:12,15,18,21
**reasons**  72:8
**recall**  6:18 13:15
23:16 27:23 28:6
28:17,20 31:11
33:9 37:24 39:7,8
39:11,16 40:24
41:8 44:9,25 45:2
45:5,13 46:11,25
47:2,4,5 49:8,13
49:24 50:6,14
51:4,6,11,14,17
53:1,3,7,18 54:6
54:13 55:8 58:3

58:14 60:16 61:3
61:24 63:8 65:1,2
67:13 73:10,15,19
73:20,22 74:14,15
74:18,25 75:3,6,6
75:20 76:25 77:20
77:22 78:10,21,25
79:1,4,5,8,9,13,16
79:20 90:22 92:5
99:1 104:14
106:18 107:6
111:24,25 112:2,3
112:10,13,15,18
112:20 113:13,17
114:4 117:10
**receipt**  92:12,24
**receive**  44:18
80:20
**received**  13:6,13
13:18 41:11 42:3
80:14 97:12
**receiving**  74:15
91:19
**recollection**  113:3
113:9 114:16
**record**  4:4,12 5:7
7:24 14:2 32:2,6
48:3 71:2,6 85:14
85:17,19,23 86:2,7
87:3 95:13 111:16
111:20 119:17,25
122:16
**recorded**  4:14
**recording**  4:10
**records**  96:9
**recycled**  39:25
**recycling**  39:23
**red**  17:4,6,7,8,10
18:16 67:15 68:1
68:25 69:17,18,20
70:15 71:19 72:2

110:1,8
**reduced**  122:14
**referenced**  123:6
**referred**  56:24
**referring**  23:5
24:4 49:1 55:19
58:7 60:6 62:15
80:21 100:12
**reflect**  7:14
**refresh**  68:10,20
**regard**  6:14 88:13
**regarding**  13:14
13:18 21:8,8
22:23 23:7,14,14
24:9,15,22,25 25:1
25:4 26:23 45:15
45:20 68:6,12
75:9 78:23 88:23
89:5,25 90:5 93:5
99:3 101:15
113:10 114:2,5,9
**regardless**  6:21
21:7 76:8 90:4,17
90:20
**regards**  6:8,13
48:6 74:18 95:9
**register**  59:19,19
63:1,1 64:18 74:1
101:22 109:22,22
110:6
**registers**  58:4
59:18 101:24
**regular**  26:17
59:15 60:22 117:6
**related**  5:2
**released**  123:21
**relevance**  108:9
**relevant**  34:4
118:13
**remains**  56:19

**remember**  9:9
10:10 27:5,8 33:3
38:3 75:21 87:9
95:9 98:18 112:2
113:12 114:7,8,10
114:12,13 115:17
115:22 116:1,2,3
**remembered**  2:3
114:23
**remembering**
117:10
**remembers**  27:4
**reminder**  22:21
**remodel**  34:20,22
35:10,17,19
**remodeling**  35:14
**remodels**  35:12
**remote**  1:12 2:1,3
4:21 120:6 121:7
**remotely**  2:13
4:20,22 5:6,19
121:5 122:9
**repeat**  8:18 10:5
10:10,17 16:24
21:13 30:10 40:18
41:18 47:25 48:2
51:23 56:2 74:9
115:20
**rephrase**  8:19
**replenishing**  35:8
**replenishment**
34:19,22 35:7
**report**  3:16 29:5,6
29:8,10,23 42:6
46:15 47:6,8,10,12
47:14 48:5,9,13
81:23 83:22 84:11
86:25 109:3
115:18,23
**reported**  1:25 46:9

Page 16

[reporter - second]

| | | | |
|---|---|---|---|
| **reporter**  2:6 5:1 | 117:3 119:1 | 83:9,16 84:21,22 | 76:23 77:2,7,17,20 |
| 5:15 7:6,20 8:2 | **response**  10:25 | 85:10,20 87:2 | 77:24 78:3 84:8 |
| 10:5,22 11:21,25 | 13:24 47:4 50:13 | 91:21 92:18 97:2 | 90:2,5,7,13 91:7 |
| 12:6 13:23,25 | 58:10 80:13 84:19 | 97:11 102:19 | 91:14 92:11,17,24 |
| 15:20,25 22:6,8 | 91:12 95:12 | 103:23 105:6,20 | 118:9 |
| 23:24 85:15 87:4 | **responses**  7:5,9,11 | 105:23 107:17 | **saving**  78:15 |
| 99:11,15 122:5 | 7:22 81:6 | 109:25 112:17 | **saw**  45:8 |
| **reporter's**  122:1 | **responsible**  9:21 | 113:2 116:9,11 | **saying**  48:8 63:25 |
| **reporting**  28:23 | 79:17 | 119:14,15 | 72:14 73:15 90:7 |
| 42:5,5 | **responsive**  81:5 | **rodeo**  2:15 | 100:7 103:3 |
| **reports**  23:14 24:9 | **result**  41:7 | **role**  9:25 15:7 | **says**  47:15 |
| 25:3 30:19 81:9 | **resulting**  79:11 | 42:12 49:9 50:8 | **sbelaw.com**  2:23 |
| 81:12,19 | **retained**  3:9 120:3 | 58:16 92:10,23 | 123:2 |
| **request**  3:14 41:9 | **retaining**  118:15 | **room**  5:5 19:9,11 | **sburnett**  2:23 |
| 82:10 | **retention**  40:14 | 35:9 36:16 | 123:2 |
| **requested**  120:8 | 99:14,18,20,21,22 | **routine**  49:25 75:3 | **scene**  54:9 60:10 |
| 124:1,9,10 | 99:25 100:4,12,16 | 75:7,7,9 95:7 | 103:6 106:15 |
| **requests**  80:8 | 100:23 101:4,6,14 | **rules**  86:12 124:8 | **schedule**  16:10 |
| **research**  30:2 | 118:6 | **run**  42:18 | 123:10 |
| **reserve**  119:14 | **return**  123:17 | **running**  26:11 | **scheduled**  98:7 |
| **residing**  121:24 | 124:6 | 35:25 | **school**  32:12 33:1 |
| **respect**  7:23 13:10 | **returning**  119:4 | | 33:18,19,20,22,23 |
| 16:25 32:23 39:3 | **review**  7:8 24:11 | **s** | 33:24 34:6 |
| 39:4,8 41:10 46:7 | 24:13 81:12,19 | **s**  3:7 4:1 25:22,23 | **schooling**  32:20 |
| 47:11 55:3 57:13 | 109:16 110:23 | 27:19 42:11 125:3 | 33:10,14,15 |
| 57:21 64:16,23 | 123:8,10,13 124:2 | **safe**  36:25 46:19 | **schools**  32:23 |
| 65:4 73:6 95:20 | **reviewing**  27:9 | **safety**  9:22 36:22 | **scope**  30:14 59:3 |
| 96:4,10 99:18 | 79:2 115:17 | 36:23 37:3,7 | 60:17,24 |
| 100:3 115:8,11 | **rid**  82:20 | 57:13 93:18,23 | **screen**  19:18,22 |
| 116:23 | **right**  6:20 13:17 | **saldana**  3:17 | 110:2 |
| **respond**  11:17 | 17:12 19:4,7 | 110:15,18 111:1 | **scroll**  110:17 |
| 12:20 16:23 31:5 | 20:12 26:20 30:5 | **sales**  9:10 36:21 | **seal**  122:19 |
| 34:12 38:19 41:16 | 31:2,7 36:17 37:9 | 38:2 53:9 116:14 | **sean**  2:20 5:13 |
| 43:7 47:22 51:22 | 40:7 42:16 45:7 | 117:17 | 21:21 31:23 68:14 |
| 56:15 58:1,20 | 56:4 57:5,14,20 | **santa**  2:21 | 70:7,10,22 80:21 |
| 60:15 62:10 64:6 | 60:2 63:9,12 64:9 | **save**  40:22 78:4,8 | 84:22 88:13,16,24 |
| 65:18 70:10 72:13 | 64:19 66:19,25 | 78:14,19,22 91:18 | 89:5,19 111:8,11 |
| 91:10 92:14 97:5 | 67:4,8,19 68:1 | 118:7,8,10 | 123:1 |
| 101:10,18 102:15 | 69:2,12,17,19 70:6 | **saved**  44:21 46:15 | **second**  3:13 18:1,4 |
| 102:25 104:20 | 77:13,15 80:19 | 46:20,21,22,23 | 18:6,9 26:6,7 |
| 105:9 106:17 | 81:1,17 82:17 | 61:25 76:1,1,3,7 | 36:18 82:9 84:21 |
| | | 76:10,11,15,19,19 | |

[second - specifically]

| | | | |
|---|---|---|---|
| 94:3 | **set** 63:6 86:12 | 49:24 51:4,10 | **soft** 9:10 31:10 |
| **seconds** 65:20 | **seven** 11:9 19:3 | 53:15 54:6,17 | 34:19,21 35:2 |
| **section** 55:10 62:3 | 62:2,8 63:3 64:19 | 56:16,18 58:14 | 55:15 56:8 |
| 103:8 104:2,8 | **share** 20:9 21:11 | 60:16 61:24 63:8 | **sold** 116:18 |
| **security** 9:22 | **shirt** 110:9 | 64:15 65:1 66:4 | **sole** 80:20 |
| 26:17 27:15 | **shoes** 35:4 | 66:18 67:13 68:3 | **solutions** 2:6 4:25 |
| **see** 17:8,11 19:21 | **shopping** 119:4 | 68:5 69:13 70:17 | 5:2 120:4 123:7 |
| 27:7 36:1 38:14 | **short** 85:5 | 71:22 73:10 74:5 | **sorry** 6:9 10:5 |
| 49:11 50:4,17 | **shortage** 9:22 | 74:25 75:20 76:9 | 11:21 15:20 22:8 |
| 55:22 62:7 63:9 | **shorthand** 122:5 | 76:25 79:25 81:22 | 23:24 25:20,21 |
| 63:12 66:24 67:7 | 122:13 | 82:1 83:21 84:1,5 | 26:15,16 27:15 |
| 67:14,20,21,23 | **show** 19:18,18 | 84:15 87:8 93:1 | 34:22 35:14 36:17 |
| 69:2,17 70:11 | 20:21 29:2,3 55:4 | 96:12 97:24 98:8 | 46:23 47:18,22 |
| 71:10,15 72:22 | 55:16 56:3 61:18 | 99:8 100:9 102:16 | 48:2 50:13,18 |
| 73:1 74:23 75:16 | 61:19 71:8 104:12 | 103:7 105:2,13,25 | 52:16 53:3 56:17 |
| 75:16,23 76:1,15 | 107:24 | 106:18 107:2,18 | 57:8,11 58:9,14 |
| 76:23 77:2,7 78:3 | **showed** 117:7 | 109:11 111:4 | 69:16 71:23 82:19 |
| 78:13 82:11,16,17 | **showing** 57:1 | 112:2,20 115:15 | 84:5 91:11 96:22 |
| 83:4,6,7,9 89:21 | 66:18 72:3 79:2 | 117:4 118:1 | 99:11 105:16 |
| 90:19 101:25 | 107:4 109:12 | 119:12 | 110:16 111:11,12 |
| 108:2,15 109:1,17 | **sic** 9:18 34:6 80:4 | **sister's** 8:9 | 114:11 117:9 |
| 110:1,8 112:7,22 | 93:2 102:21 | **site** 97:1 | **sound** 36:9 |
| **seeing** 67:18 79:5 | **side** 68:1 82:18 | **situation** 96:2 | **source** 47:20 |
| 79:9 85:1 | 109:18,23 110:2 | **situations** 51:18 | **south** 2:15 |
| **seen** 69:8 79:14 | **sign** 81:9 86:14 | 52:1 | **speak** 26:22 27:1 |
| 97:10 | 111:1 123:16 | **slip** 21:9 24:16,25 | 44:1,6,10 83:5 |
| **select** 86:19 | 124:5 | 25:5 41:10,22,25 | 91:2 |
| **send** 84:24 85:1 | **signature** 120:8 | 45:20 46:4 53:13 | **special** 94:6,7 95:1 |
| 94:7,8 107:19 | 122:22 123:21,23 | 54:24 66:20,21 | **specialist** 25:13,15 |
| 118:9 | 123:23 124:9 | 69:11 71:17 72:5 | 25:16,25 26:4 |
| **sending** 74:20 | **simply** 60:1 116:1 | 75:9,12 111:22 | 27:15 |
| **senior** 34:19 | **single** 14:25 63:8 | 112:1,4 | **specific** 16:7 22:23 |
| **sensitive** 4:5 91:5 | 76:18 97:25 | **slipped** 67:12 | 24:18 56:24 113:3 |
| 94:8 95:2 | **sir** 13:12 14:7,18 | 71:19 | 113:9,11 114:3,6,8 |
| **sent** 7:12 42:1 | 15:10 17:13,19 | **small** 59:19 61:18 | 114:9,16,18,22 |
| 44:21 46:15 81:24 | 20:13 21:20 22:13 | 63:7 | 117:22,24 |
| 83:21 84:6 91:4 | 29:1 31:15 35:16 | **smooth** 35:25 | **specifically** 8:12 |
| **sentence** 11:22 | 36:15 38:9 39:16 | **snyder** 2:20 | 18:3 29:18 36:13 |
| **service** 9:21 12:4 | 40:1 43:12,20 | **soap** 55:11 | 75:10 112:10,13 |
| 93:8,17 | 44:4 45:5,18,22 | **soapy** 108:16 | 112:18 115:17,22 |
| | 46:8 48:12 49:15 | | |

Page 18

[specifications - talking]

**specifications**
74:10,11
**specified** 41:20
**specs** 74:6
**speculation** 8:5,10
41:15 57:25 69:7
97:4 104:19 105:8
108:12
**spell** 5:25 25:18,23
27:18 29:14 42:10
**spelling** 29:20
30:4
**spent** 46:2
**spill** 79:11 93:20
93:21,25 94:5,10
94:14,18,19,20
95:5,7,15,22,24
96:7 97:1 114:24
**spillage** 93:6,15
109:13
**spills** 94:1,3,4,24
95:6,17,21 96:3,5
**spoke** 25:15 43:18
43:21,23 44:5
45:10 51:2
**spoken** 24:21
25:10 50:22,23
**spot** 69:5
**square** 62:8 64:11
**ss** 121:3 122:3
**stand** 58:13 72:24
79:6
**standing** 11:19,23
11:25 12:8
**stands** 12:21 54:19
73:8
**start** 24:20 55:10
60:23 98:11
**starting** 62:19
**state** 2:7 5:6,8,25
33:13 121:2 122:2

122:6,23 123:9,12
**stated** 37:12 48:13
**statement** 65:8,13
88:8 110:25
**statements** 88:9
**states** 1:1 4:17
32:13 33:15,19
**station** 94:18,19
94:20 95:15
**stations** 93:20,25
94:10,14 95:8
**stay** 95:23
**steps** 96:17 112:20
**steve** 20:3 23:20
30:13 34:2 37:8
55:5 57:8 60:20
67:17 69:7 72:6
80:9 82:22 83:15
84:16 85:17 86:5
87:2 96:21 119:16
**steven** 2:15,17
5:11
**stewart** 111:6
**stipulate** 86:22,23
87:1
**stipulated** 86:9,13
**stipulation** 123:20
**stock** 36:22
**stop** 17:10 19:21
19:22 36:17 67:10
89:12
**store** 14:15,25
15:9,9,18 16:4,5
16:14 17:1,15,18
17:22 18:2,7,19,25
19:8 31:21 37:19
37:22 40:17 41:3
41:3,13 42:2,4,7
42:13,15,18,21
43:1,10,14 44:19
50:4 52:18 57:15

58:18,25 59:2,7,12
61:2 62:14,22
63:16,18,23 64:3
64:24 65:6 71:13
74:8,13 76:7,12,22
76:24 77:25 78:5
78:7,17 79:3,19,22
79:23 80:3 90:6
90:14,19 91:14,17
91:25 92:3,7,9,22
92:22 93:4 94:17
97:17 98:21
102:22 113:10
116:12,18 117:12
117:19 118:5
119:4,6,11
**stores** 13:11,19
14:12,16,22 15:1
**storing** 99:3
**strike** 24:22 37:20
105:17 108:13
**study** 11:10
**stuff** 55:12
**subject** 21:1 32:8
41:21 56:21 86:20
**subscribed** 121:20
**substantive** 7:13
**suite** 2:15,21
**supervise** 26:19
31:13
**supervisor** 42:19
**suppose** 38:22
41:25 65:22 66:8
75:12
**supposed** 52:7
**sure** 13:20 26:2
27:3 34:2 35:24
36:10,25 37:1
44:20 55:6,13
72:11 81:7 85:9
93:7,9,13 95:16

96:17 97:14
105:12 112:5
**surrounding**
118:16
**surveillance** 13:11
13:18 25:4
**swear** 5:16
**sworn** 5:19 6:23
121:5,20 122:9

**t**

**t** 3:2,7 25:22 27:13
29:15,15 35:11,18
36:4 58:11 125:3
125:3
**table** 8:14
**take** 4:11 7:20 8:2
17:4 19:12 31:22
62:3 67:1 85:2,10
96:16 108:5
**taken** 2:5 4:15 6:6
6:15,24 7:6 8:24
32:3 46:9 71:3
85:24 111:17
121:8 122:12
**talk** 24:15,23 28:9
37:3,5 41:20
44:15,17 72:9
77:23 111:3,5
113:10 114:2,5
**talked** 43:25 44:23
45:3 46:16 51:8
73:7 91:25 93:14
99:2 110:15,18
116:4,6,6,8,24
**talking** 7:21 15:21
21:21 27:8 31:9
41:21 44:14 46:4
46:11 52:10 55:6
55:14,14 60:21,21
64:10,11 68:14
92:19 95:4 107:17

Page 19

[talking - trained]

| | | | |
|---|---|---|---|
| 110:4 113:2 | **tc0002** 84:17 | 103:25 119:22 | 58:19 61:3,25,25 |
| **talks** 82:14 | **tc0004** 110:17 | 120:1 | 64:5 65:23 66:7 |
| **target** 1:7,12 2:1,4 | **team** 9:14,18 | **thank** 10:22 12:6 | 66:10,18 67:18 |
| 4:15,16 5:14 9:5,7 | 10:12 11:19 12:5 | 29:25 99:15 | 68:12 71:1,5 77:1 |
| 9:16,24 10:24 | 14:20,21,24 15:5,8 | **thanks** 15:24 | 79:2,17 85:22 |
| 11:13,19,24,24 | 16:3 18:21,22,23 | **thereof** 121:11 | 86:1 89:9 90:17 |
| 12:1,8,11,12,15,17 | 18:24 26:11,14,16 | **thing** 76:19 86:15 | 91:24 94:1 95:17 |
| 12:21,25 13:2,7,11 | 26:17,19 31:10,14 | **things** 9:22 80:13 | 98:17 100:11 |
| 13:14,19 14:12,20 | 34:15 35:4 36:25 | 88:20 118:12 | 102:8 103:12 |
| 14:22,22 15:5 | 46:1 48:6,25 91:7 | **think** 10:19 13:24 | 104:5 106:21 |
| 17:18 19:4,6,8 | 92:11,23 93:2,8,18 | 13:25 27:10 37:7 | 111:15,19 113:20 |
| 24:9 25:25 26:4 | 93:23 94:1,7,21 | 38:3 65:10 66:24 | 117:8,8,12,12,19 |
| 26:17 27:15,22 | 95:22 97:18,20,22 | 67:2,11,25 68:21 | 117:19 118:6,11 |
| 28:1,5,8,11,13,14 | 98:1,5,9,12,16,20 | 69:5,10,18,23 75:1 | 122:13 123:10,18 |
| 28:14,16,19,22 | 98:23 106:3 107:7 | 80:12 85:4 111:9 | 123:24 124:7 |
| 29:4 30:9,12 | 108:19 109:8 | 111:11 116:13 | **times** 6:17,19 10:4 |
| 31:17 33:19 34:10 | **technology** 4:21 | **thinks** 82:22 | 10:8 15:17 44:23 |
| 34:17,25 35:13 | **tehran** 32:15 34:8 | **third** 54:5 | 54:16 65:2,10 |
| 37:4 38:23 39:10 | **telephone** 2:16,22 | **thirty** 38:2 | 103:7 116:24 |
| 39:15 40:15,19,21 | **tell** 5:19 13:17 | **thought** 73:11 | **timing** 24:19 |
| 40:24 41:13,20,21 | 17:1 18:12 27:12 | **three** 6:19 9:4 | **title** 27:10 |
| 44:3,8 48:23 | 28:7,10,15,18 | 39:13,18,20 59:13 | **today** 7:17 9:1 |
| 51:20 52:18,23 | 30:13,23 39:19 | 65:10 71:5 85:22 | 38:23 80:11 89:24 |
| 53:14,20,24 60:19 | 49:23 59:14 67:10 | 91:22 94:13,14 | 97:13 101:25 |
| 62:14,21,22 63:18 | 69:7 89:15 112:18 | 98:1,5,10,12,16 | 106:4 |
| 63:23 73:24 80:4 | **telling** 32:8 102:10 | 116:5,13 | **today's** 80:7 87:18 |
| 93:4,13,18 94:11 | 102:19 103:17 | **throw** 94:9 | 119:22 120:1 |
| 96:9,14,16 97:15 | 106:4 112:9 | **tide** 109:17 | **told** 21:4,7 28:21 |
| 98:2 99:6 118:21 | **ten** 16:16 111:9 | **ties** 95:2 | 48:13 53:19 70:4 |
| 119:9 120:2 123:4 | **term** 38:3 | **time** 2:9 5:9 7:21 | 70:17 75:20 104:1 |
| 125:1 | **terms** 16:20 20:5 | 8:18 9:8 14:23 | 112:21 115:2 |
| **target's** 12:8 13:4 | 30:23 51:9 64:19 | 15:3,21 20:21 | **tom** 25:22 58:11 |
| 95:19 99:2 | 74:22 | 22:17 26:1,5 27:8 | **top** 18:5 62:25 |
| **tasks** 9:19 20:15 | **testified** 5:21 | 27:20,25 28:4,11 | 94:22 |
| 42:17 | 23:20 89:24 | 28:19 32:1,5 33:8 | **topics** 46:11 82:3 |
| **taylor** 1:4 4:16 | **testify** 122:10 | 37:1 38:17,25 | 82:14 86:4 97:10 |
| 5:12 | **testifying** 6:25 | 39:2,6 40:17,21,23 | **total** 120:2 |
| **tc00001-6** 3:17 | **testimony** 7:17 | 42:19 43:5,15,17 | **towel** 94:24 |
| **tc00002** 108:3 | 8:21 9:1 70:1,18 | 43:21 44:3,4 45:3 | **trading** 109:24 |
| **tc00003** 109:13 | 86:17 102:14,24 | 45:8 46:2 49:4,23 | **trained** 93:23 |
| 110:4 | 103:14,19,21,22 | 53:10,10 54:5 | |

Veritext Legal Solutions
866 299-5127

[training – walls]

| | | | |
|---|---|---|---|
| **training** 9:24 10:2 10:4,8,24 12:7 13:6,8,10,13,16,18 | 94:14 100:1,15 110:1 113:24 118:19 | 106:12 112:23 **unique** 58:23 **unit** 4:13 | 44:20,21 46:14 47:6 75:18,23 78:14 83:23 90:5 |

**training** 9:24 10:2
  10:4,8,24 12:7
  13:6,8,10,13,16,18
**transcript** 7:8,12
  86:17,18 119:18
  122:15 123:6,8,10
  123:13,13,21
  124:2,2
**transported**
  118:23 119:8
**trash** 94:9,20,21
**tree** 17:11,12,14
  18:13 38:4,6
  77:12,13
**trial** 86:25
**truck** 44:12
**true** 33:17 100:22
  116:21,23 117:12
  121:14 122:15
**truth** 5:20,20,20
  32:9 122:10,10,11
**try** 18:18 78:22
  111:13
**trying** 31:2 61:19
  61:21 76:20
**tss** 27:8,15
**turn** 4:8 18:11
  104:6
**turnover** 97:24
  98:16
**turns** 17:4,6,7,10
  18:16
**twenty** 64:11
**twice** 93:25 95:8
**two** 3:16 7:20 8:8
  8:16 18:8 22:5,6,7
  22:10,12,24 23:4
  23:19 24:1,2,4,5,7
  32:5 67:15 71:1
  73:12 80:17 84:16
  87:6,9 89:3 94:13

94:14 100:1,15
  110:1 113:24
  118:19
**type** 13:5,6 58:6
  73:23 96:9 106:5
**types** 116:5,11,16
**typewriting**
  122:14

**u**

**uh** 9:10 28:13
  38:11
**understand** 7:2,18
  8:15 10:16 16:23
  27:24 28:3 31:4
  31:16 32:7 38:19
  38:20 41:17 42:12
  42:16 51:22 52:15
  58:9 61:13,14,17
  62:10,11 72:7
  76:20 101:11
  102:25 103:1
  119:1,2
**understanding**
  13:1 18:7 26:3
  30:8 34:1 44:8
  61:21 83:22 84:13
  101:19 105:2
**understands** 55:13
**understood** 7:25
  8:20,22 36:1
  41:23
**unfortunately**
  97:25
**unintelligible** 6:10
  10:3,15 11:20
  15:13,19 22:5,7,9
  23:23 49:20 50:10
  59:16 62:18 70:9
  70:13 77:8 81:3
  83:17 88:1 89:1
  89:11 102:17

106:12 112:23
**unique** 58:23
**unit** 4:13
**united** 1:1 4:17
  32:13 33:15,19
**units** 120:3
**unnamed** 98:10
**uribe** 2:24 4:24
**use** 13:21 17:3
  29:7 68:19 94:21
  117:17,19,24
**uses** 79:22

**v**

**v** 4:16 42:11 123:4
  125:1
**vacation** 20:14
  97:13
**vague** 15:14 16:22
  17:20 38:18 41:6
  51:21 56:13 57:8
  57:11 58:19 60:14
  60:20 61:12 62:9
  64:5 65:17 71:21
  78:24 84:4 91:9
  92:13 101:9
  104:18 117:2
  118:25
**varied** 19:1
**varies** 16:10
**various** 96:11
**verbally** 8:4
**verbatim** 122:16
**verification** 121:1
**veritext** 2:6 4:21
  4:25 5:2 120:4
  123:7,9,11
**verna** 111:5
**victim** 119:8
**video** 4:10,14
  13:11,19 21:17
  37:17 40:22,23

44:20,21 46:14
  47:6 75:18,23
  78:14 83:23 90:5
  90:15,19 92:4,15
  92:16,21 98:20,25
  118:7,8
**videoconference**
  2:5
**videographer** 2:24
  4:3,25 5:15 31:25
  32:4 70:25 71:4
  85:8,21,25 111:14
  111:18 119:21,25
**videos** 78:3
**videotape** 37:11
  37:14 82:14 83:12
  84:12,14 91:22
  92:1,8
**videotaped** 1:12
  2:1,3 120:6 121:8
**viewpoint** 38:15
  66:16
**virtual** 4:21
**vision** 59:3 60:5,13
  60:18,25,25 61:9
  61:20,22 62:13,21
  63:17,22 64:2,4,20
  64:25 65:7,14
**vs** 1:6

**w**

**wait** 15:22
**waived** 89:19
  123:23,23
**waiving** 123:20
**walk** 94:1 95:22
  96:7
**wall** 51:19,25
  52:17 109:23,24
**walls** 37:22 39:10
  79:23

Page 21

[want - zoom]

| | | |
|---|---|---|
| **want**  12:20 20:9 21:11 29:19 55:6 55:13 66:1 67:10 72:10 73:6 87:5 87:10,15 88:11,14 89:13,15 91:21 116:4 | 60:16 61:14 62:11 64:7 65:19 66:4 70:24 71:22 77:9 78:25 82:25 83:3 83:6,20 84:5 85:9 87:20 92:15 97:6 101:11,19 102:16 103:1 104:21 105:10 106:18 107:2 112:24 113:17 117:4 119:2 121:7 122:8 122:19 123:13,16 124:2,5 125:24 | **x** |
| | | **x**  3:1,2,7 36:4 124:1 |
| **wanted**  10:9 27:3 27:4 112:7 | | **y** |
| **water**  93:22 94:5 96:1 | | **yeah**  30:16 31:24 33:24 34:5 44:15 50:19 52:13 84:23 117:18 |
| **way**  7:24 19:4 24:3 29:17 33:4 46:10 80:6 | | **year**  26:1 97:25 114:24 |
| **we've**  65:15 95:4 116:4,6,7 | | **years**  9:17 15:6 18:23 32:25 33:2 34:10 |
| **week**  15:11,15 16:3,6,9 68:16,17 77:5 88:17 90:18 113:21 115:6 | | **yep**  119:15 |
| | **witnesses**  80:18 | **z** |
| **weekends**  16:11 | **wonder**  84:24 | |
| **weekly**  13:9 106:8 | **word**  10:20 29:7,7 99:12 | **z**  58:11 |
| **weeks**  11:9 40:2,4 40:6 100:1,1,15,15 113:24 | **words**  12:12 | **zebra**  58:12 |
| | **work**  15:11 16:3 16:14 18:11 104:5 | **zip**  95:2 |
| **went**  75:25 90:1 | **workday**  16:13 | **zoom**  65:19,19,25 66:12,13,15,17 82:24 |
| **western**  1:2 4:19 | **worked**  34:9 91:25 98:8,17 | |
| **whispering**  4:6 | **working**  17:10,18 18:13 20:23 35:24 36:6,8 38:23 39:9 39:14,20 49:4 51:16 53:23 54:11 54:15,20 55:3 56:12 57:2,18,21 77:14,15 98:6,24 | |
| **wide**  61:10,21 | | |
| **wider**  59:3 61:19 | | |
| **width**  64:10 | | |
| **witness**  2:19 3:9 4:22 5:16,19 9:13 10:7 11:18,23 12:2,21 15:13,15 16:24 21:5,13 22:7 23:23 24:1 30:6 34:13 38:20 41:17 48:4,18 51:23 54:6 56:16 58:2,21 59:17 | **worry**  29:22 | |
| | **wrapped**  111:13 | |
| | **write**  25:20 | |
| | **writing**  19:24 | |
| | **wrong**  37:8 84:18 | |
| | **wrote**  87:13,16 88:20 | |

Page 22

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.