**ETEHAD LAW, APC**
Simon P. Etehad (SBN 186449)
simon@etehadlaw.com
Steven Berkowitz (SBN 124051)
steven@etehadlaw.com
150 South Rodeo Drive, Suite 350
Beverly Hills, California 90212
t 310.550.1220 | f 888.266.5502

# UNITED STATED DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| CONNIE TAYLOR BROADOUS | CASE NO.: 2:20-cv-10950 GW (JEMx) |
| | Hon. George H. Wu |
| Plaintiff, | **DECLARATION OF STEVEN BERKOWITZ IN SUPPORT OF PLAINTIFF'S MOTION FOR SPOLIATION OF EVIDENCE** |
| v. | |
| TARGET CORPORATION; individually and dba TARGET STORE T-2329; and DOES 1 TO 20, | **[Motion For Spoliation filed separately]** |
| | **DATE:  December 30, 2021**<br>**TIME:  8:30 a.m.**<br>**DEPT.: 9D** |
| Defendants. | |

# DECLARATION OF STEVEN BERKOWITZ IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS

I, Steven Berkowitz, declare as follows:

1.      I am attorney licensed to practice before this Court, and I am employed with the law firm Etehad Law, APC, attorneys of record for Plaintiff Connie Taylor Broadous in this action.  As such I am fully familiar with the facts and circumstances of this action.

1

**DECLARATION OF STEVEN BERKOWITZ IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS**                                                   **Case No.** 2:20-cv-10950 GW (JEMx)

2.     I make this declaration in support of Plaintiff's Motion to Compel Production of Documents.

3.     The date of the subject incident, i.e., Plaintiff's slip and fall, is June 1, 2020 as provided in the Complaint.

4.     On January 12, 2021, Defendant Target Corporation ("Target") served its initial disclosures pursuant to Fed. R. Civ. P. Rule 26(a)(1).

5.     On July 27, 2021 Plaintiff propounded a notice of deposition of the PMQs of Target (which PMQs, based upon the deposition topics listed, would necessarily have included the supervising manager on duty at Target who was in charge of the investigation and interviews of witnesses, i.e., Anita Pittman).  This deposition notice also included demands for production.  Attached hereto as **Exhibit "A"** is a true and correct copy of this Deposition Notice.  The deposition was scheduled for August 17, 2021.

6.     Thereafter, Target's counsel repeatedly continued the Anita Pittman deposition, contending that she was not available.  On September 8, 2021, I caused a First Amended Notice of Deposition to be served, seeking deposition(s) on September 20, 2021, a true and correct copy of which is attached as **Exhibit "B."**  Anita Pittman was not available for that day.  On September 27, 2021, I caused a Second Amended Notice of Deposition to be provided to correspond to another set of deposition dates provided by Target's counsel in early October, a true and correct copy of which is attached as **Exhibit "C."**  Again, Target contended Anita Pittman was not available for her deposition.  It was not until November 16, 2021, when Target's counsel permitted me to take Ms. Pittman's deposition.

7.     It was during Ms. Pittman's November 16 deposition that I learned, for the first time, that there were three incident reports regarding Target's investigation and interviews **on the day of the incident**.  Prior to November 16, 2021, Target, despite my

DECLARATION OF STEVEN BERKOWITZ IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL
PRODUCTION OF DOCUMENTS                                     Case No. 2:20-cv-10950 GW (JEMx)

requests for all incident reports, had only produced one incident report, which contained only a statement from Plaintiff.  No documents were produced to me at this deposition.

8.    With respect to one of the incident reports withheld by Target, Ms. Pittman testified that it contained Target's interview on the date of the incident with witness, Luis Saldana, as well as his contact information.  Target never disclosed Luis Saldana in the January 12, 2021 Rule 26 initial disclosures.  The other incident report withheld included Ms. Pittman's observations regarding the incident.

9.    A true and correct copy of Ms. Pittman's deposition transcript, with the relevant excerpts highlighted regarding spoliation of evidence, is attached hereto as **Exhibit "D."**

9.    On September 14, 2021, Target also served its Supplemental Disclosures Pursuant to Fed. R. Civ. P. Rule 26(e). At that time, Target chose to identify Luis Saldana, despite having his name and contact information, as well as his interview, since

10    On, or around November 9, 2021, Target filed its Motion for Summary Judgment. As one of its exbibits in support thereof, Target included a declaration of nonparty witness, Luis Saldana, executed on August 18, 2021, relying principally on this declaration as the basis in its motion that it did not have advanced notice of the liquid on the Target floor which caused Plaintiff's slip and fall.

11.    On November 24, 2021, I contacted Defendant's counsel in an effort to meet and confer regarding the two incident reports identified in the deposition that Defendant had not yet disclosed, the failure to produce policies requested, and the failure to produce video surveillance.

**DECLARATION OF STEVEN BERKOWITZ IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS**                    **Case No.** 2:20-cv-10950 GW (JEMx)

The communications continued for 5 days and, ultimately, failed to resolve the discovery issue in dispute without court intervention.

12.  On both June 12 and 15, 2020, Etehad Law sent two preservation letters, to Target and to Target's management company, Sedgwick, to preserve all video footage regarding any aspect of the incident, before and after.  True and correct copies are attached, collectively, as Exhibit "E."

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct.

Executed this 7th day of December, 2021, at Los Angeles, California.

*/s/ Steven Berkowitz*

Steven Berkowitz

**DECLARATION OF STEVEN BERKOWITZ IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS**                    **Case No.** 2:20-cv-10950 GW (JEMx)

# EXHIBIT "A"

**ETEHAD LAW, A Professional Corporation**
Simon P. Etehad, Esq., SBN 186449
Steven Berkowitz, Esq. SBN 124051
150 S. Rodeo Drive, Suite 350
Beverly Hills, California 90212
t 310.550.1220 | f 888.266.5502 | e steven@etehadlaw.com

Attorneys for Plaintiff Connie Taylor Broadous

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA-WESTERN DIVISION

| | |
|---|---|
| **CONNIE TAYLOR BROADOUS,**<br><br>Plaintiff,<br><br>v.<br><br>**TARGET CORPORATION**; individually and dba TARGET STORE T-2320; and DOES 1 through 20, inclusive,<br><br>Defendants. | **CASE NO.:   2:20-cv-10950 GW (JEMx)**<br>**Hon. George H. Wu**<br><br>**NOTICE OF DEPOSITION OF DEFENDANT AND REQUEST FOR PRODUCTION OF DOCUMENTS**<br><br>Date:   August 17, 2021<br>Time:   10:00 a.m.<br>Place:  Remote Deposition (via Zoom) |

**TO DEFENDANT TARGET CORPORATION AND ITS COUNSEL OF RECORD**

        **PLEASE TAKE NOTICE** that pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Plaintiff will take the deposition of the person(s) most qualified on behalf of Defendant Target Corporation, dba Target Store T-2320, with respect to the matters listed in Exhibit "A." This deposition will take place remotely commencing at 10:00 a.m., on August 17, 2021, unless the parties mutually agree to hold the deposition on a different date or time.

        Said deposition will be stenographically recorded before a notary public and videotaped and will continue from day to day, or on a different date and different time.

        In the event deponent requires the services of a translator to interpret the proceedings, immediate notice must be given this office, and in no event later than 7 working days preceding the

deposition.

**PLEASE TAKE FURTHER NOTICE** that pursuant to Rules 30 and 34 of the *Federal Rules of Civil Procedure*, the deponent is required to produce the following documents and/or other tangible things not previously produced at deposition:

DEFINITIONS

1. "INCIDENT" refers to the events of June 1, 2020 at Target that led to the injuries Plaintiff alleges in the Complaint filed in this action.

2. "TARGET STORE" refers to the Target store in which the INCIDENT is alleged to have occurred, as stated in the Complaint.

3. "DOCUMENT" means a writing, as defined in Rule 1001 of Federal Rules of Evidence, and includes the original or a copy of handwriting, typewriting, printing, photostating, photographing, and every other means of recording upon any tangible thing and form of communicating or representation, including letters, words, pictures, sounds, or symbols, or combinations of them.

REQUESTS FOR PRODUCTION

REQUEST FOR PRODUCTION NO. 1:

All DOCUMENTS evidencing pictures and videotape of the INCIDENT.

REQUEST FOR PRODUCTION NO. 2:

All DOCUMENTS evidencing pictures and videotape of Plaintiff at the TARGET STORE on June 1, 2020.

REQUEST FOR PRODUCTION NO. 3:

All DOCUMENTS evidencing pictures and videotape of Plaintiff leaving the TARGET STORE on June 1, 2020.

REQUEST FOR PRODUCTION NO. 4:

All DOCUMENTS evidencing pictures and videotape of any spillage or droppage of any item on the floor of the TARGET STORE in the early afternoon of June 1, 2020, in the area where Plaintiff slipped and fell, before her fall.

Etehad Law, A Professional Corporation
150 S. Rodeo Dr., Suite 350, Beverly Hills, California 90212
t 310.550.1220 | f 888.266.5502 | e steven@etehadlaw.com

1  REQUEST FOR PRODUCTION NO. 5:

2  All DOCUMENTS evidencing pictures and videotape of any liquid on the floor of the

3  TARGET STORE in the early afternoon of June 1, 2020, in the area where Plaintiff slipped and fell.

4  REQUEST FOR PRODUCTION NO. 6:

5  All DOCUMENTS evidencing pictures and videotape of any clean up of the liquid on the

6  floor of the TARGET STORE in the early afternoon of June 1, 2020, in the area where Plaintiff

7  slipped and fell.

8  REQUEST FOR PRODUCTION NO. 7:

9  All DOCUMENTS evidencing all reports made of the INCIDENT on June 1, 2020.

10  REQUEST FOR PRODUCTION NO. 8:

11  All DOCUMENTS evidencing all statements of all witnesses regarding the INCIDENT on

12  June 1, 2020.

13  REQUEST FOR PRODUCTION NO. 9:

14  All DOCUMENTS evidencing all statements of employees regarding the INCIDENT, on June

15  1, 2020.

16  REQUEST FOR PRODUCTION NO. 10:

17  All DOCUMENTS evidencing all statements of all employees regarding removing any

18  container from the floor of the TARGET STORE on June 1, 2020, just before the alleged slip and fall

19  of Plaintiff, in the area where she fell.

20  REQUEST FOR PRODUCTION NO. 11:

21  All DOCUMENTS evidencing the knowledge or notice of the liquid on the floor of the

22  TARGET STORE on June 1, 2020, in the area where Plaintiff slipped and fell, before her fall.

23  REQUEST FOR PRODUCTION NO. 12:

24  All DOCUMENTS evidencing any investigation of the Defendant regarding the INCIDENT.

25  REQUEST FOR PRODUCTION NO. 13:

26  All DOCUMENTS evidencing all policies and procedures of the TARGET STORE for its

27  employees regarding the monitoring and/or maintenance of the floor regarding any spills of any

28  products or debris on the floor, in effect as of June 1, 2020.

Etehad Law, A Professional Corporation
150 S. Rodeo Dr., Suite 350, Beverly Hills, California 90212
t 310.550.1220 | f 888.266.5502 | e steven@etehadlaw.com

Etehad Law, A Professional Corporation
150 S. Rodeo Dr., Suite 350, Beverly Hills, California 90212
t 310.550.1220 | f 888.266.5502 | e steven@etehadlaw.com

1   <u>REQUEST FOR PRODUCTION NO. 14:</u>

2   All DOCUMENTS evidencing all policies and procedures of the TARGET STORE for its

3   employees regarding the cleanup of any spills of any products or debris on the floor, in effect as of

4   June 1, 2020.

5   <u>REQUEST FOR PRODUCTION NO. 15:</u>

6   All DOCUMENTS evidencing all policies and procedures of the TARGET STORE for its

7   employees regarding the placement of any warnings or notices regarding a floor area that requires

8   clean up of any spills of any products or debris on the floor, in effect as of June 1, 2020.

9   <u>REQUEST FOR PRODUCTION NO. 16:</u>

10   All DOCUMENTS evidencing all DOCUMENTS in support of any contention by

11   Defendant that it was not negligent in failing to maintain or clean up the floor where Plaintiff

12   alleges that she slipped and fell, prior to her slip and fall, at any time in the hour before her fall at

13   the TARGET STORE on June 1, 2020.

14   <u>REQUEST FOR PRODUCTION NO. 17:</u>

15   All DOCUMENTS evidencing all DOCUMENTS in support of any contention by Defendant

16   that it was not negligent in failing to notice a yellow-like liquid on the floor of the TARGET STORE

17   on June 1, 2020, where Plaintiff alleged that she slipped and fell, prior to her slip and fall.

18   <u>REQUEST FOR PRODUCTION NO. 18:</u>

19   All DOCUMENTS evidencing all DOCUMENTS in support of any contention by Defendant

20   that it acted reasonably in monitoring and maintaining the floor of the TARGET STORE on June 1,

21   2020, where Plaintiff alleged that she slipped and fell, during the hour prior to her slip and fall.

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

1  REQUEST FOR PRODUCTION NO. 19:

2  All DOCUMENTS evidencing all DOCUMENTS in support of any contention by Defendant

3  that Plaintiff's own negligence, in whole or in part, caused her slip and fall at the TARGET STORE

4  on June 1, 2020.

5

6

7  DATED: July 27, 2021                          **ETEHAD LAW, APC**

8

9                                        By:   *Steven Berkowitz*
                                              _____

10                                            Steven Berkowitz, Esq.
                                              Attorneys for Plaintiff

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Etehad Law, A Professional Corporation
150 S. Rodeo Dr., Suite 350, Beverly Hills, California 90212
t 310.550.1220 | f 888.266.5502 | e steven@etehadlaw.com

- 5 -

EXHIBIT A

*PMQ Topics for Target Deposition -30(b)(6)*

Matters for Examination:

1. Pictures and videotape of INCIDENT.  ("INCIDENT" refers to the events of June 1, 2020 at Target that led to the injuries Plaintiff alleges in the Complaint filed in this action), including but not limited to subject spill or drop of the liquid (or container containing the same) upon which Plaintiff is alleged to have caused her fall.

2. Pictures and videotape of Plaintiff at the TARGET STORE on June 1, 2020 ("TARGET STORE" refers to the Target store in which the INCIDENT is alleged to have occurred, as stated in the Complaint).

3. Pictures and videotape of Plaintiff leaving the TARGET STORE on June 1, 2020.

4. Pictures and videotape of any liquid on the floor of the TARGET STORE in the early afternoon of June 1, 2020, in the area where Plaintiff slipped and fell.

5. All reports made of the INCIDENT on June 1, 2020.

6. All statements of all employees regarding removing any container from the floor of the TARGET STORE on June 1, 2020, just before the alleged slip and fall of Plaintiff, in the area where she fell.

7. The notice or knowledge of the TARGET STORE of the liquid on the floor of the TARGET STORE on June 1, 2020, in the area where Plaintiff slipped and fell, before her fall.

8. Any investigation performed by the Defendant regarding the INCIDENT.

9. All policies and procedures of the TARGET STORE for its employees regarding the monitoring and/or maintenance of the floor regarding any spills of any products or debris on the floor, in effect as of June 1, 2020.

10. All policies and procedures of the TARGET STORE for its employees regarding the cleanup of any spills of any products or debris on the floor, in effect as of June 1, 2020.

11. Facts showing the TARGET STORE was or was not negligent in monitoring

and maintaining the floor of the TARGET STORE on June 1, 2020, where
Plaintiff alleged that she slipped and fell, during the hour prior to her slip and
fall.

12. Facts showing any negligence on the part of Plaintiff in slipping and falling at the
TARGET STORE on June 1, 2020.

13. Authentication of records produced or referenced during discovery by the parties in this
action.

**PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the county of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is:

Etehad Law, APC
150 South Rodeo Drive, Suite 350
Beverly Hills, California 90212

On July 27, 2021, I served the foregoing document described as: Notice of Deposition of Defendant and Request for Production of Document on the interested parties in this action as follows:

| | |
|---|---|
| Sean R. Burnett, Esq.<br>Jessica Farley, Esq.<br>SNYDER BURNETT EGERER, LLP<br>5383 Hollister Avenue, Suite 240<br>Santa Barbara, CA 93111<br>Email: sburnett@sbelaw.com<br>jfarley@sbelaw.com | Attorneys for Defendant Target Corporation |

☒  <u>By electronic mail</u>: Based on a court order or an agreement of the parties to accept electronic service, I caused the documents to be sent to the electronic address(es) of the addressee(s) listed above.

☐  <u>By personal service</u>: I caused such envelope to be delivered by hand to the addressee(s) listed above.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on July 27, 2021, at Beverly Hills, California.

*Steven Berkowitz*
Steven Berkowitz

PROOF OF SERVICE

EXHIBIT B

**ETEHAD LAW, A Professional Corporation**
Simon P. Etehad, Esq., SBN 186449
Steven Berkowitz, Esq. SBN 124051
150 S. Rodeo Drive, Suite 350
Beverly Hills, California 90212
t 310.550.1220 | f 888.266.5502 | e steven@etehadlaw.com

Attorneys for Plaintiff Connie Taylor Broadous

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA-WESTERN DIVISION

| | |
|---|---|
| CONNIE TAYLOR BROADOUS,<br><br>　　　　Plaintiff,<br><br>v.<br><br>TARGET CORPORATION; individually and dba TARGET STORE T-2320; and Does 1 through 20, inclusive,<br><br>　　　　Defendants. | CASE NO.:   2:20-cv-10950 GW (JEMx)<br>Hon. George H. Wu<br><br>FIRST AMENDED NOTICE OF DEPOSITION OF DEFENDANT AND REQUEST FOR PRODUCTION OF DOCUMENTS<br><br>Date:   September 20, 2021<br>Time:   10:00 a.m.<br>Place:  Remote Deposition (via Zoom) |

**TO DEFENDANT TARGET CORPORATION AND ITS COUNSEL OF RECORD**

　　　　**PLEASE TAKE NOTICE** that pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Plaintiff will take the deposition of the person(s) most qualified on behalf of Defendant Target Corporation, dba Target Store T-2320, with respect to the matters listed in Exhibit "A." This deposition or depositions will take place remotely commencing at 10:00 a.m., on September 20, 2021, unless the parties mutually agree to hold the deposition(s) on a different date or time.

　　　　Said deposition(s) will be stenographically recorded before a notary public and videotaped and will continue from day to day, or on a different date and different time.

　　　　In the event any deponent requires the services of a translator to interpret the proceedings, immediate notice must be given this office, and in no event later than 7 working days preceding the

Etehad Law, A Professional Corporation
150 S. Rodeo Dr., Suite 350, Beverly Hills, California 90212
t 310.550.1220 | f 888.266.5502 | e steven@etehadlaw.com

1   deposition.

2   **PLEASE TAKE FURTHER NOTICE** that pursuant to Rules 30 and 34 of the *Federal Rules*

3   *of Civil Procedure*, the deponent(s) is, or are, required to produce the following documents and/or

4   other tangible things not previously produced at deposition:

5   DEFINITIONS

6   1. "TARGET STORE" refers to the Target store in which the INCIDENT is alleged to have

7   occurred, as stated in the Complaint.

8   2. "INCIDENT" refers to the events of June 1, 2020 at the TARGET STORE that led to the

9   injuries Plaintiff alleges in the Complaint filed in this action.  This includes any depiction of Plaintiff

10   at the TARGET STORE that day, and any depiction of the soapy liquid or its container alleged to be

11   involved in connection with Plaintiff's slip and fall at the TARGET STORE that day.

12   3. "DOCUMENT" means a writing, as defined in Rule 1001 of Federal Rules of Evidence,

13   and includes the original or a copy of handwriting, typewriting, printing, photostating,

14   photographing, and every other means of recording upon any tangible thing and form of

15   communicating or representation, including letters, words, pictures, sounds, or symbols, or

16   combinations of them.

17   REQUESTS FOR PRODUCTION

18   REQUEST FOR PRODUCTION NO. 1:

19   All DOCUMENTS evidencing pictures and videotape of the INCIDENT.

20   REQUEST FOR PRODUCTION NO. 2:

21   All DOCUMENTS evidencing pictures and videotape of Plaintiff at the TARGET STORE on

22   June 1, 2020.

23   REQUEST FOR PRODUCTION NO. 3:

24   All DOCUMENTS evidencing pictures and videotape of Plaintiff leaving the TARGET

25   STORE on June 1, 2020.

26   REQUEST FOR PRODUCTION NO. 4:

27   All DOCUMENTS evidencing pictures and videotape of any spillage or droppage of any

28   item on the floor of the TARGET STORE in the early afternoon of June 1, 2020, in the area where

Etehad Law, A Professional Corporation
150 S. Rodeo Dr., Suite 350, Beverly Hills, California 90212
t 310.550.1220 | f 888.266.5502 | e steven@etehadlaw.com

Plaintiff slipped and fell, before her fall.

REQUEST FOR PRODUCTION NO. 5:

All DOCUMENTS evidencing pictures and videotape of any liquid on the floor of the TARGET STORE in the early afternoon of June 1, 2020, in the area where Plaintiff slipped and fell.

REQUEST FOR PRODUCTION NO. 6:

All DOCUMENTS evidencing pictures and videotape of any clean up of the liquid on the floor of the TARGET STORE in the early afternoon of June 1, 2020, in the area where Plaintiff slipped and fell.

REQUEST FOR PRODUCTION NO. 7:

All DOCUMENTS evidencing all reports made of the INCIDENT on June 1, 2020.

REQUEST FOR PRODUCTION NO. 8:

All DOCUMENTS evidencing all statements of all witnesses regarding the INCIDENT on June 1, 2020.

REQUEST FOR PRODUCTION NO. 9:

All DOCUMENTS evidencing all statements of employees regarding the INCIDENT, on June 1, 2020.

REQUEST FOR PRODUCTION NO. 10:

All DOCUMENTS evidencing all statements of all employees regarding removing any container from the floor of the TARGET STORE on June 1, 2020, just before the alleged slip and fall of Plaintiff, in the area where she fell.

REQUEST FOR PRODUCTION NO. 11:

All DOCUMENTS evidencing the knowledge or notice of the liquid on the floor of the TARGET STORE on June 1, 2020, in the area where Plaintiff slipped and fell, before her fall.

REQUEST FOR PRODUCTION NO. 12:

All DOCUMENTS evidencing any investigation of the Defendant regarding the INCIDENT.

REQUEST FOR PRODUCTION NO. 13:

All DOCUMENTS evidencing all policies and procedures of the TARGET STORE for its employees regarding the monitoring and/or maintenance of the floor regarding any spills of any

Etehad Law, A Professional Corporation
150 S. Rodeo Dr., Suite 350, Beverly Hills, California 90212
t 310.550.1220 | f 888.266.5502 | e steven@etehadlaw.com

DEPOSITION NOTICE AND REQUEST FOR PRODUCTION OF DOCUMENTS

Etehad Law, A Professional Corporation
150 S. Rodeo Dr., Suite 350, Beverly Hills, California 90212
t 310.550.1220 | f 888.266.5502 | e steven@etehadlaw.com

1  products or debris on the floor, in effect as of June 1, 2020.

2  REQUEST FOR PRODUCTION NO. 14:

3  All DOCUMENTS evidencing all policies and procedures of the TARGET STORE for its

4  employees regarding the cleanup of any spills of any products or debris on the floor, in effect as of

5  June 1, 2020.

6  REQUEST FOR PRODUCTION NO. 15:

7  All DOCUMENTS evidencing all policies and procedures of the TARGET STORE for its

8  employees regarding the placement of any warnings or notices regarding a floor area that requires

9  clean up of any spills of any products or debris on the floor, in effect as of June 1, 2020.

10  REQUEST FOR PRODUCTION NO. 16:

11  All DOCUMENTS evidencing all DOCUMENTS in support of any contention by

12  Defendant that it was not negligent in failing to maintain or clean up the floor where Plaintiff

13  alleges that she slipped and fell, prior to her slip and fall, at any time in the hour before her fall at

14  the TARGET STORE on June 1, 2020.

15  REQUEST FOR PRODUCTION NO. 17:

16  All DOCUMENTS evidencing all DOCUMENTS in support of any contention by Defendant

17  that it was not negligent in failing to notice a yellow-like liquid on the floor of the TARGET STORE

18  on June 1, 2020, where Plaintiff alleged that she slipped and fell, prior to her slip and fall.

19  REQUEST FOR PRODUCTION NO. 18:

20  All DOCUMENTS evidencing all DOCUMENTS in support of any contention by Defendant

21  that it acted reasonably in monitoring and maintaining the floor of the TARGET STORE on June 1,

22  2020, where Plaintiff alleged that she slipped and fell, during the hour prior to her slip and fall.

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

- 4 -

1  REQUEST FOR PRODUCTION NO. 19:

2  All DOCUMENTS evidencing all DOCUMENTS in support of any contention by Defendant

3  that Plaintiff's own negligence, in whole or in part, caused her slip and fall at the TARGET STORE

4  on June 1, 2020.

5

6

7  DATED: September 8, 2021                    **ETEHAD LAW, APC**

8

9                                                By:   *Steven Berkowitz*
                                                      ──────────────────────
10                                                    Steven Berkowitz, Esq.
                                                      Attorneys for Plaintiff

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Etehad Law, A Professional Corporation
150 S. Rodeo Dr., Suite 350, Beverly Hills, California 90212
t 310.550.1220 | f 888.266.5502 | e steven@etehadlaw.com

- 5 -
DEPOSITION NOTICE AND REQUEST FOR PRODUCTION OF DOCUMENTS

***PMQ Topics for Target Deposition -30(b)(6)***

Matters for Examination:

1. Pictures and videotape of INCIDENT.  ("INCIDENT" refers to the events of June 1, 2020 at Target that led to the injuries Plaintiff alleges in her Complaint in this action), and its investigation, including but not limited to the subject spill or drop of the soapy liquid (or container containing the same) upon which Plaintiff is alleged to have caused her fall, and the container containing subject soapy liquid, whether, before, during, or after Plaintiff's fall.

2. Pictures and videotape of Plaintiff at the TARGET STORE on June 1, 2020 ("TARGET STORE" refers to the Target store in which the INCIDENT is alleged to have occurred, as stated in the Complaint).

3. Pictures and videotape of Plaintiff at the TARGET STORE on June 1, 2020.

4. Pictures and videotape of any liquid on the floor of the TARGET STORE in the early afternoon of June 1, 2020, in the area where Plaintiff slipped and fell.

5. All reports made of the INCIDENT on June 1, 2020.

6. All statements of all employees regarding removing any container from the floor of the TARGET STORE on June 1, 2020, just before the alleged slip and fall of Plaintiff, in the area where she fell.

7. The notice or knowledge of the TARGET STORE of the liquid on the floor of the TARGET STORE on June 1, 2020, where Plaintiff fell, before her fall.

8. Any investigation performed by the Defendant regarding the INCIDENT.

9. All policies and procedures of the TARGET STORE for its employees regarding the monitoring and/or maintenance of the floor regarding any spills of any products or debris on the floor, in effect as of June 1, 2020.

10. All policies and procedures of the TARGET STORE for its employees regarding the cleanup of any spills of any products or debris on the floor, in effect as of June 1, 2020.

11. Facts showing the TARGET STORE was or was not negligent in monitoring and maintaining its floor on June 1, 2020, where Plaintiff alleged she fell, during the hour prior to her fall.

12. Facts showing any negligence on the part of Plaintiff in slipping and falling at the TARGET STORE on June 1, 2020.

13. Authentication of records produced/referenced during discovery in this case.

14. Pictures and videotape from the three closest TARGET STORE cameras to Plaintiff's fall site at the TARGET STORE, for the period 30 minutes before, and 30 minutes after, the fall of Plaintiff at the TARGET STORE.

15. On the day of the INCIDENT, the camera locations of the TARGET STORE contained working cameras within 40 feet of the site of Plaintiff's fall.

16. On the day of the INCIDENT, with respect to those which camera locations of the TARGET STORE within 40 feet of the site of Plaintiff's fall, a description of the locations in which no cameras existed or were not working.

17. On the day of the INCIDENT, with respect to those which camera locations of the TARGET STORE within 40 feet of the site of the slip and fall, explain why any existing cameras inside those locations were not working.

18. On the day of the INCIDENT, with respect to those working camera locations of the TARGET STORE within 40 feet of the site of the slip and fall, the description of the types of cameras and their capacities, including make, model, resolution, and field of view.

19. On the day of the INCIDENT, with respect to those working camera locations of the TARGET STORE within 40 feet of the site of the slip and fall, identify the persons in charge of operating and monitoring the cameras and his or her responsibilities

20. On the day of the INCIDENT, with respect to those camera locations of TARGET STORE containing working cameras within 40 feet of the site of the slip and fall, for a personal injury accident such as the one suffered by Plaintiff, in which an ambulance was called, what is the policy with respect to preserving any relevant footage (concerning the incident, the injured party, or events which led to the incident).

21. On the day of the INCIDENT, with respect to those working camera locations of the the TARGET STORE within 40 feet of the site of the fall, a comparison of the field of vision offered by the cameras overlooking the checkstands compared to the cameras overlooking the long horizontal aisle connecting adjacent to each checkstand aisle. See attached picture depicting the "horizontal aisle."

22. On the day of the incident, with respect to those camera locations of Target containing working cameras within 40 feet of the site of the fall, a description of how long the camera footage is stored by Target, and the policy of Target regarding storing camera footage.

EXHIBIT A



**PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the county of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is:

Etehad Law, APC
150 South Rodeo Drive, Suite 350
Beverly Hills, California 90212

On September 8, 2021, I served the foregoing document described as: Notice of Deposition of Defendant and Request for Production of Document on the interested parties in this action as follows:

| | |
|---|---|
| Sean R. Burnett, Esq.<br>Jessica Farley, Esq.<br>SNYDER BURNETT EGERER, LLP<br>5383 Hollister Avenue, Suite 240<br>Santa Barbara, CA 93111<br>Email: sburnett@sbelaw.com<br>jfarley@sbelaw.com | Attorneys for Defendant Target Corporation |

☒ <u>By electronic mail</u>: Based on a court order or an agreement of the parties to accept electronic service, I caused the documents to be sent to the electronic address(es) of the addressee(s) listed above.

☐ <u>By personal service</u>: I caused such envelope to be delivered by hand to the addressee(s) listed above.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on September 8, 2021, at Beverly Hills, California.

*Steven Berkowitz*
Steven Berkowitz

PROOF OF SERVICE

Etehad Law, APC
150 South Rodeo Drive, Suite 350, Beverly Hills, California 90212
Tel (310) 550-1220 | Fax (888) 266-5502

# EXHIBIT "C"

**ETEHAD LAW, A Professional Corporation**
Simon P. Etehad, Esq., SBN 186449
Steven Berkowitz, Esq. SBN 124051
150 S. Rodeo Drive, Suite 350
Beverly Hills, California 90212
t 310.550.1220 | f 888.266.5502 | e steven@etehadlaw.com

Attorneys for Plaintiff Connie Taylor Broadous

Etehad Law, A Professional Corporation
150 S. Rodeo Dr., Suite 350, Beverly Hills, California 90212
t 310.550.1220 | f 888.266.5502 | e steven@etehadlaw.com

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA-WESTERN DIVISION

| | |
|---|---|
| **CONNIE TAYLOR BROADOUS,**<br><br>Plaintiff,<br><br>v.<br><br>**TARGET CORPORATION**; individually and dba TARGET STORE T-2320; and Does 1 through 20, inclusive,<br><br>Defendants. | **CASE NO.:   2:20-cv-10950 GW (JEMx)**<br>**Hon. George H. Wu**<br><br>**SECOND AMENDED NOTICE OF DEPOSITION OF DEFENDANT AND REQUEST FOR PRODUCTION OF DOCUMENTS**<br><br>Date:   October 4, 2021 at 10:00 a.m.<br>         and October 8, 2021 at 2:30 p.m.<br><br>Place:  Remote Deposition (via Zoom) |

**TO DEFENDANT TARGET CORPORATION AND ITS COUNSEL OF RECORD**

**PLEASE TAKE NOTICE** that pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Plaintiff will take the deposition of the person(s) most qualified on behalf of Defendant Target Corporation, dba Target Store T-2320, with respect to the matters listed in Exhibit "A." This deposition or depositions will take place remotely commencing at 10:00 a.m., on October 4, 2021, and 2:30 p.m., on October 8, 2021 unless the parties mutually agree to hold the deposition(s) on a different date or time.

Said deposition(s) will be stenographically recorded before a notary public and videotaped and will continue from day to day, or on a different date and different time.

1   In the event any deponent requires the services of a translator to interpret the proceedings,

2   immediate notice must be given this office, and in no event later than 7 working days preceding the

3   deposition.

4   **PLEASE TAKE FURTHER NOTICE** that pursuant to Rules 30 and 34 of the *Federal Rules*

5   *of Civil Procedure*, the deponent(s) is, or are, required to produce the following documents and/or

6   other tangible things not previously produced at the first deposition held on October 4, 2021:

7   DEFINITIONS

8   1. "TARGET STORE" refers to the Target store in which the INCIDENT is alleged to have

9   occurred, as stated in the Complaint.

10   2. "INCIDENT" refers to the events of June 1, 2020 at the TARGET STORE that led to the

11   injuries Plaintiff alleges in the Complaint filed in this action.  This includes any depiction of Plaintiff

12   at the TARGET STORE that day, and any depiction of the soapy liquid or its container alleged to be

13   involved in connection with Plaintiff's slip and fall at the TARGET STORE that day.

14   3. "DOCUMENT" means a writing, as defined in Rule 1001 of Federal Rules of Evidence,

15   and includes the original or a copy of handwriting, typewriting, printing, photostating,

16   photographing, and every other means of recording upon any tangible thing and form of

17   communicating or representation, including letters, words, pictures, sounds, or symbols, or

18   combinations of them.

19   REQUESTS FOR PRODUCTION

20   REQUEST FOR PRODUCTION NO. 1:

21   All DOCUMENTS evidencing pictures and videotape of the INCIDENT.

22   REQUEST FOR PRODUCTION NO. 2:

23   All DOCUMENTS evidencing pictures and videotape of Plaintiff at the TARGET STORE on

24   June 1, 2020.

25   REQUEST FOR PRODUCTION NO. 3:

26   All DOCUMENTS evidencing pictures and videotape of Plaintiff leaving the TARGET

27   STORE on June 1, 2020.

28   REQUEST FOR PRODUCTION NO. 4:

*Etehad Law, A Professional Corporation*
150 S. Rodeo Dr., Suite 350, Beverly Hills, California 90212
t 310.550.1220 | f 888.266.5502 | e steven@etehadlaw.com

DEPOSITION NOTICE AND REQUEST FOR PRODUCTION OF DOCUMENTS

1  All DOCUMENTS evidencing pictures and videotape of any spillage or droppage of any

2  item on the floor of the TARGET STORE in the early afternoon of June 1, 2020, in the area where

3  Plaintiff slipped and fell, before her fall.

4  REQUEST FOR PRODUCTION NO. 5:

5  All DOCUMENTS evidencing pictures and videotape of any liquid on the floor of the

6  TARGET STORE in the early afternoon of June 1, 2020, in the area where Plaintiff slipped and fell.

7  REQUEST FOR PRODUCTION NO. 6:

8  All DOCUMENTS evidencing pictures and videotape of any clean up of the liquid on the

9  floor of the TARGET STORE in the early afternoon of June 1, 2020, in the area where Plaintiff

10  slipped and fell.

11  REQUEST FOR PRODUCTION NO. 7:

12  All DOCUMENTS evidencing all reports made of the INCIDENT on June 1, 2020.

13  REQUEST FOR PRODUCTION NO. 8:

14  All DOCUMENTS evidencing all statements of all witnesses regarding the INCIDENT on

15  June 1, 2020.

16  REQUEST FOR PRODUCTION NO. 9:

17  All DOCUMENTS evidencing all statements of employees regarding the INCIDENT, on June

18  1, 2020.

19  REQUEST FOR PRODUCTION NO. 10:

20  All DOCUMENTS evidencing all statements of all employees regarding removing any

21  container from the floor of the TARGET STORE on June 1, 2020, just before the alleged slip and fall

22  of Plaintiff, in the area where she fell.

23  REQUEST FOR PRODUCTION NO. 11:

24  All DOCUMENTS evidencing the knowledge or notice of the liquid on the floor of the

25  TARGET STORE on June 1, 2020, in the area where Plaintiff slipped and fell, before her fall.

26  REQUEST FOR PRODUCTION NO. 12:

27  All DOCUMENTS evidencing any investigation of the Defendant regarding the INCIDENT.

28  REQUEST FOR PRODUCTION NO. 13:

Etehad Law, A Professional Corporation
150 S. Rodeo Dr., Suite 350, Beverly Hills, California 90212
t 310.550.1220 | f 888.266.5502 | e steven@etehadlaw.com

Etehad Law, A Professional Corporation
150 S. Rodeo Dr., Suite 350, Beverly Hills, California 90212
t 310.550.1220 | f 888.266.5502 | e steven@etehadlaw.com

1   All DOCUMENTS evidencing all policies and procedures of the TARGET STORE for its

2   employees regarding the monitoring and/or maintenance of the floor regarding any spills of any

3   products or debris on the floor, in effect as of June 1, 2020.

4   REQUEST FOR PRODUCTION NO. 14:

5   All DOCUMENTS evidencing all policies and procedures of the TARGET STORE for its

6   employees regarding the cleanup of any spills of any products or debris on the floor, in effect as of

7   June 1, 2020.

8   REQUEST FOR PRODUCTION NO. 15:

9   All DOCUMENTS evidencing all policies and procedures of the TARGET STORE for its

10  employees regarding the placement of any warnings or notices regarding a floor area that requires

11  clean up of any spills of any products or debris on the floor, in effect as of June 1, 2020.

12  REQUEST FOR PRODUCTION NO. 16:

13  All DOCUMENTS evidencing all DOCUMENTS in support of any contention by

14  Defendant that it was not negligent in failing to maintain or clean up the floor where Plaintiff

15  alleges that she slipped and fell, prior to her slip and fall, at any time in the hour before her fall at

16  the TARGET STORE on June 1, 2020.

17  REQUEST FOR PRODUCTION NO. 17:

18  All DOCUMENTS evidencing all DOCUMENTS in support of any contention by Defendant

19  that it was not negligent in failing to notice a yellow-like liquid on the floor of the TARGET STORE

20  on June 1, 2020, where Plaintiff alleged that she slipped and fell, prior to her slip and fall.

21  REQUEST FOR PRODUCTION NO. 18:

22  All DOCUMENTS evidencing all DOCUMENTS in support of any contention by Defendant

23  that it acted reasonably in monitoring and maintaining the floor of the TARGET STORE on June 1,

24  2020, where Plaintiff alleged that she slipped and fell, during the hour prior to her slip and fall.

25  ///

26  ///

27  ///

28  ///

DEPOSITION NOTICE AND REQUEST FOR PRODUCTION OF DOCUMENTS

1  REQUEST FOR PRODUCTION NO. 19:

2  All DOCUMENTS evidencing all DOCUMENTS in support of any contention by Defendant

3  that Plaintiff's own negligence, in whole or in part, caused her slip and fall at the TARGET STORE

4  on June 1, 2020.

5

6

7  DATED: September 27, 2021                    **ETEHAD LAW, APC**

8                                                    By: _____

9                                                         Steven Berkowitz, Esq.

10                                                        Attorneys for Plaintiff

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Etehad Law, A Professional Corporation
150 S. Rodeo Dr., Suite 350, Beverly Hills, California 90212
t 310.550.1220 | f 888.266.5502 | e steven@etehadlaw.com

- 5 -

**_PMQ Topics for Target Deposition -30(b)(6)_**

Matters for Examination:

1.  Pictures and videotape of INCIDENT.  ("INCIDENT" refers to the events of June 1, 2020 at Target that led to the injuries Plaintiff alleges in her Complaint in this action), and its investigation, including but not limited to the subject spill or drop of the soapy liquid (or container containing the same) upon which Plaintiff is alleged to have caused her fall, and the container containing subject soapy liquid, whether, before, during, or after Plaintiff's fall.

2.  Pictures and videotape of Plaintiff at the TARGET STORE on June 1, 2020 ("TARGET STORE" refers to the Target store in which the INCIDENT is alleged to have occurred, as stated in the Complaint).

3.  Pictures and videotape of Plaintiff at the TARGET STORE on June 1, 2020.

4.  Pictures and videotape of any liquid on the floor of the TARGET STORE in the early afternoon of June 1, 2020, in the area where Plaintiff slipped and fell.

5.  All reports made of the INCIDENT on June 1, 2020.

6.  All statements of all employees regarding removing any container from the floor of the TARGET STORE on June 1, 2020, just before the alleged slip and fall of Plaintiff, in the area where she fell.

7.  The notice or knowledge of the TARGET STORE of the liquid on the floor of the TARGET STORE on June 1, 2020, where Plaintiff fell, before her fall.

8.  Any investigation performed by the Defendant regarding the INCIDENT.

9.  All policies and procedures of the TARGET STORE for its employees regarding the monitoring and/or maintenance of the floor regarding any spills of any products or debris on the floor, in effect as of June 1, 2020.

10. All policies and procedures of the TARGET STORE for its employees regarding the cleanup of any spills of any products or debris on the floor, in effect as of June 1, 2020.

11. Facts showing the TARGET STORE was or was not negligent in monitoring and maintaining its floor on June 1, 2020, where Plaintiff alleged she fell, during the hour prior to her fall.

12. Facts showing any negligence on the part of Plaintiff in slipping and falling at the TARGET STORE on June 1, 2020.

13. Authentication of records produced/referenced during discovery in this case.

14. Pictures and videotape from the three closest TARGET STORE cameras to Plaintiff's fall site at the TARGET STORE, for the period 30 minutes before, and 30 minutes after, the fall of Plaintiff at the TARGET STORE.

15.  On the day of the INCIDENT, the camera locations of the TARGET STORE contained working cameras within 40 feet of the site of Plaintiff's fall.

16. On the day of the INCIDENT, with respect to those which camera locations of the TARGET STORE within 40 feet of the site of Plaintiff's fall, a description of the locations in which no cameras existed or were not working.

17. On the day of the INCIDENT, with respect to those which camera locations of the TARGET STORE within 40 feet of the site of the slip and fall, explain why any existing cameras inside those locations were not working.

18. On the day of the INCIDENT, with respect to those working camera locations of the TARGET STORE within 40 feet of the site of the slip and fall, the description of the types of cameras and their capacities, including make, model, resolution, and field of view.

19. On the day of the INCIDENT, with respect to those working camera locations of the TARGET STORE within 40 feet of the site of the slip and fall, identify the persons in charge of operating and monitoring the cameras and his or her responsibilities

20. On the day of the INCIDENT, with respect to those camera locations of TARGET STORE containing working cameras within 40 feet of the site of the slip and fall, for a personal injury accident such as the one suffered by Plaintiff, in which an ambulance was called, what is the policy with respect to preserving any relevant footage (concerning the incident, the injured party, or events which led to the incident).

21. On the day of the INCIDENT, with respect to those working camera locations of the the TARGET STORE within 40 feet of the site of the fall, a comparison of the field of vision offered by the cameras overlooking the checkstands compared to the cameras overlooking the long horizontal aisle connecting adjacent to each checkstand aisle.  See attached picture depicting the "horizontal aisle."

22. On the day of the incident, with respect to those camera locations of Target containing working cameras within 40 feet of the site of the fall, a description of how long the camera footage is stored by Target, and the policy of Target regarding storing camera footage.



**PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the county of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is:

Etehad Law, APC
150 South Rodeo Drive, Suite 350
Beverly Hills, California 90212

On September 27, 2021, I served the foregoing document described as: Second Amended Notice of Deposition of Defendant and Request for Production of Document on the interested parties in this action as follows:

| | |
|---|---|
| Sean R. Burnett, Esq.<br>Jessica Farley, Esq.<br>SNYDER BURNETT EGERER, LLP<br>5383 Hollister Avenue, Suite 240<br>Santa Barbara, CA 93111<br>Email: sburnett@sbelaw.com<br>jfarley@sbelaw.com | Attorneys for Defendant Target Corporation |

☒ <u>By electronic mail</u>: Based on a court order or an agreement of the parties to accept electronic service, I caused the documents to be sent to the electronic address(es) of the addressee(s) listed above.

☐ <u>By personal service</u>: I caused such envelope to be delivered by hand to the addressee(s) listed above.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on September 27, 2021, at Beverly Hills, California.

*Steven Berkowitz*
Steven Berkowitz

PROOF OF SERVICE

EXHIBIT D

# Deposition Transcript

Case Number: 2:20-cv-10950 GW
Date: November 16, 2021

In the matter of:

# Broadous v Target Corporation, et al.

# Anita Kay Pittman



**CERTIFIED COPY**

Reported by:

Wendy V. Frazier
CSR No. 8035

**Steno**
**Official Reporters**

**1100 Glendon Ave.**
**Suite 1850**
**Los Angeles, CA 90024**
concierge@steno.com
**(310) 573-8380**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA-WESTERN DIVISION


CONNIE TAYLOR BROADOUS,

          Plaintiff,

v.                      NO.  2:20-cv-10950 GW (JEMx)

TARGET CORPORATION; individually
and dba TARGET STORE T-2320; and
Does 1 through 20, inclusive,

          Defendants.
_____/


10:01 A.M.

VIDEOTAPED DEPOSITION OF

ANITA KAY PITTMAN

---oOo---

TUESDAY, NOVEMBER 16, 2021

VIA STENO CONNECT


REPORTED BY:  WENDY V. FRAZIER, CSR#8035

```
 1                  A P P E A R A N C E S

 2

 3

 4    For the Plaintiff Connie Taylor Broadous:

 5              Etehad Law, APC
                By:  Steven Berkowitz, Esq.
 6                  (Via Steno Connect)
                150 S. Rodeo Drive, Suite 350
 7              Beverly Hills, California  90212
                310-550-1220
 8              steven@etehadlaw.com

 9

10    For the Defendant Target Corporation:

11              Snyder Burnett Egerer, LLP
                By:  Sean R. Burnett, Esq.
12                  (Via Steno Connect)
                5383 Hollister Avenue, Suite 240
13              Santa Barbara, California  93111
                805-692-2800
14              sburnett@sbelaw.com

15

16
      Also present:
17
                Eli Wheeler, Videographer
18

19                        ---oOo---

20

21

22

23

24

25
```

```
 1                    INDEX OF EXAMINATIONS

 2                                                           PAGE

 3   Examination By Mr. Berkowitz......................    5

 4   Examination By Mr. Burnett........................   76

 5   Further Examination By Mr. Berkowitz..............   76

 6

 7

 8                         ---oOo---

 9

10

11                    INDEX OF EXHIBITS

12   PLAINTIFF'S                                          PAGE

13   Exhibit A    Second Amended Notice of Deposition
                  of Defendant and Request for
14                Production OF Documents.................    9

15   Exhibit B    Defendant's Supplemental Initial
                  Disclosures Pursuant to FRCP 26(e)......   11
16
     Exhibit C    Letter dated June 12, 2020, from
17                Mr. Etehad to Target...................   37

18   Exhibit D    Letter dated June 15, 2020 from.
                  Mr. Etehad to Sedgwick.................   38
19
     Exhibit E    Color photograph.......................   66
20
     Exhibit F    Declaration of Luis Saldana............   71
21

22                         ---oOo---

23

24

25
```

 1          BE IT REMEMBERED that on Thursday, November 16,

 2    2021, at the hour of 10:01 A.M., of said day.  All

 3    present here are appearing through Steno Connect at their

 4    respective places, before me, WENDY V. FRAZIER, a

 5    Certified Shorthand Reporter, in and for the State of

 6    California.

 7

 8                  ANITA KAY PITTMAN,

 9

10    called as a witness herein, and after being first duly

11    sworn by me to tell the truth, the whole truth, and

12    nothing but the truth, was examined and testified as

13    follows:

10:00:56  14

10:01:01  15          THE VIDEOGRAPHER:  Good morning.  We are on now

10:01:06  16    on the record at 10:01 A.M. Pacific Time on November

10:01:10  17    16th, 2021, to begin the deposition of Anita Pittman,

10:01:14  18    Target Managing Agent in the matter of Broadous versus

10:01:18  19    Target Corporation, et al.  This case is venued in United

10:01:22  20    States District Court, Central District of California -

10:01:33  21    Western Division.  The case number is 2:20-cv-10950.

10:01:37  22    This deposition is taking place via the Steno Correct

10:01:40  23    platform.  The legal videographer is Eli Wheeler here on

10:01:42  24    behalf of Steno.  And the court reporter is Wendy

10:01:44  25    Frazier, are also here on behalf of Steno.

| | | |
|---|---|---|
| 10:01:45 | 1 | Would counsel please identify yourselves and |
| 10:01:48 | 2 | state whom you represent. |
| 10:01:51 | 3 | MR. BERKOWITZ:  Steven Berkowitz on behalf of |
| 10:01:53 | 4 | the plaintiff Connie Broadous. |
| 10:01:55 | 5 | MR. BURNETT:  Sean Burnett on behalf of Target |
| 10:01:58 | 6 | Corporation and the deponent, Anita Pittman.  And I will |
| 10:02:00 | 7 | just say for the record, she -- though the notice states |
| 10:02:05 | 8 | that she is not a, quote, managing agent. |
| 10:02:07 | 9 | MS. FARLEY:  I'm Jessica Farley also on behalf |
| 10:02:10 | 10 | of Target.  I will just be observing. |
| 10:02:12 | 11 | THE VIDEOGRAPHER:  All right.  Thank you, |
| 10:02:13 | 12 | Counsel.  Would our reporter please swear in the witness? |
| | 13 | |
| | 14 | (Whereupon the oath was administered to the witness.) |
| | 15 | |
| 10:02:29 | 16 | EXAMINATION BY MR. BERKOWITZ |
| 10:02:33 | 17 | Q.      Can you state your full name, including middle |
| 10:02:34 | 18 | name? |
| 10:02:36 | 19 | A.      Anita Kay Pittman. |
| 10:02:38 | 20 | Q.      All right.  And what does K stand for? |
| 10:02:40 | 21 | A.      Kay, K-a-y. |
| 10:02:43 | 22 | Q.      Thank you.  Is it your understanding you are |
| 10:02:48 | 23 | here then as a -- one of the persons most qualified or |
| 10:02:51 | 24 | knowledgeable with respect to the deposition topics I |
| 10:02:53 | 25 | previously provided? |

| 10:02:54 | 1 | A.        Yes. |
|---|---|---|

10:02:56   2         MR. BURNETT:  And Steve, just to make the record

10:02:59   3  clear, because obviously we had Lelah Jafari testify as

10:03:03   4  to of many of these topics, the categories on which she

10:03:21   5  is being designated are categories 4 through 8.

10:03:23   6         And with respect -- sorry, Steve, to interrupt.

10:03:27   7  Just with respect to number 4, as to pictures only, not

10:03:29   8  as to video.

10:03:45   9  Q.        BY MR. BERKOWITZ:  Have you ever had your

10:03:47  10  deposition taken before?

10:03:48  11  A.        Yes.

10:03:50  12  Q.        Approximately how many times?

10:03:50  13  A.        Once.

10:03:55  14  Q.        Was that as an agent on behalf of Target?

10:04:00  15  A.        Yes.

10:04:03  16  Q.        Okay.  And how long ago was that deposition?

10:04:06  17  A.        About eight years ago.

10:04:12  18  Q.        Let me go over the deposition caveats.

10:04:17  19         You understand you have just been sworn under

10:04:18  20  oath?

10:04:18  21  A.        Yes.

10:04:21  22  Q.        The oath you have taken is entitled to just as

10:04:24  23  much importance as if you were testifying in a court of

10:04:25  24  law under oath.

10:04:26  25         Do you understand that?

ANITA KAY PITTMAN
NOVEMBER 16, 2021

JOB NO. 201975

| | | |
|---|---|---|
| 10:04:30 | 1 | A.        Yes. |
| 10:04:33 | 2 | Q.        Now, the questions that I ask, any questions |
| 10:04:35 | 3 | asked by your counsel, and the responses you provide will |
| 10:04:38 | 4 | be taken down by the court reporter here and later |
| 10:04:42 | 5 | prepared in a booklet form. |
| 10:04:45 | 6 | After completion of the transcript, you will |
| 10:04:48 | 7 | have an opportunity to review that transcript and to make |
| 10:04:51 | 8 | any changes to your responses. |
| 10:04:52 | 9 | Do you understand that? |
| 10:04:53 | 10 | A.        Yes. |
| 10:04:56 | 11 | Q.        If for any reason you make changes to your |
| 10:05:00 | 12 | responses -- to the transcript, and they are of a |
| 10:05:03 | 13 | substantive nature, I will have an opportunity to comment |
| 10:05:07 | 14 | upon that, and it may adversely reflect your credibility. |
| 10:05:11 | 15 | For that reason, it's more important that you give your |
| 10:05:14 | 16 | most complete and accurate testimony today.  Understood? |
| 10:05:15 | 17 | A.        Yes. |
| 10:05:18 | 18 | Q.        Now, the court reporter cannot take down two |
| 10:05:22 | 19 | people talking at the same time.  I will do my best to |
| 10:05:25 | 20 | allow you to finish your responses if you will afford me |
| 10:05:28 | 21 | the same courtesy and allow me to finish my questions. |
| 10:05:28 | 22 | Okay? |
| 10:05:29 | 23 | A.        Yes. |
| 10:05:33 | 24 | Q.        Okay.  There may be times when you are not able |
| 10:05:38 | 25 | to give an exact answer, such as a date, or time, or |

| | | |
|---|---|---|
| 10:05:43 | 1 | number of feet.  But I am entitled to estimates.  I'm not |
| 10:05:45 | 2 | looking for speculation or a guess. |
| 10:05:49 | 3 | And here's the difference between an |
| 10:05:53 | 4 | approximation or estimate on the one hand and speculation |
| 10:05:55 | 5 | or a guess on the other hand. |
| 10:06:00 | 6 | If I were to ask you the length of the table in |
| 10:06:03 | 7 | front of you, you have some foundational knowledge or |
| 10:06:06 | 8 | observation, you can give me an estimate. |
| 10:06:09 | 9 | If I were to ask you my sister's name, you have |
| 10:06:12 | 10 | no foundational knowledge.  That would be a guess. |
| 10:06:14 | 11 | Do you understand the difference between the |
| 10:06:14 | 12 | two? |
| 10:06:15 | 13 | A.      Yes. |
| 10:06:26 | 14 | Q.      Okay.  When I ask a question, if you have the |
| 10:06:32 | 15 | requirement of seeking clarification, or me to repeat, or |
| 10:06:37 | 16 | to rephrase, make sure you ask.  Otherwise, I will have |
| 10:06:40 | 17 | assumed that you fully understood my question and have |
| 10:06:42 | 18 | given your best and most complete response.  Okay? |
| 10:06:43 | 19 | A.      Yes. |
| 10:06:46 | 20 | Q.      Okay.  Are you taking any medication, or have |
| 10:06:49 | 21 | you consumed any alcohol that would prevent you from |
| 10:06:52 | 22 | giving your -- your most complete and accurate responses |
| 10:06:53 | 23 | today? |
| 10:06:53 | 24 | A.      No. |
| 10:07:01 | 25 | Q.      Do you have any documents today that you wish to |

| | | |
|---|---|---|
| 10:07:02 | 1 | produce? |
| 10:07:04 | 2 | A.        No. |
| 10:07:05 | 3 | Q.        Okay. |
| 10:07:07 | 4 | MR. BURNETT:  Steve, I will just say for the |
| 10:07:09 | 5 | record, we have produced everything we are going to |
| 10:07:14 | 6 | produce before Ms. Jafari's deposition. |
| 10:07:21 | 7 | Q.        BY MR. BERKOWITZ:  With respect to the -- the |
| 10:07:25 | 8 | last PMK deposition notice I provided, which had document |
| 10:07:27 | 9 | requests, have you had an opportunity to look at those |
| 10:07:33 | 10 | document requests? |
| 10:07:35 | 11 | I will make it easier for you.  I will attach as |
| 10:07:37 | 12 | an exhibit -- this will be Exhibit A. |
| | 13 | (Plaintiff's Exhibit A was marked for |
| 10:07:39 | 14 | identification.) |
| 10:07:43 | 15 | Q.        BY MR. BERKOWITZ:  So I'm attaching as Exhibit A |
| 10:07:48 | 16 | the September 27, 2021, Second Amended Notice of |
| 10:07:57 | 17 | Deposition and the Person Most Qualified on behalf of |
| 10:07:58 | 18 | Target. |
| 10:08:11 | 19 | Can you see that document? |
| 10:08:15 | 20 | A.        Yes, I can.  Is this for me?  Yes. |
| 10:08:20 | 21 | Q.        Yes.  So I'm now going to go to the document |
| 10:08:21 | 22 | requests. |
| 10:08:24 | 23 | Have you seen any of these document requests |
| 10:08:25 | 24 | before? |
| 10:08:27 | 25 | A.        No. |

| | | |
|---|---|---|
| 10:08:32 | 1 | Q.       Okay.  Let's just go over -- and I'm going to |
| 10:08:34 | 2 | ask you the following question for each of them. |
| 10:08:41 | 3 |          And that is, with respect to the incident, and |
| 10:08:51 | 4 | that is the -- described as the June 1st, 2020 incident, |
| 10:08:55 | 5 | at the Target store that led to Connie Broadous' |
| 10:09:00 | 6 | injuries.  That includes any depiction of Connie Broadous |
| 10:09:03 | 7 | at the store that day, and any depiction of the soapy |
| 10:09:06 | 8 | liquid, or its container alleged to be involved in |
| 10:09:09 | 9 | connection with her slip and fall at Target that day. |
| 10:09:16 | 10 |          Okay.  Number 1, do you know of the existence of |
| 10:09:18 | 11 | any pictures or videotape of the incident? |
| 10:09:21 | 12 | A.       There were pictures. |
| 10:09:23 | 13 |          MR. BURNETT:  I will object that it's vague. |
| 10:09:25 | 14 | She has already responded, though. |
| 10:09:27 | 15 | Q.       BY MR. BERKOWITZ:  Go ahead. |
| 10:09:30 | 16 | A.       There was pictures. |
| 10:09:31 | 17 | Q.       All right.  And what pictures have you seen |
| 10:09:33 | 18 | regarding the incident? |
| 10:09:38 | 19 | A.       The pictures that I've seen were the ones where |
| 10:09:42 | 20 | we took with the bar code on it of the soap. |
| 10:09:48 | 21 | Q.       Okay.  So I'm now going to show you -- show you |
| 10:09:52 | 22 | what has been produced by Target and see if you can |
| 10:10:05 | 23 | confirm this.  Let me stop this screen share, and let me |
| 10:10:18 | 24 | bring up the second document. |
| 10:10:19 | 25 |          All right.  I'm going to mark something that is |

| | | |
|---|---|---|
| 10:10:24 | 1 | composed of seven pages.  First page is entitled |
| 10:10:28 | 2 | Defendant's Supplemental Initial Disclosures Pursuant To |
| 10:10:34 | 3 | FRCP 26 (e).  And this is Exhibit B.  If you were to |
| 10:10:43 | 4 | scroll down here, you'll see two pictures.  So page 5 |
| 10:10:46 | 5 | shows a picture of a detergent. |
| 10:10:52 | 6 | Is this a picture that you are familiar with? |
| 10:10:52 | 7 | A.      Yes. |
| | 8 | (Plaintiff's Exhibit B was marked for |
| 10:10:52 | 9 | identification.) |
| 10:10:54 | 10 | Q.      BY MR. BERKOWITZ:  And do you know who took this |
| 10:10:55 | 11 | picture? |
| 10:10:57 | 12 | A.      Yes. |
| 10:10:59 | 13 | Q.      And who is that? |
| 10:11:01 | 14 | A.      Ruth. |
| 10:11:04 | 15 | Q.      And what's Ruth last name? |
| 10:11:07 | 16 | A.      I'm not -- I'm not sure of her last name. |
| 10:11:10 | 17 | Q.      Is she -- was she an employee of the store at |
| 10:11:11 | 18 | Target at that time? |
| 10:11:12 | 19 | A.      Yes. |
| 10:11:15 | 20 | Q.      And the -- when I talk about the store or |
| 10:11:18 | 21 | Target, I'm talking about the Target location at 11133 |
| 10:11:24 | 22 | Balboa Boulevard, Granda Hills.  Okay? |
| 10:11:24 | 23 | A.      Yes. |
| 10:11:32 | 24 | Q.      Okay.  And did you ask her to take this picture? |
| 10:11:33 | 25 | A.      Yes. |

ANITA KAY PITTMAN
NOVEMBER 16, 2021

JOB NO. 201975

| | | |
|---|---|---|
| 10:11:35 | 1 | Q.      Can -- and do know who is holding the detergent |
| 10:11:36 | 2 | in this picture? |
| 10:11:38 | 3 | A.      No.  I'm not sure. |
| 10:11:42 | 4 | Q.      And do you know why this picture was taken? |
| 10:11:45 | 5 | A.      Yes. |
| 10:11:47 | 6 | Q.      And why is that? |
| 10:11:52 | 7 | A.      That's what -- the soap that they found. |
| 10:11:55 | 8 | Q.      Okay.  We'll get to that shortly.  Let's go on |
| 10:11:57 | 9 | to the next picture. |
| 10:12:00 | 10 | This is page 6 of Exhibit B. |
| 10:12:03 | 11 | Do you recognize this picture? |
| 10:12:04 | 12 | A.      Yes. |
| 10:12:08 | 13 | Q.      And what does that depict? |
| 10:12:10 | 14 | A.      Where the soap spilled. |
| 10:12:14 | 15 | Q.      Okay.  And with respect to that previous picture |
| 10:12:17 | 16 | we just looked at of the detergent -- |
| 10:12:17 | 17 | A.      Yes. |
| 10:12:20 | 18 | Q.      -- do you understand that picture to have been |
| 10:12:24 | 19 | taken by Ruth on June 1st, 2020, the day of the incident? |
| 10:12:26 | 20 | A.      Yes. |
| 10:12:28 | 21 | Q.      Okay.  And do you know who took the second |
| 10:12:32 | 22 | picture, page 6, Exhibit B? |
| 10:12:33 | 23 | A.      No.  I don't remember. |
| 10:12:38 | 24 | Q.      And do you know if this picture was taken on |
| 10:12:40 | 25 | June 1st, 2020? |

| | | |
|---|---|---|
| 10:12:42 | 1 | A.        Yes. |
| 10:12:45 | 2 | Q.        And do you know if it was taken by an employee |
| 10:12:48 | 3 | of the store, Target? |
| 10:12:50 | 4 | A.        Yes. |
| 10:12:53 | 5 | Q.        Okay.  Was that picture taken at your direction? |
| 10:12:54 | 6 | A.        Yes. |
| 10:12:57 | 7 | Q.        Okay.  Were you present when this picture was |
| 10:12:58 | 8 | taken? |
| 10:12:59 | 9 | A.        Yes. |
| 10:13:03 | 10 | Q.        Were you present when the picture of the -- of |
| 10:13:05 | 11 | the detergent was taken? |
| 10:13:06 | 12 | A.        Yes. |
| 10:13:11 | 13 | Q.        Those are the only two pictures I have that were |
| 10:13:12 | 14 | taken by Target. |
| 10:13:14 | 15 |           Do you -- do you know of any other pictures |
| 10:13:16 | 16 | taken by Target? |
| 10:13:18 | 17 | A.        No.  I'm sorry. |
| 10:13:21 | 18 | Q.        Okay.  Do you know of any other pictures taken |
| 10:13:25 | 19 | by Target on June 1st, 2020, or thereafter in connection |
| 10:13:26 | 20 | with the incident? |
| 10:13:27 | 21 | A.        No. |
| 10:13:40 | 22 | Q.        Okay.  We're going to stop the sharing of that |
| 10:13:43 | 23 | picture.  Let's go back to the initial document we were |
| 10:13:45 | 24 | going over, Exhibit A. |
| 10:14:02 | 25 |           Okay.  Request number 1 also asked for videotape |

| | | |
|---|---|---|
| 10:14:03 | 1 | of the incident. |
| 10:14:07 | 2 | Are you aware of any videotape of the incident? |
| 10:14:07 | 3 | A.      No. |
| 10:14:10 | 4 | Q.      And you understand the definition of incident is |
| 10:14:13 | 5 | right here, number 2.  It includes any depiction of |
| 10:14:16 | 6 | plaintiff at the store that day. |
| 10:14:19 | 7 | So based on that definition, are you -- are you |
| 10:14:24 | 8 | aware of any videotape of the incident? |
| 10:14:24 | 9 | A.      No. |
| 10:14:26 | 10 | Q.      All right.  Did you personally look for |
| 10:14:29 | 11 | videotape of the incident at any time? |
| 10:14:30 | 12 | A.      No. |
| 10:14:33 | 13 | Q.      Did someone on your behalf or at your direction |
| 10:14:36 | 14 | look for videotape of the incident? |
| 10:14:37 | 15 | A.      Yes. |
| 10:14:39 | 16 | Q.      Okay.  And who was that? |
| 10:14:45 | 17 | A.      TSS, Jonathan. |
| 10:14:51 | 18 | Q.      Did you just use the initials, PSS? |
| 10:14:55 | 19 | A.      I'm sorry.  No, TSS. |
| 10:14:58 | 20 | Q.      And what does TSS stand for? |
| 10:15:03 | 21 | A.      Target Safety Specialist.  I'm sorry.  Security |
| 10:15:04 | 22 | Specialist. |
| 10:15:20 | 23 | Q.      And did you -- by the way, do you know |
| 10:15:22 | 24 | Jonathan's last name? |
| 10:15:22 | 25 | A.      No. |

| | | |
|---|---|---|
| 10:15:28 | 1 | Q.      On June 1st, 2020, do you recall directing |
| 10:15:30 | 2 | Jonathan to look for videotape of the incident? |
| 10:15:31 | 3 | A.      Yes. |
| 10:15:46 | 4 | Q.      Okay.  Now, was Jonathan a member of |
| 10:15:51 | 5 | Ms. Jafari's Asset Protection Team? |
| 10:15:53 | 6 | A.      Yes. |
| 10:16:00 | 7 | Q.      And on June 1st, 2020, do you recall how many |
| 10:16:07 | 8 | people at that Target were part of the Asset Protection |
| 10:16:08 | 9 | Team? |
| 10:16:09 | 10 | A.      No. |
| 10:16:15 | 11 | Q.      Okay.  But do you recall that Jafari was present |
| 10:16:18 | 12 | at the store on June 1st, 2020? |
| 10:16:19 | 13 | A.      No. |
| 10:16:23 | 14 | Q.      Okay.  Do you recall that Jonathan was present |
| 10:16:25 | 15 | at the store on June 1st, 2020? |
| 10:16:25 | 16 | A.      Yes. |
| 10:16:28 | 17 | Q.      Do you recall any other persons who were part of |
| 10:16:31 | 18 | the Asset Protection Team who were present at the store |
| 10:16:33 | 19 | on June 1st, 2020? |
| 10:16:34 | 20 | A.      No. |
| 10:16:39 | 21 | Q.      Do you understand what Jonathan's position -- |
| 10:16:44 | 22 | well, what his tasks are at the store as of June 1st, |
| 10:16:45 | 23 | 2020? |
| 10:16:48 | 24 | A.      Yes. |
| 10:16:49 | 25 | Q.      And what were they? |

| | | |
|---|---|---|
| 10:16:54 | 1 | A.      He was post -- he posted at the door and greeted |
| 10:16:57 | 2 | guests. |
| 10:16:58 | 3 | Q.      Anything else? |
| 10:17:00 | 4 | A.      No. |
| 10:17:09 | 5 | Q.      Was he an employee that you supervised at the |
| 10:17:13 | 6 | store as of June, 2020? |
| 10:17:14 | 7 | A.      No. |
| 10:17:20 | 8 | Q.      Were you at all his supervisor in any respect on |
| 10:17:21 | 9 | June 1st, 2020? |
| 10:17:23 | 10 | A.      No. |
| 10:17:29 | 11 | Q.      And would his supervisor as of June 1st, 2020 be |
| 10:17:31 | 12 | Ms. Jafari, then? |
| 10:17:34 | 13 | A.      No.  She wasn't there. |
| 10:17:37 | 14 | Q.      Oh, do you know who his supervisor was on June |
| 10:17:39 | 15 | 1st, 2020? |
| 10:17:51 | 16 | A.      No.  He -- he was -- he -- if we needed him to |
| 10:17:55 | 17 | do something, he reported -- we would ask him, but his |
| 10:17:58 | 18 | supervisor -- his direct supervisor was not there. |
| 10:18:02 | 19 | Q.      Okay.  But do you -- do you recall the name of |
| 10:18:04 | 20 | that direct supervisor? |
| 10:18:09 | 21 | A.      His direct supervisor is Mrs. Jafari. |
| 10:18:16 | 22 | Q.      Okay.  Now, other than the two pictures we just |
| 10:18:22 | 23 | looked at, part of Exhibit B, do you recall seeing any |
| 10:18:26 | 24 | other pictures or videotape of the incident at any time |
| 10:18:30 | 25 | that was taken by Target? |

| | | |
|---|---|---|
| 10:18:32 | 1 | A.       No. |
| 10:18:52 | 2 | Q.       At any time did you personally look at the |
| 10:18:57 | 3 | monitors of the surveillance cameras to determine if |
| 10:18:59 | 4 | there is any videotape of the -- any part of the |
| 10:19:00 | 5 | incident? |
| 10:19:01 | 6 | A.       No. |
| 10:19:08 | 7 | Q.       Did you investigate the incident? |
| 10:19:09 | 8 | MR. BURNETT:  Objection, vague.  You can |
| 10:19:11 | 9 | respond. |
| 10:19:14 | 10 | THE WITNESS:  Well, by investigate, I did what |
| 10:19:17 | 11 | my portion of the incident, yes. |
| 10:19:18 | 12 | Q.       BY MR. BERKOWITZ:  All right.  And tell me what |
| 10:19:21 | 13 | your portion of the incident entailed? |
| 10:19:26 | 14 | A.       I will speak to the guests that had fell, and |
| 10:19:32 | 15 | anyone with her, and any witnesses around. |
| 10:19:37 | 16 | Q.       Okay.  And immediately prior to the incident, do |
| 10:19:40 | 17 | you -- let me strike that. |
| 10:19:42 | 18 | First of all, do you know what time of the day |
| 10:19:44 | 19 | the incident with Connie Broadous occurred? |
| 10:19:46 | 20 | A.       No.  I don't remember. |
| 10:19:48 | 21 | Q.       Do you know what day of the week the incident |
| 10:19:51 | 22 | occurred with Connie Broadous? |
| 10:19:52 | 23 | A.       No, I don't. |
| 10:19:55 | 24 | Q.       Okay.  Let -- let me refresh your memory.  It |
| 10:20:00 | 25 | occurred approximately 1:00 P.M. on a Monday, June 1st, |

| | | |
|---|---|---|
| 10:20:00 | 1 | 2020. |
| 10:20:03 | 2 | Does that refresh your memory at all? |
| 10:20:07 | 3 | A.    No.  I'm -- no. |
| 10:20:11 | 4 | Q.    Okay.  Do you recall how many employees were |
| 10:20:15 | 5 | present at the store that day in the afternoon at around |
| 10:20:17 | 6 | 1:00 -- |
| 10:20:18 | 7 | A.    No. |
| 10:20:19 | 8 | Q.    -- on behalf of Target. |
| 10:20:20 | 9 | A.    No. |
| 10:20:23 | 10 | Q.    Okay.  Can you give me an estimate? |
| 10:20:24 | 11 | A.    No. |
| 10:20:32 | 12 | Q.    Okay.  What was your job title on June 1st, |
| 10:20:33 | 13 | 2020, at Target? |
| 10:20:38 | 14 | A.    ETL Specialty Sales. |
| 10:20:48 | 15 | Q.    And can you tell me what those -- those three |
| 10:20:53 | 16 | initials are again?  E, as in Elaine; is that correct, is |
| 10:20:53 | 17 | one? |
| 10:21:05 | 18 | A.    Executive Team Leader. |
| 10:21:08 | 19 | Q.    And how long have you been an Executive Team |
| 10:21:10 | 20 | Leader for any Target store? |
| 10:21:13 | 21 | A.    Twenty-six years. |
| 10:21:15 | 22 | Q.    And what -- approximately when did you start |
| 10:21:18 | 23 | being an Executive Team Leader? |
| 10:21:20 | 24 | A.    1995. |
| 10:21:30 | 25 | Q.    And before being an ETL at Target, did you have |

ANITA KAY PITTMAN
NOVEMBER 16, 2021

JOB NO. 201975

| | | |
|---|---|---|
| 10:21:34 | 1 | any other position while with Target? |
| 10:21:35 | 2 | A.       No. |
| 10:21:38 | 3 | Q.       So when you started with Target, your position |
| 10:21:44 | 4 | initially was ETL Specialty Sales; is that correct? |
| 10:21:45 | 5 | A.       No. |
| 10:21:48 | 6 | Q.       What was your initial position then, with |
| 10:21:49 | 7 | Target? |
| 10:21:52 | 8 | A.       ETL food. |
| 10:22:00 | 9 | Q.       Okay.  Did that change at some point? |
| 10:22:01 | 10 | A.       Yes. |
| 10:22:03 | 11 | Q.       And when is the next change that occurred, |
| 10:22:13 | 12 | approximately? |
| 10:22:19 | 13 | A.       19 -- year 2000. |
| 10:22:24 | 14 | Q.       And in 2000, what was your title at Target? |
| 10:22:26 | 15 | A.       ETL Guest Service. |
| 10:22:34 | 16 | Q.       What -- what were the responsibilities as ETL |
| 10:22:37 | 17 | Guest Service at Target? |
| 10:22:40 | 18 | A.       I was in charge of running the front lanes, |
| 10:22:46 | 19 | making sure there was no long lines, the team was -- |
| 10:22:49 | 20 | guest service, helping all the guests, in charge of the |
| 10:22:53 | 21 | return section also of the store.  Guest Service. |
| 10:22:56 | 22 | Q.       And how long did you hold that position? |
| 10:22:59 | 23 | A.       Like one year. |
| 10:23:02 | 24 | Q.       And what was your next position with Target? |
| 10:23:08 | 25 | A.       The following year I went back to ETL Food. |

ANITA KAY PITTMAN
NOVEMBER 16, 2021

JOB NO. 201975

| | | |
|---|---|---|
| 10:23:12 | 1 | Q.        And when is it -- when did you have your next |
| 10:23:14 | 2 | position with Target? |
| 10:23:25 | 3 | A.        2010.  I went to ETL Softlines. |
| 10:23:32 | 4 | Q.        And what were your -- and what your |
| 10:23:35 | 5 | responsibilities as ETL Softlines for Target? |
| 10:23:40 | 6 | A.        Making sure the team -- getting all the clothes |
| 10:23:45 | 7 | out, making sure they were selling, putting up |
| 10:23:50 | 8 | planograms, doing price -- making sure price change was |
| 10:23:51 | 9 | done. |
| 10:23:56 | 10 | Q.        And how long did you remain in that position? |
| 10:24:11 | 11 | A.        I remained in that position until 2000 -- '11, |
| 10:24:20 | 12 | '12 -- 2016. |
| 10:24:24 | 13 | Q.        And what was your position next in 2016? |
| 10:24:27 | 14 | A.        That's -- they changed it to ETL Specialty |
| 10:24:30 | 15 | Sales. |
| 10:24:36 | 16 | Q.        Did you have any different -- or change tasks |
| 10:24:39 | 17 | other than what you have described for ETL Softlines? |
| 10:24:40 | 18 | A.        Yes. |
| 10:24:41 | 19 | Q.        And what was that? |
| 10:24:45 | 20 | A.        I picked up two more departments, electronics |
| 10:24:47 | 21 | and the beauty department. |
| 10:24:54 | 22 | Q.        Tell me about your responsibilities as ETL |
| 10:24:57 | 23 | Specialty Services for electronics? |
| 10:25:02 | 24 | A.        Just making sure we had merchandise available |
| 10:25:05 | 25 | for the guests.  Helping the guests, service the guests. |

| | | |
|---|---|---|
| 10:25:10 | 1 | Any questions they had about any merchandise.  Making |
| 10:25:14 | 2 | sure the team knew how to answer and respond. |
| 10:25:16 | 3 | Q.     Does electronics refer to a particular |
| 10:25:23 | 4 | department at Target, such as computers, or does it refer |
| 10:25:24 | 5 | to something other than that? |
| 10:25:27 | 6 | A.     Electronic stands for the whole department, |
| 10:25:31 | 7 | computers, gaming, phone accessories. |
| 10:25:45 | 8 | Q.     And did that position remain to the current |
| 10:25:45 | 9 | date? |
| 10:25:46 | 10 | A.     Yes. |
| 10:25:52 | 11 | Q.     Okay.  And as ETL Specialty Services, have you |
| 10:26:03 | 12 | ever worked with the Asset Protection Team at all for any |
| 10:26:03 | 13 | reason? |
| 10:26:04 | 14 |         MR. BURNETT:  Objection, vague.  You can |
| 10:26:06 | 15 | respond. |
| 10:26:07 | 16 |         THE WITNESS:  I have worked with the lead of -- |
| 10:26:10 | 17 | their leader, Ms. Jafari. |
| 10:26:12 | 18 | Q.     BY MR. BERKOWITZ:  In what connection? |
| 10:26:16 | 19 | A.     When we have counts.  We are looking for our |
| 10:26:19 | 20 | things.  We have to count certain high -- high-priced |
| 10:26:23 | 21 | items, and when there was a number discrepancy, she would |
| 10:26:25 | 22 | let me know and then we would have to follow up with the |
| 10:26:28 | 23 | team and follow-up and see how they pushed the |
| 10:26:29 | 24 | merchandise out. |
| 10:26:36 | 25 | Q.     Now, do you recall having -- having any |

| | | |
|---|---|---|
| 10:26:41 | 1 | conversation with Ms. Jafari with respect to the incident |
| 10:26:42 | 2 | at any time? |
| 10:26:42 | 3 | A.     No. |
| 10:26:47 | 4 | Q.     And can you tell me what your discussions were |
| 10:26:50 | 5 | with Jonathan regarding the incident? |
| 10:26:53 | 6 | A.     I told Jonathan I had a guest incident.  I |
| 10:26:57 | 7 | had -- a guest fell.  I told him the area, and around the |
| 10:27:01 | 8 | time, and I needed him to check to see if there was video |
| 10:27:02 | 9 | coverage. |
| 10:27:05 | 10 | Q.     And how long did it take him to get back to you |
| 10:27:06 | 11 | regarding that? |
| 10:27:08 | 12 | A.     I don't remember. |
| 10:27:12 | 13 | Q.     Do you think he got back to you that day, June |
| 10:27:12 | 14 | 1st, 2020? |
| 10:27:14 | 15 | A.     Yes. |
| 10:27:18 | 16 | Q.     Okay.  And what did he say?  Do you recall? |
| 10:27:20 | 17 | A.     He said that there was no video coverage. |
| 10:27:23 | 18 | Q.     And did he explain to you what he was looking |
| 10:27:24 | 19 | for, specifically? |
| 10:27:26 | 20 | A.     No. |
| 10:27:32 | 21 | Q.     Do you know if he was looking for the video |
| 10:27:36 | 22 | coverage of the person who took the detergent and dropped |
| 10:27:36 | 23 | it? |
| 10:27:37 | 24 | A.     No. |
| 10:27:43 | 25 | Q.     Do you know if he was looking for video footage |

| | | |
|---|---|---|
| 10:27:47 | 1 | of Connie Broadous who was the victim in this matter |
| 10:27:50 | 2 | anywhere in the store? |
| 10:27:51 | 3 | MR. BURNETT:  I will just object to the term |
| 10:27:54 | 4 | "victim," but you can respond to the question. |
| 10:27:57 | 5 | THE WITNESS:  No.  I asked him to check where |
| 10:28:00 | 6 | she fell. |
| 10:28:04 | 7 | Q.      BY MR. BERKOWITZ:  Why didn't you broaden that |
| 10:28:10 | 8 | scope at that time and include any video footage leading |
| 10:28:14 | 9 | up to the incident and connect it to the incident? |
| 10:28:23 | 10 | A.      Because we -- we do it to get to see where the |
| 10:28:27 | 11 | guest fell.  That's what I -- that's what we do. |
| 10:28:32 | 12 | Q.      Okay.  At any time in a slip and fall have you |
| 10:28:36 | 13 | ever broadened the search to just beyond the area where |
| 10:28:39 | 14 | the fall occurred to see what happened leading up to the |
| 10:28:40 | 15 | fall? |
| 10:28:41 | 16 | A.      No, I haven't. |
| 10:28:45 | 17 | Q.      Okay.  By the way, how many slip-and-fall |
| 10:28:49 | 18 | incidents have you been involved in as an ETL Specialty |
| 10:28:53 | 19 | Services manager? |
| 10:28:54 | 20 | MR. BURNETT:  Objection, vague.  You can |
| 10:28:55 | 21 | respond. |
| 10:28:57 | 22 | THE WITNESS:  I don't know the number. |
| 10:28:58 | 23 | Q.      BY MR. BERKOWITZ:  What is your best estimate? |
| 10:29:03 | 24 | A.      I can't estimate.  I don't know the number. |
| 10:29:06 | 25 | Q.      For example, is it more than a thousand?  You |

| | | |
|---|---|---|
| 10:29:09 | 1 | can give me a range.  If you don't know the number, you |
| 10:29:13 | 2 | might say, anywhere say 50 to a hundred, or 200 to 500, |
| 10:29:16 | 3 | or maybe five to ten.  Give me a range. |
| 10:29:18 | 4 | A.      I will say five to ten. |
| 10:29:24 | 5 | Q.      And of those five -- and by the way, are we |
| 10:29:28 | 6 | talking about five-to-ten slip-and-falls since 2016 when |
| 10:29:32 | 7 | you became ETL Specialty Services Manager? |
| 10:29:37 | 8 | A.      This -- that's how many I remember since I have |
| 10:29:38 | 9 | been doing it.  Yes. |
| 10:29:47 | 10 | Q.      Okay.  And of those five-to-ten slip-and-fall |
| 10:29:51 | 11 | incidents, how many of them involved an ambulance taking |
| 10:30:03 | 12 | away the -- the person who allegedly was injured? |
| 10:30:07 | 13 | A.      I -- I don't remember any for -- I don't |
| 10:30:08 | 14 | remember any. |
| 10:30:11 | 15 | Q.      Okay.  But do you recall that Connie Broadous |
| 10:30:13 | 16 | was taken away by ambulance? |
| 10:30:13 | 17 | A.      Yes. |
| 10:30:17 | 18 | Q.      Okay.  So that's the only one you remember in a |
| 10:30:20 | 19 | slip and fall being taken away by ambulance; is that |
| 10:30:20 | 20 | correct? |
| 10:30:21 | 21 | A.      Yes. |
| 10:30:32 | 22 | Q.      Now, with respect to this slip and fall on June |
| 10:30:36 | 23 | 1st, 2020, why did you get involved as opposed to another |
| 10:30:37 | 24 | manager at the store? |
| 10:30:43 | 25 | A.      Because I was the midleader on duty, and I |

| | | |
|---|---|---|
| 10:30:44 | 1 | responded to the call. |
| 10:30:48 | 2 | Q.      What does it mean to be a midleader? |
| 10:30:52 | 3 | A.      I would take all the phone calls from guests, |
| 10:30:55 | 4 | and any -- any issues team members had, I will respond |
| 10:30:56 | 5 | first. |
| 10:31:06 | 6 | Q.      And are you a midleader every time you work at |
| 10:31:10 | 7 | the store in ETL Specialty Services? |
| 10:31:10 | 8 | A.      No. |
| 10:31:12 | 9 | Q.      All right.  How does it determine that you be -- |
| 10:31:14 | 10 | you were a midleader that day? |
| 10:31:17 | 11 | A.      It was -- it was scheduled that way. |
| 10:31:19 | 12 | Q.      And who scheduled that? |
| 10:31:20 | 13 | A.      My store manager. |
| 10:31:25 | 14 | Q.      Okay.  And at the time on June 1st, 2020, who |
| 10:31:26 | 15 | was your store manager? |
| 10:31:35 | 16 | A.      It was Brian Salazar. |
| 10:31:39 | 17 | Q.      Is Brian B-r-i-a-n, or is it another spelling? |
| 10:31:42 | 18 | A.      I think it was B-r-i-a-n. |
| 10:31:47 | 19 | Q.      And Salazar, S-a-l -- |
| 10:31:49 | 20 | A.      -- a-z-a-r. |
| 10:31:51 | 21 | Q.      -- z-a-r.  Okay. |
| 10:31:53 | 22 |         And do you know how long Brian Salazar has been |
| 10:31:57 | 23 | a -- was a store manager at this particular Target? |
| 10:32:00 | 24 | A.      No.  I'm sorry.  I'm so sorry.  It wasn't Brian. |
| 10:32:05 | 25 | I'm sorry.  It was Jennifer, my boss now. |

| | | |
|---|---|---|
| 10:32:09 | 1 | Q.        On June 1st, 2020, was Jennifer the store |
| 10:32:09 | 2 | manager? |
| 10:32:10 | 3 | A.        Yes. |
| 10:32:13 | 4 | Q.        Okay.  And what's Jennifer's last name? |
| 10:32:18 | 5 | A.        Halverson, H-a-l-v-e-r-s-a-n [sic]. |
| 10:32:25 | 6 | Q.        That fourth letter, is that an "f" like in |
| 10:32:26 | 7 | Frank? |
| 10:32:35 | 8 | A.        H-a-l-v-e-r-s-o-n. |
| 10:32:39 | 9 | Q.        And do you know how many years Jennifer |
| 10:32:42 | 10 | Halverson has been a store manager at this particular |
| 10:32:43 | 11 | store? |
| 10:32:48 | 12 | A.        She has been at this store going on two years. |
| 10:32:57 | 13 | Q.        Was she present at the store on the day of the |
| 10:32:58 | 14 | incident? |
| 10:33:03 | 15 | A.        No.  I don't remember.  I don't remember.  No. |
| 10:33:23 | 16 | Q.        Okay.  Let's go back to Exhibit A.  Hold on a |
| 10:33:23 | 17 | second. |
| 10:33:33 | 18 |           With respect to the slip-and-fall incident in |
| 10:33:36 | 19 | which you were a midleader and you -- did you take |
| 10:33:38 | 20 | reports on each one of them? |
| 10:33:42 | 21 | A.        What do you mean, "each one of them"? |
| 10:33:44 | 22 | Q.        On each slip and fall that you were involved in |
| 10:33:49 | 23 | at the store, were you responsible for preparing a |
| 10:33:51 | 24 | report? |
| 10:33:53 | 25 | A.        Yes.  If -- if I wrote it out, yes. |

| | | |
|---|---|---|
| 10:33:56 | 1 | Q.        And we're talking about an incident report; is |
| 10:33:56 | 2 | that correct? |
| 10:33:57 | 3 | A.        Yes. |
| 10:34:00 | 4 | Q.        Okay.  Do you remember how many incident reports |
| 10:34:04 | 5 | you have written since you became an ETL Specialty |
| 10:34:07 | 6 | Services Manager for slip and falls? |
| 10:34:10 | 7 | A.        No. |
| 10:34:12 | 8 | Q.        What's your best estimate? |
| 10:34:16 | 9 | A.        Five to ten. |
| 10:34:29 | 10 | Q.        And is there a Target policy or procedure with |
| 10:34:34 | 11 | respect to the preparation of an incident report for a |
| 10:34:35 | 12 | slip and fall? |
| 10:34:38 | 13 | A.        We have a packet that we follow. |
| 10:34:43 | 14 | Q.        Okay.  And as of June 1st, 2020, did you have a |
| 10:34:47 | 15 | Target packet regarding policies or procedures that you |
| 10:34:49 | 16 | followed for incident reports? |
| 10:34:50 | 17 | A.        Yes. |
| 10:34:53 | 18 | Q.        Okay.  And do you know what is required in |
| 10:34:57 | 19 | preparing an incident report for a slip and fall as of |
| 10:34:59 | 20 | June 1st, 2020? |
| 10:35:02 | 21 | A.        I had the incident jacket.  The first report I |
| 10:35:05 | 22 | take is from the guest that fell.  Any witness |
| 10:35:10 | 23 | statements, I take.  Any team -- any team members who |
| 10:35:13 | 24 | were around, and any other witnesses. |
| 10:35:24 | 25 | Q.        Is that it with respect to policies or |

ANITA KAY PITTMAN
NOVEMBER 16, 2021

JOB NO. 201975

| | | |
|---|---|---|
| 10:35:27 | 1 | procedures in connection with an incident report for that |
| 10:35:30 | 2 | slip and fall as of June 1st, 2020? |
| 10:35:34 | 3 | A.      We also take pictures.  And we -- if there is |
| 10:35:38 | 4 | any video, we try to get the video of the slip and fall. |
| 10:35:44 | 5 | Q.      Is there any policy or procedure as of June 1st, |
| 10:35:50 | 6 | 2020, at Target with respect to what type of pictures or |
| 10:35:54 | 7 | areas that you should take or look at? |
| 10:35:59 | 8 | A.      We take the picture of the -- whatever is |
| 10:36:04 | 9 | involved in the slip and fall in the area of the fall. |
| 10:36:10 | 10 | Q.      Well, for example, when you went to the incident |
| 10:36:14 | 11 | scene, you saw a soapy liquid on the floor; is that |
| 10:36:14 | 12 | correct? |
| 10:36:15 | 13 | A.      Yes. |
| 10:36:18 | 14 | Q.      And you -- at some point you discovered there |
| 10:36:23 | 15 | was a container that was involved that had contained that |
| 10:36:25 | 16 | soapy liquid; is that right? |
| 10:36:25 | 17 | A.      Yes. |
| 10:36:30 | 18 | Q.      Okay.  Did you do any -- did you look for any |
| 10:36:33 | 19 | video footage, or direct anyone to look for any video |
| 10:36:39 | 20 | footage of the person who was responsible for carrying |
| 10:36:43 | 21 | that container with the soapy liquid and eventually |
| 10:36:46 | 22 | spilling it? |
| 10:36:46 | 23 | A.      No. |
| 10:36:49 | 24 | Q.      Why not? |
| 10:36:50 | 25 | MR. BURNETT:  Objection.  Asked and answered. |

| | | |
|---|---|---|
| 10:36:51 | 1 | You can respond. |
| 10:36:53 | 2 | THE WITNESS:  That's not part of my |
| 10:36:54 | 3 | investigation. |
| 10:36:57 | 4 | Q.    BY MR. BERKOWITZ:  And how do you know it's not |
| 10:36:59 | 5 | part of your investigation? |
| 10:37:01 | 6 | A.    Because I follow the procedure from the incident |
| 10:37:02 | 7 | jacket. |
| 10:37:09 | 8 | Q.    And do you have a copy of that -- of that policy |
| 10:37:15 | 9 | or procedure that was in existence back then on June 1st, |
| 10:37:15 | 10 | 2020? |
| 10:37:18 | 11 | A.    The incident jacket that we use? |
| 10:37:22 | 12 | Q.    No, the policy or procedure of Target with |
| 10:37:24 | 13 | respect to what you should do? |
| 10:37:26 | 14 | A.    I don't have it with me.  No. |
| 10:37:28 | 15 | Q.    Okay.  Where would it be found? |
| 10:37:32 | 16 | A.    I follow the procedures in front of the incident |
| 10:37:36 | 17 | jacket. |
| 10:37:38 | 18 | MR. BURNETT:  Steve, is there a request that is |
| 10:37:39 | 19 | related to this? |
| 10:37:44 | 20 | MR. BERKOWITZ:  Yes.  We'll get to it in a |
| 10:37:46 | 21 | second.  Well, I will tell you what.  I will go to it |
| 10:37:47 | 22 | right now. |
| 10:37:55 | 23 | Q.    Let's look at number 14.  Request for production |
| 10:37:59 | 24 | number 14, Exhibit A.  "All documents evidencing all |
| 10:38:02 | 25 | policies and procedure of the Target store for its |

| | | |
|---|---|---|
| 10:38:04 | 1 | employees regarding the cleanup of any spills of any |
| 10:38:07 | 2 | products or debris," that's just cleanup. |
| 10:38:11 | 3 | Do you recall -- do you know if there is any |
| 10:38:13 | 4 | policies or procedures of Target store regarding the |
| 10:38:18 | 5 | cleanup of any spills in effect on June 1st, 2020? |
| 10:38:19 | 6 | A.      Yes. |
| 10:38:26 | 7 | Q.      Okay.  And did they exist as of June 1st, 2020? |
| 10:38:27 | 8 | A.      Yes. |
| 10:38:30 | 9 | Q.      Okay.  And do you know what they were entitled? |
| 10:38:33 | 10 | A.      Do I know what they what? |
| 10:38:35 | 11 | Q.      What they were called?  What did Target call |
| 10:38:36 | 12 | these documents? |
| 10:38:39 | 13 | A.      Their -- the cleaning -- cleaning -- spill |
| 10:38:44 | 14 | procedure -- clean -- Spill Procedure Cleanup, and -- |
| 10:38:46 | 15 | Spill Procedure Cleanups. |
| 10:39:03 | 16 | Q.      Okay.  And as of June 1st, 2020, you had access |
| 10:39:06 | 17 | to such Spill Procedure Cleanup policies, right? |
| 10:39:07 | 18 | A.      Yes. |
| 10:39:11 | 19 | Q.      Do you know how many pages those were, |
| 10:39:15 | 20 | approximately? |
| 10:39:15 | 21 | A.      No. |
| 10:39:19 | 22 | Q.      Okay.  Let's look at number 15.  "All documents |
| 10:39:22 | 23 | evidencing all policies and procedures of Target |
| 10:39:26 | 24 | regarding the placement of any warnings or notices |
| 10:39:30 | 25 | regarding the floor area that requires cleanup in effect |

ANITA KAY PITTMAN
NOVEMBER 16, 2021

JOB NO. 201975

| | | |
|---|---|---|
| 10:39:32 | 1 | as of June 1st, 2020." |
| 10:39:35 | 2 | Did you have any such policies or procedures as |
| 10:39:37 | 3 | of June 1st, 2020? |
| 10:39:38 | 4 | A.    Yes. |
| 10:39:41 | 5 | Q.    Okay.  And what were they entitled, if you can |
| 10:39:42 | 6 | recall? |
| 10:39:44 | 7 | A.    What are they what? |
| 10:39:47 | 8 | Q.    What was the name of those policies and |
| 10:39:48 | 9 | procedures? |
| 10:39:51 | 10 | A.    For -- cleanup a spill? |
| 10:39:54 | 11 | Q.    No, with respect to warnings or notices, number |
| 10:40:01 | 12 | 15 is what I'm reading from on Exhibit A. |
| 10:40:16 | 13 | A.    Are you saying before the fall, or after the |
| 10:40:16 | 14 | fall? |
| 10:40:20 | 15 | Q.    No.  In effect as of June 1st, 2020, were there |
| 10:40:22 | 16 | any policies or procedures regarding the placement of any |
| 10:40:26 | 17 | warnings or notices regarding the floor area that |
| 10:40:27 | 18 | required a cleanup? |
| 10:40:28 | 19 | A.    Yes. |
| 10:40:31 | 20 | Q.    Okay.  And do you remember the name of those |
| 10:40:32 | 21 | documents? |
| 10:40:32 | 22 | A.    No. |
| 10:40:36 | 23 | Q.    Okay.  Do you still have them at Target? |
| 10:40:36 | 24 | A.    Yes. |
| 10:40:39 | 25 | Q.    And you had those at Target as of June 1st, |

| | | |
|---|---|---|
| 10:40:41 | 1 | 2020; is that correct? |
| 10:40:42 | 2 | A.      Yes. |
| 10:41:03 | 3 | Q.      Okay.  Okay.  Look at number 13. |
| 10:41:05 | 4 | "All documents evidencing all policies and |
| 10:41:09 | 5 | procedures of Target regarding the monitoring and/or |
| 10:41:13 | 6 | maintenance of the floor regarding spillage in effect as |
| 10:41:15 | 7 | of June 1st, 2020." |
| 10:41:15 | 8 | Do you see that? |
| 10:41:16 | 9 | A.      Yes. |
| 10:41:19 | 10 | Q.      Were there such policies or procedures of Target |
| 10:41:22 | 11 | as of June 1st, 2020? |
| 10:41:23 | 12 | A.      Yes. |
| 10:41:25 | 13 | Q.      Okay.  Do you remember the name of those |
| 10:41:26 | 14 | documents? |
| 10:41:34 | 15 | A.      No.  They are inside -- no, I don't. |
| 10:41:36 | 16 | Q.      Okay.  Were they part of the Spill Procedure |
| 10:41:38 | 17 | Cleanup policy? |
| 10:41:38 | 18 | A.      Yes. |
| 10:41:42 | 19 | Q.      Okay.  Do you remember what they said regarding |
| 10:41:46 | 20 | what the policy or procedure was for monitoring or |
| 10:41:49 | 21 | maintenance of the floor? |
| 10:41:51 | 22 | MR. BURNETT:  Objection to the extent it calls |
| 10:41:52 | 23 | for a narrative.  You can respond. |
| 10:41:54 | 24 | THE WITNESS:  So are you talking before a spill, |
| 10:41:57 | 25 | after -- are you talking about after a spill? |

| | | |
|---|---|---|
| 10:42:01 | 1 | Q.       BY MR. BERKOWITZ:  No.  Let's see.  Regarding |
| 10:42:05 | 2 | the monitoring or maintenance of the floor.  So how about |
| 10:42:09 | 3 | we'll start with after the spill. |
| 10:42:12 | 4 | A.       So when there is a spill, in the -- whoever |
| 10:42:15 | 5 | finds the spill, who calls it out, we never leave it |
| 10:42:18 | 6 | unattended.  They call for help for someone to come, and |
| 10:42:21 | 7 | they will bring caution cones if it's something that we |
| 10:42:26 | 8 | can use, absorbent to clean it up with, they bring mops, |
| 10:42:29 | 9 | they bring paper towels, everything they need to clean up |
| 10:42:30 | 10 | the spill. |
| 10:42:32 | 11 | Q.       Okay.  And that's in a written policy or |
| 10:42:36 | 12 | procedure of Target in effect as of June 1st, 2020; is |
| 10:42:36 | 13 | that right? |
| 10:42:37 | 14 | A.       Yes. |
| 10:42:42 | 15 | Q.       Okay.  And you had access to same on June 1st, |
| 10:42:43 | 16 | 2020; is that correct? |
| 10:42:44 | 17 | A.       Yes. |
| 10:42:48 | 18 | Q.       Now, what about any policies or procedures of |
| 10:42:51 | 19 | Target prior to a spill regarding the monitoring or |
| 10:42:55 | 20 | maintenance of the floor? |
| 10:42:58 | 21 | A.       The team -- as you are walking the floor, on the |
| 10:43:01 | 22 | floor, we are told to, you know, look, be aware of our |
| 10:43:05 | 23 | surroundings, be looking out for any water spills, or |
| 10:43:07 | 24 | trash on the floor. |
| 10:43:10 | 25 | Q.       Okay.  And would that be in the same documents |

| | | |
|---|---|---|
| 10:43:13 | 1 | we described, Spill Procedure Cleanup policies? |
| 10:43:16 | 2 | A.        I'm not sure. |
| 10:43:20 | 3 | Q.        Was it in effect, though, in writing as of June |
| 10:43:20 | 4 | 1st, 2020? |
| 10:43:52 | 5 | A.        I'm -- I'm not sure.  No. |
| 10:43:59 | 6 | Q.        In connection with the incident on June 1st, |
| 10:44:03 | 7 | 2020, did you specifically look at any policies or |
| 10:44:05 | 8 | procedures to guide you? |
| 10:44:12 | 9 | A.        Are you talking about after the incident? |
| 10:44:14 | 10 | During the incident? |
| 10:44:15 | 11 | Q.        Yes. |
| 10:44:15 | 12 | A.        Yes. |
| 10:44:19 | 13 | Q.        Okay.  And what policies and procedures did you |
| 10:44:24 | 14 | look at to guide you regarding this particular incident |
| 10:44:25 | 15 | with Connie Broadous? |
| 10:44:27 | 16 | A.        I followed the incident jacket. |
| 10:44:29 | 17 | Q.        I'm sorry.  The incident what? |
| 10:44:31 | 18 | A.        I followed the incident jacket.  What it says to |
| 10:44:33 | 19 | do on the incident jacket. |
| 10:44:38 | 20 | Q.        Okay.  And you have already described that to me |
| 10:44:42 | 21 | as to what to do with the incident jacket? |
| 10:44:43 | 22 |          Let me ask you this way. |
| 10:44:45 | 23 |          What did the incident jacket say that you |
| 10:44:46 | 24 | followed? |
| 10:44:51 | 25 | A.        To get witness statements, team member |

ANITA KAY PITTMAN
NOVEMBER 16, 2021

JOB NO. 201975

| | | |
|---|---|---|
| 10:44:56 | 1 | statements, pictures, and if there is any video, video. |
| 10:45:00 | 2 | Q.      And when it discusses video, specifically what |
| 10:45:03 | 3 | does it say about video as to what should be taken -- or, |
| 10:45:06 | 4 | excuse me, what should be looked at? |
| 10:45:07 | 5 | A.      Video of the incident. |
| 10:45:10 | 6 | Q.      And how does it describe the word "incident"? |
| 10:45:16 | 7 | A.      Just video of the -- any video of the incident |
| 10:45:19 | 8 | happening. |
| 10:45:26 | 9 | Q.      Is it your -- was it your understanding as of |
| 10:45:31 | 10 | June 1st, 2020, that incident simply meant the area where |
| 10:45:32 | 11 | the fall occurred? |
| 10:45:33 | 12 | A.      Yes. |
| 10:45:38 | 13 | Q.      But no other area; is that correct? |
| 10:45:39 | 14 | A.      Correct. |
| 10:45:52 | 15 | Q.      Did you ever receive a notice from anyone to |
| 10:45:56 | 16 | preserve video footage in this matter? |
| 10:46:02 | 17 | A.      Did I receive a notice from anyone? |
| 10:46:08 | 18 | Q.      Yeah, to preserve, maintain, video footage in |
| 10:46:09 | 19 | this matter? |
| 10:46:15 | 20 | A.      No.  I followed what it said on the jacket. |
| 10:46:18 | 21 | Q.      Do you know who Sedgwick, S-e-d-w-i-c-k [sic], |
| 10:46:27 | 22 | Claims Management Services is? |
| 10:46:27 | 23 | A.      Yes. |
| 10:46:31 | 24 | Q.      Okay.  In connection with Target, what's the |
| 10:46:35 | 25 | relationship of Sedgwick Claims Management Services to |

| | | |
|---|---|---|
| 10:46:36 | 1 | Target? |
| 10:46:40 | 2 | A.      Well, that's where we send the packet to. |
| 10:46:42 | 3 | Q.      What packet are you referring to? |
| 10:46:43 | 4 | A.      The incident jacket. |
| 10:46:48 | 5 | Q.      Are you saying a completed incident report is |
| 10:46:49 | 6 | who you send that to? |
| 10:46:50 | 7 | A.      Yes. |
| 10:46:53 | 8 | Q.      And in this case with Connie Broadous, did you |
| 10:46:58 | 9 | send the incident report to Sedgwick? |
| 10:46:59 | 10 | A.      Yes. |
| 10:47:08 | 11 | Q.      Okay.  Is Sedgwick, if you know, owned or |
| 10:47:10 | 12 | controlled by Target? |
| 10:47:11 | 13 | A.      I don't know. |
| 10:47:16 | 14 | Q.      Each time, though, in the past when -- your |
| 10:47:19 | 15 | five-to-ten incident reports that you prepared, did you |
| 10:47:23 | 16 | send that to Sedgwick, those reports? |
| 10:47:23 | 17 | A.      Yes. |
| 10:47:27 | 18 | Q.      Okay.  How do you send it to Sedgwick?  Do you |
| 10:47:29 | 19 | email it to them?  Do you express mail it to them? |
| 10:47:30 | 20 | What's the procedure? |
| 10:47:33 | 21 | A.      We put it in the -- our mail, and it gets sent |
| 10:47:35 | 22 | to them. |
| 10:47:46 | 23 |         MR. BERKOWITZ:  I'm going to mark as Exhibit C, |
| 10:48:23 | 24 | a June 12th, 2020 letter from Etehad Law to Target. |
| | 25 | //// |

| | | |
|---|---|---|
| | 1 | (Plaintiff's Exhibit C was marked for |
| 10:48:26 | 2 | identification.) |
| 10:48:36 | 3 | Q.     BY MR. BERKOWITZ:  Can you see this letter? |
| 10:48:37 | 4 | A.     Yes. |
| 10:48:46 | 5 | Q.     This is a letter from Etehad Law, among other |
| 10:48:50 | 6 | things, requesting preservation of evidence, including |
| 10:48:53 | 7 | photographs or video. |
| 10:48:54 | 8 | Do you see that? |
| 10:48:56 | 9 | A.     Yes.  I see that. |
| 10:48:58 | 10 | Q.     And do you also see it says from four hours |
| 10:49:00 | 11 | prior to the incident up to and including four hours |
| 10:49:01 | 12 | after the incident? |
| 10:49:12 | 13 | Do you see that? |
| 10:49:12 | 14 | A.     Yes. |
| 10:49:15 | 15 | Q.     Did you ever receive a copy of this letter? |
| 10:49:16 | 16 | A.     No. |
| 10:49:21 | 17 | Q.     Did anyone talk to you about this notice of |
| 10:49:23 | 18 | preservation of evidence? |
| 10:49:24 | 19 | A.     No. |
| 10:49:38 | 20 | Q.     Do you know the -- and if you don't know, just |
| 10:49:39 | 21 | let me know. |
| 10:49:41 | 22 | Do you know the policy of your Target store with |
| 10:49:48 | 23 | respect to how long they keep video footage with respect |
| 10:49:50 | 24 | to a slip-and-fall incident? |
| 10:49:51 | 25 | A.     No. |

| | | |
|---|---|---|
| 10:49:56 | 1 | Q.      Do you know who would know that policy, which |
| 10:49:57 | 2 | person? |
| 10:49:59 | 3 | A.      No, I don't. |
| 10:50:01 | 4 | Q.      You don't know if it's -- whether it's |
| 10:50:04 | 5 | Ms. Jafari or someone else that would have that |
| 10:50:04 | 6 | knowledge? |
| 10:50:05 | 7 | A.      I -- I don't know. |
| 10:50:46 | 8 | Q.      Let me mark as Exhibit -- by the way, in that |
| 10:50:49 | 9 | last letter we just looked at that was sent to Target at |
| 10:50:53 | 10 | your store address, do you know generally who would have |
| 10:50:57 | 11 | received it as of June 1st, 2020 on behalf of Target? |
| 10:50:58 | 12 | A.      No.  I do not. |
| 10:51:06 | 13 | Q.      Did Jennifer, your store manager, ever discuss |
| 10:51:09 | 14 | that letter with -- that we just looked at, Exhibit C, |
| 10:51:10 | 15 | with you? |
| 10:51:10 | 16 | A.      No. |
| 10:51:15 | 17 | MR. BERKOWITZ:  Let me mark as Exhibit D, a |
| 10:51:18 | 18 | letter dated June 15th, 2020. |
| | 19 | (Plaintiff's Exhibit D was marked for |
| 10:51:20 | 20 | identification.) |
| 10:51:28 | 21 | Q.      BY MR. BERKOWITZ:  This is the identical letter |
| 10:51:32 | 22 | we just looked at, but it's dated June 15th, and it's |
| 10:51:33 | 23 | sent to Sedgwick. |
| 10:51:34 | 24 | Have you ever seen this letter before? |
| 10:51:35 | 25 | A.      No.  I have not. |

ANITA KAY PITTMAN
NOVEMBER 16, 2021

JOB NO. 201975

| | | |
|---|---|---|
| 10:51:39 | 1 | Q.        Did Sedgwick ever discuss any type of |
| 10:51:42 | 2 | requirement to preserve evidence? |
| 10:51:43 | 3 | A.        No. |
| 10:51:44 | 4 |           MR. BURNETT:  Objection, vague.  You can |
| 10:51:46 | 5 | respond. |
| 10:51:46 | 6 |           THE WITNESS:  No. |
| 10:51:47 | 7 | Q.        BY MR. BERKOWITZ:  You're -- you're right.  By |
| 10:51:48 | 8 | the way, let me rephrase that. |
| 10:51:53 | 9 |           Did Sedgwick ever discuss this letter regarding |
| 10:51:56 | 10 | preservation of evidence regarding Connie Broadous with |
| 10:51:57 | 11 | you? |
| 10:51:58 | 12 | A.        No. |
| 10:52:21 | 13 | Q.        During the time that -- and by the way, when you |
| 10:52:29 | 14 | say you're an ETL Specialty Services employee of the |
| 10:52:33 | 15 | store, are you in effect a manager -- one of the managers |
| 10:52:35 | 16 | of the store? |
| 10:52:35 | 17 |           MR. BURNETT:  Objection, vague.  You can |
| 10:52:37 | 18 | respond. |
| 10:52:39 | 19 |           THE WITNESS:  I'm a department manager. |
| 10:52:52 | 20 | Q.        BY MR. BERKOWITZ:  On June 1st, 2020, at the |
| 10:52:58 | 21 | time of the incident, was there anyone higher ranking |
| 10:53:04 | 22 | than you at the store who was present at the store as an |
| 10:53:06 | 23 | employee of Target? |
| 10:53:19 | 24 | A.        I -- I don't remember. |
| 10:53:20 | 25 |           MR. BURNETT:  Hey, Steve, in the next five, can |

10:53:23  1   we take a break when you -- when you're in a good spot?

10:53:24  2            MR. BERKOWITZ:  Actually, why don't we take a

10:53:26  3   break now.  Is that all right?

10:53:27  4            MR. BURNETT:  That's fine with me.

10:53:28  5            MR. BERKOWITZ:  All right.  How about -- we're

10:53:34  6   moving quickly, so I don't expect this to be an all-day

10:53:36  7   thing, or even close to it.

10:53:37  8            MR. BURNETT:  I hope not.

10:53:38  9            MR. BERKOWITZ:  No.  That doesn't give you

10:53:41  10  enough information.  We're off the record, by the way.

10:53:42  11           THE VIDEOGRAPHER:  Okay.  I will read us off

10:53:45  12  real quick, just because we're on video as well.

10:53:47  13           We are now off the record.  The time is now

          14  10:53 A.M.

11:02:04  15           (Recess.)

11:02:06  16           THE VIDEOGRAPHER:  We are now back on the

11:02:09  17  record.  The time is 11:02 A.M. Pacific Time.

11:02:14  18  Q.        BY MR. BERKOWITZ:  Ms. Pittman, is there

11:02:17  19  anything you wish to add or amend?

11:02:17  20  A.        No.

11:03:00  21  Q.        Okay.  Okay.  Let's go back to Exhibit A.  Let

11:03:01  22  me -- hold on a second.  Let me see if I can maximize

11:03:15  23  this.  How is this?  Can you see Exhibit A?

11:03:20  24  A.        Is that for Ms. Pittman?

11:03:21  25  Q.        Yes.

| 11:03:22 | 1 | A.       Yes, I can. |
| 11:03:32 | 2 | Q.       Okay.  Let's go to number 7, Exhibit A.  It |
| 11:03:34 | 3 | asked for all reports made of the incident. |
| 11:03:40 | 4 | Now, there was a -- approximate two-page report |
| 11:03:46 | 5 | prepared of the incident on the date of the incident. |
| 11:03:49 | 6 | Do you recall that's -- is that the only report |
| 11:03:52 | 7 | that was prepared regarding the incident? |
| 11:03:57 | 8 | A.       From what I did in the incident jacket, yes. |
| 11:04:03 | 9 | Q.       Okay.  If I were to go to -- oops.  Let's stop |
| 11:04:20 | 10 | the sharing and let's go to Exhibit B.  Okay. |
| 11:04:25 | 11 | Can you see the first page, Supplemental |
| 11:04:27 | 12 | Disclosures? |
| 11:04:28 | 13 | A.       Yes. |
| 11:04:38 | 14 | Q.       Okay.  Now, if I were to go to page 4, it says, |
| 11:04:40 | 15 | "Guest Incident Report." |
| 11:04:42 | 16 | Is this a document you prepared? |
| 11:04:43 | 17 | A.       Yes. |
| 11:04:45 | 18 | Q.       Okay.  And is that your writing on top, |
| 11:04:48 | 19 | "Location; Report"? |
| 11:04:48 | 20 | A.       Yes. |
| 11:04:53 | 21 | Q.       Okay.  And do you -- do you -- do you recall how |
| 11:04:56 | 22 | long after the slip and fall this occurred where you |
| 11:04:58 | 23 | prepared it? |
| 11:05:02 | 24 | A.       I prepared it after the ambulance took her to |
| 11:05:04 | 25 | the hospital once they left the building. |

| | | |
|---|---|---|
| 11:05:10 | 1 | Q.        Had you already talken -- excuse me.   Had you |
| 11:05:13 | 2 | already interviewed Connie Broadous before she was taken |
| 11:05:14 | 3 | away by ambulance? |
| 11:05:14 | 4 | A.        Yes. |
| 11:05:16 | 5 | Q.        Okay.   Had you already interviewed Verna |
| 11:05:21 | 6 | Stewart, this person right here in the middle of this |
| 11:05:25 | 7 | page -- first page, before the ambulance took Connie |
| 11:05:26 | 8 | Broadous away? |
| 11:05:26 | 9 | A.        Yes. |
| 11:05:30 | 10 | Q.        Okay.   Now you see where it says "Guest |
| 11:05:32 | 11 | Description of the Incident, Injury, and/or Damages (in |
| 11:05:34 | 12 | their own words)"? |
| 11:05:34 | 13 | A.        Yes. |
| 11:05:38 | 14 | Q.        Whose words are those that you just -- it starts |
| 11:05:40 | 15 | with, "Walking to check out"? |
| 11:05:51 | 16 | A.        It was Connie. |
| 11:05:54 | 17 | Q.        And you see where it says, "What was the cause |
| 11:05:57 | 18 | of the incident?"   And it says, "Slipped on soap on |
| 11:05:58 | 19 | floor"? |
| 11:05:58 | 20 | A.        Yes. |
| 11:06:03 | 21 | Q.        Did you write that, or did Connie tell you that? |
| 11:06:04 | 22 | MR. BURNETT:   Objection, vague.   You can |
| 11:06:05 | 23 | respond. |
| 11:06:06 | 24 | THE WITNESS:   That's what I asked the guest. |
| 11:06:08 | 25 | That's what she told me. |

| | | |
|---|---|---|
| 11:06:13 | 1 | Q.        BY MR. BERKOWITZ:   Okay.   And these are all -- |
| 11:06:15 | 2 | it says, "Questions to ask the guest." |
| 11:06:18 | 3 | Are all these responses under this category |
| 11:06:21 | 4 | questions to ask the guest? |
| 11:06:21 | 5 | A.        Yes. |
| 11:06:23 | 6 | Q.        Responses of Connie? |
| 11:06:24 | 7 | A.        Yes. |
| 11:06:28 | 8 | Q.        Did she tell you -- did she describe anything |
| 11:06:31 | 9 | more than how she was injured, or the extent of her |
| 11:06:33 | 10 | injuries, other than what you have here? |
| 11:06:34 | 11 | A.        No. |
| 11:06:38 | 12 | Q.        Did she sign this? |
| 11:06:38 | 13 | A.        Yes. |
| 11:06:46 | 14 | Q.        And did you -- is that your signature too on |
| 11:06:49 | 15 | June 1st, 2020, on this report? |
| 11:06:49 | 16 | A.        Yes. |
| 11:06:55 | 17 | Q.        And then what did you do with this report after |
| 11:06:57 | 18 | it was prepared? |
| 11:07:03 | 19 | A.        After it was prepared, I gave her a copy, and |
| 11:07:07 | 20 | then we kept -- put the rest of it together in the |
| 11:07:09 | 21 | envelope and mailed it off. |
| 11:07:13 | 22 | Q.        Now, are there any other witnesses that you |
| 11:07:17 | 23 | interviewed on June 1st, 2020, in connection with the |
| 11:07:17 | 24 | incident? |
| 11:07:29 | 25 | A.        Yes. |

| 11:07:30 | 1 | Q. | And who was that? |
|---|---|---|---|

11:07:30   1   Q.   And who was that?

11:07:32   2   A.   There was a gentleman there.

11:07:37   3   Q.   Do you -- do you recall the gentleman's name?

11:07:38   4   A.   No.  I do not.

11:07:42   5   Q.   How do you know this person was a witness?

11:07:47   6   A.   Because he gave us his phone number at the --

11:07:56   7   and he told them -- he told us what he saw.

11:08:04   8   Q.   Is there another document that contains what he

11:08:08   9   told you, or any of your team members?

11:08:18   10   A.   I don't remember.

11:08:24   11   Q.   If once you talk to a witness in connection with

11:08:28   12   an incident, is that part of the incident report that you

11:08:31   13   eventually go on and send to Sedgwick?

11:08:32   14   A.   Yes.

11:08:38   15   Q.   But in this case, we're looking at the Exhibit

11:08:46   16   B, pages 4 -- excuse me, 3 and 4.  I take that back.

11:08:49   17   It's page -- it's just one page, it looks like.

11:08:51   18   Is the incident report just one page?

11:08:52   19   A.   No.

11:08:58   20   Q.   All I have is this one page.  "Guest Incident

11:09:05   21   Report."  And then your signature and Connie's signature

11:09:06   22   are on the bottom of this.

11:09:11   23   Do you know of any other documents pertaining to

11:09:12   24   this incident report?

11:09:14   25   A.   Any team members who were there.

ANITA KAY PITTMAN
NOVEMBER 16, 2021                                                    JOB NO. 201975

| | | |
|---|---|---|
| 11:09:19 | 1 | Q.      And were there other documents pertaining to the |
| 11:09:24 | 2 | incident regarding their -- what they witnessed, or what |
| 11:09:25 | 3 | they talked about? |
| 11:09:29 | 4 | A.      There -- if there was a team member that saw |
| 11:09:31 | 5 | anything, there was a page for them to fill out. |
| 11:09:34 | 6 | Q.      Well, what about this gentleman you just |
| 11:09:37 | 7 | described who gave his phone number and stated what he |
| 11:09:40 | 8 | saw? |
| 11:09:42 | 9 |         Where is the writing regarding that? |
| 11:09:46 | 10 | A.      It had -- I don't know. |
| 11:09:49 | 11 | Q.      Have you ever looked for it? |
| 11:09:53 | 12 | A.      No. |
| 11:09:58 | 13 | Q.      Do you know if it exists, a writing stating what |
| 11:10:04 | 14 | this witness saw, or said, or his phone number? |
| 11:10:06 | 15 | A.      I don't remember if there was a witness |
| 11:10:09 | 16 | statement in the packet.  I don't remember. |
| 11:10:11 | 17 | Q.      But you do recall speaking to a gentleman, |
| 11:10:12 | 18 | right? |
| 11:10:12 | 19 | A.      Yes. |
| 11:10:15 | 20 | Q.      Do you recall his name? |
| 11:10:16 | 21 | A.      No. |
| 11:10:20 | 22 | Q.      Do you recall what he looked like? |
| 11:10:20 | 23 | A.      No. |
| 11:10:22 | 24 | Q.      Do you recall approximately how old he was? |
| 11:10:23 | 25 | A.      No. |

| | | |
|---|---|---|
| 11:10:25 | 1 | Q. Do you recall what he told you? |
| 11:10:28 | 2 | A. Yes. |
| 11:10:30 | 3 | Q. All right. And what did he tell you? |
| 11:10:34 | 4 | A. He said it happened within seconds. She was |
| 11:10:38 | 5 | walking behind another lady, and the lady dropped the |
| 11:10:42 | 6 | soap, and it happened within seconds of her falling. |
| 11:10:53 | 7 | Q. So he said she was walking behind a lady |
| 11:10:56 | 8 | carrying the soap; is that right? |
| 11:10:56 | 9 | A. No. |
| 11:10:57 | 10 | MR. BURNETT: Objection. Misstates testimony. |
| 11:10:58 | 11 | You can respond. |
| 11:10:59 | 12 | THE WITNESS: Yes. |
| 11:11:01 | 13 | Q. BY MR. BERKOWITZ: Okay. And he said that the |
| 11:11:05 | 14 | lady then dropped the soap, or the container with the |
| 11:11:06 | 15 | soap? |
| 11:11:07 | 16 | A. Yes. |
| 11:11:12 | 17 | Q. And then he said within seconds, Connie Broadous |
| 11:11:13 | 18 | fell? |
| 11:11:13 | 19 | A. Yes. |
| 11:11:16 | 20 | Q. He didn't know the name, obviously, but he said |
| 11:11:18 | 21 | within seconds this woman fell; is that right? |
| 11:11:19 | 22 | A. Yes. |
| 11:11:21 | 23 | Q. Okay. Do you recall anything else he said? |
| 11:11:24 | 24 | A. No. |
| 11:11:29 | 25 | Q. Did you ask him questions? |

ANITA KAY PITTMAN
NOVEMBER 16, 2021

JOB NO. 201975

| | | |
|---|---|---|
| 11:11:30 | 1 | A.      No. |
| 11:11:34 | 2 | Q.      Did he just volunteer this to you, then? |
| 11:11:39 | 3 | A.      It -- I asked -- let me rephrase it. |
| 11:11:43 | 4 | I -- he asked -- Ruth talked to him, and he told |
| 11:11:44 | 5 | Ruth. |
| 11:11:53 | 6 | Q.      And would it have been store policy for Ruth to |
| 11:11:55 | 7 | have put that in writing, what he told her? |
| 11:12:00 | 8 | A.      Yes, if she filled out the statement. |
| 11:12:02 | 9 | Q.      And is it your understanding that she did fill |
| 11:12:05 | 10 | out a written statement what he told her, right? |
| 11:12:05 | 11 | MR. BURNETT:  Objection.  Calls for speculation. |
| 11:12:07 | 12 | You can respond, if you know. |
| 11:12:09 | 13 | THE WITNESS:  I'm not sure. |
| 11:12:10 | 14 | Q.      BY MR. BERKOWITZ:  Did you ever talk to Ruth |
| 11:12:13 | 15 | after the incident and ask her, "Did you fill out a |
| 11:12:17 | 16 | report regarding what the gentleman said?" |
| 11:12:19 | 17 | A.      No.  I don't remember doing that. |
| 11:12:21 | 18 | Q.      All right.  And all the way through the present |
| 11:12:25 | 19 | to today, have you ever talked to Ruth as to whether she |
| 11:12:27 | 20 | prepared a report what this guy said? |
| 11:12:29 | 21 | A.      No.  I did not. |
| 11:12:37 | 22 | Q.      But on June 1st, 2020, is it correct that Target |
| 11:12:41 | 23 | had the name and telephone number of this guy, which he |
| 11:12:42 | 24 | gave you? |
| 11:12:43 | 25 | A.      Yes. |

| 11:12:46 | 1 | Q.      Okay.  And how do you know that? |
| 11:12:56 | 2 | A.      Because -- I -- I don't -- there was a report |
| 11:12:59 | 3 | with his name and phone number on there. |
| 11:13:02 | 4 | Q.      Okay.  And where did you see that report? |
| 11:13:10 | 5 | A.      I -- I put -- we also have to -- I put it in the |
| 11:13:13 | 6 | incident jacket. |
| 11:13:17 | 7 | Q.      Okay.  This document we're looking at right now, |
| 11:13:23 | 8 | page 4 of Exhibit B, doesn't refer to this witness, |
| 11:13:24 | 9 | right? |
| 11:13:25 | 10 | A.      No. |
| 11:13:27 | 11 | Q.      I'm sorry.  Would that be correct, it doesn't |
| 11:13:29 | 12 | refer to the witness; is that correct? |
| 11:13:29 | 13 | A.      Correct. |
| 11:13:34 | 14 | Q.      Okay.  But you said it's on the jacket.  And |
| 11:13:37 | 15 | when you say "on the jacket," that means it's in a -- in |
| 11:13:41 | 16 | another writing, or part of the -- part of the writing |
| 11:13:44 | 17 | that you sent on to Sedgwick, right? |
| 11:13:44 | 18 | A.      Yes. |
| 11:13:50 | 19 | Q.      Okay.  Where is that document today, the jacket |
| 11:13:51 | 20 | you are referring to? |
| 11:13:56 | 21 | A.      I -- I don't know if it's at Sedgwick.  I don't |
| 11:13:57 | 22 | know. |
| 11:14:02 | 23 | Q.      Okay.  But is it fair to say that this document |
| 11:14:06 | 24 | we're looking at, page 4 of Exhibit B, is not complete? |
| 11:14:08 | 25 | That there is another document that should be part of the |

ANITA KAY PITTMAN
NOVEMBER 16, 2021                                                    JOB NO. 201975

| | | |
|---|---|---|
| 11:14:10 | 1 | jacket; is that correct? |
| 11:14:12 | 2 | MR. BURNETT:  Objection.  Calls for a legal |
| 11:14:15 | 3 | conclusion, calls for speculation.  You can respond. |
| 11:14:16 | 4 | THE WITNESS:  Yes. |
| 11:14:27 | 5 | Q.        BY MR. BERKOWITZ:  And do you know if Sedgwick |
| 11:14:30 | 6 | had that information regarding the gentleman's name and |
| 11:14:33 | 7 | number? |
| 11:14:35 | 8 | MR. BURNETT:  Objection to the extent it calls |
| 11:14:36 | 9 | for speculation.  You can respond. |
| 11:14:37 | 10 | THE WITNESS:  Yes.  I believe so. |
| 11:14:39 | 11 | Q.        BY MR. BERKOWITZ:  Okay.  And that would have |
| 11:14:44 | 12 | been immediately after June 1st, 2020, when the report |
| 11:14:46 | 13 | was sent to them, right? |
| 11:14:47 | 14 | A.        Yes. |
| 11:14:57 | 15 | Q.        Do you know if that person, that gentleman you |
| 11:14:59 | 16 | are talking about, ever gave his address? |
| 11:15:02 | 17 | A.        No, I don't. |
| 11:15:04 | 18 | Q.        Would that have been part of the policy and |
| 11:15:08 | 19 | procedure of Target on June 1st, 2020, to get the |
| 11:15:10 | 20 | witness' address? |
| 11:15:12 | 21 | A.        I don't remember what it called for on the |
| 11:15:15 | 22 | report.  So I don't remember. |
| 11:15:19 | 23 | Q.        Well, take a look at this, Exhibit B, page 4. |
| 11:15:22 | 24 | It asked for the address. |
| 11:15:25 | 25 | Do you see that, for guests? |

| | | |
|---|---|---|
| 11:15:26 | 1 | A.      Yes. |
| 11:15:30 | 2 | Q.      Do you -- do you believe it also would have |
| 11:15:33 | 3 | asked for the address of the witness, just like it asked |
| 11:15:37 | 4 | for Verna Stewart's address; is that correct? |
| 11:15:39 | 5 | MR. BURNETT:  Objection.  Asked and answered. |
| 11:15:42 | 6 | Calls for speculation.  You can respond, if you know. |
| 11:15:43 | 7 | THE WITNESS:  No.  I don't remember. |
| 11:15:52 | 8 | Q.      BY MR. BERKOWITZ:  Approximately when were you |
| 11:15:55 | 9 | first aware there was a lawsuit filed in this -- in this |
| 11:15:56 | 10 | matter? |
| 11:16:16 | 11 | A.      Oh, gosh.  I don't remember.  I -- I don't |
| 11:16:17 | 12 | remember when. |
| 11:16:21 | 13 | Q.      Okay.  But would it be fair to say you knew |
| 11:16:23 | 14 | months and months ago, right?  More than four or five |
| 11:16:25 | 15 | months ago that a lawsuit had been filed? |
| 11:16:26 | 16 | A.      No. |
| 11:16:31 | 17 | Q.      Okay.  What is your best estimate as to when you |
| 11:16:39 | 18 | were aware there was a lawsuit filed?  Just a range. |
| 11:16:48 | 19 | A.      I don't remember, but probably months ago. |
| 11:16:51 | 20 | Q.      All right.  More than three months ago? |
| 11:16:54 | 21 | A.      No.  It's more than three -- I have been gone -- |
| 11:16:55 | 22 | yeah.  More than three months ago. |
| 11:16:57 | 23 | Q.      More than six months ago? |
| 11:16:58 | 24 | A.      No. |
| 11:17:05 | 25 | Q.      Okay.  But since you found out that a lawsuit |

ANITA KAY PITTMAN
NOVEMBER 16, 2021

JOB NO. 201975

| 11:17:11 | 1 | had been filed, have you talked to Ruth about this |
| 11:17:13 | 2 | incident? |
| 11:17:13 | 3 | A.        No. |
| 11:17:14 | 4 | MR. BURNETT:  Objection.  Asked and answered. |
| 11:17:15 | 5 | You can respond. |
| 11:17:17 | 6 | THE WITNESS:  No.  I have not. |
| 11:17:20 | 7 | Q.        BY MR. BERKOWITZ:  Other than your attorney, or |
| 11:17:25 | 8 | attorneys, have you talked to anyone else about this |
| 11:17:29 | 9 | incident other than what you also described here today? |
| 11:17:33 | 10 | A.        No. |
| 11:17:36 | 11 | Q.        Did you -- without telling me the content, did |
| 11:17:39 | 12 | you talk to your insurance carrier's representative about |
| 11:17:40 | 13 | the incident? |
| 11:17:42 | 14 | A.        No, I haven't. |
| 11:17:44 | 15 | Q.        Were you interviewed by the insurance carrier |
| 11:17:46 | 16 | regarding the incident? |
| 11:17:46 | 17 | A.        No. |
| 11:17:49 | 18 | Q.        Were you interviewed by anyone at Target |
| 11:17:51 | 19 | regarding the incident? |
| 11:17:57 | 20 | A.        Can you specify? |
| 11:18:00 | 21 | Q.        Not including your -- any attorneys. |
| 11:18:00 | 22 | A.        Okay. |
| 11:18:04 | 23 | Q.        Were you interviewed by anyone at Target |
| 11:18:05 | 24 | regarding the incident? |
| 11:18:06 | 25 | A.        No. |

ANITA KAY PITTMAN
NOVEMBER 16, 2021

JOB NO. 201975

| | | |
|---|---|---|
| 11:18:22 | 1 | Q.       Now, let's go back to when you asked for video |
| 11:18:26 | 2 | footage of the incident, and you stated that you meant |
| 11:18:29 | 3 | incident to be the place where the slip and fall |
| 11:18:30 | 4 | occurred, right? |
| 11:18:31 | 5 | A.       Correct. |
| 11:18:36 | 6 | Q.       Okay.  What if a person had been running and |
| 11:18:39 | 7 | then slipped and fall [sic], if you only looked at the |
| 11:18:42 | 8 | place where the fall occurred, the video footage would |
| 11:18:44 | 9 | not show the running; is that correct? |
| 11:18:45 | 10 | MR. BURNETT:  Objection.  Calls for speculation, |
| 11:18:48 | 11 | incomplete hypothetical.  You can respond, if you know. |
| 11:18:49 | 12 | THE WITNESS:  I don't know. |
| 11:18:52 | 13 | Q.       BY MR. BERKOWITZ:  What I'm asking is this. |
| 11:18:58 | 14 | Since things leading up to an incident are relevant, have |
| 11:19:02 | 15 | you ever looked at video footage of a slip and fall in |
| 11:19:06 | 16 | the moments before the -- the area that is depicting the |
| 11:19:08 | 17 | person involved or persons involved? |
| 11:19:09 | 18 | A.       No. |
| 11:19:11 | 19 | MR. BURNETT:  Objection, vague. |
| 11:19:14 | 20 | Q.       BY MR. BERKOWITZ:  And is it your understanding |
| 11:19:19 | 21 | that that is not what's called for when you are asked to |
| 11:19:23 | 22 | look for video footage of an incident, to look at things |
| 11:19:28 | 23 | happening before the actual slip and fall?  Is that your |
| 11:19:29 | 24 | understanding? |
| 11:19:30 | 25 | MR. BURNETT:  Objection, vague.  You can |

| | | |
|---|---|---|
| 11:19:31 | 1 | respond. |
| 11:19:31 | 2 | THE WITNESS:   Yes. |
| 11:19:38 | 3 | Q.      BY MR. BERKOWITZ:  Okay.  By the way, does |
| 11:19:44 | 4 | Target have any motorized carts for handicapped persons |
| 11:19:48 | 5 | or elderly at the store as of June 1st, 2020? |
| 11:19:49 | 6 | A.      Yes. |
| 11:19:53 | 7 | Q.      Okay.  Have there been any accidents that you |
| 11:19:56 | 8 | are aware of involving motorized carts? |
| 11:19:57 | 9 | A.      I don't know. |
| 11:20:29 | 10 | Q.      At any time have you ever attempted to track |
| 11:20:33 | 11 | this gentleman who gave the statement in connection with |
| 11:20:35 | 12 | the incident to follow up? |
| 11:20:35 | 13 | A.      No. |
| 11:20:39 | 14 | Q.      At any time are you aware of anyone at Target |
| 11:20:45 | 15 | who attempted to get ahold of this gentleman who stated |
| 11:20:47 | 16 | he witnessed what occurred? |
| 11:20:50 | 17 | A.      No.  I'm not aware. |
| 11:20:52 | 18 | Q.      Do you -- does this refresh your memory that |
| 11:20:56 | 19 | that gentleman's name is Luis Saldano? |
| 11:20:56 | 20 | A.      No. |
| 11:21:01 | 21 | Q.      L-u-i-s S-a-l-d-a-n-o. |
| 11:21:01 | 22 | A.      No. |
| 11:21:06 | 23 | Q.      Do you know if this gentleman was accompanied by |
| 11:21:12 | 24 | anyone, a friend, acquaintance, when he gave the |
| 11:21:13 | 25 | statement? |

| | | |
|---|---|---|
| 11:21:16 | 1 | A.      No.  I do not. |
| 11:21:21 | 2 | Q.      Did that gentleman speak to you directly? |
| 11:21:25 | 3 | A.      No. |
| 11:21:28 | 4 | Q.      Did you speak to that gentleman? |
| 11:21:29 | 5 | A.      No. |
| 11:21:32 | 6 | Q.      When -- did you see Ruth speaking to the |
| 11:21:32 | 7 | gentleman? |
| 11:21:36 | 8 | A.      No. |
| 11:21:40 | 9 | Q.      Was he -- was Ruth present at the scene of the |
| 11:21:43 | 10 | accident when you were conducting your interview of |
| 11:21:46 | 11 | Connie Broadous or Verna Stewart? |
| 11:21:51 | 12 | A.      I don't remember where she was when I was |
| 11:21:53 | 13 | talking to them, but she was there. |
| 11:22:02 | 14 | Q.      Okay.  And at the time Ruth was present at the |
| 11:22:05 | 15 | scene of the accident, how long had she been working for |
| 11:22:10 | 16 | Target, if you know? |
| 11:22:12 | 17 | A.      Do you mean that day, or -- |
| 11:22:14 | 18 | Q.      No.  How long -- I'm sorry.  You're -- that's a |
| 11:22:14 | 19 | good point. |
| 11:22:17 | 20 | How -- how long had she been an employee of |
| 11:22:20 | 21 | Target prior to June 1st, 2020? |
| 11:22:22 | 22 | A.      I don't know how long she has worked for Target. |
| 11:22:24 | 23 | Q.      Okay.  Do you know if Ruth still works for |
| 11:22:25 | 24 | Target? |
| 11:22:25 | 25 | A.      Yes. |

ANITA KAY PITTMAN
NOVEMBER 16, 2021

JOB NO. 201975

| | | |
|---|---|---|
| 11:22:32 | 1 | Q.      Okay.  And at the time of the incident, what was |
| 11:22:34 | 2 | Ruth's position again? |
| 11:22:38 | 3 | A.      GSTL. |
| 11:22:42 | 4 | Q.      Do you know if she still occupies that same |
| 11:22:43 | 5 | position with Target? |
| 11:23:02 | 6 | A.      Yes. |
| 11:23:19 | 7 | Q.      Can you tell me the initials again that you just |
| 11:23:22 | 8 | used? |
| 11:23:24 | 9 | A.      GSTL. |
| 11:23:26 | 10 | Q.      G, like in George, right? |
| 11:23:26 | 11 | A.      Yes. |
| 11:23:29 | 12 | Q.      TSL? |
| 11:23:32 | 13 | A.      S, as in Steve, TL. |
| 11:23:37 | 14 | Q.      What does GSTL stand for? |
| 11:23:39 | 15 | A.      Guest Service Team Leader. |
| 11:23:44 | 16 | Q.      At the time of the incident on June 1st, 2020, |
| 11:23:49 | 17 | was Ruth considered a manager? |
| 11:23:50 | 18 |         MR. BURNETT:  Objection, vague.  You can |
| 11:23:51 | 19 | respond. |
| 11:24:00 | 20 |         THE WITNESS:  No. |
| 11:24:08 | 21 | Q.      BY MR. BERKOWITZ:  Was her super -- were you her |
| 11:24:11 | 22 | supervisor at the time of the incident? |
| 11:24:19 | 23 | A.      I guess, yes, if I was running the store.  Yes. |
| 11:24:23 | 24 | Q.      And do you recall Ruth's last name? |
| 11:24:24 | 25 | A.      No. |

| | | |
|---|---|---|
| 11:24:44 | 1 | Q.        Besides Connie Broadous, Verna Stewart, the two |
| 11:24:49 | 2 | people mentioned in your report, and this gentleman who |
| 11:24:54 | 3 | Ruth interviewed, do you recall, you or any other |
| 11:24:56 | 4 | employee interviewing any other witnesses in connection |
| 11:24:57 | 5 | with the incident? |
| 11:24:58 | 6 | A.        No. |
| 11:25:08 | 7 | Q.        Did Ruth ever discuss with you her interview of |
| 11:25:09 | 8 | this gentleman? |
| 11:25:17 | 9 | A.        Well, the day of she told me what he said. |
| 11:25:22 | 10 | Q.        Okay.   And why did you not include that in your |
| 11:25:26 | 11 | written report, what Ruth told you? |
| 11:25:30 | 12 | A.        My report was the guest incident.   And then |
| 11:25:33 | 13 | there is other reports.   Ruth's report, whoever -- |
| 11:25:36 | 14 | whoever the team -- whoever the store witnesses were, and |
| 11:25:40 | 15 | then there is my -- there is an LOD report. |
| 11:25:49 | 16 | Q.        L, like in lake, O as in open, D like in dog? |
| 11:25:49 | 17 | A.        Yes. |
| 11:25:51 | 18 | Q.        What does LOD stand for? |
| 11:25:53 | 19 | A.        Leader On Duty. |
| 11:25:57 | 20 | Q.        Who prepared the LOD report for June 1st, 2020, |
| 11:25:58 | 21 | regarding this incident? |
| 11:25:59 | 22 | A.        I did. |
| 11:26:10 | 23 | Q.        And what information did the LOD report contain? |
| 11:26:13 | 24 | A.        Whatever my observations were. |
| 11:26:20 | 25 | Q.        And who did you send that report to? |

| | | |
|---|---|---|
| 11:26:23 | 1 | A.       It went in -- it's part of the packet.   It went |
| 11:26:25 | 2 | to Sedgwick. |
| 11:26:28 | 3 | Q.       Okay.  Do you recall what your observations were |
| 11:26:31 | 4 | that you put in that report, the LOD report? |
| 11:26:32 | 5 | A.       No.  No, I don't. |
| 11:26:35 | 6 | Q.       Do you recall how many pages the LOD report was? |
| 11:26:42 | 7 | A.       To fill -- it's one page that I fill out. |
| 11:26:50 | 8 | Q.       So aside from the incident report we looked at, |
| 11:26:55 | 9 | which contains actual statements from the witnesses, and |
| 11:27:00 | 10 | from Connie Broadous, the alleged victim, what types of |
| 11:27:03 | 11 | observations do you normally include in a report like |
| 11:27:05 | 12 | this, generally? |
| 11:27:08 | 13 | A.       What comes in the packet, or -- |
| 11:27:11 | 14 | Q.       No.  Your LOD report, what generally is |
| 11:27:13 | 15 | contained when you talk about observations? |
| 11:27:18 | 16 | A.       It might ask me anything the guest said.  If -- |
| 11:27:22 | 17 | what did I see?  Did I see the spill?  How big was the |
| 11:27:25 | 18 | spill? |
| 11:27:31 | 19 | Q.       Okay.  And that was also part of the jacket |
| 11:27:35 | 20 | package that you sent to Sedgwick right after the |
| 11:27:36 | 21 | incident; is that correct? |
| 11:27:36 | 22 | A.       Yes. |
| 11:27:40 | 23 | Q.       So far we have identified the following |
| 11:27:44 | 24 | documents that was sent to Sedgwick after the accident. |
| 11:27:47 | 25 |          The incident report that we went over in |

| | | |
|---|---|---|
| 11:27:53 | 1 | Exhibit B.   Ruth's report and the LOD; is that correct? |
| 11:27:53 | 2 | A.        Yes. |
| 11:27:55 | 3 |           MR. BURNETT:  Objection.  Misstates testimony, |
| 11:27:57 | 4 | calls for speculation.  You can respond. |
| 11:27:57 | 5 |           THE WITNESS:  Yes. |
| 11:28:00 | 6 | Q.        BY MR. BERKOWITZ:  Are there any other reports |
| 11:28:03 | 7 | that were sent to Sedgwick regarding this incident other |
| 11:28:05 | 8 | than those three? |
| 11:28:06 | 9 | A.        No. |
| 11:28:13 | 10 | Q.        And in preparation for your deposition today, |
| 11:28:15 | 11 | did you look at that LOD report? |
| 11:28:16 | 12 | A.        No. |
| 11:28:19 | 13 | Q.        In preparation for your deposition today, did |
| 11:28:21 | 14 | you look at Ruth's report? |
| 11:28:22 | 15 | A.        No. |
| 11:28:24 | 16 |           MR. BURNETT:  Objection -- |
| 11:28:24 | 17 |           THE WITNESS:  Sorry. |
| 11:28:26 | 18 | Q.        BY MR. BERKOWITZ:  What doc -- what documents |
| 11:28:28 | 19 | have you reviewed in preparation for your deposition |
| 11:28:29 | 20 | today? |
| 11:28:37 | 21 | A.        I haven't reviewed documents. |
| 11:28:42 | 22 | Q.        Who found the container that a picture was taken |
| 11:28:44 | 23 | of in Exhibit B? |
| 11:28:45 | 24 | A.        I don't remember. |
| 11:28:55 | 25 | Q.        How long after the fall of Connie Broadous did |

ANITA KAY PITTMAN
NOVEMBER 16, 2021

JOB NO. 201975

| 11:28:57 | 1 | someone locate the container? |
| 11:29:00 | 2 | A.       I don't know. |
| 11:29:04 | 3 | Q.       How was -- where was this container that was |
| 11:29:07 | 4 | depicted in Exhibit B? |
| 11:29:09 | 5 | MR. BURNETT:  Objection.  Vague as to time.  You |
| 11:29:10 | 6 | can respond. |
| 11:29:11 | 7 | THE WITNESS:  Again, I -- I don't know. |
| 11:29:14 | 8 | Q.       BY MR. BERKOWITZ:  But -- that's a good |
| 11:29:15 | 9 | objection. |
| 11:29:21 | 10 | Someone -- was it an employee on behalf of |
| 11:29:26 | 11 | Target who found a container that allegedly contained the |
| 11:29:29 | 12 | liquid that was on the floor where Connie fell? |
| 11:29:32 | 13 | A.       I don't remember who found it. |
| 11:29:34 | 14 | Q.       All right.  Could it have been a customer that |
| 11:29:35 | 15 | found it, then? |
| 11:29:36 | 16 | MR. BURNETT:  Objection.  Calls for speculation. |
| 11:29:37 | 17 | You can respond. |
| 11:29:40 | 18 | THE WITNESS:  Again, I don't remember who found |
| 11:29:40 | 19 | it. |
| 11:29:50 | 20 | Q.       BY MR. BERKOWITZ:  Do you know if a customer |
| 11:29:55 | 21 | dropped that container containing the soapy liquid where |
| 11:29:56 | 22 | Connie fell? |
| 11:29:59 | 23 | A.       That's what I was told. |
| 11:30:01 | 24 | Q.       And who told you that? |
| 11:30:09 | 25 | A.       Ruth told me that's what she was told. |

| | | |
|---|---|---|
| 11:30:14 | 1 | Q.      Did Ruth tell you who told her that a customer |
| 11:30:17 | 2 | dropped a liquid container? |
| 11:30:21 | 3 | A.      I don't remember who -- who told her. |
| 11:30:30 | 4 | Q.      Do you know how Ruth discovered that? |
| 11:30:32 | 5 | A.      No.  I do not. |
| 11:30:40 | 6 | Q.      Did you ever attempt to look for pictures or |
| 11:30:44 | 7 | video footage taken by Target of this customer dropping |
| 11:30:47 | 8 | the container? |
| 11:30:49 | 9 | MR. BURNETT:  Objection.  Asked and answered, |
| 11:30:51 | 10 | but you can respond. |
| 11:30:53 | 11 | THE WITNESS:  Did I personally look for pictures |
| 11:30:55 | 12 | and video? |
| 11:30:57 | 13 | Q.      BY MR. BERKOWITZ:  Of the customer who dropped |
| 11:30:58 | 14 | the liquid? |
| 11:31:02 | 15 | A.      No.  I did not. |
| 11:31:07 | 16 | Q.      Would that have been important as part of your |
| 11:31:11 | 17 | investigation to determine if there was any pictures or |
| 11:31:16 | 18 | video of the customer dropping the container? |
| 11:31:17 | 19 | MR. BURNETT:  Objection.  Calls for speculation, |
| 11:31:19 | 20 | vague.  You can respond. |
| 11:31:21 | 21 | THE WITNESS:  I asked someone else to look for |
| 11:31:24 | 22 | video.  I personally didn't look for video. |
| 11:31:26 | 23 | Q.   BY MR. BERKOWITZ:  When you asked -- you are |
| 11:31:29 | 24 | talking about Jonathan -- asking Jonathan to look for it, |
| 11:31:29 | 25 | right? |

ANITA KAY PITTMAN                                                    JOB NO. 201975
NOVEMBER 16, 2021

| | | |
|---|---|---|
| 11:31:30 | 1 | A.      Correct. |
| 11:31:33 | 2 | Q.      When you asked Jonathan to look for the video, |
| 11:31:35 | 3 | did you tell him to look for video of the customer |
| 11:31:37 | 4 | dropping the liquid? |
| 11:31:38 | 5 | A.      No.  I did not. |
| 11:31:45 | 6 | Q.      You only asked him to look for video of the area |
| 11:31:47 | 7 | where the spill occurred; is that correct? |
| 11:32:00 | 8 | A.      Where the guest fell, correct. |
| 11:32:04 | 9 | Q.      Do you know if Ruth sent a report to Sedgwick |
| 11:32:12 | 10 | indicating what an employee told her regarding how the |
| 11:32:14 | 11 | container fell on the ground -- |
| 11:32:15 | 12 | MR. BURNETT:  Objection.  Calls for speculation. |
| 11:32:18 | 13 | Q.      BY MR. BERKOWITZ:  -- and caused the spill? |
| 11:32:19 | 14 | MR. BURNETT:  Objection.  Calls for speculation. |
| 11:32:20 | 15 | You can respond, if you know. |
| 11:32:22 | 16 | THE WITNESS:  If she -- if she filled out a |
| 11:32:24 | 17 | report and gave to it me, it was all in the accident |
| 11:32:28 | 18 | jacket that I sent to Sedgwick. |
| 11:32:31 | 19 | Q.      BY MR. BERKOWITZ:  If a customer -- if she was |
| 11:32:35 | 20 | told by an employee, "Hey, look a customer dropped this |
| 11:32:38 | 21 | container and here is where that container was found," |
| 11:32:41 | 22 | should that have been included in the report as part of |
| 11:32:44 | 23 | the jacket package sent to Sedgwick? |
| 11:32:45 | 24 | MR. BURNETT:  Objection.  Incomplete |
| 11:32:48 | 25 | hypothetical, calls for speculation.  You can respond. |

| | | |
|---|---|---|
| 11:32:49 | 1 | THE WITNESS:  If that's what she put in her |
| 11:32:52 | 2 | statement. |
| 11:32:53 | 3 | Q.    BY MR. BERKOWITZ:  Right.  But should -- I'm |
| 11:32:57 | 4 | asking, was it a policy or procedure of Target to have |
| 11:33:02 | 5 | included that information in the jacket package sent to |
| 11:33:03 | 6 | Sedgwick? |
| 11:33:04 | 7 | MR. BURNETT:  Same objections.  You can respond |
| 11:33:06 | 8 | if you understand. |
| 11:33:07 | 9 | THE WITNESS:  No.  I don't understand the |
| 11:33:07 | 10 | question. |
| 11:33:11 | 11 | Q.    BY MR. BERKOWITZ:  So Ruth gets information from |
| 11:33:16 | 12 | another employee that a customer dropped this container |
| 11:33:18 | 13 | causing this spillage. |
| 11:33:20 | 14 | Is that information as part of the policy and |
| 11:33:24 | 15 | procedure of Target that should have been included in the |
| 11:33:25 | 16 | jacket report? |
| 11:33:27 | 17 | MR. BURNETT:  Same objections. |
| 11:33:31 | 18 | THE WITNESS:  It's what she put in her |
| 11:33:34 | 19 | statement.  If she wrote that in her statement, she has |
| 11:33:37 | 20 | to write what she dealt with and put in her statement. |
| 11:33:39 | 21 | Q.    BY MR. BERKOWITZ:  Right.  But that's not what |
| 11:33:41 | 22 | I'm asking.  I'm asking, was it a policy or procedure of |
| 11:33:46 | 23 | Target at the time on June 1st, 2020, to require Ruth to |
| 11:33:48 | 24 | put that in her report -- |
| 11:33:48 | 25 | MR. BURNETT:  Same objection. |

| | | |
|---|---|---|
| 11:33:53 | 1 | Q.     BY MR. BERKOWITZ:  -- as to what she heard? |
| 11:33:54 | 2 | MR. BURNETT:  You can respond. |
| 11:33:57 | 3 | THE WITNESS:  You say, "Does Target make her say |
| 11:34:00 | 4 | that?"  Target tells her to put -- what she puts in her |
| 11:34:02 | 5 | report.  So -- |
| 11:34:04 | 6 | Q.     BY MR. BERKOWITZ:  You told me Target had a |
| 11:34:08 | 7 | policy or procedure with respect to how are -- what you |
| 11:34:11 | 8 | are to look at and put in the report.  Ruth has the same |
| 11:34:15 | 9 | obligation, right, with respect to her report, right? |
| 11:34:19 | 10 | She responds to a policy or procedure of Target; is that |
| 11:34:20 | 11 | correct? |
| 11:34:21 | 12 | MR. BURNETT:  Objection.  Assumes facts.  You |
| 11:34:22 | 13 | can respond. |
| 11:34:24 | 14 | THE WITNESS:  Correct. |
| 11:34:26 | 15 | Q.     BY MR. BERKOWITZ:  Right.  So I'm asking you, |
| 11:34:30 | 16 | did Target have a policy or procedure requiring Ruth to |
| 11:34:36 | 17 | put down what she heard as to how this spill occurred? |
| 11:34:37 | 18 | A.     I don't know what the witness statement asked |
| 11:34:40 | 19 | for.  Whatever it asked for, she put -- wrote -- wrote it |
| 11:34:43 | 20 | down.  I didn't look at what the questions are for the |
| 11:34:46 | 21 | witness -- team member witness to put down. |
| 11:34:50 | 22 | Q.     Well, wouldn't it be a very similar report to |
| 11:34:51 | 23 | what you had? |
| 11:34:53 | 24 | A.     No.  I have different things.  It would ask her |
| 11:34:57 | 25 | what she heard, what she saw.  And she would write down |

| | | |
|---|---|---|
| 11:34:59 | 1 | what she heard and what she saw. |
| 11:35:03 | 2 | Q.       Okay.  So since it asked her what she saw, what |
| 11:35:06 | 3 | she heard, then that information regarding the -- what |
| 11:35:09 | 4 | she was told about the customer and the spill should have |
| 11:35:10 | 5 | been included in that report?  Yes? |
| 11:35:11 | 6 | MR. BURNETT:  Objection.  Incomplete |
| 11:35:13 | 7 | hypothetical, calls for speculation.  It also assumes |
| 11:35:15 | 8 | facts.  You can respond. |
| 11:35:17 | 9 | THE WITNESS:  I don't know what she wrote down. |
| 11:35:20 | 10 | Whatever she wrote down.  If she put that there, that's |
| 11:35:21 | 11 | what she put there. |
| 11:35:24 | 12 | Q.       BY MR. BERKOWITZ:  Well, let's assume it's a |
| 11:35:30 | 13 | fact that employee X tells Ruth a customer dropped this |
| 11:35:33 | 14 | in this location, a soapy liquid. |
| 11:35:37 | 15 | Is that something that Ruth then should have put |
| 11:35:40 | 16 | in the report if it asked her what she saw or what she |
| 11:35:41 | 17 | heard?  Yes or no. |
| 11:35:43 | 18 | MR. BURNETT:  Incomplete hypothetical.  You can |
| 11:35:44 | 19 | respond, if you know. |
| 11:35:45 | 20 | THE WITNESS:  I don't know. |
| 11:35:59 | 21 | Q.       BY MR. BERKOWITZ:  Okay.  Before Connie Broadous |
| 11:36:04 | 22 | fell in this area, are you aware of any warning signs, or |
| 11:36:08 | 23 | cones, or other safety precautions taken by Target |
| 11:36:13 | 24 | regarding this spill? |
| 11:36:23 | 25 | A.       Before she fell?  No. |

ANITA KAY PITTMAN
NOVEMBER 16, 2021

JOB NO. 201975

| 11:36:27 | 1 | Q. You know what a "Sweep log" is? |
| 11:36:28 | 2 | A. No. |
| 11:36:32 | 3 | Q. Do you have any documents showing that any |
| 11:36:42 | 4 | employees as of June 1st, 2020, monitored or swept |
| 11:36:45 | 5 | various areas of the store? |
| 11:36:48 | 6 | MR. BURNETT: Objection. Compound, vague. You |
| 11:36:49 | 7 | can respond, if you know. |
| 11:36:51 | 8 | THE WITNESS: I don't know what you mean. |
| 11:36:54 | 9 | Q. BY MR. BERKOWITZ: Is there anything in writing |
| 11:36:57 | 10 | that employees sign off on saying that, "I have monitored |
| 11:37:02 | 11 | on such and such time, and such and such date, aisle 5, |
| 11:37:04 | 12 | or the main aisle, and it's clean." |
| 11:37:06 | 13 | Anything like that? |
| 11:37:07 | 14 | A. No. |
| 11:37:13 | 15 | Q. Okay. With resp -- but employees you said have |
| 11:37:18 | 16 | a duty to monitor the floor for safety, right? |
| 11:37:19 | 17 | A. Yes. |
| 11:37:22 | 18 | Q. Okay. Is there any documents that they -- that |
| 11:37:27 | 19 | as of June 1st, 2020, they fill out to evidence that? |
| 11:37:28 | 20 | A. No. |
| 11:37:39 | 21 | Q. Are there any safety logs that you're aware of |
| 11:37:45 | 22 | as of June 1st, 2020, that any employees fill out at |
| 11:37:53 | 23 | Target regarding cleaning, monitoring, checking aisles |
| 11:37:55 | 24 | and floor for safety? |
| 11:38:05 | 25 | MR. BURNETT: Objection, vague. |

ANITA KAY PITTMAN
NOVEMBER 16, 2021

JOB NO. 201975

| | | |
|---|---|---|
| 11:38:07 | 1 | THE WITNESS:  Are you asking me is there a form |
| 11:38:08 | 2 | that they fill out? |
| 11:38:08 | 3 | Q.      BY MR. BERKOWITZ:  Yes. |
| 11:38:09 | 4 | A.      No. |
| 11:38:31 | 5 | MR. BERKOWITZ:  Let me mark as Exhibit E a |
| 11:38:34 | 6 | picture of the store's main aisle. |
| | 7 | (Plaintiff's Exhibit E was marked for |
| 11:38:45 | 8 | identification.) |
| 11:38:49 | 9 | Q.      BY MR. BERKOWITZ:  Do you recognize this |
| 11:38:50 | 10 | picture? |
| 11:38:50 | 11 | A.      Yes. |
| 11:38:56 | 12 | Q.      Now, this aisle that's coming across passing |
| 11:39:02 | 13 | checkout stands, 20, 21, 19, 17, 15, 13 and so on -- |
| 11:39:03 | 14 | A.      Uh-huh. |
| 11:39:06 | 15 | Q.      -- is that considered the main aisle? |
| 11:39:06 | 16 | A.      Yes. |
| 11:39:13 | 17 | Q.      Okay.  And do you know approximately where |
| 11:39:17 | 18 | Connie Broadous fell in connection with this picture? |
| 11:39:22 | 19 | A.      Not the approximate spot, no.  I know the area. |
| 11:39:25 | 20 | Q.      Do you know what the closest checkout stand was |
| 11:39:29 | 21 | to her where she fell? |
| 11:39:33 | 22 | A.      I believe it was like the closest to the last |
| 11:39:37 | 23 | one.  I can't see the number. |
| 11:39:41 | 24 | Q.      All right.  You see my cursor right here? |
| 11:39:41 | 25 | A.      Yes. |

ANITA KAY PITTMAN
NOVEMBER 16, 2021

JOB NO. 201975

| | | |
|---|---|---|
| 11:39:44 | 1 | Q.      Do you see where it shows 20 here, and 21 here? |
| 11:39:45 | 2 | A.      Yes. |
| 11:39:50 | 3 | Q.      Okay.  Does that help you at all as to guide you |
| 11:39:52 | 4 | where she may have fallen? |
| 11:39:56 | 5 | A.      Yes.  It was closer to the area where the |
| 11:40:01 | 6 | batteries are, the last check stand, check line in that |
| 11:40:01 | 7 | area. |
| 11:40:07 | 8 | Q.      Now, was it between the battery checkout stand |
| 11:40:11 | 9 | and checkout stand where 21 is located? |
| 11:40:13 | 10 | A.      I don't remember. |
| 11:40:18 | 11 | Q.      Okay.  All right.  Now, as you look at this |
| 11:40:25 | 12 | picture, you see a number of areas where there are |
| 11:40:28 | 13 | locations for cameras, right? |
| 11:40:30 | 14 |         Do you see these black dots right here on the |
| 11:40:31 | 15 | ceiling? |
| 11:40:32 | 16 | A.      Yes. |
| 11:40:35 | 17 | Q.      Okay.  At any time as part of your duties, have |
| 11:40:40 | 18 | you monitored the surveillance video footage of any |
| 11:40:42 | 19 | persons at the store? |
| 11:40:47 | 20 | A.      No. |
| 11:40:53 | 21 | Q.      Would you know, for example, how many working |
| 11:40:56 | 22 | cameras there were at the store on June 1st, 2020? |
| 11:40:57 | 23 | A.      No.  I do not. |
| 11:41:13 | 24 | Q.      But there are times, right, when someone is |
| 11:41:18 | 25 | believed to have stolen merchandise that you have looked |

ANITA KAY PITTMAN
NOVEMBER 16, 2021

JOB NO. 201975

| 11:41:20 | 1  | at video footage; is that correct? |
| 11:41:21 | 2  | MR. BURNETT:  Objection.  Lacks foundation, |
| 11:41:22 | 3  | calls for speculation.  You can respond. |
| 11:41:25 | 4  | THE WITNESS:  Do I look?  No, I don't. |
| 11:41:26 | 5  | Q.      BY MR. BERKOWITZ:  At any time have you ever |
| 11:41:28 | 6  | looked at video footage during the time you have been at |
| 11:41:30 | 7  | the store? |
| 11:41:31 | 8  | A.      No. |
| 11:41:47 | 9  | Q.      Okay.  On June 1st, 2020, which is a Monday, |
| 11:41:51 | 10 | about 1:00, do you believe there were a lot of people at |
| 11:41:54 | 11 | the store, or very few people at the store?  What is your |
| 11:41:57 | 12 | best description as to the number of customers?  We're |
| 11:41:59 | 13 | only talking about customers at the store. |
| 11:42:00 | 14 | MR. BURNETT:  Objection, vague.  You can |
| 11:42:00 | 15 | respond. |
| 11:42:02 | 16 | THE WITNESS:  You are saying were there a lot of |
| 11:42:03 | 17 | customers? |
| 11:42:04 | 18 | Q.      BY MR. BERKOWITZ:  What I want, I want you to |
| 11:42:08 | 19 | give me a description as to approximately how many |
| 11:42:13 | 20 | customers there were in the store around 1:00 on June |
| 11:42:13 | 21 | 1st, 2020? |
| 11:42:17 | 22 | A.      Oh, I don't know how many customers were there. |
| 11:42:21 | 23 | Q.      On a Monday at 1:00, would you have expected it |
| 11:42:23 | 24 | to have been crowded? |
| 11:42:24 | 25 | MR. BURNETT:  Objection, vague.  You can |

| | | |
|---|---|---|
| 11:42:25 | 1 | respond. |
| 11:42:27 | 2 | THE WITNESS:  I don't know.  No.  I don't know. |
| 11:42:31 | 3 | Q.      BY MR. BERKOWITZ:  Would you have expected on a |
| 11:42:35 | 4 | Monday, on June 1st, 2020, for it not to have been |
| 11:42:40 | 5 | crowded? |
| 11:42:40 | 6 | MR. BURNETT:  Objection, vague.  You can |
| 11:42:41 | 7 | respond. |
| 11:42:47 | 8 | THE WITNESS:  Again, I don't know. |
| 11:42:49 | 9 | Q.      BY MR. BERKOWITZ:  What are your busiest days of |
| 11:42:51 | 10 | the week for customers? |
| 11:42:53 | 11 | A.      The weekend. |
| 11:42:56 | 12 | Q.      And after -- besides Saturday and Sunday, what's |
| 11:42:58 | 13 | the next busiest day? |
| 11:43:05 | 14 | A.      Probably Friday evenings. |
| 11:43:08 | 15 | Q.      Would it be fair to say that Monday is one of |
| 11:43:10 | 16 | the slower days then, compared to the other days of the |
| 11:43:11 | 17 | week? |
| 11:43:16 | 18 | A.      Compared to Friday, Saturday, Sunday, yes. |
| 11:43:20 | 19 | Q.      And would it be fair to say that compared to say |
| 11:43:26 | 20 | early in the morning, or -- or worktime hours, say after |
| 11:43:31 | 21 | 4:00 in the evening, that would be a slower time period? |
| 11:43:31 | 22 | MR. BURNETT:  Objection, vague.  You can |
| 11:43:33 | 23 | respond. |
| 11:43:53 | 24 | THE WITNESS:  No.  I wouldn't say that. |
| 11:43:54 | 25 | MR. BERKOWITZ:  Okay.  Why don't we take a |

ANITA KAY PITTMAN
NOVEMBER 16, 2021

JOB NO. 201975

| | | |
|---|---|---|
| 11:43:56 | 1 | five-minute break.  And let's see, it's 11:00 -- off the |
| 11:43:57 | 2 | record, first. |
| 11:43:58 | 3 | THE VIDEOGRAPHER:  Okay.  We are now off the |
| 11:44:01 | 4 | record.  The time is 11:43 A.M. |
| 11:53:41 | 5 | (Recess.) |
| 11:53:44 | 6 | THE VIDEOGRAPHER:  We are now back on the |
| 11:53:48 | 7 | record.  The time is 11:53 A.M. Pacific Time. |
| 11:53:56 | 8 | Q.      BY MR. BERKOWITZ:  This gentleman that you |
| 11:53:59 | 9 | referred to who Ruth interviewed, have you ever seen this |
| 11:54:02 | 10 | gentleman at the store at any time? |
| 11:54:07 | 11 | A.      I don't even remember him.  So I don't recall. |
| 11:54:13 | 12 | Q.      Later on is it your understanding that someone |
| 11:54:18 | 13 | on behalf of Target talked to this gentleman about what |
| 11:54:21 | 14 | he witnessed?  This is after the day of the accident. |
| 11:54:22 | 15 | MR. BURNETT:  Just object to the extent that |
| 11:54:25 | 16 | it's information outside of any attorney/client |
| 11:54:29 | 17 | communications.  You can provide a response. |
| 11:54:30 | 18 | THE WITNESS:  I don't know anything about that. |
| 11:54:49 | 19 | Q.      BY MR. BERKOWITZ:  When you work at Target, do |
| 11:54:54 | 20 | you also have an office that you use for administrative, |
| 11:54:57 | 21 | clerical at Target? |
| 11:54:57 | 22 | A.      Yes. |
| 11:55:01 | 23 | Q.      Okay.  And is that office -- as of June 1st, |
| 11:55:06 | 24 | 2020, did you have an office at Target for that purpose? |
| 11:55:07 | 25 | A.      Yes. |

ANITA KAY PITTMAN
NOVEMBER 16, 2021

JOB NO. 201975

| | | |
|---|---|---|
| 11:55:13 | 1 | Q.       And is that office in the same area where the |
| 11:55:15 | 2 | camera monitors are? |
| 11:55:16 | 3 | A.       No. |
| 11:55:18 | 4 | Q.       How close is it to the office containing the |
| 11:55:20 | 5 | camera monitors? |
| 11:55:24 | 6 | A.       It's pretty -- it's -- it's not close at all. |
| 11:55:27 | 7 | It's at the other end of the store. |
| 11:55:39 | 8 | Q.       Other than you, Ruth, and Jonathan who you |
| 11:55:43 | 9 | mentioned, are you aware of anyone else who investigated |
| 11:55:45 | 10 | this incident, not including your attorneys? |
| 11:55:46 | 11 | A.       No. |
| 11:55:55 | 12 | Q.       Do you know if Jafari ever investigated this |
| 11:55:56 | 13 | incident? |
| 11:56:06 | 14 | A.       No. |
| 11:56:17 | 15 | MR. BERKOWITZ:  Let me mark as Exhibit F, a |
| 11:56:20 | 16 | declaration of an individual named Luis Saldona. |
| | 17 | (Plaintiff's Exhibit F was marked for |
| 11:56:26 | 18 | identification.) |
| 11:56:43 | 19 | Q.       BY MR. BERKOWITZ:  Have you ever seen this |
| 11:56:44 | 20 | declaration before? |
| 11:56:46 | 21 | A.       No. |
| 11:56:59 | 22 | Q.       I want you to look at paragraph 5 of this |
| 11:57:00 | 23 | declaration. |
| 11:57:04 | 24 | He says, "As I began to unload my items onto the |
| 11:57:09 | 25 | conveyer belt at the register, I heard a loud noise that |

ANITA KAY PITTMAN
NOVEMBER 16, 2021

JOB NO. 201975

| 11:57:12 | 1 | sounded like a boom.  It sounded to me as though |
| 11:57:13 | 2 | something had been dropped." |
| 11:57:14 | 3 | Do you see that? |
| 11:57:15 | 4 | A.     Yes. |
| 11:57:22 | 5 | Q.     Okay.  Did you ever attempt to determine how |
| 11:57:25 | 6 | loud of a sound the dropping of the container with the |
| 11:57:27 | 7 | soapy liquid was? |
| 11:57:28 | 8 | A.     No. |
| 11:57:32 | 9 | Q.     Do you know if anyone at the store attempted to |
| 11:57:36 | 10 | determine how loud of a noise this was that he is |
| 11:57:38 | 11 | referring to in paragraph 5? |
| 11:57:38 | 12 | A.     No, I -- |
| 11:57:41 | 13 | MR. BURNETT:  Objection, vague.  You can go |
| 11:57:42 | 14 | ahead. |
| 11:57:44 | 15 | Q.     BY MR. BERKOWITZ:  I'm sorry, your response? |
| 11:57:45 | 16 | A.     No. |
| 11:57:52 | 17 | Q.     Okay.  Now, number 6 -- paragraph 6, it says, |
| 11:57:55 | 18 | "Within three seconds of the boom, I heard a second loud |
| 11:57:58 | 19 | noise.  I immediately took a few steps back from the |
| 11:58:01 | 20 | register and looked around.  I observed an elderly woman |
| 11:58:02 | 21 | on the floor." |
| 11:58:05 | 22 | Is that consistent with what you were told by |
| 11:58:09 | 23 | Ruth when she talked to a gentleman as to what occurred? |
| 11:58:15 | 24 | A.     No.  I don't -- no. |
| 11:58:18 | 25 | Q.     What's different as to what Ruth told you? |

ANITA KAY PITTMAN
NOVEMBER 16, 2021

JOB NO. 201975

| | | |
|---|---|---|
| 11:58:22 | 1 | A.        The boom, and him taking a few steps back from |
| 11:58:23 | 2 | the register. |
| 11:58:26 | 3 | Q.        You don't recall Ruth telling you that? |
| 11:58:27 | 4 | A.        No. |
| 11:58:38 | 5 | Q.        Okay.  Now, when he says he was at a register, |
| 11:58:41 | 6 | do you -- was it your understanding that the gentleman |
| 11:58:47 | 7 | who was involved that said he witnessed this, was at the |
| 11:58:50 | 8 | cash register at Target at the time? |
| 11:58:52 | 9 | A.        Yes. |
| 11:58:55 | 10 | Q.        Okay.  Do you remember -- do you have an |
| 11:58:58 | 11 | understanding of which cash register that was?  What |
| 11:59:00 | 12 | number cash register? |
| 11:59:06 | 13 | A.        No, I don't. |
| 11:59:09 | 14 | Q.        Do you recall, though, that when you talked to |
| 11:59:16 | 15 | Ruth, she also used the words within three seconds that |
| 11:59:18 | 16 | this guy heard a second noise?  Three seconds of the |
| 11:59:21 | 17 | first noise he heard a second noise? |
| 11:59:22 | 18 | MR. BURNETT:  Objection.  Calls for speculation. |
| 11:59:24 | 19 | You can respond. |
| 11:59:25 | 20 | THE WITNESS:  I was told it was within three |
| 11:59:28 | 21 | seconds.  I don't recall if it was Ruth, or who told me |
| 11:59:30 | 22 | that.  But yes, I recall it was someone -- they said it |
| 11:59:31 | 23 | was three seconds. |
| 11:59:32 | 24 | Q.        BY MR. BERKOWITZ:  All right.  Now, this |
| 11:59:34 | 25 | individual uses the word "boom." |

ANITA KAY PITTMAN
NOVEMBER 16, 2021

JOB NO. 201975

| | | |
|---|---|---|
| 11:59:37 | 1 | What -- what did Ruth say within three seconds |
| 11:59:40 | 2 | of what when you talked to her? |
| 11:59:46 | 3 | A.      Within three seconds of the soap falling and the |
| 11:59:49 | 4 | guest picking it up, then within three seconds someone |
| 11:59:50 | 5 | fell. |
| 11:59:54 | 6 | Q.      Okay.  Did Ruth ever give you descriptive words |
| 11:59:58 | 7 | as to sound -- the magnitude of the sound? |
| 12:00:20 | 8 | A.      No. |
| 12:00:25 | 9 | Q.      If there was a loud boom and there was a cashier |
| 12:00:29 | 10 | fairly close to that boom, would you -- that loud noise, |
| 12:00:31 | 11 | would you have expected the cash register [sic] to look |
| 12:00:34 | 12 | at the source of that sound? |
| 12:00:35 | 13 | MR. BURNETT:  Objection.  Incomplete |
| 12:00:38 | 14 | hypothetical.  It's also vague.  You can respond, if you |
| 12:00:40 | 15 | understand the question. |
| 12:00:42 | 16 | THE WITNESS:  I don't know if she would. |
| 12:00:45 | 17 | Q.      BY MR. BERKOWITZ:  If the sound sounded like a |
| 12:00:48 | 18 | piece of merchandise falling on the floor, would you have |
| 12:00:52 | 19 | expected the cashier to have looked at that to determine |
| 12:00:54 | 20 | if it was safe -- |
| 12:00:57 | 21 | MR. BURNETT:  Same objections. |
| 12:01:00 | 22 | Q.      BY MR. BERKOWITZ:  -- to walk upon? |
| 12:01:01 | 23 | MR. BURNETT:  You can respond, if you |
| 12:01:02 | 24 | understand. |
| 12:01:02 | 25 | THE WITNESS:  I don't know. |

ANITA KAY PITTMAN
NOVEMBER 16, 2021

JOB NO. 201975

| | | |
|---|---|---|
| 12:01:12 | 1 | Q.       BY MR. BERKOWITZ:  By the way, were you |
| 12:01:16 | 2 | available for your deposition in October? |
| 12:01:16 | 3 | A.       No. |
| 12:01:20 | 4 | Q.       Okay.  Could you have been available, if you -- |
| 12:01:22 | 5 | if requested? |
| 12:01:24 | 6 | MR. BURNETT:  Objection.  You don't -- |
| 12:01:27 | 7 | Ms. Pittman, you don't need to answer that question. |
| 12:01:31 | 8 | Mr. Berkowitz, I have explained to you before, she was on |
| 12:01:34 | 9 | a leave of absence.  So, no, she wasn't available. |
| 12:01:38 | 10 | Q.       BY MR. BERKOWITZ:  Well, what I'm asking, was |
| 12:01:40 | 11 | there anything physically preventing you from appearing |
| 12:01:44 | 12 | at a deposition in October of this year? |
| 12:01:45 | 13 | A.       Yes. |
| 12:01:59 | 14 | Q.       And for the entire month of October? |
| 12:02:00 | 15 | MR. BURNETT:  Ms. Pittman, I'm going to instruct |
| 12:02:04 | 16 | you not to answer the question.  It invades your right to |
| 12:02:14 | 17 | privacy. |
| 12:02:22 | 18 | MR. BERKOWITZ:  Those are all the questions that |
| 12:02:24 | 19 | I have. |
| 12:02:25 | 20 | MR. BURNETT:  Let me take a quick break, Steve. |
| 12:02:29 | 21 | Give me five, and I will figure out -- I need to look at |
| 12:02:31 | 22 | my notes and figure out if I have anything. |
| 12:02:32 | 23 | MR. BERKOWITZ:  All right. |
| 12:02:33 | 24 | THE VIDEOGRAPHER:  Okay.  We are now off the |
| 12:02:36 | 25 | record.  The time is 12:02 Pacific Time. |

| | | |
|---|---|---|
| 12:05:28 | 1 | (Recess) |
| 12:05:35 | 2 | THE VIDEOGRAPHER:  We are now back on the |
| 12:05:39 | 3 | record.  The time is 12:05 P.M. Pacific Time. |
| 12:05:40 | 4 | MR. BURNETT:  I just have one question, |
| 12:05:42 | 5 | Mr. Berkowitz. |
| | 6 | EXAMINATION BY MR. BURNETT |
| 12:05:45 | 7 | Q.     Ms. Pittman, do you have a specific memory as |
| 12:05:49 | 8 | you sit here today of Ruth preparing any kind of report |
| 12:05:51 | 9 | related to this incident? |
| 12:05:53 | 10 | A.     No. |
| 12:05:55 | 11 | MR. BURNETT:  That's all I have. |
| 12:06:04 | 12 | MR. BERKOWITZ:  Let me follow-up, Ms. Pittman. |
| 12:06:05 | 13 | FURTHER EXAMINATION BY MR. BERKOWITZ |
| 12:06:17 | 14 | Q.     If Ruth had interviewed a gentleman who stated |
| 12:06:20 | 15 | he witnessed the accident and told her what he thought |
| 12:06:24 | 16 | occurred, would you have expected Ruth to have prepared a |
| 12:06:25 | 17 | written report? |
| 12:06:26 | 18 | MR. BURNETT:  Objection.  Incomplete |
| 12:06:28 | 19 | hypothetical, calls for speculation.  You can respond, if |
| 12:06:30 | 20 | you know. |
| 12:06:32 | 21 | THE WITNESS:  If I gave her the paper.  I don't |
| 12:06:33 | 22 | know. |
| 12:06:34 | 23 | Q.     BY MR. BERKOWITZ:  No.  That's not what I asked. |
| 12:06:40 | 24 | If Ruth had interviewed a percipient witness who |
| 12:06:44 | 25 | told her what he thought occurred and gave her his |

ANITA KAY PITTMAN
NOVEMBER 16, 2021

JOB NO. 201975

| | | |
|---|---|---|
| 12:06:47 | 1 | contact information, would you have expected her to |
| 12:06:50 | 2 | include that in a written report regarding the incident? |
| 12:06:52 | 3 | MR. BURNETT:  Same objections. |
| 12:06:55 | 4 | THE WITNESS:  Yes.  If she filled out the |
| 12:06:56 | 5 | report.  Yes. |
| 12:07:02 | 6 | Q.       BY MR. BERKOWITZ:  That wasn't my question.  I |
| 12:07:04 | 7 | didn't ask if she filled out the report. |
| 12:07:07 | 8 | My question was, would you have expected her to |
| 12:07:09 | 9 | fill out a written report after a percipient witness told |
| 12:07:12 | 10 | her what he thought happened? |
| 12:07:13 | 11 | A.       No. |
| 12:07:14 | 12 | MR. BURNETT:  Same objections.  Go ahead. |
| 12:07:15 | 13 | Q.       BY MR. BERKOWITZ:  You wouldn't have expected |
| 12:07:18 | 14 | her to put -- fill out a written report after a |
| 12:07:23 | 15 | percipient witness told her what he observed? |
| 12:07:25 | 16 | A.       Like I said, if she -- if I gave her the form to |
| 12:07:28 | 17 | fill it out, yes, I would. |
| 12:07:30 | 18 | Q.       But if you didn't give her the form, would you |
| 12:07:33 | 19 | have expected her to ask you for the form to fill out? |
| 12:07:34 | 20 | A.       No. |
| 12:07:35 | 21 | Q.       Why not? |
| 12:07:39 | 22 | A.       Because it's up to me to fill out the report. |
| 12:07:43 | 23 | Q.       But Ruth, you told me, told you at the scene |
| 12:07:47 | 24 | what she heard.  Why didn't you give her the form to fill |
| 12:07:48 | 25 | out? |

ANITA KAY PITTMAN
NOVEMBER 16, 2021

JOB NO. 201975

| | | |
|---|---|---|
| 12:07:49 | 1 | MR. BURNETT:  Objection.  Assumes facts, but you |
| 12:07:50 | 2 | can respond. |
| 12:07:52 | 3 | THE WITNESS:  Like I said, I don't -- I gave the |
| 12:07:55 | 4 | report.  I don't remember what was put on the report, if |
| 12:07:58 | 5 | she filled out the report.  If she gave it back to me, I |
| 12:07:59 | 6 | don't know what happened. |
| 12:08:00 | 7 | Q.     BY MR. BERKOWITZ:  But generally under those |
| 12:08:04 | 8 | circumstances, if Ruth came to you and told you what a |
| 12:08:07 | 9 | percipient witness observed in connection with a slip and |
| 12:08:12 | 10 | fall, you would have either expected her to fill out a |
| 12:08:15 | 11 | report, or you would have given her a report to fill out; |
| 12:08:16 | 12 | is that correct? |
| 12:08:18 | 13 | MR. BURNETT:  Objection.  Incomplete |
| 12:08:20 | 14 | hypothetical, calls for speculation.  It's also compound. |
| 12:08:21 | 15 | You can respond. |
| 12:08:22 | 16 | THE WITNESS:  Yes. |
| 12:08:23 | 17 | MR. BERKOWITZ:  That's all I have. |
| 12:08:24 | 18 | MR. BURNETT:  I don't have anything else. |
| 12:08:27 | 19 | MR. BERKOWITZ:  Okay.  I will send you, Wendy |
| 12:08:31 | 20 | and Sean, the exhibits right now. |
| 12:08:31 | 21 | MR. BURNETT:  Okay. |
| | 22 | THE VIDEOGRAPHER:  And I will take us off the |
| 12:08:36 | 23 | record.  And right before I do that, would anyone like to |
| 12:08:39 | 24 | make transcript orders on the record that haven't already |
| 12:08:40 | 25 | been placed? |

ANITA KAY PITTMAN
NOVEMBER 16, 2021

JOB NO. 201975

| | | |
|---|---|---|
| 12:08:42 | 1 | MR. BURNETT:  Yes.  I would like a copy, please. |
| 12:08:46 | 2 | MR. BERKOWITZ:  All right.  And Wendy, you will |
| 12:08:48 | 3 | be able to provide that to me, you think, within how many |
| 12:08:52 | 4 | hours, you think? |
| 12:08:53 | 5 | THE REPORTER:  I can do it -- I can give it to |
| 12:08:54 | 6 | you tomorrow. |
| 12:08:55 | 7 | MR. BERKOWITZ:  Oh, that would be great.  By the |
| | 8 | way, Eli and Wendy, this is one of the smoothest |
| 12:09:00 | 9 | depositions I have been through.  Everything was working. |
| 12:09:05 | 10 | I appreciate your service.  I have never experienced that |
| 12:09:07 | 11 | before. |
| 12:09:07 | 12 | THE VIDEOGRAPHER:  Oh, that's very good to hear. |
| 12:09:10 | 13 | And so I will take us off the record now.  And then one |
| 12:09:13 | 14 | more thing, would anyone like to place any additional |
| 12:09:16 | 15 | video orders in on the record that haven't already been |
| 12:09:16 | 16 | made? |
| 12:09:18 | 17 | MR. BURNETT:  Not at this time. |
| 12:09:20 | 18 | THE VIDEOGRAPHER:  Okay.  Thank you.  And would |
| 12:09:23 | 19 | you like picture and picture, Mr. Berkowitz?  So picture |
| 12:09:26 | 20 | and picture is basically the exhibits that you presented |
| 12:09:31 | 21 | will be shown on the video edit. |
| 12:09:32 | 22 | MR. BERKOWITZ:  Yes. |
| 12:09:34 | 23 | THE VIDEOGRAPHER:  Okay.  So noted.  So I will |
| 12:09:37 | 24 | take us off the record now. |
| 12:09:39 | 25 | This concludes the deposition of Anita Pittman |

```
12:09:42  1  in the matter of Broadous versus Target Corporation, et

          2  al.

12:09:45  3          We are now off the record.  The time is 12:09

12:09:47  4  P.M. Pacific Time.

          5          (Deposition concluded at 12:09 P.M.)

          6                  ---oOo---

          7

          8

          9

         10

         11

         12

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25
```

```
 1                    DEPONENT'S SIGNATURE

 2

 3

 4        Please be advised I have read the foregoing
          deposition, pages 1 through 80 inclusive.
          I hereby state there are:
 5
          (Check one) _____  no corrections
 6
                      _____  corrections per attached
 7

 8

 9

10
     _____      _____
11   DATE                  ANITA KAY PITTMAN

12

13

14

15

16
                       ---oOo---
17

18

19

20

21

22

23

24

25
```

ANITA KAY PITTMAN
NOVEMBER 16, 2021

JOB NO. 201975

```
 1              DEPONENT'S CHANGES OR CORRECTIONS

 2    DEPONENT:  ANITA KAY PITTMAN
      CASE:  BROADOUS VS. TARGET
 3    DATE OF DEPOSITION:  TUESDAY, NOVEMBER 16, 2021

 4    Note:  If you are adding to your testimony, print the
      exact words you want to add.  If you are deleting words
 5    from your testimony, print the exact words you want to
      delete.  Specify with "Add" or "Delete" and sign this
 6    form.

 7
      Page    Line      Change, Add, Delete
 8
 9    _____   _____     _____

10    _____   _____     _____

11    _____   _____     _____

12    _____   _____     _____

13    _____   _____     _____

14    _____   _____     _____

15    _____   _____     _____

16    _____   _____     _____

17    _____   _____     _____

18    _____   _____     _____

19    _____   _____     _____

20    _____   _____     _____

21    _____   _____     _____

      Pursuant to Section 2025 (q) (1) of the Code of Civil
22    Procedure of the State of California, I hereby certify
      that I have read my deposition transcript, made those
23    changes and corrections that I deem necessary, and
      approve the same as now true and correct.

24

25    _____          _____
      DATE                   ANITA KAY PITTMAN
```

1              CERTIFICATE OF REPORTER

2         I, Wendy V. Frazier, CSR No. 8035, a Certified

3    Shorthand Reporter in and for the State of California,

4    hereby certify that the witness in the foregoing

5    deposition,

6                   ANITA KAY PITTMAN,

7
     was by me duly sworn to testify the truth, the whole
8
     truth, and nothing but the truth in the within-entitled
9
     cause; that said deposition was taken in shorthand by me,
10
     a duly Certified Shorthand Reporter and a disinterested
11
     person, at the time and place here stated, and was
12
     thereafter reduced to typewriting, by computer, under my
13
     direction and supervision.
14
          I further certify that I am not of counsel or
15
     attorney for either or any of the parties to said
16
     deposition, nor in any way interested in the outcome of
17
     this cause, and that I am not related to any of the
18
     parties thereto.
19
          IN WITNESS WHEREOF, I have hereunto set my hand on
20
     this 22nd day of November, 2021.
21

22
     _____
23   Wendy V. Frazier, CSR #8035
     Certified Shorthand
24   Reporter in and for the
     State of California
25

**Exhibits**

**Exhibit A**  3:13 9:12,13, 15 13:24 26:16 29:24 31:12 40:21,23 41:2

**Exhibit B**  3:15 11:3,8 12:10,22 16:23 41:10 44:15,16 48:8,24 49:23 58:1,23 59:4

**Exhibit C**  3:16 36:23 37:1 38:14

**Exhibit D**  3:18 38:17, 19

**Exhibit E**  3:19 66:5,7

**Exhibit F**  3:20 71:15,17

**(**

**(e)**  11:3

**-**

**---ooo---**  80:6

**1**

**1**  10:10 13:25
**10:01**  4:2,16
**10:53**  40:14
**11**  20:11
**11133**  11:21
**11:00**  70:1
**11:02**  40:17
**11:43**  70:4
**11:53**  70:7
**12**  20:12
**12:02**  75:25
**12:05**  76:3
**12:09**  80:3,5
**12th**  36:24
**13**  32:3 66:13
**14**  29:23,24

**15**  30:22 31:12 66:13
**15th**  38:18,22
**16**  4:1
**16th**  4:17
**17**  66:13
**19**  19:13 66:13
**1995**  18:24
**1:00**  17:25 18:6 68:10, 20,23
**1st**  10:4 12:19,25 13:19 15:1,7,12,15,19,22 16:9,11,15 17:25 18:12 22:14 24:23 25:14 26:1 27:14,20 28:2,5 29:9 30:5,7,16 31:1,3,15,25 32:7,11 33:12,15 34:4,6 35:10 38:11 39:20 43:15,23 47:22 49:12, 19 53:5 54:21 55:16 56:20 62:23 65:4,19,22 67:22 68:9,21 69:4 70:23

**2**

**2**  14:5
**20**  66:13 67:1
**200**  24:2
**2000**  19:13,14 20:11
**2010**  20:3
**2016**  20:12,13 24:6
**2020**  10:4 12:19,25 13:19 15:1,7,12,15,19, 23 16:6,9,11,15 18:1,13 22:14 24:23 25:14 26:1 27:14,20 28:2,6 29:10 30:5,7,16 31:1,3,15 32:1,7,11 33:12,16 34:4,7 35:10 36:24 38:11,18 39:20 43:15, 23 47:22 49:12,19 53:5 54:21 55:16 56:20 62:23 65:4,19,22 67:22 68:9,21 69:4 70:24

**2021**  4:2,17 9:16
**21**  66:13 67:1,9

**26**  11:3
**27**  9:16
**2:20-cv-10950**  4:21

**3**

**3**  44:16

**4**

**4**  6:5,7 41:14 44:16 48:8,24 49:23
**4:00**  69:21

**5**

**5**  11:4 65:11 71:22 72:11
**50**  24:2
**500**  24:2

**6**

**6**  12:10,22 72:17

**7**

**7**  41:2

**8**

**8**  6:5

**A**

**a-z-a-r**  25:20
**A.M.**  4:2,16 40:14,17 70:4,7
**absence**  75:9
**absorbent**  33:8
**access**  30:16 33:15
**accessories**  21:7
**accident**  54:10,15 57:24 61:17 70:14 76:15

**accidents**  53:7
**accompanied**  53:23
**accurate**  7:16 8:22
**acquaintance**  53:24
**actual**  52:23 57:9
**add**  40:19
**additional**  79:14
**address**  38:10 49:16, 20,24 50:3,4
**administered**  5:14
**administrative**  70:20
**adversely**  7:14
**afford**  7:20
**afternoon**  18:5
**agent**  4:18 5:8 6:14
**ahead**  10:15 72:14 77:12
**ahold**  53:15
**aisle**  65:11,12 66:6,12, 15
**aisles**  65:23
**alcohol**  8:21
**all-day**  40:6
**alleged**  10:8 57:10
**allegedly**  24:12 59:11
**ambulance**  24:11,16, 19 41:24 42:3,7
**amend**  40:19
**Amended**  9:16
**and/or**  32:5 42:11
**Anita**  4:8,17 5:6,19 79:25
**appearing**  4:3 75:11
**approximate**  41:4 66:19
**approximately**  6:12 17:25 18:22 19:12 30:20 45:24 50:8 66:17 68:19
**approximation**  8:4

**area**  22:7 23:13 28:9 30:25 31:17 35:10,13 52:16 61:6 64:22 66:19 67:5,7 71:1

**areas**  28:7 65:5 67:12

**Asset**  15:5,8,18 21:12

**assume**  64:12

**assumed**  8:17

**assumes**  63:12 64:7 78:1

**attach**  9:11

**attaching**  9:15

**attempt**  60:6 72:5

**attempted**  53:10,15 72:9

**attorney**  51:7

**attorney/client**  70:16

**attorneys**  51:8,21 71:10

**aware**  14:2,8 33:22 50:9,18 53:8,14,17 64:22 65:21 71:9

**B**

**B-R-I-A-N**  25:17,18

**back**  13:23 19:25 22:10,13 26:16 29:9 40:16,21 44:16 52:1 70:6 72:19 73:1 76:2 78:5

**Balboa**  11:22

**bar**  10:20

**based**  14:7

**basically**  79:20

**batteries**  67:6

**battery**  67:8

**beauty**  20:21

**began**  71:24

**begin**  4:17

**behalf**  4:24,25 5:3,5,9 6:14 9:17 14:13 18:8 38:11 59:10 70:13

**believed**  67:25

**belt**  71:25

**Berkowitz**  5:3,16 6:9 9:7,15 10:15 11:10 17:12 21:18 23:7,23 29:4,20 33:1 36:23 37:3 38:17,21 39:7,20 40:2, 5,9,18 43:1 46:13 47:14 49:5,11 50:8 51:7 52:13,20 53:3 55:21 58:6,18 59:8,20 60:13, 23 61:13,19 62:3,11,21 63:1,6,15 64:12,21 65:9 66:3,5,9 68:5,18 69:3,9, 25 70:8,19 71:15,19 72:15 73:24 74:17,22 75:1,8,10,18,23 76:5, 12,13,23 77:6,13 78:7, 17,19 79:2,7,19,22

**big**  57:17

**black**  67:14

**booklet**  7:5

**boom**  72:1,18 73:1,25 74:9,10

**boss**  25:25

**bottom**  44:22

**Boulevard**  11:22

**break**  40:1,3 70:1 75:20

**Brian**  25:16,17,22,24

**bring**  10:24 33:7,8,9

**broaden**  23:7

**broadened**  23:13

**Broadous**  4:18 5:4 10:6 17:19,22 23:1 24:15 34:15 36:8 39:10 42:2,8 46:17 54:11 56:1 57:10 58:25 64:21 66:18 80:1

**Broadous'**  10:5

**building**  41:25

**Burnett**  5:5 6:2 9:4 10:13 17:8 21:14 23:3, 20 28:25 29:18 32:22 39:4,17,25 40:4,8 42:22 46:10 47:11 49:2,8 50:5 51:4 52:10,19,25 55:18 58:3,16 59:5,16 60:9,19

61:12,14,24 62:7,17,25 63:2,12 64:6,18 65:6,25 68:2,14,25 69:6,22 70:15 72:13 73:18 74:13,21,23 75:6,15,20 76:4,6,11,18 77:3,12 78:1,13,18,21 79:1,17

**busiest**  69:9,13

**C**

**California**  4:6,20

**call**  25:1 30:11 33:6

**called**  4:10 30:11 49:21 52:21

**calls**  25:3 32:22 33:5 47:11 49:2,3,8 50:6 52:10 58:4 59:16 60:19 61:12,14,25 64:7 68:3 73:18 76:19 78:14

**camera**  71:2,5

**cameras**  17:3 67:13,22

**carrier**  51:15

**carrier's**  51:12

**carrying**  28:20 46:8

**carts**  53:4,8

**case**  4:19,21 36:8 44:15

**cash**  73:8,11,12 74:11

**cashier**  74:9,19

**categories**  6:4,5

**category**  43:3

**caused**  61:13

**causing**  62:13

**caution**  33:7

**caveats**  6:18

**ceiling**  67:15

**Central**  4:20

**Certified**  4:5

**change**  19:9,11 20:8, 16

**changed**  20:14

**charge**  19:18,20

**check**  22:8 23:5 42:15 67:6

**checking**  65:23

**checkout**  66:13,20 67:8,9

**circumstances**  78:8

**Claims**  35:22,25

**clarification**  8:15

**clean**  30:14 33:8,9 65:12

**cleaning**  30:13 65:23

**cleanup**  30:1,2,5,14, 17,25 31:10,18 32:17 34:1

**Cleanups**  30:15

**clear**  6:3

**clerical**  70:21

**close**  40:7 71:4,6 74:10

**closer**  67:5

**closest**  66:20,22

**clothes**  20:6

**code**  10:20

**comment**  7:13

**communications**  70:17

**compared**  69:16,18,19

**complete**  7:16 8:18,22 48:24

**completed**  36:5

**completion**  7:6

**composed**  11:1

**compound**  65:6 78:14

**computers**  21:4,7

**concluded**  80:5

**concludes**  79:25

**conclusion**  49:3

**conducting**  54:10

**cones**  33:7 64:23

**confirm**  10:23

ANITA KAY PITTMAN
NOVEMBER 16, 2021

JOB NO. 201975

connect  4:3 23:9

connection  10:9 13:19
21:18 28:1 34:6 35:24
43:23 44:11 53:11 56:4
66:18 78:9

Connie  5:4 10:5,6
17:19,22 23:1 24:15
34:15 36:8 39:10 42:2,
7,16,21 43:6 46:17
54:11 56:1 57:10 58:25
59:12,22 64:21 66:18

Connie's  44:21

considered  55:17
66:15

consistent  72:22

consumed  8:21

contact  77:1

contained  28:15 57:15
59:11

container  10:8 28:15,
21 46:14 58:22 59:1,3,
11,21 60:2,8,18 61:11,
21 62:12 72:6

content  51:11

controlled  36:12

conversation  22:1

conveyer  71:25

copy  29:8 37:15 43:19
79:1

Corporation  4:19 5:6
80:1

correct  4:22 18:16 19:4
24:20 27:2 28:12 32:1
33:16 35:13,14 47:22
48:11,12,13 49:1 50:4
52:5,9 57:21 58:1 61:1,
7,8 63:11,14 68:1 78:12

counsel  5:1,12 7:3

count  21:20

counts  21:19

court  4:20,24 6:23 7:4,
18

courtesy  7:21

coverage  22:9,17,22

credibility  7:14

crowded  68:24 69:5

current  21:8

cursor  66:24

customer  59:14,20
60:1,7,13,18 61:3,19,20
62:12 64:4,13

customers  68:12,13,
17,20,22 69:10

**D**

Damages  42:11

date  7:25 21:9 41:5
65:11

dated  38:18,22

day  4:2 10:7,9 12:19
14:6 17:18,21 18:5
22:13 25:10 26:13
54:17 56:9 69:13 70:14

days  69:9,16

dealt  62:20

debris  30:2

declaration  71:16,20,
23

Defendant's  11:2

definition  14:4,7

department  20:21
21:4,6 39:19

departments  20:20

depict  12:13

depicted  59:4

depicting  52:16

depiction  10:6,7 14:5

deponent  5:6

deposition  4:17,22
5:24 6:10,16,18 9:6,8,
17 58:10,13,19 75:2,12
79:25 80:5

depositions  79:9

describe  35:6 43:8

description  42:11

68:12,19

descriptive  74:6

designated  6:5

detergent  11:5 12:1,16
13:11 22:22

determine  17:3 25:9
60:17 72:5,10 74:19

difference  8:3,11

direct  16:18,20,21
28:19

directing  15:1

direction  13:5 14:13

directly  54:2

Disclosures  11:2
41:12

discovered  28:14 60:4

discrepancy  21:21

discuss  38:13 39:1,9
56:7

discusses  35:2

discussions  22:4

District  4:20

Division  4:21

doc  58:18

document  9:8,10,19,
21,23 10:24 13:23
41:16 44:8 48:7,19,23,
25

documents  8:25 29:24
30:12,22 31:21 32:4,14
33:25 44:23 45:1 57:24
58:18,21 65:3,18

dog  56:16

door  16:1

dots  67:14

dropped  22:22 46:5,14
59:21 60:2,13 61:20
62:12 64:13 72:2

dropping  60:7,18 61:4
72:6

duly  4:10

duties  67:17

duty  24:25 56:19 65:16

**E**

early  69:20

easier  9:11

edit  79:21

effect  30:5,25 31:15
32:6 33:12 34:3 39:15

Elaine  18:16

elderly  53:5 72:20

Electronic  21:6

electronics  20:20,23
21:3

Eli  4:23 79:8

email  36:19

employee  11:17 13:2
16:5 39:14,23 54:20
56:4 59:10 61:10,20
62:12 64:13

employees  18:4 30:1
65:4,10,15,22

end  71:7

entailed  17:13

entire  75:14

entitled  6:22 8:1 11:1
30:9 31:5

envelope  43:21

estimate  8:4,8 18:10
23:23,24 27:8 50:17

estimates  8:1

et al  4:19

Etehad  36:24 37:5

ETL  18:14,25 19:4,8,15,
16,25 20:3,5,14,17,22
21:11 23:18 24:7 25:7
27:5 39:14

evening  69:21

evenings  69:14

eventually  28:21 44:13

ANITA KAY PITTMAN
NOVEMBER 16, 2021

JOB NO. 201975

evidence 37:6,18 39:2, 10 65:19

evidencing 29:24 30:23 32:4

exact 7:25

EXAMINATION 5:16 76:6,13

examined 4:12

excuse 35:4 42:1 44:16

Executive 18:18,19,23

exhibit 9:12,13,15 11:3, 8 12:10,22 13:24 16:23 26:16 29:24 31:12 36:23 37:1 38:8,14,17, 19 40:21,23 41:2,10 44:15 48:8,24 49:23 58:1,23 59:4 66:5,7 71:15,17

exhibits 78:20 79:20

exist 30:7

existence 10:10 29:9

exists 45:13

expect 40:6

expected 68:23 69:3 74:11,19 76:16 77:1,8, 13,19 78:10

experienced 79:10

explain 22:18

explained 75:8

express 36:19

extent 32:22 43:9 49:8 70:15

## F

fact 64:13

facts 63:12 64:8 78:1

fair 48:23 50:13 69:15, 19

fairly 74:10

fall 10:9 23:12,14,15 24:19,22 26:22 27:12, 19 28:2,4,9 31:13,14 35:11 41:22 52:3,7,8,

15,23 58:25 78:10

fallen 67:4

falling 46:6 74:3,18

falls 27:6

familiar 11:6

Farley 5:9

feet 8:1

fell 17:14 22:7 23:6,11 27:22 46:18,21 59:12, 22 61:8,11 64:22,25 66:18,21 74:5

figure 75:21,22

filed 50:9,15,18 51:1

fill 45:5 47:9,15 57:7 65:19,22 66:2 77:9,14, 17,19,22,24 78:10,11

filled 47:8 61:16 77:4,7 78:5

finds 33:5

fine 40:4

finish 7:20,21

five-minute 70:1

five-to-ten 24:6,10 36:15

floor 28:11 30:25 31:17 32:6,21 33:2,20,21,22, 24 42:19 59:12 65:16, 24 72:21 74:18

follow 21:22 27:13 29:6,16 53:12

follow-up 21:23 76:12

food 19:8,25

footage 22:25 23:8 28:19,20 35:16,18 37:23 52:2,8,15,22 60:7 67:18 68:1,6

form 7:5 66:1 77:16,18, 19,24

found 12:7 29:15 50:25 58:22 59:11,13,15,18 61:21

foundation 68:2

foundational 8:7,10

fourth 26:6

Frank 26:7

Frazier 4:4,25

FRCP 11:3

Friday 69:14,18

friend 53:24

front 8:7 19:18 29:16

full 5:17

fully 8:17

## G

gaming 21:7

gave 43:19 44:6 45:7 47:24 49:16 53:11,24 61:17 76:21,25 77:16 78:3,5

generally 38:10 57:12, 14 78:7

gentleman 44:2 45:6, 17 47:16 49:15 53:11, 15,23 54:2,4,7 56:2,8 70:8,10,13 72:23 73:6 76:14

gentleman's 44:3 49:6 53:19

George 55:10

give 7:15,25 8:8 18:10 24:1,3 40:9 68:19 74:6 75:21 77:18,24 79:5

giving 8:22

good 4:15 40:1 54:19 59:8 79:12

gosh 50:11

Granda 11:22

great 79:7

greeted 16:1

ground 61:11

GSTL 55:3,9,14

guess 8:2,5,10 55:23

guest 19:15,17,20,21

22:6,7 23:11 27:22 41:15 42:10,24 43:2,4 44:20 55:15 56:12 57:16 61:8 74:4

guests 16:2 17:14 19:20 20:25 25:3 49:25

guide 34:8,14 67:3

guy 47:20,23 73:16

## H

H-A-L-V-E-R-S-A-N 26:5

H-A-L-V-E-R-S-O-N 26:8

Halverson 26:5,10

hand 8:4,5

handicapped 53:4

happened 23:14 46:4,6 77:10 78:6

happening 35:8 52:23

hear 79:12

heard 63:1,17,25 64:1, 3,17 71:25 72:18 73:16, 17 77:24

helping 19:20 20:25

Hey 39:25 61:20

high 21:20

high-priced 21:20

higher 39:21

Hills 11:22

hold 19:22 26:16 40:22

holding 12:1

hope 40:8

hospital 41:25

hour 4:2

hours 37:10,11 69:20 79:4

hundred 24:2

hypothetical 52:11 61:25 64:7,18 74:14 76:19 78:14

**I**

**identical** 38:21

**identification** 9:14
11:9 37:2 38:20 66:8
71:18

**identified** 57:23

**identify** 5:1

**immediately** 17:16
49:12 72:19

**importance** 6:23

**important** 7:15 60:16

**incident** 10:3,4,11,18
12:19 13:20 14:1,2,4,8,
11,14 15:2 16:24 17:5,
7,11,13,16,19,21 22:1,
5,6 23:9 26:14,18 27:1,
4,11,16,19,21 28:1,10
29:6,11,16 34:6,9,10,
14,16,17,18,19,21,23
35:5,6,7,10 36:4,5,9,15
37:11,12,24 39:21 41:3,
5,7,8,15 42:11,18 43:24
44:12,18,20,24 45:2
47:15 48:6 51:2,9,13,
16,19,24 52:2,3,14,22
53:12 55:1,16,22 56:5,
12,21 57:8,21,25 58:7
71:10,13 76:9 77:2

**incidents** 23:18 24:11

**include** 23:8 56:10
57:11 77:2

**included** 61:22 62:5,15
64:5

**includes** 10:6 14:5

**including** 5:17 37:6,11
51:21 71:10

**incomplete** 52:11
61:24 64:6,18 74:13
76:18 78:13

**indicating** 61:10

**individual** 71:16 73:25

**information** 40:10
49:6 56:23 62:5,11,14
64:3 70:16 77:1

**initial** 11:2 13:23 19:6

**initially** 19:4

**initials** 14:18 18:16
55:7

**injured** 24:12 43:9

**injuries** 10:6 43:10

**Injury** 42:11

**inside** 32:15

**instruct** 75:15

**insurance** 51:12,15

**interrupt** 6:6

**interview** 54:10 56:7

**interviewed** 42:2,5
43:23 51:15,18,23 56:3
70:9 76:14,24

**interviewing** 56:4

**invades** 75:16

**investigate** 17:7,10

**investigated** 71:9,12

**investigation** 29:3,5
60:17

**involved** 10:8 23:18
24:11,23 26:22 28:9,15
52:17 73:7

**involving** 53:8

**issues** 25:4

**items** 21:21 71:24

**J**

**jacket** 27:21 29:7,11,17
34:16,18,19,21,23
35:20 36:4 41:8 48:6,
14,15,19 49:1 57:19
61:18,23 62:5,16

**Jafari** 6:3 15:11 16:12,
21 21:17 22:1 38:5
71:12

**Jafari's** 9:6 15:5

**Jennifer** 25:25 26:1,9
38:13

**Jennifer's** 26:4

**Jessica** 5:9

**job** 18:12

**Jonathan** 14:17 15:2,4,
14 22:5,6 60:24 61:2
71:8

**Jonathan's** 14:24
15:21

**June** 10:4 12:19,25
13:19 15:1,7,12,15,19,
22 16:6,9,11,14 17:25
18:12 22:13 24:22
25:14 26:1 27:14,20
28:2,5 29:9 30:5,7,16
31:1,3,15,25 32:7,11
33:12,15 34:3,6 35:10
36:24 38:11,18,22
39:20 43:15,23 47:22
49:12,19 53:5 54:21
55:16 56:20 62:23 65:4,
19,22 67:22 68:9,20
69:4 70:23

**K**

**K-A-Y** 5:21

**Kay** 4:8 5:19,21

**kind** 76:8

**knew** 21:2 50:13

**knowledge** 8:7,10 38:6

**knowledgeable** 5:24

**L**

**L-U-I-S** 53:21

**Lacks** 68:2

**lady** 46:5,7,14

**lake** 56:16

**lanes** 19:18

**law** 6:24 36:24 37:5

**lawsuit** 50:9,15,18,25

**lead** 21:16

**leader** 18:18,20,23
21:17 55:15 56:19

**leading** 23:8,14 52:14

**leave** 33:5 75:9

**led** 10:5

**left** 41:25

**legal** 4:23 49:2

**Lelah** 6:3

**length** 8:6

**letter** 26:6 36:24 37:3,5,
15 38:9,14,18,21,24
39:9

**lines** 19:19

**liquid** 10:8 28:11,16,21
59:12,21 60:2,14 61:4
64:14 72:7

**locate** 59:1

**located** 67:9

**location** 11:21 41:19
64:14

**locations** 67:13

**LOD** 56:15,18,20,23
57:4,6,14 58:1,11

**log** 65:1

**logs** 65:21

**long** 6:16 18:19 19:19,
22 20:10 22:10 25:22
37:23 41:22 54:15,18,
20,22 58:25

**looked** 12:16 16:23
35:4 38:9,14,22 45:11,
22 52:7,15 57:8 67:25
68:6 72:20 74:19

**lot** 68:10,16

**loud** 71:25 72:6,10,18
74:9,10

**Luis** 53:19 71:16

**M**

**made** 41:3 79:16

**magnitude** 74:7

**mail** 36:19,21

**mailed** 43:21

**main** 65:12 66:6,15

ANITA KAY PITTMAN
NOVEMBER 16, 2021

JOB NO. 201975

**maintain** 35:18

**maintenance** 32:6,21 33:2,20

**make** 6:2 7:7,11 8:16 9:11 63:3 78:24

**making** 19:19 20:6,7,8, 24 21:1

**Management** 35:22,25

**manager** 23:19 24:7,24 25:13,15,23 26:2,10 27:6 38:13 39:15,19 55:17

**managers** 39:15

**managing** 4:18 5:8

**mark** 10:25 36:23 38:8, 17 66:5 71:15

**marked** 9:13 11:8 37:1 38:19 66:7 71:17

**matter** 4:18 23:1 35:16, 19 50:10 80:1

**maximize** 40:22

**means** 48:15

**meant** 35:10 52:2

**medication** 8:20

**member** 15:4 34:25 45:4 63:21

**members** 25:4 27:23 44:9,25

**memory** 17:24 18:2 53:18 76:7

**mentioned** 56:2 71:9

**merchandise** 20:24 21:1,24 67:25 74:18

**middle** 5:17 42:6

**midleader** 24:25 25:2, 6,10 26:19

**Misstates** 46:10 58:3

**moments** 52:16

**Monday** 17:25 68:9,23 69:4,15

**monitor** 65:16

**monitored** 65:4,10

67:18

**monitoring** 32:5,20 33:2,19 65:23

**monitors** 17:3 71:2,5

**month** 75:14

**months** 50:14,15,19, 20,22,23

**mops** 33:8

**morning** 4:15 69:20

**motorized** 53:4,8

**moving** 40:6

## N

**named** 71:16

**narrative** 32:23

**nature** 7:13

**needed** 16:16 22:8

**noise** 71:25 72:10,19 73:16,17 74:10

**noted** 79:23

**notes** 75:22

**notice** 5:7 9:8,16 35:15, 17 37:17

**notices** 30:24 31:11,17

**November** 4:1,16

**number** 4:21 6:7 8:1 10:10 13:25 14:5 21:21 23:22,24 24:1 29:23,24 30:22 31:11 32:3 41:2 44:6 45:7,14 47:23 48:3 49:7 66:23 67:12 68:12 72:17 73:12

## O

**oath** 5:14 6:20,22,24

**object** 10:13 23:3 70:15

**objection** 17:8 21:14 23:20 28:25 32:22 39:4, 17 42:22 46:10 47:11 49:2,8 50:5 51:4 52:10, 19,25 55:18 58:3,16 59:5,9,16 60:9,19

61:12,14,24 62:25 63:12 64:6 65:6,25 68:2,14,25 69:6,22 72:13 73:18 74:13 75:6 76:18 78:1,13

**objections** 62:7,17 74:21 77:3,12

**obligation** 63:9

**observation** 8:8

**observations** 56:24 57:3,11,15

**observed** 72:20 77:15 78:9

**observing** 5:10

**occupies** 55:4

**occurred** 17:19,22,25 19:11 23:14 35:11 41:22 52:4,8 53:16 61:7 63:17 72:23 76:16,25

**October** 75:2,12,14

**office** 70:20,23,24 71:1, 4

**oops** 41:9

**open** 56:16

**opportunity** 7:7,13 9:9

**opposed** 24:23

**orders** 78:24 79:15

**owned** 36:11

## P

**P.M.** 17:25 76:3 80:4,5

**Pacific** 4:16 40:17 70:7 75:25 76:3 80:4

**package** 57:20 61:23 62:5

**packet** 27:13,15 36:2,3 45:16 57:1,13

**pages** 11:1 30:19 44:16 57:6

**paper** 33:9 76:21

**paragraph** 71:22 72:11,17

**part** 15:8,17 16:23 17:4 29:2,5 32:16 44:12 48:16,25 49:18 57:1,19 60:16 61:22 62:14 67:17

**passing** 66:12

**past** 36:14

**people** 7:19 15:8 56:2 68:10,11

**percipient** 76:24 77:9, 15 78:9

**period** 69:21

**person** 9:17 22:22 24:12 28:20 38:2 42:6 44:5 49:15 52:6,17

**personally** 14:10 17:2 60:11,22

**persons** 5:23 15:17 52:17 53:4 67:19

**pertaining** 44:23 45:1

**phone** 21:7 25:3 44:6 45:7,14 48:3

**photographs** 37:7

**physically** 75:11

**picked** 20:20

**picking** 74:4

**picture** 11:5,6,11,24 12:2,4,9,11,15,18,22,24 13:5,7,10,23 28:8 58:22 66:6,10,18 67:12 79:19, 20

**pictures** 6:7 10:11,12, 16,17,19 11:4 13:13,15, 18 16:22,24 28:3,6 35:1 60:6,11,17

**piece** 74:18

**Pittman** 4:8,17 5:6,19 40:18,24 75:7,15 76:7, 12 79:25

**place** 4:22 52:3,8 79:14

**placement** 30:24 31:16

**places** 4:4

**plaintiff** 5:4 14:6

**plaintiff's** 9:13 11:8 37:1 38:19 66:7 71:17

**planograms** 20:8

**platform** 4:23

**PMK** 9:8

**point** 19:9 28:14 54:19

**policies** 27:15,25 29:25 30:4,17,23 31:2,8,16 32:4,10 33:18 34:1,7,13

**policy** 27:10 28:5 29:8, 12 32:17,20 33:11 37:22 38:1 47:6 49:18 62:4,14,22 63:7,10,16

**portion** 17:11,13

**position** 15:21 19:1,3, 6,22,24 20:2,10,11,13 21:8 55:2,5

**post** 16:1

**posted** 16:1

**precautions** 64:23

**preparation** 27:11 58:10,13,19

**prepared** 7:5 36:15 41:5,7,16,23,24 43:18, 19 47:20 56:20 76:16

**preparing** 26:23 27:19 76:8

**present** 4:3 13:7,10 15:11,14,18 18:5 26:13 39:22 47:18 54:9,14

**presented** 79:20

**preservation** 37:6,18 39:10

**preserve** 35:16,18 39:2

**pretty** 71:6

**prevent** 8:21

**preventing** 75:11

**previous** 12:15

**previously** 5:25

**price** 20:8

**prior** 17:16 33:19 37:11 54:21

**privacy** 75:17

**procedure** 27:10 28:5 29:6,9,12,25 30:14,15, 17 32:16,20 33:12 34:1 36:20 49:19 62:4,15,22 63:7,10,16

**procedures** 27:15 28:1 29:16 30:4,23 31:2,9,16 32:5,10 33:18 34:8,13

**produce** 9:1,6

**produced** 9:5 10:22

**production** 29:23

**products** 30:2

**Protection** 15:5,8,18 21:12

**provide** 7:3 70:17 79:3

**provided** 5:25 9:8

**PSS** 14:18

**purpose** 70:24

**Pursuant** 11:2

**pushed** 21:23

**put** 36:21 43:20 47:7 48:5 57:4 62:1,18,20,24 63:4,8,17,19,21 64:10, 11,15 77:14 78:4

**puts** 63:4

**putting** 20:7

---

**Q**

**qualified** 5:23 9:17

**question** 8:14,17 10:2 23:4 62:10 74:15 75:7, 16 76:4 77:6,8

**questions** 7:2,21 21:1 43:2,4 46:25 63:20 75:18

**quick** 40:12 75:20

**quickly** 40:6

**quote** 5:8

---

**R**

**range** 24:1,3 50:18

**ranking** 39:21

**read** 40:11

**reading** 31:12

**real** 40:12

**reason** 7:11,15 21:13

**recall** 15:1,7,11,14,17 16:19,23 18:4 21:25 22:16 24:15 30:3 31:6 41:6,21 44:3 45:17,20, 22,24 46:1,23 55:24 56:3 57:3,6 70:11 73:3, 14,21,22

**receive** 35:15,17 37:15

**received** 38:11

**Recess** 40:15 70:5 76:1

**recognize** 12:11 66:9

**record** 4:16 5:7 6:2 9:5 40:10,13,17 70:2,4,7 75:25 76:3 78:23,24 79:13,15,24 80:3

**refer** 21:3,4 48:8,12

**referred** 70:9

**referring** 36:3 48:20 72:11

**reflect** 7:14

**refresh** 17:24 18:2 53:18

**register** 71:25 72:20 73:2,5,8,11,12 74:11

**related** 29:19 76:9

**relationship** 35:25

**relevant** 52:14

**remain** 20:10 21:8

**remained** 20:11

**remember** 12:23 17:20 22:12 24:8,13,14,18 26:15 27:4 31:20 32:13, 19 39:24 44:10 45:15, 16 47:17 49:21,22 50:7,

11,12,19 54:12 58:24 59:13,18 60:3 67:10 70:11 73:10 78:4

**REMEMBERED** 4:1

**repeat** 8:15

**rephrase** 8:16 39:8 47:3

**report** 26:24 27:1,11, 19,21 28:1 36:5,9 41:4, 6,15,19 43:15,17 44:12, 18,21,24 47:16,20 48:2, 4 49:12,22 56:2,11,12, 13,15,20,23,25 57:4,6, 8,11,14,25 58:1,11,14 61:9,17,22 62:16,24 63:5,8,9,22 64:5,16 76:8,17 77:2,5,7,9,14, 22 78:4,5,11

**reported** 16:17

**reporter** 4:5,24 5:12 7:4,18 79:5

**reports** 26:20 27:4,16 36:15,16 41:3 56:13 58:6

**represent** 5:2

**representative** 51:12

**request** 13:25 29:18,23

**requested** 75:5

**requesting** 37:6

**requests** 9:9,10,22,23

**require** 62:23

**required** 27:18 31:18

**requirement** 8:15 39:2

**requires** 30:25

**requiring** 63:16

**resp** 65:15

**respect** 5:24 6:6,7 9:7 10:3 12:15 16:8 22:1 24:22 26:18 27:11,25 28:6 29:13 31:11 37:23 63:7,9

**respective** 4:4

**respond** 17:9 21:2,15 23:4,21 25:4 29:1 32:23

39:5,18 42:23 46:11
47:12 49:3,9 50:6 51:5
52:11 53:1 55:19 58:4
59:6,17 60:10,20 61:15,
25 62:7 63:2,13 64:8,19
65:7 68:3,15 69:1,7,23
73:19 74:14,23 76:19
78:2,15

**responded** 10:14 25:1

**responds** 63:10

**response** 8:18 70:17
72:15

**responses** 7:3,8,12,20
8:22 43:3,6

**responsibilities** 19:16
20:5,22

**responsible** 26:23
28:20

**rest** 43:20

**return** 19:21

**review** 7:7

**reviewed** 58:19,21

**running** 19:18 52:6,9
55:23

**Ruth** 11:14,15 12:19
47:4,5,6,14,19 51:1
54:6,9,14,23 55:17
56:3,7,11 59:25 60:1,4
61:9 62:11,23 63:8,16
64:13,15 70:9 71:8
72:23,25 73:3,15,21
74:1,6 76:8,14,16,24
77:23 78:8

**Ruth's** 55:2,24 56:13
58:1,14

**S**

**S-A-L** 25:19

**S-A-L-D-A-N-O** 53:21

**S-E-D-W-I-C-K** 35:21

**safe** 74:20

**safety** 14:21 64:23
65:16,21,24

**Salazar** 25:16,19,22

**Saldano** 53:19

**Saldona** 71:16

**Sales** 18:14 19:4 20:15

**Saturday** 69:12,18

**scene** 28:11 54:9,15
77:23

**scheduled** 25:11,12

**scope** 23:8

**screen** 10:23

**scroll** 11:4

**Sean** 5:5 78:20

**search** 23:13

**seconds** 46:4,6,17,21
72:18 73:15,16,21,23
74:1,3,4

**section** 19:21

**Security** 14:21

**Sedgwick** 35:21,25
36:9,11,16,18 38:23
39:1,9 44:13 48:17,21
49:5 57:2,20,24 58:7
61:9,18,23 62:6

**seeking** 8:15

**selling** 20:7

**send** 36:2,6,9,16,18
44:13 56:25 78:19

**September** 9:16

**service** 19:15,17,20,21
20:25 55:15 79:10

**Services** 20:23 21:11
23:19 24:7 25:7 27:6
35:22,25 39:14

**share** 10:23

**sharing** 13:22 41:10

**Shorthand** 4:5

**shortly** 12:8

**show** 10:21 52:9

**showing** 65:3

**shown** 79:21

**shows** 11:5 67:1

**sic** 26:5 35:21 52:7
74:11

**sign** 43:12 65:10

**signature** 43:14 44:21

**signs** 64:22

**similar** 63:22

**simply** 35:10

**sister's** 8:9

**sit** 76:8

**slip** 10:9 23:12 24:19,22
26:22 27:6,12,19 28:2,
4,9 41:22 52:3,15,23
78:9

**slip-and-fall** 23:17
24:10 26:18 37:24

**slip-and-falls** 24:6

**slipped** 42:18 52:7

**slower** 69:16,21

**smoothest** 79:8

**soap** 10:20 12:7,14
42:18 46:6,8,14,15 74:3

**soapy** 10:7 28:11,16,21
59:21 64:14 72:7

**Softlines** 20:3,5,17

**sound** 72:6 74:7,12,17

**sounded** 72:1 74:17

**source** 74:12

**speak** 17:14 54:2,4

**speaking** 45:17 54:6

**Specialist** 14:21,22

**Specialty** 18:14 19:4
20:14,23 21:11 23:18
24:7 25:7 27:5 39:14

**specific** 76:7

**specifically** 22:19 34:7
35:2

**speculation** 8:2,4
47:11 49:3,9 50:6 52:10
58:4 59:16 60:19 61:12,
14,25 64:7 68:3 73:18
76:19 78:14

**spelling** 25:17

**spill** 30:13,14,15,17
31:10 32:16,24,25 33:3,
4,5,10,19 34:1 57:17,18
61:7,13 63:17 64:4,24

**spillage** 32:6 62:13

**spilled** 12:14

**spilling** 28:22

**spills** 30:1,5 33:23

**spot** 40:1 66:19

**stand** 5:20 14:20 55:14
56:18 66:20 67:6,8,9

**stands** 21:6 66:13

**start** 18:22 33:3

**started** 19:3

**starts** 42:14

**state** 4:5 5:2,17

**stated** 45:7 52:2 53:15
76:14

**statement** 45:16 47:8,
10 53:11,25 62:2,19,20
63:18

**statements** 27:23
34:25 35:1 57:9

**states** 4:20 5:7

**stating** 45:13

**Steno** 4:3,22,24,25

**steps** 72:19 73:1

**Steve** 6:2,6 9:4 29:18
39:25 55:13 75:20

**Steven** 5:3

**Stewart** 42:6 54:11
56:1

**Stewart's** 50:4

**stolen** 67:25

**stop** 10:23 13:22 41:9

**store** 10:5,7 11:17,20
13:3 14:6 15:12,15,18,
22 16:6 18:5,20 19:21
23:2 24:24 25:7,13,15,
23 26:1,10,11,12,13,23
29:25 30:4 37:22 38:10,

13 39:15,16,22 47:6
53:5 55:23 56:14 65:5
67:19,22 68:7,11,13,20
70:10 71:7 72:9

**store's**  66:6

**strike**  17:17

**substantive**  7:13

**Sunday**  69:12,18

**super**  55:21

**supervised**  16:5

**supervisor**  16:8,11,14,
18,20,21 55:22

**Supplemental**  11:2
41:11

**surroundings**  33:23

**surveillance**  17:3
67:18

**swear**  5:12

**Sweep**  65:1

**swept**  65:4

**sworn**  4:11 6:19

---

**T**

**table**  8:6

**taking**  4:22 8:20 24:11
73:1

**talk**  11:20 37:17 44:11
47:14 51:12 57:15

**talked**  45:3 47:4,19
51:1,8 70:13 72:23
73:14 74:2

**talken**  42:1

**talking**  7:19 11:21 24:6
27:1 32:24,25 34:9
49:16 54:13 60:24
68:13

**Target**  4:18,19 5:5,10
6:14 9:18 10:5,9,22
11:18,21 13:3,14,16,19
14:21 15:8 16:25 18:8,
13,20,25 19:1,3,7,14,
17,24 20:2,5 21:4 25:23
27:10,15 28:6 29:12,25
30:4,11,23 31:23,25

32:5,10 33:12,19 35:24
36:1,12,24 37:22 38:9,
11 39:23 47:22 49:19
51:18,23 53:4,14 54:16,
21,22,24 55:5 59:11
60:7 62:4,15,23 63:3,4,
6,10,16 64:23 65:23
70:13,19,21,24 73:8
80:1

**tasks**  15:22 20:16

**team**  15:5,9,18 18:18,
19,23 19:19 20:6 21:2,
12,23 25:4 27:23 33:21
34:25 44:9,25 45:4
55:15 56:14 63:21

**telephone**  47:23

**telling**  51:11 73:3

**tells**  63:4 64:13

**ten**  24:3,4 27:9

**term**  23:3

**testified**  4:12

**testify**  6:3

**testifying**  6:23

**testimony**  7:16 46:10
58:3

**thing**  40:7 79:14

**things**  21:20 37:6
52:14,22 63:24

**thought**  76:15,25 77:10

**thousand**  23:25

**Thursday**  4:1

**time**  4:16 7:19,25 11:18
14:11 16:24 17:2,18
22:2,8 23:8,12 25:6,14
36:14 39:13,21 40:13,
17 53:10,14 54:14 55:1,
16,22 59:5 62:23 65:11
67:17 68:5,6 69:21
70:4,7,10 73:8 75:25
76:3 79:17 80:3,4

**times**  6:12 7:24 67:24

**title**  18:12 19:14

**TL**  55:13

**today**  7:16 8:23,25
47:19 48:19 51:9 58:10,

13,20 76:8

**told**  22:6,7 33:22 42:25
44:7,9 46:1 47:4,7,10
56:9,11 59:23,24,25
60:1,3 61:10,20 63:6
64:4 72:22,25 73:20,21
76:15,25 77:9,15,23
78:8

**tomorrow**  79:6

**top**  41:18

**topics**  5:24 6:4

**towels**  33:9

**track**  53:10

**transcript**  7:6,7,12
78:24

**trash**  33:24

**truth**  4:11,12

**TSL**  55:12

**TSS**  14:17,19,20

**Twenty-six**  18:21

**two-page**  41:4

**type**  28:6 39:1

**types**  57:10

---

**U**

**Uh-huh**  66:14

**unattended**  33:6

**understand**  6:19,25
7:9 8:11 12:18 14:4
15:21 62:8,9 74:15,24

**understanding**  5:22
35:9 47:9 52:20,24
70:12 73:6,11

**understood**  7:16 8:17

**United**  4:19

**unload**  71:24

---

**V**

**vague**  10:13 17:8 21:14
23:20 39:4,17 42:22
52:19,25 55:18 59:5

60:20 65:6,25 68:14,25
69:6,22 72:13 74:14

**venued**  4:19

**Verna**  42:5 50:4 54:11
56:1

**versus**  4:18 80:1

**victim**  23:1,4 57:10

**video**  6:8 22:8,17,21,25
23:8 28:4,19 35:1,2,3,5,
7,16,18 37:7,23 40:12
52:1,8,15,22 60:7,12,
18,22 61:2,3,6 67:18
68:1,6 79:15,21

**videotape**  10:11 13:25
14:2,8,11,14 15:2 16:24
17:4

**volunteer**  47:2

---

**W**

**walk**  74:22

**walking**  33:21 42:15
46:5,7

**warning**  64:22

**warnings**  30:24 31:11,
17

**water**  33:23

**week**  17:21 69:10,17

**weekend**  69:11

**Wendy**  4:4,24 78:19
79:2,8

**Western**  4:21

**Wheeler**  4:23

**witness'**  49:20

**witnessed**  45:2 53:16
70:14 73:7 76:15

**witnesses**  17:15 27:24
43:22 56:4,14 57:9

**woman**  46:21 72:20

**word**  35:6 73:25

**words**  42:12,14 73:15
74:6

**work**  25:6 70:19

**worked**  21:12,16 54:22

**working**  54:15 67:21
79:9

**works**  54:23

**worktime**  69:20

**write**  42:21 62:20 63:25

**writing**  34:3 41:18
45:9,13 47:7 48:16 65:9

**written**  27:5 33:11
47:10 56:11 76:17 77:2,
9,14

**wrote**  26:25 62:19
63:19 64:9,10

---

### Y

---

**year**  19:13,23,25 75:12

**years**  6:17 18:21 26:9,
12

---

### Z

---

**z-a-r**  25:21

EXHIBIT E



ETEHADLAW
*Building trust through success*

9454 Wilshire Boulevard, Suite 711
Beverly Hills, California 90212
Telephone:  (310) 550-1220
Fax:         (888) 266-5502

Simon P. Etehad, Esq.
Steven Berkowitz, Esq.
David Carman, Esq.

June 12, 2020

**VIA U.S. MAIL CERTIFIED**

Target
11133 Balboa Blvd.
Granada Hills, CA 91344

Certified Mail #:        7016-1370-0000-0425-2484

|  | RE: | **Our Client** | : | **Connie Taylor Broadous** |
|--|-----|----------------|---|---------------------------|
|  |     | **Date of Loss** | : | **06/01/2020** |
|  |     | **Location** | : | **11133 Balboa Blvd.** |
|  |     |  |  | **Granada Hills, CA 91344** |

To Whom It May Concern

Please be advised that this office has been retained to represent the above named individual with respect to their injuries resulting from the slip-and-fall incident which occurred on the above referenced date. We ask that you please refrain from contacting our client in any manner whatever, and direct all inquiries and correspondence regarding this matter to our office.

1.      Request for Insurance Information

Please provide this office with a statement of your insurance policy limits, any applicable excess or umbrella coverage, the nature and identity of coverage provisions, and whether said policy was in force and effect at the time of the above referenced incident.

2.      Request for Preservation of Evidence

This letter further reconfirms your obligation to preserve any and all evidentiary items relating to the subject incident, including, but not limited to:

- any samples or parts of the floor reflecting the type in use at time and the location of the incident;
- all records (notes, letters, emails, contracts, logs, etc.) relating to the inspection, repair, service, modification or maintenance of your floor(s) for the period beginning one (1) year before the incident through the date of incident;
- photographs or video of the incident (from 4 hours prior to the incident up to and including 4 hours after the incident), incident scene, and its subsequent, inspection, repair, service, modification or maintenance (request is made for the native files of any photographs or video);

Target
Date of Incident: 06/01/2020
June 12, 2020
Page 2 of 7

- photographs or video of our client on the date of the incident, including but not limited to, the entrance, use, and exit of the establishment (request is made for the native files of any photographs or video);

- oral or written statements relating to the incident, incident scene, or its subsequent inspection, repair, service, modification or maintenance; and

- all records reflecting oral or written communications or agreements with our client regarding the incident and incident scene.

We are also specifically requesting that your company take steps to preserve the data and information described in this letter.

We ask that you preserve documents, tangible things and electronically stored information potentially relevant to the issues in this case. As used in this document, "you" and "your" refers to **[entity name]**, and its predecessors, successors, parents, subsidiaries, divisions and affiliates, and their respective officers, directors, agents, attorneys, accountants, employees, partners and other persons occupying similar positions or performing similar functions.

You should anticipate that much of the information subject to disclosure or responsive to discovery in this case is stored on your current and/or former computer systems and other media and devices (including personal digital assistants, voice-messaging systems, online repositories and cell phones.)

Electronically stored information (hereinafter "ESI") should be afforded the broadest possible meaning and includes (by way of example and not as an exclusive list) potentially relevant information electronically, magnetically, optically or otherwise stored as:

- digital communications (e.g., e-mail, voice mail, instant messaging);
- e-mail server stores (e.g., Lotus Domino .NSF or Microsoft Exchange .EDB);
- word processed documents (e.g., Word or WordPerfect files and drafts);
- spreadsheets and tables (e.g., Excel or Lotus 123 worksheets);
- accounting application data (e.g. MAS90, Ultimate, QuickBooks);
- image and facsimile files (e.g., .PDF, .TIFF, .JPG, .GIF images);
- sound recordings (e.g., .WAV and .MP3 files);
- video and animation (e.g., .AVI and .MOV files);
- databases (e.g., Access, Oracle, SQL Server data, SAP);
- contact and relationship management data (e.g., Outlook, ACT!);
- calendar and diary application data (e.g., Valiant, Outlook PST, blog entries);
- online access data (e.g., E-Verify, Temporary Internet Files, History, Cookies);
- presentation (e.g., PowerPoint, Corel Presentations);
- network access and server activity logs;
- project management application data;
- computer aided design/drawing files; and
- backup and archival files (e.g., Veritas, Zip, .GHO).

Target
Date of Incident: 06/01/2020
June 12, 2020
Page 3 of 7

ESI resides not only in areas of electronic, magnetic and optical storage media reasonably accessible to you, but also in areas you may deem not reasonably accessible. You are obligated to preserve potentially relevant evidence from both sources of ESI, even if you do not anticipate producing such ESI.

The demand that you preserve both accessible and inaccessible ESI is reasonable and necessary. Pursuant to the rules of civil procedure, you must identify all sources of ESI you decline to produce and demonstrate to the court why such sources are not reasonably accessible. For good cause shown, the court may order production of the ESI, even if it is not reasonably accessible. Accordingly, you must preserve ESI that you deem inaccessible so as not to preempt the court's authority.

3.      Preservation Requires Immediate Intervention

You must act immediately to preserve potentially relevant ESI, including, without limitation, information relating to the categories detailed in Section 2 of this letter, including ESI you may use to support claims or defenses in this case.

Adequate preservation of ESI requires more than simply refraining from efforts to destroy or dispose of such evidence. You must intervene to prevent loss due to routine operations or malfeasance and employ proper techniques and protocols to preserve ESI. Booting a drive, examining its contents or running any application may irretrievably alter the evidence it contains and constitute unlawful spoliation of evidence. Preservation requires action.

Nothing in this demand for preservation of ESI should be understood to diminish your concurrent obligation to preserve documents, tangible things and other potentially relevant evidence.

4.      Suspension of Routine Destruction

You are directed to immediately initiate a litigation hold for potentially relevant ESI, documents and tangible things and to act diligently and in good faith to secure and audit compliance with such litigation hold. You are further directed to immediately identify and modify or suspend features of your information systems and devices that, in routing operation, operate to cause the loss of potentially relevant ESI. Examples of such features and operations include:

- purging the contents of e-mail repositories;
- using data or media wiping, disposal, erasure or encryption utilities or devices;
- overwriting, erasing, destroying or discarding backup media;
- re-assigning, re-imaging or disposing of systems, servers, devices or media;
- running antivirus or other programs affecting wholesale metadata alteration;
- releasing or purging online storage repositories;
- using metadata stripper utilities;
- disabling server, packet or local instant messaging logging; and
- executing drive or file defragmentation or compression programs.

5.      Guard Against Deletion

You should anticipate that your officers, employees or others may seek to hide, destroy or alter ESI. You must act to prevent and guard against such actions. Especially where company machines were used for

Target
Date of Incident: 06/01/2020
June 12, 2020
Page 4 of 7

Internet access or personal communications, you should anticipate that users may seek to delete or destroy information they regard as personal, confidential or embarrassing, and in so doing, they may also delete or destroy potentially relevant ESI. This concern is not unique to you. It is simply conduct that occurs with such regularity that any custodian of ESI and their counsel must anticipate and guard against its occurrence.

6.     Act to Prevent Spoliation

You should take affirmative steps to prevent anyone with access to your data, systems and archives from seeking to modify, destroy or hide ESI on network or local hard drives and on other media or devices (such as by deleting or overwriting files, using data shredding and overwriting applications, defragmentation, re-imaging, damaging or replacing media, encryption, compression, steganography or the like).

///

7.     System Sequestration or Forensically Sound Imaging

As an appropriate and cost effective means of preservation, you should remove from service and securely sequester the systems, media and devices housing potentially relevant ESI of All Custodians.

In the event you deem it impractical to sequester systems, media and devices, we believe that the breadth of preservation required, coupled with the modest number of systems implicated, dictates that forensically sound imaging of the systems, media and devices of those named above is expedient and cost effective. As we anticipate the need for forensic examination of one or more of the systems and the presence of relevant evidence in forensically accessible areas of the drives, we demand that you employ forensically sound ESI preservation methods. Failure to use such methods poses a significant threat of spoliation and data loss.

"Forensically sound ESI preservation" means duplication of all data stored on the evidence media while employing a proper chain of custody and using tools and methods that make no changes to the evidence and support authentication of the duplicate as a true and complete bit-for-bit image of the original. The products of forensically sound duplication are called, inter alia, "bitstream images" or "clones" of the evidence media. A forensically sound preservation method guards against changes to metadata evidence and preserves all parts of the electronic evidence, including deleted evidence within "unallocated clusters" and "slack space."

Be advised that a conventional copy, backup or "ghosting" of a hard drive does not produce a forensically sound image because it only captures active, unlocked data files and fails to preserve forensically significant data existing in, for example, unallocated clusters and slack space.

8.     Further Preservation by Imaging

With respect to the hard drives and storage devices of all custodians, demand is made that you immediately obtain, authenticate and preserve forensically sound images of the hard drives in any computer system (including portable and home computers) used by that person during the period during all relevant time periods to the present time, as well as recording and preserving the system time and date of each such computer.

Target
Date of Incident: 06/01/2020
June 12, 2020
Page 5 of 7

Once obtain-ed, each such forensically sound image should be labeled to identify the date of acquisition, the person or entity acquiring the image and the system and medium from which it was obtained. Each such image should be preserved without alteration.

9.    Preservation in Native Form

You should anticipate that certain ESI, including but not limited to spreadsheets and databases, will be sought in the form or forms in which it is ordinarily maintained (i.e., native form). Accordingly, you should preserve ESI in such native forms, and you should not employ methods to preserve ESI that remove or degrade the ability to search the ESI by electronic means or that make it difficult or burdensome to access or use the information.

You should additionally refrain from actions that shift ESI from reasonably accessible media and forms to less accessible media and forms if the effect of such actions is to make such ESI not reasonably accessible.

10.    Metadata

You should further anticipate the need to disclose and produce system and application metadata and act to preserve it. System metadata is information describing the history and characteristics of other ESI. This information is typically associated with tracking or managing an electronic file and often includes data reflecting a file's name, size, custodian, location and dates of creation and last modification or access. Application metadata is information automatically included or embedded in electronic files, but which may not be apparent to a user, including deleted content, draft language, commentary, collaboration and distribution data and dates of creation and printing. For electronic mail, metadata includes all header routing data and Base 64 encoded attachment data, in addition to the To, From, Subject, Received Date, CC and BCC fields.

Metadata may be overwritten or corrupted by carless handling or improper preservation, including by moving, copying or examining the contents of files.

11.    Servers

With respect to servers used to manage e-mail (e.g., Microsoft Exchange, Lotus Domino, and Google Apps) and network storage (often called a "network share"), the complete contents of each user's network share and e-mail account should be preserved. There are several ways to preserve the contents of a server. If you are uncertain whether the preservation method you plan to employ is one that we will accept as sufficient, please immediately contact the undersigned.

12.    Home Systems, Laptops, Online Accounts and Other ESI Venues

Though we expect that you will act swiftly to preserve data on office workstations and servers, you should also determine if any home or portable systems or devices may contain potentially relevant data. To the extent that you have sent or received potentially relevant e-mails or created or reviewed potentially relevant documents away from the office, you must preserve the contents of systems, devices and media used for these purposes (including not only potentially relevant data from portable and home computers, but also from portable thumb drivers, CD-R/DVD- R discs and the user's PDA, smart phone, voice mailbox or other forms of ESI storage.) Similarly, if you used online or browser-based e-mail accounts or

Target
Date of Incident: 06/01/2020
June 12, 2020
Page 6 of 7

services (such as Gmail, AOL, Yahoo Mail or the like) to send or receive potentially relevant messages and attachments, the contents of these account mailboxes (including Sent, Deleted and Archived Message folders) should be preserved.

13.   <u>Ancillary Preservation</u>

You must preserve documents and other tangible items that may be required to access, interpret or search potentially relevant ESI, including logs, control sheets, specifications, indices, naming protocols, file lists, network diagrams, flow charts, instruction sheets, data entry forms, abbreviation keys, user ID and password rosters and the like.

You must preserve passwords, keys and other authenticators required to access encrypted files or run applications, along with the installation discs, user manuals and license keys for applications required to access the ESI.

You must preserve cabling, drivers and hardware, other than a standard 3.5" floppy disc driver or standard CD or DVD optical driver, if needed to access or interpret media on which ESI is stored. This includes tape drivers, bar code readers, Zip drives and other legacy or proprietary devices.

14.   <u>Paper Preservation of ESI is Inadequate</u>

As hard copies do no preserve electronic searchability or metadata, they are not an adequate substitute for, or cumulative of, electronically stored versions. If information exists in both electronic and paper forms, you should preserve both forms.

15.   <u>Agents, Attorneys and Third Parties</u>

Your preservation obligation extends beyond ESI in your care, possession or custody and includes ESI in the custody of others that is subject to your direction or control. Accordingly, you must notify any current or former agent, attorney, employee, custodian and contractor in possession of potentially relevant ESI to preserve such ESI to the full extent of your obligation to do so, and you must take reasonable steps to secure their compliance.

16.   <u>Preservation Protocols</u>

We are desirous of working with you to agree upon an acceptable protocol for forensically sound preservation and can supply a suitable protocol if you will furnish an inventory and description of the systems and media to be preserved. Alternatively, if you promptly disclose the preservation protocol you intend to employ, perhaps we can identify any points of disagreement and resolve them.

A successful and compliant ESI preservation effort requires expertise. If you do not currently have such expertise at your disposal, we urge you to engage the services of an expert in electronic evidence and computer forensics. Perhaps our respective experts can work cooperatively to secure a balance between evidence preservation and burden that is fair to both sides and acceptable to the court.

Target
Date of Incident: 06/01/2020
June 12, 2020
Page 7 of 7

17. <u>Do Not Delay Preservation</u>

I am available to discuss reasonable preservation steps; however, you should not defer preservation steps pending such discussions if ESI may be lost or corrupted as a consequence of delay. Should your failure to preserve potentially relevant evidence result in the corruption, loss or delay in production of evidence to which we are entitled, such failure would constitute spoliation of evidence, and we will not hesitate to seek sanctions.

18. <u>Confirmation of Compliance</u>

**Please confirm within twenty (20) days of this letter that you have taken the steps outlined in this letter to preserve ESI and tangible documents potentially relevant to this action**. **If you have not undertaken the steps outlined above, or have taken other actions, please describe what you have done to preserve potentially relevant evidence. If you do not have the potentially relevant evidence in your custody or control, please describe why you do not have it in your custody and control and please provide the name, address and phone number of the person or facility who does have such relevant evidence.**

**It is imperative that you take affirmative steps to preserve these items as the failure to do so may constitute negligent or intentional spoliation of evidence in which case we would seek evidentiary, issue and/or terminating sanctions. Kindly advise us where these items are located and to the extent that you are aware, the identity, address, and telephone number of any other party who may have in his possession any evidence relating to the incident.**

Please do NOT dispose of any of these documents and items as we will need them. We would be willing to pick them up and pay for them. Thank you for your prompt attention to this matter.

Should you need any further information at this time, please do not hesitate to contact this office.

Sincerely,
**ETEHAD LAW, APC**

Simon P. Etehad
Attorney at Law

SPE/jc



9454 Wilshire Boulevard, Suite 711                     Simon P. Etehad, Esq.
Beverly Hills, California 90212                         Steven Berkowitz, Esq.
Telephone:  (310) 550-1220                              David Carman, Esq.
Fax:         (888) 266-5502

June 15, 2020

**<u>VIA USPS & FAX</u>**

Sedgwick Claims Management Services, Inc.
P.O. Box 1453
Lexington, KY 40512

Fax: **(866) 470-5765**

|         | RE:                 |     |                           |
|---------|---------------------|-----|---------------------------|
|         | **Our Client**      | :   | **Connie Taylor Broadous**|
|         | **Date of Loss**    | :   | **06/01/2020**            |
|         | **File No**         | :   | **108221H0001**           |
|         | **Location**        | :   | **Target**                |
|         |                     |     | **11133 Balboa Blvd.**    |
|         |                     |     | **Granada Hills, CA 91344**|

To Whom It May Concern

Please be advised that this office has been retained to represent the above named individual with respect to their injuries resulting from the slip-and-fall incident which occurred on the above referenced date. We ask that you please refrain from contacting our client in any manner whatever, and direct all inquiries and correspondence regarding this matter to our office.

1.    <u>Request for Insurance Information</u>

Please provide this office with a statement of your insurance policy limits, any applicable excess or umbrella coverage, the nature and identity of coverage provisions, and whether said policy was in force and effect at the time of the above referenced incident.

2.    <u>Request for Preservation of Evidence</u>

This letter further reconfirms your obligation to preserve any and all evidentiary items relating to the subject incident, including, but not limited to:

- any samples or parts of the floor reflecting the type in use at time and the location of the incident;
- all records (notes, letters, emails, contracts, logs, etc.) relating to the inspection, repair, service, modification or maintenance of your floor(s) for the period beginning one (1) year before the incident through the date of incident;

Sedgwick Claims
Date of Incident: 06/01/2020
June 15, 2020
Page 2 of 7

- photographs or video of the incident (from 4 hours prior to the incident up to and including 4 hours after the incident), incident scene, and its subsequent, inspection, repair, service, modification or maintenance (request is made for the native files of any photographs or video);

- photographs or video of our client on the date of the incident, including but not limited to, the entrance, use, and exit of the establishment (request is made for the native files of any photographs or video);

- oral or written statements relating to the incident, incident scene, or its subsequent inspection, repair, service, modification or maintenance; and

- all records reflecting oral or written communications or agreements with our client regarding the incident and incident scene.

We are also specifically requesting that your company take steps to preserve the data and information described in this letter.

We ask that you preserve documents, tangible things and electronically stored information potentially relevant to the issues in this case. As used in this document, "you" and "your" refers to **[entity name]**, and its predecessors, successors, parents, subsidiaries, divisions and affiliates, and their respective officers, directors, agents, attorneys, accountants, employees, partners and other persons occupying similar positions or performing similar functions.

You should anticipate that much of the information subject to disclosure or responsive to discovery in this case is stored on your current and/or former computer systems and other media and devices (including personal digital assistants, voice-messaging systems, online repositories and cell phones.)

Electronically stored information (hereinafter "ESI") should be afforded the broadest possible meaning and includes (by way of example and not as an exclusive list) potentially relevant information electronically, magnetically, optically or otherwise stored as:

- digital communications (e.g., e-mail, voice mail, instant messaging);
- e-mail server stores (e.g., Lotus Domino .NSF or Microsoft Exchange .EDB);
- word processed documents (e.g., Word or WordPerfect files and drafts);
- spreadsheets and tables (e.g., Excel or Lotus 123 worksheets);
- accounting application data (e.g. MAS90, Ultimate, QuickBooks);
- image and facsimile files (e.g., .PDF, .TIFF, .JPG, .GIF images);
- sound recordings (e.g., .WAV and .MP3 files);
- video and animation (e.g., .AVI and .MOV files);
- databases (e.g., Access, Oracle, SQL Server data, SAP);
- contact and relationship management data (e.g., Outlook, ACT!);
- calendar and diary application data (e.g., Valiant, Outlook PST, blog entries);
- online access data (e.g., E-Verify, Temporary Internet Files, History, Cookies);
- presentation (e.g., PowerPoint, Corel Presentations);
- network access and server activity logs;
- project management application data;
- computer aided design/drawing files; and

Sedgwick Claims
Date of Incident: 06/01/2020
June 15, 2020
Page 3 of 7

- backup and archival files (e.g., Veritas, Zip, .GHO).

ESI resides not only in areas of electronic, magnetic and optical storage media reasonably accessible to you, but also in areas you may deem not reasonably accessible. You are obligated to preserve potentially relevant evidence from both sources of ESI, even if you do not anticipate producing such ESI.

The demand that you preserve both accessible and inaccessible ESI is reasonable and necessary. Pursuant to the rules of civil procedure, you must identify all sources of ESI you decline to produce and demonstrate to the court why such sources are not reasonably accessible. For good cause shown, the court may order production of the ESI, even if it is not reasonably accessible. Accordingly, you must preserve ESI that you deem inaccessible so as not to preempt the court's authority.

3.     <u>Preservation Requires Immediate Intervention</u>

You must act immediately to preserve potentially relevant ESI, including, without limitation, information relating to the categories detailed in Section 2 of this letter, including ESI you may use to support claims or defenses in this case.

Adequate preservation of ESI requires more than simply refraining from efforts to destroy or dispose of such evidence. You must intervene to prevent loss due to routine operations or malfeasance and employ proper techniques and protocols to preserve ESI. Booting a drive, examining its contents or running any application may irretrievably alter the evidence it contains and constitute unlawful spoliation of evidence. Preservation requires action.

Nothing in this demand for preservation of ESI should be understood to diminish your concurrent obligation to preserve documents, tangible things and other potentially relevant evidence.

4.     <u>Suspension of Routine Destruction</u>

You are directed to immediately initiate a litigation hold for potentially relevant ESI, documents and tangible things and to act diligently and in good faith to secure and audit compliance with such litigation hold. You are further directed to immediately identify and modify or suspend features of your information systems and devices that, in routing operation, operate to cause the loss of potentially relevant ESI. Examples of such features and operations include:

- purging the contents of e-mail repositories;
- using data or media wiping, disposal, erasure or encryption utilities or devices;
- overwriting, erasing, destroying or discarding backup media;
- re-assigning, re-imaging or disposing of systems, servers, devices or media;
- running antivirus or other programs affecting wholesale metadata alteration;
- releasing or purging online storage repositories;
- using metadata stripper utilities;
- disabling server, packet or local instant messaging logging; and
- executing drive or file defragmentation or compression programs.

5.     <u>Guard Against Deletion</u>

Sedgwick Claims
Date of Incident: 06/01/2020
June 15, 2020
Page 4 of 7

You should anticipate that your officers, employees or others may seek to hide, destroy or alter ESI. You must act to prevent and guard against such actions. Especially where company machines were used for Internet access or personal communications, you should anticipate that users may seek to delete or destroy information they regard as personal, confidential or embarrassing, and in so doing, they may also delete or destroy potentially relevant ESI. This concern is not unique to you. It is simply conduct that occurs with such regularity that any custodian of ESI and their counsel must anticipate and guard against its occurrence.

6.    Act to Prevent Spoliation

You should take affirmative steps to prevent anyone with access to your data, systems and archives from seeking to modify, destroy or hide ESI on network or local hard drives and on other media or devices (such as by deleting or overwriting files, using data shredding and overwriting applications, defragmentation, re-imaging, damaging or replacing media, encryption, compression, steganography or the like).

///
7.    System Sequestration or Forensically Sound Imaging

As an appropriate and cost effective means of preservation, you should remove from service and securely sequester the systems, media and devices housing potentially relevant ESI of All Custodians.

In the event you deem it impractical to sequester systems, media and devices, we believe that the breadth of preservation required, coupled with the modest number of systems implicated, dictates that forensically sound imaging of the systems, media and devices of those named above is expedient and cost effective. As we anticipate the need for forensic examination of one or more of the systems and the presence of relevant evidence in forensically accessible areas of the drives, we demand that you employ forensically sound ESI preservation methods. Failure to use such methods poses a significant threat of spoliation and data loss.

"Forensically sound ESI preservation" means duplication of all data stored on the evidence media while employing a proper chain of custody and using tools and methods that make no changes to the evidence and support authentication of the duplicate as a true and complete bit-for-bit image of the original. The products of forensically sound duplication are called, inter alia, "bitstream images" or "clones" of the evidence media. A forensically sound preservation method guards against changes to metadata evidence and preserves all parts of the electronic evidence, including deleted evidence within "unallocated clusters" and "slack space."

Be advised that a conventional copy, backup or "ghosting" of a hard drive does not produce a forensically sound image because it only captures active, unlocked data files and fails to preserve forensically significant data existing in, for example, unallocated clusters and slack space.

8.    Further Preservation by Imaging

With respect to the hard drives and storage devices of all custodians, demand is made that you immediately obtain, authenticate and preserve forensically sound images of the hard drives in any computer system (including portable and home computers) used by that person during the period during all relevant time

Sedgwick Claims
Date of Incident: 06/01/2020
June 15, 2020
Page 5 of 7

periods to the present time, as well as recording and preserving the system time and date of each such computer.

Once obtain-ed, each such forensically sound image should be labeled to identify the date of acquisition, the person or entity acquiring the image and the system and medium from which it was obtained. Each such image should be preserved without alteration.

9.    Preservation in Native Form

You should anticipate that certain ESI, including but not limited to spreadsheets and databases, will be sought in the form or forms in which it is ordinarily maintained (i.e., native form). Accordingly, you should preserve ESI in such native forms, and you should not employ methods to preserve ESI that remove or degrade the ability to search the ESI by electronic means or that make it difficult or burdensome to access or use the information.

You should additionally refrain from actions that shift ESI from reasonably accessible media and forms to less accessible media and forms if the effect of such actions is to make such ESI not reasonably accessible.

10.    Metadata

You should further anticipate the need to disclose and produce system and application metadata and act to preserve it. System metadata is information describing the history and characteristics of other ESI. This information is typically associated with tracking or managing an electronic file and often includes data reflecting a file's name, size, custodian, location and dates of creation and last modification or access. Application metadata is information automatically included or embedded in electronic files, but which may not be apparent to a user, including deleted content, draft language, commentary, collaboration and distribution data and dates of creation and printing. For electronic mail, metadata includes all header routing data and Base 64 encoded attachment data, in addition to the To, From, Subject, Received Date, CC and BCC fields.

Metadata may be overwritten or corrupted by carless handling or improper preservation, including by moving, copying or examining the contents of files.

11.    Servers

With respect to servers used to manage e-mail (e.g., Microsoft Exchange, Lotus Domino, and Google Apps) and network storage (often called a "network share"), the complete contents of each user's network share and e-mail account should be preserved. There are several ways to preserve the contents of a server. If you are uncertain whether the preservation method you plan to employ is one that we will accept as sufficient, please immediately contact the undersigned.

12.    Home Systems, Laptops, Online Accounts and Other ESI Venues

Though we expect that you will act swiftly to preserve data on office workstations and servers, you should also determine if any home or portable systems or devices may contain potentially relevant data. To the extent that you have sent or received potentially relevant e-mails or created or reviewed potentially relevant documents away from the office, you must preserve the contents of systems, devices and media

Sedgwick Claims
Date of Incident: 06/01/2020
June 15, 2020
Page 6 of 7

used for these purposes (including not only potentially relevant data from portable and home computers, but also from portable thumb drivers, CD-R/DVD- R discs and the user's PDA, smart phone, voice mailbox or other forms of ESI storage.) Similarly, if you used online or browser-based e-mail accounts or services (such as Gmail, AOL, Yahoo Mail or the like) to send or receive potentially relevant messages and attachments, the contents of these account mailboxes (including Sent, Deleted and Archived Message folders) should be preserved.

13.    Ancillary Preservation

You must preserve documents and other tangible items that may be required to access, interpret or search potentially relevant ESI, including logs, control sheets, specifications, indices, naming protocols, file lists, network diagrams, flow charts, instruction sheets, data entry forms, abbreviation keys, user ID and password rosters and the like.

You must preserve passwords, keys and other authenticators required to access encrypted files or run applications, along with the installation discs, user manuals and license keys for applications required to access the ESI.

You must preserve cabling, drivers and hardware, other than a standard 3.5" floppy disc driver or standard CD or DVD optical driver, if needed to access or interpret media on which ESI is stored. This includes tape drivers, bar code readers, Zip drives and other legacy or proprietary devices.

14.    Paper Preservation of ESI is Inadequate

As hard copies do no preserve electronic searchability or metadata, they are not an adequate substitute for, or cumulative of, electronically stored versions. If information exists in both electronic and paper forms, you should preserve both forms.

15.    Agents, Attorneys and Third Parties

Your preservation obligation extends beyond ESI in your care, possession or custody and includes ESI in the custody of others that is subject to your direction or control. Accordingly, you must notify any current or former agent, attorney, employee, custodian and contractor in possession of potentially relevant ESI to preserve such ESI to the full extent of your obligation to do so, and you must take reasonable steps to secure their compliance.

16.    Preservation Protocols

We are desirous of working with you to agree upon an acceptable protocol for forensically sound preservation and can supply a suitable protocol if you will furnish an inventory and description of the systems and media to be preserved. Alternatively, if you promptly disclose the preservation protocol you intend to employ, perhaps we can identify any points of disagreement and resolve them.

A successful and compliant ESI preservation effort requires expertise. If you do not currently have such expertise at your disposal, we urge you to engage the services of an expert in electronic evidence and computer forensics. Perhaps our respective experts can work cooperatively to secure a balance between evidence preservation and burden that is fair to both sides and acceptable to the court.

Sedgwick Claims
Date of Incident: 06/01/2020
June 15, 2020
Page 7 of 7

17.    <u>Do Not Delay Preservation</u>

I am available to discuss reasonable preservation steps; however, you should not defer preservation steps pending such discussions if ESI may be lost or corrupted as a consequence of delay. Should your failure to preserve potentially relevant evidence result in the corruption, loss or delay in production of evidence to which we are entitled, such failure would constitute spoliation of evidence, and we will not hesitate to seek sanctions.

18.    <u>Confirmation of Compliance</u>

**Please confirm within twenty (20) days of this letter that you have taken the steps outlined in this letter to preserve ESI and tangible documents potentially relevant to this action. If you have not undertaken the steps outlined above, or have taken other actions, please describe what you have done to preserve potentially relevant evidence. If you do not have the potentially relevant evidence in your custody or control, please describe why you do not have it in your custody and control and please provide the name, address and phone number of the person or facility who does have such relevant evidence.**

**It is imperative that you take affirmative steps to preserve these items as the failure to do so may constitute negligent or intentional spoliation of evidence in which case we would seek evidentiary, issue and/or terminating sanctions. Kindly advise us where these items are located and to the extent that you are aware, the identity, address, and telephone number of any other party who may have in his possession any evidence relating to the incident.**

Please do NOT dispose of any of these documents and items as we will need them. We would be willing to pick them up and pay for them. Thank you for your prompt attention to this matter.

Should you need any further information at this time, please do not hesitate to contact this office.

Sincerely,
**ETEHAD LAW, APC**

Simon P. Etehad
Attorney at Law

SPE/jc